## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | |
|---|---|
| Tiz, Inc. d/b/a Provi,<br><br>                    Plaintiff,<br><br>    v.<br><br>Southern Glazer's Wine and Spirits, LLC and<br>Republic National Distributing Company, LLC,<br><br><br>                    Defendants. | Case No. 22-CV-1648<br><br><br>JURY TRIAL DEMANDED |

## COMPLAINT

Plaintiff Tiz, Inc., doing business as Provi (hereinafter "Provi"), brings this action to stop and remedy ongoing unlawful conduct of Defendants Southern Glazer's Wine and Spirits, LLC and its affiliates (collectively, "Southern") and Republic National Distributing Company, LLC and its affiliates (collectively, "RNDC"). Plaintiff seeks damages and injunctive relief under federal and state laws, and demands a trial by jury.

## NATURE OF THIS ACTION

1.      This case is about the nation's two dominant wine and spirits distributors unlawfully acting to stifle the growth of Plaintiff Provi, a new online marketplace for alcohol products that threatens Defendants' control of the nation's alcohol distribution and undercuts their plan to extend that control to new online markets. Defendants have acted together and individually to boycott, disparage, and tortiously interfere with Provi's business. Southern has also unlawfully forced retailers to use its own online marketplace, SG Proof ("Proof"), by tying online sales of its alcohol products to use of that specific marketplace. Defendants' conduct, taken separately and together, violates federal and state laws and has caused and will continue to cause significant harm

to Provi, alcohol producers, other distributors large and small, thousands of retail customers, and countless consumers across the country.

2.      Alcoholic beverages are manufactured, distributed, and sold under both federal and state law through a three-tier system that consists of licensed (i) producers, (ii) distributors (or wholesalers), and (iii) retailers, with limited exceptions not relevant here. This nearly 100 year-old system provides that only producers can sell to distributors, only distributors can sell to bars, restaurants, hotels, and stores (collectively "retailers"), and only retailers can sell to consumers.

3.      Parts of the alcohol industry have been so lacking in meaningful competition that, in 2021, President Biden signed an Executive Order directing the Secretary of the Treasury—in coordination with the Federal Trade Commission ("FTC") and the Department of Justice ("DOJ")—to assess "threats to competition" in the industry. The Secretary's Report to the President specifically identifies large distributors, like Southern and RNDC, as two such threats, stating "distributors with a larger national footprint may be able to leverage their size and enter exclusive agreements with producers that tend to push out smaller competitors."

4.      Southern and RNDC have long dominated wine and spirits distribution, with high market shares in numerous states, multi-year contracts for the exclusive rights to sell the most popular "must-have" alcohol brands, and extensive portfolios of other brands (*e.g.*, so-called "rail" or "well" spirits, "house" wine, and lesser-known "craft" brands).

5.      Entrenched and chummy, Southern and RNDC's corporate leaders have been known at industry conferences to flash two upheld fingers to one another symbolizing that they are today—and will remain, if they have their way—the only two distributors of significance in the country.

6.      Defendants enjoy substantial market power because retailers: (i) must buy certain brands from them in particular; and (ii) are significantly less likely to split their basket of orders once they are already shopping directly with Southern or RNDC to buy lesser-known products from other distributors, even if those distributors offer better prices or service.

7.      As the industry moves online, Defendants want to keep retailers from spending with competing wholesalers and are steering retailers to Defendants' proprietary online alcohol marketplaces, which do not include other distributors' products. Not only does Defendants' strategy maintain their control of the distribution markets and extend that control to online alcohol marketplaces, it also gives them access to valuable purchasing data that further entrenches them with retailers and allows them new monetization streams, including advertising and data analytics. As RNDC has explained, "Data has become the key to unleashing new value and insights in the end-to-end distribution process." It is for this reason that RNDC is "focused on strengthening [its] end-to-end selling model with new digital capabilities." Data will allow Defendants to achieve what RNDC's CEO calls its "primary mission" "to grow disproportionately to the rest of the industry." Southern's vision is similar: to be "the world's preeminent selling, logistics and data insights company." Provi's superior online marketplace poses unwanted competition.

8.      Unlike Defendants, Provi is a new entrant with an ambitious goal to modernize the industry by offering a revolutionary online wholesale shopping experience and by offering all licensed distributors and retailers a one-stop-shop to browse and buy all available products for purchase, not just those of a particular distributor like Southern or RNDC. Founded in 2016 by entrepreneur Taylor Katzman, Provi offers a single marketplace where retailers can search for products across distributors, fill their shopping carts with products, and then click a button for Provi to communicate the order to all relevant parties for fulfillment.

9.      Provi's marketplace saves retailers the headache and cost of dealing one-on-one with multiple individual distributors. It also gives visibility to the hundreds of small distributors across the country that only carry lesser-known or up-and-coming commodity or craft beverages.

10.     Provi improves the experience of identifying products to purchase at wholesale, lowers costs to retailers, enhances competition among distributors, and in the process generates valuable data for better decision-making and marketing by all industry participants. Not surprisingly, Provi has been popular among suppliers, retailers, and distributors—and the company was growing by leaps and bounds until Defendants intervened.

11.     Before they felt threatened, Defendants recognized—and profited from—the potential of Provi's marketplace. From as early as 2016 until the latter half of 2021, Defendants fulfilled over 120,000 alcohol orders totaling nearly $200 million in revenue that they received from retailers through Provi. Scores of Southern and RNDC sales representatives created their own accounts with Provi's online marketplace to handle retail orders through Provi. As a result, Southern and RNDC reaped substantial profits from retailers that chose to use Provi, while Provi grew quickly in popularity and scale.

12.     Unfortunately, Southern and RNDC eventually came to see Provi's growing popularity as a threat to their market power and their plans to keep retailers away from other distributors and to extend their dominance. In lockstep, Defendants took actions to protect their market power. In April 2019, both Southern and RNDC released their own online marketplaces, Proof and eRNDC, respectively, and subsequently scaled them after obtaining insight into Provi's marketplace under the guise of proposed partnerships with Provi. Then, in the spring and summer of 2021, Southern and RNDC nearly simultaneously announced that they would no longer work with Provi and would stop accepting orders that *retailers choose to submit through Provi's*

4

*marketplace*. Defendants even blocked emails from Provi so that the alcohol orders that *retailers choose* to submit to Defendants through Provi literally would not reach their respective sales representatives and, therefore, would go unfulfilled.

13.     Upon information and belief, Defendants took these actions specifically and intentionally to foreclose competition and maintain and extend their market power. For example, when national restaurant chain Red Robin complained about the Provi boycott, Southern responded that there was "good news" because Red Robin "should already be using Proof." Alan Rosenberg, General Counsel for RNDC, similarly admitted that "RNDC will continue to . . . steer our customers towards" eRNDC and "away from Provi."

14.     Retailers, meanwhile, prefer the greater choice and better quality that Provi affords them as a revolutionary online marketplace. As one retailer put it, "a marketplace like Provi is my preferred solution . . . Forcing me to use . . . single source ordering solutions like Proof sucks."

15.     Southern and RNDC have acted against their own short-term economic self-interests in pursuit of long-term anticompetitive objectives. This includes, *inter alia*: (i) forgoing substantial profits from the many alcohol orders they had been receiving through Provi, on which they typically enjoy substantial profit margins; (ii) sacrificing goodwill with the many retailers Southern and RNDC have deprived of the freedom to choose how best to meet their own alcohol purchasing needs and whose business needs Southern and RNDC have frustrated by blocking and rejecting their orders; and (iii) incurring the administrative costs associated with informing customers that they would no longer honor orders placed through Provi and handling the inevitable customer complaints they received when orders went unfulfilled.

16.     Defendants' conduct has unlawfully restrained competition among alcohol distributors, online alcohol marketplaces, and related advertising and data analytics providers. It

has harmed suppliers, retailers, and consumers by maintaining and extending Defendants' market power, increasing costs, stifling innovation, and reducing output. They also have unlawfully harmed competition in key markets that otherwise could revolutionize the sale and marketing of spirits and wine in the United States, including the markets for spirits and wine search advertising on online alcohol marketplaces and data analytics services for spirits and wine.

17.     Defendants' conduct, taken together and separately, violates Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 and 2, as well as the Illinois Antitrust Act, California's Unfair Competition Law, and Illinois state law prohibiting tortious interference with Provi's prospective and current business relationships.

18.     Provi has suffered, and continues to suffer, injury to its business and property as a direct and proximate result of Defendants' unlawful conduct and is entitled to an injunction barring their illegal conduct, monetary damages, and all other legal and equitable relief available under law and that the Court may deem proper.

## JURISDICTION, VENUE, AND INTERSTATE COMMERCE

19.     This action arises under Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15, 26, to recover treble damages and the costs of this suit, including attorneys' fees, against Defendants for injuries sustained by Provi by virtue of their violations of Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 and 2, and to enjoin further actions.

20.     This Court has jurisdiction under 28 U.S.C. §§ 1331 and 1337, and Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15(a) and 26.

21.     This Court also has subject-matter jurisdiction over the state law claims, which are substantially related to the federal claims, under 28 U.S.C. § 1367.

22.     This Court has personal jurisdiction over Southern and RNDC because each has: (a) transacted business throughout the United States, including in this District; (b) sold, shipped,

and delivered substantial quantities of alcohol throughout the United States, including in this District; and (c) engaged in anticompetitive conduct that was directed at and had a direct, foreseeable, and intended effect of causing injury to the business or property of persons residing in, located in, or doing business throughout the United States, including this District.

23.     Venue is proper in this District under Section 12 of the Clayton Act, 15 U.S.C. § 22, and under 28 U.S.C. § 1391 because Southern and RNDC transact business within this District, are licensed to do business and are doing business in this District, and because a substantial portion of the affected interstate commerce described herein was carried out in this District.

24.     The products and services of Southern and RNDC are sold in interstate commerce, and the unlawful activities alleged in this Complaint have occurred in, and have had a substantial effect upon, interstate commerce.

25.     No other forum would be more convenient for the parties and witnesses to litigate this case.

## THE PARTIES

26.     Plaintiff Provi is, and at all relevant times was, a corporation incorporated under the laws of the state of Delaware, with its principal place of business in Chicago, Illinois. Provi offers an online alcohol marketplace to facilitate purchases from licensed retailers to licensed distributors. Provi's marketplace sits outside the three-tier alcohol distribution system as it does not produce, distribute, or sell alcohol products. For this reason, Provi is not—and need not be, as confirmed by multiple alcohol governing authorities—a licensed supplier, distributor, or retailer of alcohol. Provi also sells Search and Display Advertising on its marketplace and offers data analytics services for wine and spirits.

27.     Defendant Southern is, and at all relevant times was, a limited liability company organized under the laws of the state of Delaware with its principal place of business in Miami, Florida.

28.     Southern is the nation's largest distributor of wine and distilled spirits with 2020 revenues of approximately $20 billion. Southern operates in 44 U.S. states and the District of Columbia, distributes over 7,000 alcohol brands, and is the 11th-largest private company in the United States.

29.     As the largest wine and spirits distributor in the United States, Southern maintains an extensive portfolio of leading, "must-have" brands with exclusive distribution rights in dozens of states.[1]

30.     Southern is engaged in the business of, *inter alia*, distributing alcoholic beverages with and through its wholly-owned and controlled subsidiaries.[2]

31.     Southern also owns and operates the online alcohol marketplace, Proof. According to Southern's Vice President of eCommerce, Nathan Mansperger, "Proof is a B2B platform" that "enables 24/7 online ordering and account management," allowing retail customers to "search brand portfolios, place orders, and discover new products through this platform while the Suppliers can showcase their products." In addition to communicating retailers' orders for wine and spirits

---

[1] Southern is licensed to distribute wine and distilled spirts in Alabama, Alaska, Arizona, Arkansas, California, Colorado, Delaware, the District of Columbia, Florida, Hawaii, Idaho, Illinois, Indiana, Iowa, Kansas, Kentucky, Louisiana, Maine, Maryland, Michigan, Minnesota, Mississippi, Missouri, Montana, Nebraska, Nevada, New Hampshire, New Mexico, New York, North Carolina, North Dakota, Ohio, Oklahoma, Oregon, Pennsylvania, South Carolina, South Dakota, Tennessee, Texas, Utah, Vermont, Virginia, Washington, West Virginia, and Wyoming.

[2] These subsidiaries include, but are not limited to: Southern Glazer's Leasing, LLC, Southern Glazer's Wine and Spirits of Alaska, LLC, Southern Glazer's Wine and Spirits of D.C., LLC, Southern Glazer's Wine and Spirits of Delaware, LLC, Southern Glazer's Wine and Spirits of Maryland, LLC, Southern Glazer's Wine and Spirits of Washington, LLC, Southern Glazer's Wine and Spirits-Pacific Northwest Holdings, LLC, Southern Glazer's Wine Distributors of Idaho, LLC, and Southern Glazer's Wine Distributors of Oregon, LLC.

for distribution, Proof competes with Provi through the search and display advertising and data analytics services Southern offers with Proof.

32.     Defendant RNDC is, and at all relevant times was, a corporation incorporated under the laws of the state of Delaware with its principal place of business in Atlanta, Georgia. RNDC is a privately held company, controlled and managed by a handful of families. RNDC is the second largest distributor of wine and distilled spirits in the United States with 2020 revenues of approximately $11.9 billion. RNDC operates in 37 U.S. states and the District of Columbia, distributes thousands of brands, and is the 25th-largest private company in the United States.

33.     As the second largest wine and spirits distributor in the United States, RNDC maintains an extensive portfolio of leading, "must-have" brands with exclusive distribution rights in dozens of states.[3]

34.     RNDC is engaged in the business of, *inter alia*, distributing alcoholic beverages with and through its wholly-owned and controlled subsidiaries.[4]

---

[3] RNDC entities are licensed to distribute alcohol in Alabama, Alaska, Arizona, California, Colorado, the District of Columbia, Florida, Georgia, Hawaii, Idaho, Illinois, Indiana, Iowa, Kentucky, Louisiana, Maryland, Michigan, Maine, Mississippi, Montana, Nebraska, New Hampshire, New Mexico, North Carolina, North Dakota, Ohio, Oklahoma, Oregon, Pennsylvania, South Carolina, South Dakota, Texas, Utah, Virginia, Washington, West Virginia, Wyoming, and Vermont. RNDC announced in November 2021 a partnership with Opici Family Distributing in New York; the official partnership, which would expand RNDC's footprint to include New York, is expected to launch in Q1 2022.

[4] These subsidiaries include, but are not limited to: National Distributing Company, Young's Market Company, RNDC General LLC, RNDC Texas, LLC, Republic National Distributing Company of Indiana, LLC, Republic National Distributing Company of North Dakota, Inc., Republic National Distributing Company, LLC (Kentucky), Republic National Distributing Company, LLC d/b/a Republic National Distributing Company of North Carolina, Republic National Distributing Company, LLC d/b/a Best Brands of Delaware, LLC, and Republic National Distribution Company, LLC d/b/a Republic Beverage Company, RNDC Shares Services, LLC, RNDC South Carolina, LLC, RNDC West Coast, LLC, RNDC Alaska, LLC, Republic National Distributing Company of North Dakota, Inc., Republic National Distributing Company Michigan Holdings, LLC, RNDC-NWS, LLC, and RNDC Oklahoma. RNDC also operates under the following trade names: RNDC of MT, RNDC of North Dakota, RNDC of Oregon, RNDC Hawaii, RNDC of Idaho, and RNDC of Nebraska. Furthermore, RNDC also has joint ventures with National Wine and Spirits of Michigan in Michigan and Central Liquor Company in Oklahoma.

35.     RNDC also owns and operates the online alcohol marketplace, eRNDC. In addition to communicating retailers' orders for wine and spirits for distribution, eRNDC competes with Provi through the search and display advertising and data analytics services RNDC offers and plans to offer with eRNDC.

## BACKGROUND

### A.     Regulation of Alcoholic Beverages

36.     The manufacture, distribution, and sale of alcohol is a heavily regulated industry that has not substantially changed in almost ninety years. In 1933, after the passage of the 21st Amendment ending Prohibition, Congress passed the Federal Alcohol Administration Act ("FAA Act"), 27 U.S.C. §§ 201-219a. The FAA Act established a three-tier system for the production, distribution, and sale of alcohol: only licensed producers may sell to distributors; only licensed distributors may sell to retailers; and only retailers may sell to consumers.[5]

37.     In addition to federal oversight by the Alcohol and Tobacco Tax and Trade Bureau ("TTB") of the Department of the Treasury, the 21st Amendment granted each state and the District of Columbia the authority to regulate the distribution and retail sale of alcohol within its borders. Each of these jurisdictions has a control board or commission to enforce its requirements for licensing and sale.

38.     Producers and distributors must receive permits from the TTB and from state alcohol boards. All states require distributors to be licensed with the local alcohol board to allow them to sell to retailers and transport alcohol within the state. States also require retailers to obtain liquor licenses to sell alcohol directly to consumers. Some states have a limit on the number of

---

[5] The few limited exceptions to this system—*e.g.*, carve-outs for taprooms, tasting rooms, direct-to-consumer sales, and self-distribution—are not relevant in this case.

issued distributor or retail licenses and if there are no available licenses, new entrants must buy licenses from existing businesses.

39.     Retailers that purchase alcohol fall into one of two categories: off-premise (i.e., to-go) and on-premise (i.e., establishments where the alcoholic beverages sold to consumers are consumed on the premises where they are purchased). Examples of off-premise retailers include liquor stores and grocery stores. On-premise retailers include bars, restaurants, and hotels. All retailers, both on- and off-premise, must comply with state and local liquor laws, including securing all necessary licenses and approvals to sell or serve alcoholic beverages, including wine and spirits.

### B.     The Distilled Spirits and Wine Industries

40.     Distilled spirits, wine, and beer constitute the three broad sectors of the alcohol beverage industry. There are many differences among these three different types of alcoholic beverages, including their taste profiles, alcoholic content, and regulatory framework. Beer is not a sector at issue in this case.[6]

#### i.     Distilled Spirits and Wine Overview

41.     In 2020, retail sales of distilled spirits in the United States reached approximately $86 billion dollars. Distilled spirits are made by distilling fermented material, which gives them a higher concentration of alcohol relative to beer and wine. Most distilled spirits fall into six basic segments: vodka, whiskey, rum, brandy, tequila, and gin. As Chart 1 shows, vodka and whiskey are the most consumed distilled spirits by category, accounting for more than 53% of distilled

---

[6] Several characteristics of beer distribution differentiate it from the distribution of wine and spirits, including the competitive landscape and state regulations that govern the distribution of beer and provide enhanced protection for terminating distributors. For example, Reyes is the largest beer distributor in the United States, but is not a meaningful participant in the distribution of spirits or wine. Additionally, market dynamics are significantly different as a beer wholesaler tends to align with one particular large supplier, namely either Anheuser-Busch InBev or Molson Coors.

spirit consumption.



**CHART 1**
**Distilled Spirits Consumption by Category (2020)**

42.     Wine is another alcoholic beverage category popular in the United States. Prominent regions for wine production include Napa and Sonoma in California, USA as well as Argentina, Australia, France, Italy, and Spain. Chart 2 below shows the most popular types of wine in the United States, by volume. Retail sales of wine in the United States reached nearly $67 billion dollars in 2020.

**CHART 2**
**Top 10 Most Popular Wines in the United States (2020)**



ii. ***Distilled Spirits and Wine Suppliers***

a. ***Distilled Spirits Suppliers***

43.     Distilled spirits suppliers earned more than $31 billion in 2020. As reflected below in Chart 3, the top five suppliers account for 50% of all distilled spirits by volume and the top ten account for over 70%.

**CHART 3**
**Top 10 Distilled Spirits Suppliers by Volume (2020)**



44.     These top suppliers own the rights of many "must-have" brands. For example, Diageo, the largest supplier, owns the rights to Smirnoff vodka and Captain Morgan rum, two of the best-selling spirits in the United States in 2020, as shown below in Chart 4. Examples of other iconic brands on Diageo's roster include Crown Royal whiskey, Johnnie Walker whiskey, and Ketel One vodka, among others.

**CHART 4**
**Top Distilled Spirits Brands in the United States (2020)**



45.     The next five largest suppliers account for more than 40% of the spirits sales by volume combined. Each of these suppliers also have portfolios of "must-have" brands that are fixtures in bars throughout the country. Sazerac, for example, owns Fireball, the most popular whiskey brand in the United States. Beam Suntory's Jim Beam brand is well known across the country, as are other Beam Suntory brands like Hornitos tequila, Canadian Club and Maker's Mark whiskeys, and its Pinnacle vodka. Bacardi, the fourth largest supplier, owns well-known brands that include Bacardi rum, Grey Goose vodka, and Bombay Sapphire gin, among others. Pernod Ricard owns bar mainstays such as Jameson whiskey, Absolut vodka, and Seagram's gin.

### b.  Wine Suppliers

46.     The top five wine marketers—E & J Gallo, The Wine Group, Constellation, Trinchero Family Estates, and Delicato Family Wines—market over 57% of the wine sold in the United States, as shown in Chart 5 below. E & J Gallo's share alone approaches 30% of wine consumed in the United States with leading brands like Barefoot, Black Box, Carlo Rossi, and Peter Vella. Its 2020 revenues are an estimated $5 billion.

**CHART 5**
**Top Wine Marketers by Volume (2020)**



47.     The Wine Group similarly has several popular brands, including Franzia, Almaden, and Cupcake Vineyards. The other three top-five wine marketers each markets one or more top-selling wine brands. For example, Constellation owns Woodbridge and Robert Mondavi; Trinchero owns Sutter Home; and Delicato owns Bota Box.

### iii.   Distributors

#### a.   Distilled Spirits Distributors

48.     The distribution of distilled spirits is highly concentrated with two entrenched, very powerful players (Southern and RNDC) and a number of small, fringe distributors that do not and cannot meaningfully constrain Defendants' substantial market power.

49.     A 2022 report by the U.S. Department of the Treasury, in cooperation with the DOJ and the FTC, identified distributor consolidation in the wine and spirits markets as "the greatest threat to competition in the alcohol market."[7] The Treasury report explained that the enormous

---

[7] U.S. Dep't of the Treasury, *Competition in the Markets for Beer, Wine, and Spirits*, 24 (Feb. 2022), https://home.treasury.gov/system/files/136/Competition-Report.pdf [hereinafter, Treasury Report].

market share of distributors like Southern, combined with long-term exclusive agreements, allows distributors to "accomplish indirectly what regulators would never allow them to accomplish directly," as "distributors with a larger national footprint may be able to leverage their size and enter exclusive agreements with producers that tend to push out smaller competitors."[8] This is just what Defendants have done and continue to do, to the detriment of competition in various relevant markets and ultimately consumers.

50. Defendants control commanding shares of the distilled spirits distribution in the United States, with their combined and even individual shares of distribution in distilled spirits often times exceeding 60% in many states. Defendants wield tremendous market power over local, regional, and national distribution. Their high shares, combined with their exclusive distribution rights to many of the top, "must-have" brands, make it virtually impossible for retailers to avoid purchasing from Southern and RNDC. Upon information and belief, Defendants enjoy substantial profit margins.

51. In the states where they operate, which includes nearly every state in the country, Southern and RNDC have substantial market shares, reaching as high as 100%. As shown in Table 1 below, as of 2019, their combined share exceeded 80% in ten states; in nine more plus the District of Columbia, their combined share exceeded 50%. Defendants' individual market power is substantial throughout the country, and their combined position is insurmountable. Retailers who wish to purchase spirits have virtually no alternatives.

---

[8] *Id.*

16

**TABLE 1**
**States Where Defendants' Estimated Distilled Spirits Market Share Exceeds 50% (2019)**

| Share | Combined | Southern | RNDC |
|---|---|---|---|
| 80%+ | *10 Markets*<br>California, Hawaii, Indiana, Kentucky, Louisiana, Nebraska, New Mexico, Oklahoma, South Dakota, Washington | -- | -- |
| 70%+ | *13 Markets*<br>Arkansas, Florida, North Dakota | *5 Markets*<br>Arkansas, Hawaii, Kentucky, Louisiana, Washington | -- |
| 60%+ | *15 Markets*<br>Arizona, District of Columbia | *6 Markets*<br>Indiana | -- |
| 50%+ | *20 Markets*<br>Colorado, Maryland, Michigan, Missouri, Nevada | *12 Markets*<br>California, Florida, Missouri, Nebraska, Nevada, New Mexico | *2 Markets*<br>Oklahoma, South Dakota |

### b. Wine Distributors

52.    Like the distribution of distilled spirits, the distribution of wine is similarly concentrated in states throughout the country. Defendants' high market shares are reinforced by the agreements each has in states throughout the country to distribute exclusively some of the best-selling, "must-have" wine brands, from Franzia to Robert Mondavi.

53.    Defendants each individually have high shares in several states and the District of Columbia. For example, as shown in Table 2 below, as of 2019 Southern controlled at least 50% of wine distribution in seven states, and in two of those states had shares exceeding 60%. RNDC also has similarly high shares in several states, with 2019 shares exceeding 60% in four states. Defendants' combined share exceeded 50% in 18 states and the District of Columbia, and exceeded 80% in eight markets.

**TABLE 2**
**States Where Defendants' Estimated Wine Market Share Exceeds 50% (2019)**

| Share | Combined | Southern | RNDC |
|---|---|---|---|
| 80%+ | *8 Markets*<br>Arkansas, California, Kentucky, Louisiana, North Dakota, New Mexico, Oklahoma, South Dakota | *1 Market*<br>Arkansas | -- |
| 70%+ | *9 Markets*<br>District of Columbia | *2 Markets*<br>Kentucky | *2 Markets*<br>Oklahoma, South Dakota |
| 60%+ | *12 Markets*<br>Indiana, South Carolina, Washington | -- | *4 Markets*<br>District of Columbia, New Mexico |
| 50%+ | *18 Markets*<br>Arizona, Florida, Kansas, Missouri, Nebraska, Ohio | *7 Markets*<br>Kansas, Louisiana, Missouri, Ohio, Washington | -- |

54.     These high market shares underscore the reality that retailers know all too well—there are essentially few, if any, meaningful alternatives to Defendants for retailers that want to purchase wine in most states and the District of Columbia.

### c. Barriers to Entry, Expansion, and Switching Distributors

55.     Numerous barriers entrench and insulate the power of the nation's largest distributors.

56.     Both Southern and RNDC have the exclusive rights to distribute brands that retailers view as "must-have" products for their bars or shelves. For example, Southern has a broad portfolio of top-selling brands across categories, with exclusivity in many states to distribute top distilled spirits brands like Tito's vodka—which Southern's CEO, Wayne Chaplin, recently called "just an incredible powerhouse"—Jim Beam, Tanqueray, Smirnoff, and Patron. Its exclusive distribution rights for popular wine brands includes Franzia, Robert Mondavi, and Yellowtail.

57.     RNDC also has a broad portfolio of top-selling brands across categories, with

exclusivity in some states to distribute whiskeys such as Fireball and Jack Daniel's, Tito's and Absolut vodka, and Jose Cuervo tequila. Its exclusive distribution rights for top-selling wine brands includes Bota Box, Sutter Home Winery, and Barefoot.

58.     Distribution agreements are typically exclusive and on a state-by-state and brand-by-brand basis such that one distributor may not have the complete nationwide distribution rights for a particular brand. This is in part because no one distributor sells in all of the nation's markets due to the existence of certain franchise laws which prevent suppliers from changing and/or consolidating distributors.

59.     The largest distributors, Southern and RNDC, sell in 44 and 37 states, respectively, plus the District of Columbia.

60.     Suppliers choose their exclusive distribution partners based on a number of criteria, including the strength of a distributor's network within a given state and the other brands carried by the distributor. The duration of these contracts is typically five years or more for wine and distilled spirits.

61.     For example, Pernod Ricard, the sixth largest U.S. spirits supplier by volume, renewed its distribution agreement with Southern in 2018 for another five-year term. In 2020, Southern signed a distribution agreement with Beam Suntory, the third largest U.S. spirits supplier by volume, pursuant to which Southern will represent Beam Suntory's complete portfolio of brands across 43 states until 2030.

62.     For suppliers, switching distributors is expensive, difficult, and occurs infrequently, in part because state franchise laws make it exceedingly challenging for suppliers to leave their

current distributors. Twenty-two states have franchise laws for wine and spirits.[9] As explained in the 2022 Treasury Report, these laws restrain competition at the distribution tier by imposing restrictions on the ability of suppliers to switch distributors.

63.     In many states, producers can only terminate an agreement with a distributor for "good cause," insulating distributors from competitive market forces. Because the burden of showing good cause falls squarely on the supplier, a supplier that wishes to separate from a distributor must "undertake numerous, time-consuming, and costly steps."[10] This good cause requirement is often paired with notice requirements that allow the distributor an opportunity to cure.

64.     When Bacardi, the second largest U.S. spirits supplier by sales, tried to switch distributors to Southern in 2015, it sought—at considerable expense and burden—a declaratory judgment to mitigate the risk of a lawsuit by the distributor. It then named Southern its exclusive distributor in more than 40 states, further enhancing Southern's substantial market power.

65.     In addition to these exclusive deals among distributors and suppliers, significant barriers to entry and expansion protect the entrenched industry incumbents.

66.     Regulatory requirements and limitations on the number of distributor licenses granted by some states frustrate entrants' attempts to enter new areas. Alcohol distributors are required to obtain permits at both the federal and state level. Obtaining these permits often takes months or more. Moreover, each state has various requirements such as obtaining a location to house the alcohol, a background check, and a standing agreement with an alcohol supplier. Some

---

[9] States with some form of franchise law for wine include: Alabama, Arkansas, Connecticut, Delaware, Georgia, Idaho, Kansas, Maine, Massachusetts, Michigan, Missouri, Montana, Nevada, New Jersey, New Mexico, North Carolina, Ohio, Tennessee, Vermont, Virginia, Washington, and Wisconsin. John Trinidad, *Why Wine Producers Hate Franchise Laws*, WINES & VINES (Apr. 2016).

[10] Treasury Report at 12.

Case: 1:22-cv-01648 Document #: 1 Filed: 03/29/22 Page 21 of 88 PageID #:21

states, such as Pennsylvania, have strict limits on how many distributor licenses are available. New entrants need to purchase a license from an existing distributor before being able to operate in Pennsylvania.

67.     After an entrant secures the necessary regulatory approvals to operate within a state, it must secure product from a supplier, which is no small feat, especially given that Defendants dominate alcohol distribution markets across the country. Many agreements between alcohol suppliers and distributors are exclusive and grant a distributor exclusive rights to these brands. Most agreements have terms that last many years, sometimes approaching ten years or more. For example, Southern's distribution agreement with Beam Suntory has an 11-year term. New distributors that want to distribute products subject to existing distribution agreements must either wait for the contract to run its full term or buy out the remaining term, with buyout price tags reaching five years or more of the agreements' substantial profits.

68.     There are also reputational barriers to entry that are very difficult for new entrants to overcome. Since supplier contracts typically are exclusive with respect to products and geographic areas, they are hesitant to enter into contracts with unproven distributors. Thus, a new entrant is unlikely to secure exclusive distribution rights to major brands and is instead more likely to contract for low-volume and low-margin brands that have less financial significance to suppliers and less appeal to retailers and consumers.

69.     Entrants must also incur the capital expenditures to establish a distribution network. These expenses include, *inter alia*, warehouses, trucking fleets, delivery and logistics systems, and labor. Some state alcohol laws also require licenses for alcohol salespeople, defined as any individual who solicits orders from retailers on behalf of a distributor. Such states include Florida and Michigan.

21

70.    In recent years, there has been a trend toward increased consolidation. The industry's largest distributors, Southern and RNDC, have been two of the most aggressive consolidators in the industry.

71.    Southern is itself the product of a 2016 merger between Miami-based Southern Wine & Spirits, then (as now) the largest U.S. distributor, and Dallas-based Glazer's Inc., then the fourth-largest distributor. In 2021, Southern acquired Epic Wine & Spirits of Santa Rosa, the distribution arm of Foley Family wines, a wine distributor on the West Coast.

72.    Similarly, RNDC has acquired multiple competing firms in recent years. RNDC sought to merge with rival and number three player Breakthru Beverage in 2019, but abandoned the deal following an investigation by the Federal Trade Commission into the significant anticompetitive harms likely to result from the proposed combination given RNDC's existing market dominance. Also in 2019, RNDC and Young's Market Company, the premier alcohol distributor in the western United States, formed a joint venture partnership. Pursuant to this deal, Young's became a division of RNDC and extended its reach to Alaska, California, Hawaii, Idaho, Montana, Oregon, Utah, Washington, and Wyoming, highlighting what RNDC CEO Nicholas Mehall described as the company's "aggressive plan" and "concerted effort around building out and integrating [RNDC's] footprint across the country," which required "big investments" in people, infrastructure, and integration.

### iv.    Retailers

73.    Retail businesses that sell alcoholic beverages range from large supermarkets, grocery stores, restaurants, and bars to local mom-and-pop shops. In many states, grocery stores can sell wine and spirits. Small convenience stores with a liquor license can also sell alcohol.

74.    The owner or an employee at each of these retailers, such as a bar manager at a

local bar, has responsibility to purchase the wine and spirits that their respective establishment needs to stock. In addition to managing their establishment's inventory levels, these individuals must contact the appropriate sales representative at each distributor to place an order, manage payment for the order, and keep track of their order history, including pricing and other terms. For businesses with more than one location, these administrative tasks compound quickly. It can take an employee—typically a manager—as much as a full day or more, as often as each week, to navigate and complete these many tedious tasks when required to engage with each distributor on a distributor-by-distributor and brand-by-brand level. And then that employee, potentially among others, must devote additional time and resources to managing those distinct orders through the process until the products arrive at the retailer's location(s).

75.    The retailer tier includes a subset of retailers whose scale and order volume affords them particular significance for suppliers, distributors, and online alcohol marketplace providers. Retailers with numerous (typically more than 50) locations throughout the country ("National Accounts"), such as bar, restaurant, and hotel chains, have centralized procurement processes and purchasing requirements that are more sophisticated than retailers with one or few locations. Among these requirements is the need to service locations throughout the country.

76.    National Accounts especially benefit from a centralized procurement process that offers consistent planning, forecasting, reporting, and inventory management that large distributors are best-positioned to handle, thereby giving the largest distributors a significant and virtually insurmountable advantage in competing for the high-volume, profitable business National Accounts drive in alcohol sales. National Accounts typically look to engage with partners who can help them realize administrative efficiencies by providing services like online order management that stores invoices and order histories. They also look for ways to achieve

efficiencies across their network by, for example, consolidating orders for multiple nearby locations to avoid case break fees, which distributors charge when a retailer orders less than one full case of wine or spirit products.

77.     The alcohol industry caters to National Accounts and the requirements they demand, with many vendors dedicating resources to service these accounts specifically. For example, Provi has a team of individuals devoted to National Account sales and implementation. Distributors such as Southern and RNDC also have special teams to service National Accounts.

78.     Recognizing the importance of National Accounts, RNDC announced expanded roles for leaders of its National Accounts Team in 2020. In addition to an Executive Vice President who oversees RNDC's National Accounts, the company has two Senior Vice Presidents who each have responsibility for either retail or on-premise National Accounts. A team of dozens of individuals reports to these leaders.

79.     The significance of Defendants' offerings for National Accounts is not only specialized teams that service these accounts, but the ability to do so throughout the United States, as RNDC's CEO Nicholas Mehall confirmed in a recent interview, stating "we want to make sure we're able to do business anywhere they're operating," while stressing that RNDC's "capabilities around national accounts" was a key priority for the company.

80.     Likewise, according to a 2018 press release, Southern's National Accounts team offers "a one-stop-shop for on- and off-premise customers looking to execute programs across a national footprint." Southern's CEO, Wayne Chaplin, also recently noted that Southern had "rolled Proof out to the national account on-premise [retail customers] as well."

81.     Local and regional distributors cannot serve as an effective substitute for a nationwide distributor like Southern or RNDC for these accounts.

82. Provi also markets to National Accounts. In particular, Provi offers functionality that streamlines the ordering process across large retailers' footprints—a priority for National Accounts, as confirmed by Breakthrough Beverage's Chief Operating Officer Lloyd Sobel, who has highlighted that most National Accounts repeatedly order "mandatory items" that can be "automated to some degree" through Provi. This includes its robust product catalog that makes searching for and discovering new products easy across distributors, the ability to compare pricing across products, and a central repository of the retailers' orders by location and over time, enabling National Accounts to ensure consistency in their product offerings and to reduce their administrative and other costs.

83. At its core, Provi offers National Accounts choice and efficiency, the balance of which is nearly impossible to achieve when retailers are forced to deal with distributors individually and compare products, prices, discounts, and availability from multiple sources and track their voluminous orders themselves across those various sources. And with its expansive product catalog, Provi gives retailers far more choice than they would have when working with even the largest distributors.

84. As Provi expanded into more than 20 new states in 2021, National Accounts initially lined up to work with Provi. These included Darden, Cinemark, AMC Theatres, Chili's, Red Robin, Benihana, and P.F. Chang's, which all signed agreements to work with Provi. Moreover, Buffalo Wild Wings, Hilton, Circle K, Applebees, and the Cheesecake Factory all had pilot programs in place as they evaluated a larger rollout across their establishments. National Accounts are important for Provi to achieve the scale needed to compete effectively against Southern and RNDC's online alcohol marketplaces, Proof and eRNDC, respectively.

85.     Many of Provi's National Accounts customers and prospective customers were forced to stop working with or exploring a relationship with Provi as a result of Defendants' boycott of the company and related conduct.

## C.     The Rise of Online Alcohol Marketplaces

86.     Well into the 21st century, the process by which retailers purchased alcohol had not kept pace with the times. Rather than adopting technological solutions to streamline the ordering process, retailers instead contacted their distributor sales representatives individually—often a half dozen or more distributor representatives every week—resulting in lost time, increased costs, clerical errors, and other distractions and resource strains. But Katzman recognized the advantages and efficiencies that online alcohol marketplaces can create, including for example online product comparison, easy ordering, and order history management. Enter Provi.

87.     Since Provi's founding in 2016, retailers and distributors have embraced this solution, and adoption surged (until Defendants' anticompetitive conduct curbed that growth as intended). In January 2018, Provi recorded 574 orders; by December of that year, orders had increased more than fivefold. By 2021, that number increased by a factor of ten. Concurrent with the increase in orders, Provi's geographic footprint expanded to include most of the United States. In early 2021, Provi was live in 11 states. Less than one year later, Provi had launched in 35 states.

88.     Retailers across the country explained to their sales representatives that they see Provi as an opportunity to help them operate more efficiently and achieve operational excellence, which helps drive competition and ultimately benefits consumers. As P.F. Chang's explained in a letter to its distributor sales representatives in July 2021, "Provi is an opportunity for P.F. Chang's to continue our mission in providing best in class service to our guests and thriving for operational excellence in our restaurants." And Provi offers a means by which retailers could not only

communicate orders, but also organize invoices, compare pricing, discover new products, and save time, among other efficiencies and procompetitive benefits. As Jenna Steel, Brown-Forman's Director of eCommerce, has acknowledged, such benefits are especially impactful for National Accounts, who would derive enormous value from the ability to, for example, generate weekly reports on "liquor ordering trends" or "liquor costs of goods sold" using Provi's features.

89.     Online alcohol marketplaces like Provi also create value for suppliers by giving them the potential to reach a larger audience with their online advertising and creating competition for their advertising dollars. Suppliers view each retailer as a valuable sales opportunity and have an incentive to promote their brands and spend their advertising budgets to attract these potential new customers. As Nathan Mansperger, Southern's Vice President of eCommerce, has acknowledged, online alcohol marketplaces not only allow suppliers "to access a wider network and reach out to many more customers," but also give them "the opportunity to learn more about their customers and habits to understand what is working and prioritize their marketing efforts." This model democratizes advertising and product discovery for retailers because it gives suppliers more opportunities to promote their brands.

90.     Suppliers promote their brands, in part, through their advertising expenditure, wherever their return on investment (ROI) is greatest. John Wittig, Chief Commercial Officer at Southern, and David Chaplin, Chief Growth Officer at Southern, have admitted to Provi's CEO Taylor Katzman that even major suppliers like Diageo will forgo advertising on Proof but will advertise on Provi.

91.     Provi overcame the significant barriers to entry, discussed *infra*, through its timing, diligence, and ability to raise capital. When Provi launched in 2016, alcohol e-commerce was in its infancy. Distributors such as Southern and RNDC were years away from launching online

marketplaces such as Proof and eRNDC, not yet seeing Provi as the threat they do today. Defendants in particular were still entrenched in the antiquated practices that have long enabled them to control retailer relationships and pricing, foreclose competition, and preserve their market dominance.

92.     Provi marketed its services directly to retailers, and did so through a revolutionary and innovative online alcohol marketplace. As Southern's Vice President of eCommerce, Nathan Mansperger, has explained, Provi "focused on solving retailer and distributor challenges through data" and built "a scalable business with limited resources while also aiming to transform the industry through technology." This strategy drove adoption in the early days and created momentum with both distributors and retailers to participate.

93.     Over the last five years, Provi has worked tirelessly to develop a proprietary algorithm that showcases a wide variety of products by suppliers and distributors by location and that complies with all applicable laws and rules. For example, a licensed retailer can search for "vodka" in Provi's marketplace and will then be shown a product assortment that will be a mixture of local products (only available in that market), as well as products from regional producers and craft and top-selling national suppliers. This allows all suppliers and distributors to show their product content to retail decision-makers.

94.     When developing and scaling its own online alcohol marketplace, Southern drew on the experience of Provi as an early entrant in this space. Specifically, Southern hired Provi employees who had helped to create and grow Provi's marketplace.

95.     By early 2021, with only two exceptions, the top 14 distributors in the United States were not only accepting alcohol orders that retailers communicated through Provi, but had gone

further and signed agreements to integrate their inventory and fulfillment systems with Provi. The two exceptions are Southern and RNDC.

96.     When a distributor integrates with Provi, retailers may view pricing, deals, and product information provided directly from the distributor via an API connection, enabling what one distributor, Breakthrough Beverage, described as "an end-to-end digital ecosystem that pairs Provi with [its] proprietary B2B eCommerce platform, *BREAKTHROUGH NOW* . . . help[ing] bring [its] suppliers and customers closer to the end customer." Retailers can also send orders directly to their distributor sales representatives' handheld devices where they are accepted, rejected, or edited, without the need for manual reentry. Because Provi is able to access the operational and inventory data from integrated distributors in real time, it can show more detailed product pricing and availability, allowing distributors to provide their retail customers with "24/7 access to [their] portfolio of the best and most innovative brands in the world across wine, spirits, beer, and emerging beverages," as Breakthrough Beverage further explained.

97.     Although Provi encourages distributors to integrate, it does not require distributor integration for retailers to use the marketplace or for distributors to receive orders through Provi. While Southern and RNDC did not integrate their systems with Provi, they accepted and filled tens of thousands of alcohol orders from retailers for years totaling nearly $200 million in revenue, presumably at a significant profit.

98.     There are a number of small fringe players in the online alcohol marketplace space. For example, distributors like Winebow have their own proprietary marketplaces (www.Winebow.com). Historically, some independent marketplaces (*i.e.*, not affiliated with distributors) have also entered the space. SevenFifty, which launched in New York in 2012 and became part of Provi in 2022, is one of the earliest examples. Others include Untappd and

Encompass Technologies. These other marketplaces have the same basic functionality that facilitates online orders between retailers and distributors as Provi, Proof, and eRNDC. However, these fringe players lack the broad range of products and geographic footprint that more developed marketplaces offer—and they lack the broad portfolio of "must-have" brands under long-term, exclusive contracts that Defendants enjoy. None of these small fringe players has achieved significant scale or market presence over the years, consistent with the significant barriers to entry in the industry.

99.     Defendants were late to recognize retailers' demand for e-commerce solutions. Both Southern's Proof and RNDC's eRNDC launched in April 2019, three years after Provi. But in the three short years since these launches, these distributors have identified the importance of e-commerce solutions and the data that accompany them. For example, Tracy Ariail, RNDC's Senior Vice President of eCommerce & Digital, explained in a 2020 interview—only one year after the launch of eRNDC—that the "proliferation of digital technology has made real-time data access paramount for the success of brands."

100.     Similarly, Carlos Vigil, Southern's Senior Vice President & General Manager of Digital Sales and Marketing, expanded on the value of Proof on a 2021 panel, explaining that Proof "give[s] [Southern's sales representatives] the ability to actually find opportunities and convert those opportunities, bringing in data from a number of different places," including the retailers' activity on Proof. In 2021, Southern also began offering suppliers, through its new DRAM (Digital Revolution of Alcohol Marketing) Agency, "access to digital tools and solutions, data, and education around eCommerce," according to Nathan Mansperger, Southern's Vice President of eCommerce.

## UNLAWFUL CONDUCT

### A.     Threatened by Provi's Rise, Southern and RNDC Conspired to Boycott Provi

101.    Defendants Southern and RNDC eventually came to see Provi's revolutionary offering as a competitive threat to their dominance. Provi's innovative online alcohol marketplace allowed retailers to view and purchase spirits and wine from Southern's and RNDC's competing distributors—including at lower prices—because of the newfound transparency, ease, and cost-effectiveness of doing so with Provi. It also presented a threat to their growing control of ecommerce and alcohol sales data and advertising. Frustrated by Provi's growing popularity, Southern and RNDC decided to take matters into their own hands to maintain their grip on the industry and keep Provi from its game-changing innovation.

102.    Southern and RNDC know each other well. Over the years, these companies have interacted through industry groups and events, and they even formed a lobbying entity to advance self-serving legislation, known as the Institute for Responsible Alcohol Policy. The CEOs and other top executives of both Southern and RNDC also serve on the board of directors of the Wine and Spirits Wholesalers of America. Through these interactions, Defendants' executives and employees have developed cozy relationships and enjoy many opportunities to collude against competition. In fact, it is common knowledge in the industry that senior executives at the two companies communicate with each other often.

103.    As one example of this, Southern and RNDC are currently being sued in federal court in Oklahoma by Bryan Henderson, the owner of the now-defunct Boardwalk Distribution Co., which distributed wine, spirits, and beer to retailers in Oklahoma before going bankrupt in mid-2020. In his Complaint, Plaintiff-Henderson accused Southern and RNDC, among other things, of forming a "*group boycott that eliminated Boardwalk as a viable competitor*," which they

effectuated by "obtain[ing] commitments from [suppliers] to sell wine and spirits only to" Southern and RNDC. Plaintiff-Henderson further alleged that evidence of the boycott was "shown by purchase order fulfillment of the [suppliers], who only took orders from their chosen distributor." Although the litigation is ongoing, in August 2021, the Court denied Southern's and RNDC's motion to dismiss the Complaint, finding that Plaintiff-Henderson had presented enough facts to plausibly allege that Defendants engaged in an illegal group boycott, highlighting that "*high inter-firm communications*" and "*the concentrated market structure*" were among the factors warranting this conclusion.

104.    Beginning on or about May 2021, Southern and RNDC, on information and belief, began to coordinate and collude to stop Provi from gaining scale to compete effectively with their respective online marketplaces.

105.    Southern and RNDC initiated similar and near-simultaneous communications to retailers and sales associates claiming not to accept orders communicated through Provi's marketplace. For example, on or around May 3, 2021, Southern leadership instructed regional managers to call retailers and inform them that "*[Southern] will not accept orders via email or text that have the name Provi or [SevenFifty] listed as the sender.*" Only a few days later, RNDC communicated a similar message by email directly to a specific national account that had signed with Provi, stating that RNDC had "*stop[ped] accepting orders from the Provi platform,*" a decision RNDC claims to have made in June 2020, but in reality had not effectuated. Retailers had communicated thousands of orders worth millions of dollars to RNDC *through Provi* in the months since June 2020, and Provi had made every effort to ensure that all orders that retailers chose to submit through its online marketplace were communicated to distributors and fulfilled.

106. Southern's and RNDC's announcements prompted some retailers to push back. For example, in an email to RNDC in May 2021, one National Account called RNDC's position "*confus[ing]*" since "*the only thing Provi is doing is submitting the order to the rep the same [as] has always been done . . . [while] giv[ing] us the ability to place all of our orders from one page rather than having to visit multiple places*." In subsequent emails, the same National Account discussed internally that it "*may need to go back to ordering straight from [Southern and RNDC]*" given announcements by both distributors that they would not accept orders associated with Provi—just as Defendants intended, and would later enforce, through their boycott of Provi.

107. In July 2021, restaurant chain P.F. Chang's—still seeking to use Provi's marketplace—notified all its distributors, including Southern and RNDC, that it would be communicating its beverage orders "through an online ordering platform, Provi," describing it as an "opportunity . . . to continue our mission in providing best in class service to our guests and thriving for operational excellence in our restaurants."

108. This news prompted Southern and RNDC to double-down on their coordinated attempts to block retailers from using Provi, which had previously gone unenforced. As part of their scheme, Southern and RNDC agreed to block incoming orders sent by retailers through Provi.

109. On information and belief, these plans were discussed and furthered leading up to and during a July 2021 industry gathering in Denver, Colorado—the Wine & Spirts Wholesalers of America's NextGen Summit. Representatives from both RNDC and Southern attended this event, which took place just weeks before both companies stopped accepting orders submitted through Provi.

110.    During that Summit, Provi's Head of Strategic Partnerships, Andrew Levy, gave a presentation about Provi where he highlighted—among other things—how many National Accounts had signed up to partner with or pilot Provi, including the following slide:



111.    During the presentation, Alan Rosenberg, General Counsel & Corporate Executive Vice President of RNDC, weaponized the Q&A session to publicly make a series of allegations about Provi's business proposition in front of dozens of executives from distributors around the country, including current and potential Provi business partners. Rosenberg asserted baselessly that Provi harms retailers. His remarks in that context seemed designed to encourage a boycott of Provi by both retailers and distributors—which Southern and RNDC effectuated shortly thereafter by refusing to accept orders from retailers communicated through Provi.

112.    Unabated, RNDC's Rosenberg confronted Levy again in the hallway immediately outside the room where the event occurred and accused Provi of trying to scale its user base of retailers such that RNDC would have no choice but to work with Provi—meaning, RNDC would have to accept orders coming through Provi. Rosenberg made clear directly to Levy in that second confrontation that RNDC was unhappy that Provi was getting so popular with retailers that it could threaten RNDC's inferior eRNDC marketplace.

113.    Defendants subsequently acted quickly, decisively, and in virtual lockstep to ensure Provi would not reach that scale.

114.    In furtherance of the boycott, on or about July 7, 2021, Southern sent letters to all its retailer customers—approximately 250,000 total—stating that Southern would not accept orders from Provi. Southern simultaneously communicated the same message via phone, leaving voicemails stating "*[Southern] will no longer accept orders transmitted by third-party e-commerce platforms or services, such as Provi, SevenFifty, or others*." In that same voicemail, Southern expressly steered customers to Proof in lieu of other online alcohol marketplaces—and it specifically called out Provi (and SevenFifty which Provi owns) in that message. The voicemail stated that Southern would now require "all e-commerce orders" to be made "entirely through Southern Glazer's employees and platforms," thus requiring all online orders to be submitted only through "SG Proof." Southern made clear its intention to foreclose competition, to tie its own online alcohol marketplace to its alcohol distribution services, and to deny retailers the ability to continue choosing for themselves how best to meet their needs and communicate orders. Nathan Mansperger, Southern's Vice President of eCommerce, recently acknowledged that "[i]t is critical that [Southern] continue to invest in the [eCommerce] channel," and stated that Southern's "goal is to achieve a higher share online vs offline."

115.    In the days and weeks following Alan Rosenberg's comments during Andrew Levy's presentation at the WSWA's NextGen Summit, Southern leadership throughout the country spread the word to retailers that Southern would no longer accept orders placed through Provi. This outreach occurred on July 29 and July 30 leading up to the implementation of the boycott. Southern leadership reminded retailers of the boycott on August 2, 5, 6, and 10, and on other dates.

Throughout the country, Southern leadership conveyed the message that Southern would no longer accept orders through third-party firms, including Provi.

116.    On or about August 1, 2021, Southern began blocking Provi's domain, thereby blocking orders that retailers chose to communicate through Provi. Southern actively blocked orders that retailers chose to communicate through the Provi marketplace in multiple states— including, but not limited to, Florida, Colorado, Arizona, California, and Illinois—frustrating Provi's (and Southern's) customers, including Chicago-based hospitality group Four Corners which reacted by pleading with Southern to "*stop making our lives harder.*"

117.    Based on available information, one anonymous Southern sales representative admitted that Southern's decision to reject orders that retailers communicated through third-party online alcohol marketplaces was "*the pinnacle of stupidity*" and motivated by "*an effort to force our customers to use our poor excuse of [a] software,*" Proof. That sales representative further characterized Proof as "*amateurish and very difficult to navigate*" and, more bluntly, "*an abysmal failure of epic proportions.*" Retailers shared this sentiment, with one complaining that Proof seems to be "*down every week.*" Upon information and belief, Southern also began telling its sales representatives that they could be subject to an inquisition and threatened with termination if they accepted an order from a third-party like Provi, because doing so reportedly had become a violation of company policy.

118.    Southern's efforts were successful, with over 70% of retailers re-ordering through Proof as of March 2022, even though it offers a poor user experience and suffers frequent outages—and even though retailers have expressed a strong preference for Provi.

119.    In furtherance of their boycott, on or around August 4, 2021, RNDC's Ken Rosenberg, Senior Vice President for Wine and Supplier Business Development and an owner of

RNDC, emailed an audio file of *Southern's* voicemail announcement to another online marketplace, underscoring the coordination between Southern and RNDC.

120. Until Southern's announcement, RNDC was still filling orders retailers communicated through Provi, though, as will be described below, it had made false statements and actively discouraged retailers from using Provi. Between June 2020 and August 2021, scores of RNDC sales representatives maintained and used Provi accounts to receive, process, and fulfill over 25,000 orders from retailers. That suddenly changed at or about the same time Southern announced that it would refuse orders that retailers chose to communicate through Provi. On or around August 20, 2021, a RNDC sales representative, in rejecting an order communicated through Provi, stated that "ERNDC" [sic] was RNDC's "only permitted method of online ordering" and "[o]rders placed via third-party applications or websites such as Provi will not be accepted, as they are a violation of company policy."

121. Before Defendants' boycott, Southern generated approximately $145 million in retail sales through Provi and accepted some 87,000 orders, and RNDC generated $45 million in retail sales through Provi and accepted more than 44,000 orders. After initiating the boycott, these combined sales numbers dropped precipitously.

122. Over a dozen different National Accounts stopped working with Provi on a nationwide basis or put their plans on hold, citing Provi's inability to place orders with Southern and RNDC as a reason for not moving forward. Supplier advertising growth on Provi also slowed substantially, again because of Defendants' boycott of Provi.

123. Defendants continue to enforce this boycott of Provi to this day. For example, during a meeting of the Wine and Spirits Wholesalers of America in March 2022, an executive of another distributor stated that they wanted to invite Max Lowenbaum, Provi's Senior Vice

President of Sales, to speak on a panel at this year's NextGen Summit, a valuable opportunity for Provi to expand its brand and network with new and existing business partners. Alan Rosenberg, RNDC's General Counsel & Corporate Executive Vice President, responded to this suggestion by stating in front of numerous other distributors in attendance that RNDC would "never work with Provi" and would even pull out of the event if Lowenbaum—or anyone from Provi—was invited to speak, effectively blocking Provi from participating since RNDC, as the second largest distributor, must have a presence at the conference. Like his earlier remarks at the WSWA's NextGen Summit in July 2021, discussed above, Rosenberg's remarks in this context again seemed designed to reinforce, expand, and prolong Defendants' boycott of Provi.

### B. Leveraging Their Substantial Market Power, Southern and RNDC Engage in Additional Anticompetitive Conduct

124. RNDC, like Southern and other distributors, initially embraced Provi because Provi's marketplace offers significant value to distributors by improving sales, reducing costs, and generating valuable data about orders and the retailers submitting them.

125. In 2018, RNDC's Chief Operating Officer for Michigan, Indiana, and Kentucky, John Baker, was so impressed with Provi that he introduced Provi's CEO, Taylor Katzman, to RNDC's National COO and high-level executives in Georgia just as Provi was entering that state. On July 20, 2018, Baker emailed Mark Moser (the RNDC Executive Vice President for Georgia), Bob Hendrickson (the RNDC National COO), and others at RNDC, noting, "Our paths don't cross often, but I wanted to make you aware of a potential game-changing consolidated online ordering tool that's coming to GA."

126. Although Moser declined to meet with Provi, RNDC continued to show interest in Provi's capabilities. On November 1, 2018, Kevin Bowles, the Sales Finance Manager for RNDC Georgia, requested a demo of Provi's product. The Provi team provided an overview and full

demonstration of the Provi marketplace capabilities to Bowles and Tracy Ariail, RNDC's Senior Vice President of eCommerce & Digital. At the end of the meeting, Bowles and Ariail said they would connect internally and follow up with next steps. RNDC did not disclose to Provi at that time that it was developing its own competing online alcohol marketplace, eRNDC.

127. These meetings evidently were calculated attempts to gain competitive intelligence about Provi's competing marketplace. On November 26, 2018, RNDC and California-based distributor Liberation Distribution announced a strategic partnership including development of an online ordering system. Shortly thereafter, on April 23, 2019, RNDC launched eRNDC, which it promised would "enhance and streamline how business is conducted with their customers and suppliers."

128. Southern also sought to gather competitive intelligence about Provi's platform under the guise of interest in a potential partnership. In August and September 2018, Provi and Southern discussed a potential partnership whereby Southern would integrate its distribution services with Provi's marketplace. On August 13, 2018, Southern Chief Commercial Officer John Wittig and Vice President Terry Brick submitted a series of questions related to Provi's business model, data-collection-and-use policies, and marketing practices, under the guise of evaluating such a partnership. Provi's Taylor Katzman answered that same day. After receiving this insight into Provi's business, Southern went silent on the contemplated partnership. Only about six months later, Southern officially announced the launch of Proof in six states.

129. Then, in October 2020, conversations between Southern and Provi resumed. Southern's Carlos Vigil (Senior Vice President & General Manager of Digital Sales and Marketing) and Rob Howl (Vice President, Digital Strategy & e-Commerce) met with Provi, and the two companies began exploring a pilot partnership in the Illinois market. To move forward

with that pilot, Southern insisted that it needed a better understanding of which retailers were using Provi, so Provi agreed to supply sample data about its Illinois customers if Southern signed a non-disclosure agreement. After receiving this additional insight into Provi's business, specifically for Illinois, Southern again went silent on the contemplated partnership. Later that same month, Southern launched Proof in Illinois. Southern's conduct shows that its meetings with Provi and its requests for commercial data and other insightful information from Provi were, in fact, calculated attempts to gain competitive intelligence about Provi's competing marketplace—information Southern undoubtedly has used to compete against Provi with Proof.

130.    Following the launch of eRNDC, retailers continued to communicate orders to RNDC sales representatives through Provi for nearly two years without incident. Between January 2018 and January 2020, over 100 RNDC sales representatives created their own accounts on Provi. RNDC received and fulfilled tens of thousands orders from retailers communicated through Provi during this time, worth tens of millions in revenue for RNDC.

131.    However, beginning in 2020, as Provi grew rapidly, RNDC began taking steps to discourage retailers from using Provi, initiating an erratic course of conduct that varied from bad-faith attempts to mine Provi's business strategy to attempts to put Provi out of business or restrict it to a marginal scale or fringe player.

132.    On February 24, 2020, without warning, Provi received a cease-and-desist letter from Alan Rosenberg, General Counsel & Corporate Executive Vice President for RNDC. The letter alleged baselessly that Provi was misrepresenting the existence of some sort of partnership, relationship, and agreement with RNDC to retailers. The letter demanded that Provi cease to make such representations.

133.    Provi promptly responded to correct the misinformation in the letter. On February 26, 2020, Katzman explained, "Provi is not making any representations that we have a commercial relationship, agreement or endorsement with RNDC, Young's or National Distributing Company."

134.    On March 3, 2020, after emailing and speaking with Rosenberg further, Katzman noted, "As discussed, we had an all hands meeting this morning and confirmed no one on the team has made any representation or communication that Provi has an agreement, relationship or endorsement of RNDC, NDC or YMC [Young's Market Company]. In addition, I also reiterated to the team that no such communications or representations should occur." Rosenberg inexplicably replied that RNDC still wanted a written commitment from Provi to cease and desist, even though Katzman already had twice confirmed in writing that Provi was not engaged in the alleged conduct. Katzman asked RNDC to provide examples of this conduct, which—tellingly—RNDC never did.

135.    On April 27, 2020, another RNDC representative, Erik Velazquez, reached out to Provi's regional director for the southern United States to request information about how Provi works. Although this came shortly after the baseless allegations by RNDC about Provi, Provi promptly scheduled a meeting to discuss a potential partnership, again hopeful to build a formal relationship with RNDC.

136.    Roughly a week later, on or about May 5, 2020, Ken Rosenberg, RNDC Senior Vice President for Wine and Supplier Business Development and an owner of RNDC, reached out and requested to meet with Provi to learn more about its offering. Provi, again interested in expanding its relationship with RNDC, made a presentation to Rosenberg on May 6. During the meeting, Rosenberg said he would discuss Provi with additional members of the RNDC executive team, but requested that Provi provide its entire customer list. Provi declined because this is sensitive commercial information and RNDC offered no explanation for why it needed such

extraordinary information. RNDC's anticompetitive conduct later suggested that this was yet another ruse by RNDC to mine Provi's business for RNDC's own benefit, including eRNDC.

137.    A few weeks later, on May 28, 2020, Ken Rosenberg met with the Provi team again to receive further detail on the platform. After the meeting, he again emailed Provi to ask for a "complete list of accounts that are using Provi in RNDC, DNC, and Young's States." The Provi team reiterated that Provi could not share such highly sensitive commercial data.

138.    That same month, Rosenberg inexplicably accused Provi of being owned by Breakthru Beverage, another alcohol distributor, and told Provi that RNDC did not want to move forward with an integration. Provi confirmed multiple times, including in a follow-up email, that Breakthru Beverage had no ownership interest in Provi and was merely an integrated platform customer, like many other distributors. Katzman subsequently received a call and email from Ken Rosenberg stating that "[g]oing forward [RNDC] will not be accepting orders from Provi."

139.    After the conversation, Provi employees started to receive calls from retailers stating that RNDC claimed it would no longer accept orders they chose to communicate through Provi because Breakthru Beverage owned Provi. Provi leadership and its employees expended enormous time, money, and resources combatting and correcting this false claim with retailers and others. RNDC knew the claim was false when making it given that Provi had confirmed multiple times for RNDC that Breakthru Beverage had no ownership interest in Provi. RNDC has never identified any basis for its false claim.

140.    In June 2020, RNDC's Ken Rosenberg suddenly accused Provi of receiving RNDC pricing data from retailers and inputting the data on Provi. Rosenberg stated that going forward, RNDC would not accept any orders retailers chose to communicate through Provi and one of the reasons was due to the pricing being posted. Katzman explained that pricing for RNDC on Provi

was information that a small number of *retailers themselves chose* to enter and that Provi indicated on its marketplace that this pricing was not from an "integrated" distributor (*see* paragraph 167, *infra*) and thus was not necessarily the actual pricing available from RNDC for any given products. This is entirely lawful, as Provi understands that RNDC pricing to retailers is non-proprietary and, in many cases, already publicly available. RNDC has never identified any restriction on *retailers'* right or ability to share their pricing with others, including on Provi's online alcohol marketplace. Nevertheless, in an attempt to garner goodwill with RNDC, Provi removed all RNDC pricing that had been entered by the retailers and disabled that feature.

141.    Escalating its one-sided campaign, around the same time RNDC suddenly began blocking communications from Provi. RNDC programmed its computer system firewall to block emails from Provi. RNDC also advised its employees not to respond to communications from Provi and not to accept orders that retailers chose to communicate through Provi. However, Provi continued to communicate orders that retailers chose to submit through Provi to RNDC for the rest of 2020, and RNDC continued to receive and fill those orders.

142.    On May 28, 2020, Provi CEO Katzman contacted RNDC's General Counsel, Alan Rosenberg, and reiterated that Provi is not owned by Breakthru Beverage, and requested that RNDC immediately stop spreading this rumor. Alan Rosenberg did not deny that RNDC had made statements to this effect and promised to tell RNDC employees to stop, to the extent they were doing so. Despite Rosenberg's promise, this conduct has persisted.

143.    Alan Rosenberg also conveyed to Provi that: "RNDC will continue to promote and steer our customers towards using our own e-commerce platform and away from Provi . . . ."

144.    In January 2021, Provi reached out to RNDC and requested a meeting to again discuss expanding their relationship. RNDC agreed and in April 2021 Provi met with Tracy Ariail

and Blake Moore, Director of Business Relationship Management, and presented Provi's capabilities to streamline their business by integrating with eRNDC. Ariail and Moore expressed interest in the concept and explained that they would follow up once they had additional internal conversations.

145. On July 29, 2021, Katzman met with Jenn Engel, RNDC Senior Vice President of National Accounts On-Premise. Katzman and Engel discussed the benefits of Provi, and Engel said she was a supporter of the system, noting that major National Accounts requested that RNDC and Provi work together.

146. Instead of working with Provi, however, in a further attempt to harass Provi, on August 18, 2021, RNDC sent Provi a cease-and-desist letter and started intimidating Provi's customer service representatives. For example, when a Provi representative called RNDC to follow up on the status of a retailer's order, she was transferred to another RNDC employee. After identifying herself as a Provi representative, she was told to "stop calling" RNDC and that their "legal team [was] on it." In a transparent attempt to harass Provi, near the end of the same call, a *second* person suddenly announced himself as RNDC's "corporate lawyer" and said he was "recording every one of these calls and taking note of your names so you should tell all of your colleagues, and you as well, you need to stop calling us"—without ever explaining why she had done anything wrong by simply following up on an order that a retailer had chosen to communicate through Provi.

147. RNDC continues to block and reject orders that retailers seek to communicate through Provi to this day. In February 2022, after SevenFifty became part of Provi, RNDC requested another meeting with Provi. On February 18, Provi met with top executives at RNDC including Tom Cole, Nicholas Mehall, Ken Rosenberg, Tracy Ariail, March Sachs and others.

After the meeting, Mr. Katzman asked RNDC "as a sign of good faith," to "unblock these orders communicated on Provi," to which Tracy Ariail responded, "RNDC will continue to block all incoming email traffic and/or orders sent to RNDC using Provi."

### C.     <u>Defendants Tortiously Interfered with Provi's Business</u>

148.    Prior to Defendants' anticompetitive conduct, Provi had signed partnership agreements with an expansive roster of National Accounts, including Chili's, Red Robin, Benihana, and P.F. Chang's. Provi had also signed pilot projects with other major National Accounts, including Buffalo Wild Wings, Hilton, Circle K, and The Cheesecake Factory. Provi had every reason to believe that these relationships would flourish over time, providing critical growth and spurring significant revenue.

149.    The project with Buffalo Wild Wings, and others like it, was short-lived. On July 7, 2021, Southern sent a letter to its customers informing them that effective August 1, 2021, Southern would "no longer accept orders transmitted via third party e-commerce platforms or services, such as Provi, Seven-Fifty [sic], and others." That Southern specifically identified Provi in its message highlights Provi's particular popularity among retailers, including National Accounts, and the competition Southern seeks to foreclose from Provi in particular as a result. SevenFifty, the only other provider Southern specifically identified, is owned by Provi.

150.    Over the following weeks and months, more National Accounts, including Delta Sky Club, were confronted with Southern's "strategic decision to require that the ordering options—including all e-commerce orders—will be entirely through Southern Glazer's employees and platforms," i.e. Proof. Southern was unequivocal in forcing customers to use Proof as the only online alcohol marketplace available for the many "must-have" brands Southern controls in many markets across the country.

151.     RNDC similarly disrupted Provi's ongoing relationships with National Accounts, including, at least, Oregano's and Applebee's.

152.     Defendants intentionally and unjustifiably induced these National Accounts to breach their agreements with Provi by refusing to fulfill any orders they chose, or would have chosen, to submit through Provi. But for Defendants' conduct, these retailers would have continued to use Provi. Provi has suffered—and continues to suffer—lost profits and other harm as a direct result of Defendants' actions.

## RELEVANT MARKETS

### A.     Alcohol Distribution Markets

153.     There are separate relevant markets for: (1) the distribution of distilled spirits in each state; and (2) the distribution of wine in each state.

#### i.     Market for the Distribution of Distilled Spirits

154.     The distribution of distilled spirits is a relevant product market. It is composed of distributors—dominated by Defendants Southern and RNDC—that market and sell distilled spirits to retailers. These distributors compete exclusively against other distributors for retailers' business, since federal and state regulations prevent distilled spirit producers from selling directly to retailers.

155.     Other types of alcoholic beverages, such as wine and beer, are not reasonable substitutes for spirits from a retailer's standpoint, given consumer preferences. These other alcoholic beverage products are also subject to different—sometimes more stringent—federal and state regulation. As a result, a hypothetical monopolist in distilled spirits distribution would be able to exclude competition and maintain prices above the level that would prevail in a competitive market, as demonstrated by Southern's and RNDC's longstanding power in certain geographic markets.

156.    Separate geographic markets exist for each state. Each state has a distinct regulatory scheme that distributors and retailers must follow, and most states require a state-specific permit for any distributor of distilled spirits, which means that retailers may only purchase distilled spirits from authorized distributors located in the same state. Each of the states in the U.S. where Southern or RNDC operates, as well as the District of Columbia where they both operate, constitutes a relevant geographic market.

### ii.    *Market for the Distribution of Wine*

157.    The distribution of wine is also a relevant product market. This market comprises distributors—dominated by Defendants Southern and RNDC—that market and sell wine to retailers. While many states allow consumers to purchase directly from wine producers, retailers may only purchase wine from authorized distributors located in the same state as the retail location that receives it. For that reason, wine distributors compete exclusively against other distributors for retailers' business.

158.    While most retailers purchase a variety of alcoholic beverages, the distribution of wine constitutes a distinct product market. Beer, distilled spirits, and other types of alcohol are not reasonable substitutes from retailers' standpoint given consumer preferences, and are also subject to different—sometimes more stringent—federal and state regulation. As a result, a hypothetical monopolist in wine distribution would be able to exclude competition and maintain prices above the level that would prevail in a competitive market, as demonstrated by Southern's and RNDC's longstanding power in certain geographic markets.

159.    Separate geographic markets exist for each state. Each state has a distinct regulatory scheme that distributors and retailers must follow, and most states require state-specific permits for any distributor of wine, which means retailers may only purchase wine from authorized

distributors located in the same state. Each of the states in the U.S. where Southern or RNDC operates, as well as the District of Columbia where they both operate, constitutes a relevant geographic market.

### iii. Southern and RNDC Dominate the Markets for the Distribution of Distilled Spirits and the Distribution of Wine

#### a. Distribution of Distilled Spirits

160.     Defendants Southern and RNDC individually and combined have monopoly or market power in the markets for the distribution of distilled spirits throughout the United States. In 12 markets, Southern, as of 2019, had a market share of 50% or more, as shown below in Table 3. In five of these markets (Arkansas, Hawaii, Kentucky, Louisiana, and Washington), Southern's share exceeded 70%. Similarly, RNDC had a market share in excess of 50% in two markets— Oklahoma and South Dakota. And in a total of 20 markets, including some of the country's most populous states like California and Florida, the combined share of Southern and RNDC exceeded 50%. Defendants' distribution rights—sometimes exclusive—to "must have" brands reinforce their control of these markets, making them essentially unavoidable for retailers that wish to purchase distilled spirits.

**TABLE 3[11]**
**States Where Estimated Individual or Combined Market Shares for the Distribution of Distilled Spirits Exceeds 50% for Southern or RNDC**

| State | Southern | RNDC | Illustrative "Must-Have" Brand Distribution Rights |
|---|---|---|---|
| AR | 77.9% | 0.0% | Southern: Tito's, Fireball, Crown Royal, Bacardi, Jim Beam |
| AZ | 46.6% | 19.7% | Southern: Tito's, Jim Beam<br>RNDC: Fireball |
| CA | 53.5% | 30.7% | Southern: Crown Royal, Jim Beam<br>RNDC: Tito's, Jack Daniel's |
| CO | 32.4% | 24.4% | Southern: Bacardi, Jim Beam<br>RNDC: Tito's, Fireball |
| DC | 18.1% | 43.4% | Southern: Bacardi, Jim Beam<br>RNDC: Tito's, Fireball |
| FL | 54.0% | 20.5% | Southern: Crown Royal, Jim Beam<br>RNDC: Fireball, Crown Royal, New Amsterdam |
| HI | 78.5% | 16.3% | Southern: Smirnoff, Crown Royal, Bacardi, Jim Beam<br>RNDC: Tito's, Fireball |
| IN | 62.7% | 29.7% | Southern: Tito's, Crown Royal, Bacardi<br>RNDC: Fireball, Jack Daniel's |
| KY | 73.0% | 22.0% | Southern: Crown Royal, Bacardi, Jim Beam<br>RNDC: Tito's, Fireball, Jack Daniel's |
| LA | 70.8% | 26.7% | Southern: Tito's, Fireball, Crown Royal, Bacardi, Jim Beam<br>RNDC: Jack Daniel's |
| MD | 28.9% | 30.8% | Southern: Bacardi, Jim Beam<br>RNDC: Fireball, Tito's |
| MI | 5.2% | 48.4% | Southern: Jim Beam<br>RNDC: Tito's, Smirnoff, Fireball |
| MO | 58.5% | 0.0% | Southern: Tito's, Fireball, Crown Royal |
| ND | 39.4% | 32.2% | Southern: Bacardi, Jim Beam<br>RNDC: Smirnoff, Fireball |
| NE | 51.7% | 37.9% | Southern: Tito's, Crown Royal, Bacardi<br>RNDC: Fireball, Jack Daniel's |
| NM | 50.3% | 49.2% | Southern: Tito's, Crown Royal, Bacardi<br>RNDC: Smirnoff, Fireball, Jack Daniel's |
| NV | 51.5% | 0.0% | Southern: Fireball, Crown Royal |
| OK | 40.6% | 59.2% | Southern: Tito's, Smirnoff<br>RNDC: Jack Daniel's |
| SD | 46.7% | 53.2% | Southern: Bacardi, Jim Beam<br>RNDC: Tito's, Fireball, Jack Daniel's |
| WA | 71.0% | 13.8% | Southern: Crown Royal, Bacardi, Jim Beam<br>RNDC: Jack Daniel's |

[11] Shares are estimated from 2019 data. Given trends in distributor consolidation, current shares are believed to be higher.

### b. *Wine Distribution*

161.    Defendants Southern and RNDC dominate the wine distribution market in many states. As shown below in Table 4, as of 2019, Southern had a market share exceeding 50% in seven markets and RNDC's share exceeded 50% in four markets. There were also 18 markets where Defendants' combined share exceeded 50%. Each Defendant has distribution rights to— and, in many cases, exclusive distribution rights to—many of the most popular wine brands in many markets and their current market shares are believed to be even higher given continuing consolidation in wine distribution since 2019. Examples of these brands include Robert Mondavi, Sutter Home Winery, Franzia, and Barefoot. Having the right to distribute these brands, and in many markets several of these brands, bolsters the Defendants' market power and forces retailers to do business with the Defendants if they wish to purchase these brands.

**TABLE 4**
**Markets Where Estimated Wine Distribution Combined**
**Market Share for Defendants Exceeds 50%**

| State | Southern | RNDC | Illustrative "Must-Have" Brand Distribution Rights |
|---|---|---|---|
| AR | 96.4% | 0.0% | Southern: Barefoot, Robert Mondavi, Sutter Home |
| AZ | 45.3% | 12.8% | Southern: Franzia, Robert Mondavi, Bota Box<br>RNDC: Sutter Home |
| CA | 46.1% | 37.4% | Southern: Franzia, Robert Mondavi, Bota Box<br>RNDC: Sutter Home, Barefoot |
| DC | 8.6% | 69.0% | Southern: Robert Mondavi<br>RNDC: Franzia, Barefoot, Robert Mondavi, Bota Box, Sutter Home |
| FL | 31.2% | 26.9% | Southern: Robert Mondavi, Bota Box, Sutter Home<br>RNDC: Barefoot, Sutter Home |
| IN | 29.0% | 37.9% | Southern: Sutter Home<br>RNDC: Franzia, Bota Box |
| KS | 58.7% | 0.0% | Southern: Franzia |
| KY | 71.3% | 24.4% | Southern: Franzia, Robert Mondavi<br>RNDC: Barefoot |
| LA | 50.2% | 41.9% | Southern: Barefoot, Robert Mondavi<br>RNDC: Bota Box, Robert Mondavi, Sutter Home |
| MO | 58.2% | 0.0% | Southern: Barefoot, Sutter Home |
| ND | 32.2% | 48.6% | Southern: Robert Mondavi<br>RNDC: Robert Mondavi |
| NE | 17.0% | 38.3% | Southern: Robert Mondavi<br>RNDC: Robert Mondavi, Bota Box |
| NM | 38.6% | 61.2% | Southern: Robert Mondavi<br>RNDC: Franzia, Barefoot, Robert Mondavi |
| OH | 54.0% | 1.3% | Southern: Barefoot, Sutter Home |
| OK | 22.9% | 76.8% | Southern: Barefoot<br>RNDC: Franzia, Barefoot, Bota Box, Sutter Home |
| SC | 23.4% | 40.1% | Southern: Bota Box, Robert Mondavi, Sutter Home<br>RNDC: Franzia, Robert Mondavi |
| SD | 25.0% | 74.9% | Southern: Robert Mondavi<br>RNDC: Robert Mondavi, Bota Box, Sutter Home |
| WA | 58.2% | 9.4% | Southern: Franzia |

## B. Online Alcohol Marketplaces

162. Online Alcohol Marketplaces in each state are a relevant market.

163.     Online Alcohol Marketplaces give licensed retailers the ability to browse a wide range of products, easily compare prices of those products, view order histories, and communicate orders to one or more distributors, all through a convenient online portal that is accessible around-the-clock. By enabling greater transparency into available products, especially those that are less recognized and more competitively priced, Online Alcohol Marketplaces drive competition among suppliers and create benefits for retailers, and ultimately consumers. Online Alcohol Marketplaces thus function as a digital hub for the consideration and purchase of wine and spirits with much greater ease, and at a lower cost in terms of time, attention, and resources. Online Alcohol Marketplaces include only those marketplaces available to establishments licensed either to make, distribute, or sell alcoholic products under the three-tier system. They do not include online portals for direct-to-consumer sales.

164.     Online Alcohol Marketplaces address many of the inefficiencies created by the three-tier system of distilled spirits and wine regulation. Because distributors hold the exclusive rights to their catalogue of brands that retailers must purchase from them, retailers historically spend hours each week contacting distribution representatives—via in-person meetings, over the phone, or by text message—just to submit orders. Online Alcohol Marketplaces replace this costly, burdensome, error-prone system by utilizing more reliable and efficient means (e.g., APIs) to communicate orders from the retailer to the distributor sales representative for acceptance and fulfillment.

165.     Online Alcohol Marketplaces feature a digital catalog that allows retailers to browse and compare the many SKUs that are available across many product categories before making an independent purchasing decision. Because the number of individual product SKUs has quadrupled in the past decade, Online Alcohol Marketplaces save retailers substantial time, money,

and resources by allowing the apples-to-apples comparison of products through a user-friendly and readily-available tool; this can include products from different distributors in a single marketplace for Online Alcohol Marketplaces, such as Provi. Retailers value accurate, high-quality information presented in a reliable, user-friendly format, and so Online Alcohol Marketplaces compete to present the most useful and attractive content to retailers.

166. Online Alcohol Marketplaces also allow retailers to easily track their order history (including across distributors with Online Alcohol Marketplaces such as Provi) and product lines in a centralized hub. Rather than managing many individual paper or electronic invoices from multiple distributors by hand, retailers can access and evaluate their own purchasing behavior in the same site where they make new purchases, creating enormous value for retailers seeking to better understand and grow their businesses.

167. Some distributors are integrated with Online Alcohol Marketplaces, creating additional opportunities for retailers to compare products. When a distributor integrates with Provi, retailers may view pricing, deals, and product information directly from the distributor via an API connection. Retailers can also send orders directly to their distributor sales representatives' handheld devices where the distributor sales representatives determine whether they are accepted, rejected, or edited without the need for manual reentry. Because Online Alcohol Marketplaces are able to access the operational and inventory data from integrated distributors in real time, they can show more detailed product pricing and availability. Online Alcohol Marketplaces are also able to present pricing information and discounts for which the retailer is eligible in accordance with applicable law. Proof and eRNDC, as Southern and RNDC's proprietary Online Alcohol Marketplaces, respectively, are integrated with the distributor by design. Provi encourages

distributors to integrate (to become "distributor partners"), but does not require distributor integration for retailers to obtain the benefit of using the Provi platform.

168. The competitive landscape for Online Alcohol Marketplaces includes services such as Proof, eRNDC, Provi, and a fringe group of other smaller providers that lack market power. These services all compete for retailers' traffic and the opportunity to communicate the retailers' orders to distributors in accordance with the established three-tier system. Whether a particular Online Alcohol Marketplace communicates orders to a single distributor, such as Proof and eRNDC, or to multiple distributors, such as Provi, is immaterial. All of these Online Alcohol Marketplaces compete for the same business and corresponding data from retailers, as Southern and RNDC have acknowledged.

169. Defendants recognize that their Online Alcohol Marketplaces compete with Provi. The voicemail that Southern sent to all its customers in August 2021 stating that it would no longer accept orders through Provi specifically stated that Southern developed Proof to displace Provi and other third-party marketplaces: "[A]s we developed our own tools and capabilities, it is only natural that we would move to our own people and systems, in lieu of relying on third parties." Carlos Vigil, Senior Vice President & General Manager of Digital Sales and Marketing at Southern, has expressed publicly that Southern views Provi as a competitor to Proof, as have other Southern executives.

170. Likewise, when RNDC wrote its customers, informing them of its decision to stop accepting orders from Provi, it directed customers to use "alternative options"—namely eRNDC.

171. Each state in the United States is a relevant geographic market. Because each state's regulatory framework is unique, Online Alcohol Marketplaces must be tailored to satisfy the particular requirements of that state. Additionally, Online Alcohol Marketplaces must account for

each state's unique mix of distributors. As a result, retailers using the same Online Alcohol Marketplace in different states can have different experiences, including different content displayed to them. Payment options also differ across states because state regulations govern the payment methods permitted in each state. For example, some states prohibit the use of credit card payments on these Online Alcohol Marketplaces and only permit ACH payments. Online Alcohol Marketplaces, like Provi, have to be sensitive to these differing regulatory requirements to assure compliance across their platforms.

172.     Other methods of communicating retail alcohol orders—such as in-person or phone orders—are not reasonable substitutes for Online Alcohol Marketplaces. A critical component of Online Alcohol Marketplaces is that they are available 24/7 for retailers to explore the available products, select the products of their choosing, and communicate those orders to the appropriate distributors. Southern highlights this unique value when promoting Proof. This feature of Online Alcohol Marketplaces enables retailers to determine and communicate orders when convenient for them, which in turn frees them up to focus on their own customers during their regular business hours. Text messages and emails also do not offer the same functionality as Online Alcohol Marketplaces, including the ability to explore all available products and to follow the processing of each order through fulfillment, from receiving notifications of when the distributor representative reviews the order to when the order has been placed. Text messages, emails, telephone calls, and in-person communications also lack the order management features that Online Alcohol Marketplaces offer, including the ability to easily and cost-effectively maintain, search, and review past orders and invoices in a centralized location. Online Alcohol Marketplaces do this automatically for retailers with each order they submit. Doing this manually across

countless orders and invoices consumes valuable time and resources that retailers are better served devoting to other business needs.

### C.   **Advertising on Online Alcohol Marketplaces**

173.    Advertising on Online Alcohol Marketplaces constitutes a relevant product market.

174.    Suppliers choose to allocate their advertising budgets among various alternatives, including online advertising on Online Alcohol Marketplaces. Within this market, there are two distinct submarkets: Search Advertising and Display Advertising. These different forms of online advertisements market to customers at different levels of the acquisition funnel. Suppliers think about this funnel to describe the state of mind of a retail customer leading up to a potential purchase, as illustrated by the figure below. At the top of the funnel, retailers are gathering information and have some brand awareness, but are not close to making a purchase. At the bottom of the funnel, retailers express brand favorability and intent to purchase, culminating in a purchase.

The Retailer Purchase Funnel



175.    Search advertising is toward the bottom of the retailer purchase funnel because it draws on specific queries entered by retailers that evince information about their specific

purchasing intent, which could relate to distinct brands or products. Because this information reveals the intent of the customer and is closer to the independent purchasing decision, it is more valuable to advertising suppliers that are willing to pay more for search advertising.

176.    Display Advertising focuses on retail customers at the top of the customer acquisition funnel. Display Advertising is purchased by advertising suppliers that seek to generally promote their brand in a geographic market, regardless of what retailers reveal about their preferences through searches or clicks.

177.    To remain compliant with applicable alcohol beverage law, under either model of Search or Display Advertising, suppliers' advertising dollars never directly or indirectly reach any retailer, and no targeted advertising is permitted to individual retailers or for preferential product display of a supplier's product.

### i.    Search Advertising on Online Alcohol Marketplaces

178.    Search Advertising on Online Alcohol Marketplaces in the United States is a relevant submarket. This market consists of the advertisements displayed on Online Alcohol Marketplaces, such as Provi, Proof, and eRNDC, in response to searches conducted by retailers.

179.    Retailers use Online Alcohol Marketplaces to search and shop for wine and spirits online. Retailers reveal their preferences and priorities through their keyword searches (e.g. "most popular whiskey"). Online advertising gives all suppliers the opportunity to showcase their content to retailer decision makers.

180.    Search Advertising on Online Alcohol Marketplaces is particularly valuable because these retailers are far down the customer acquisition funnel. Search ads, which are displayed based on queries (but not focused on any particular retailer), provide insight into the

intent of retailers and are thus far down the customer acquisition funnel. This feature of search ads makes them especially valuable to advertising suppliers.

181.   The competitive landscape for distilled spirits and wine Search Advertising on Online Alcohol Marketplaces includes operators of those marketplaces that compete for the attention of retailers, including Provi, Proof, and eRNDC. Supplier websites with brand information, but without a mechanism to communicate orders for wine and spirits between the retail buyer and the distributor, are not reasonable substitutes or competitors in this market. Supplier websites that do not have a mechanism to communicate orders, but instead merely convey information about products and brands, lack the functionality that retailers seek when they navigate to an Online Alcohol Marketplace, intending to search, shop, and—at least in the case of Provi—discover new products, all in one place.

182.   Other forms of advertising are not reasonable substitutes for Search Advertising on Online Alcohol Marketplaces. Advertising on Online Alcohol Marketplaces is distinct from advertising elsewhere online, because advertising on other media, such as offline or on other sites, by not providing retailers the ability to communicate wine and spirits orders results in intangible ROI for suppliers when evaluating the effectiveness of their advertising spend. The significant value of Online Alcohol Marketplaces is that unlike other online search advertising (i.e., Google searches) suppliers can obtain better transparency on their ROAS (Return on Ad Spend) while promoting their content to retail decision-makers. Indeed, Provi's ROAS is in the neighborhood of 5:1 to 7:1 (i.e., for every dollar spent on advertising, the return is approximately five to seven times the amount spent), while Instacart is at 4:1, Amazon is at 3:1, and Walmart is at 2.7:1 for its advertising partners.

### ii. *Display Advertising on Online Alcohol Marketplaces*

183.    Display Advertising on Online Alcohol Marketplaces is a relevant submarket.

184.    Advertising suppliers use Display Advertising to focus on a broad set of retailers without inputs such as search queries, as in search advertising. Instead, Display Advertising is shown to all retailers that utilize the site.

185.    The ads shown through Display Advertising on sites like Provi are determined by the geographic location of the retailer. For example, an advertiser may choose to purchase a banner ad for their brand or a particular product in a particular city. The ad will be displayed equally to all retailers located within that city that visit the site, regardless of whether they have indicated an interest in that particular brand or product.

186.    Other forms of advertising are not reasonable substitutes for Display Advertising on Online Alcohol Marketplaces. Display Advertising on Online Alcohol Marketplaces is distinct from advertising elsewhere online because advertising on other media, such as offline or on other sites, does not provide retailers the ability to communicate wine and spirits orders. Advertising on other online sites is also not a substitute, because retailers must then either navigate to an Online Alcohol Marketplace or place an order using an offline method, with a lower probability of conversion and lack of clear ROAS. Advertising on sites geared toward consumers rather than retailers are also not reasonable substitutes because of the differences in the audience and its attributes. Other forms of advertising on Online Alcohol Marketplaces, such as Search Advertising, are not substitutes for Display Advertising because of its more focused nature that is driven by retailers' activities on the marketplace (*i.e.* entering search terms or clicking links).

### iii.    Geographic Market

187.    Providers of Online Alcohol Marketplaces compete for suppliers' advertising dollars on a nationwide basis. Suppliers may decide to run their advertising campaigns on Online Alcohol Marketplaces in every state within the United States or in a single state or combination of states. The location of retailers to whom the suppliers want to direct their advertisements is one factor that drives this decision. Retailers in any given state or states will only be interested in products available where they operate. Online Alcohol Marketplaces also use retailer information, including the state or states where they are located, to direct advertisements accordingly. Suppliers take these considerations into account when determining how and where to allocate their advertising budgets. Thus, while providers of Online Alcohol Marketplaces compete for suppliers' advertising dollars nationally, Search Advertising and Display Advertising on Online Alcohol Marketplaces is state-specific.

### iv.    Southern and RNDC Have Market and/or Monopoly Power in Search Advertising and Display Advertising on Online Alcohol Marketplaces

188.    Defendants Southern and RNDC have market power, and each of them has monopoly or market power, in each of the Search Advertising on Online Alcohol Marketplaces markets where they have high shares and/or the ability to control sales for must-have brands in the related spirits and wine distribution markets. As shown in Tables 3 and 4 and discussed above, Defendants had a share of 50% or more in nearly two dozen markets as of 2019. Southern alone, as of 2019, had a share of 50% or more in 12 distilled spirits distribution markets (Arkansas, California, Florida, Hawaii, Indiana, Kentucky, Louisiana, Missouri, Nebraska, New Mexico, Nevada, and Washington), and seven wine distribution markets (Arkansas, Kansas, Kentucky, Louisiana, Missouri, Ohio and Washington). RNDC's share, as of 2019, exceeded 50% in two

distilled spirits distribution markets (Oklahoma and South Dakota), and four wine distribution markets (District of Columbia, New Mexico, Oklahoma, and South Dakota).

189.    Likewise, the Defendants also have market power, and each of them has monopoly or market power, in each of the Display Advertising on Online Alcohol Marketplaces markets where they have high shares, and/or the ability to control sales for must-have brands, in the related spirits and wine distribution markets. As shown in Tables 3 and 4 and discussed above, Defendants had a share of 50% or more in nearly two dozen markets as of 2019. Southern alone, as of 2019, had a share of 50% or more in 12 distilled spirits distribution markets (Arkansas, California, Florida, Hawaii, Indiana, Kentucky, Louisiana, Missouri, Nebraska, New Mexico, Nevada, and Washington), and seven wine distribution markets (Arkansas, Kansas, Kentucky, Louisiana, Missouri, Ohio and Washington). RNDC's share, as of 2019, exceeded 50% in two distilled spirits distribution markets (Oklahoma and South Dakota), and four wine distribution markets (District of Columbia, New Mexico, Oklahoma, and South Dakota).

190.    Defendants' power in wine and spirits distribution allows them to exercise comparable power in the Search Advertising and Display Advertising on Online Alcohol Marketplaces markets.

191.    Taking Southern for example, retailers are forced to rely on Proof for online alcohol orders by virtue of Southern's refusal to allow retailers to use third-party Online Alcohol Marketplaces such as Provi. This means Southern possesses essentially the same substantial market power in the online Search Advertising and Display Advertising markets as it does over alcohol distribution in those states where it controls distribution—which include Arkansas, Kentucky, and Washington among the many others listed above—because the same retailers that must come to Southern for distribution must likewise come to it for the corresponding online

alcohol orders, and those orders are what subject retailers to Search Advertising and Display Advertising online. And those online orders—that Southern requires through Proof—also are what generate the highly valuable data that Southern uses to sell Search Advertising and Display Advertising for Proof. Nathan Mansperger, Southern's Vice President of eCommerce, recently acknowledged that Southern's "goal is to achieve a higher share online vs offline," confirming its intention to extend its longstanding market dominance to online markets with even higher shares of those markets.

192.    RNDC similarly dominates the Search Advertising and Display Advertising markets in those states, including Oklahoma and South Dakota, where it dominates alcohol distribution.

D.    **Data Analytics Services**

193.    Data Analytics Services for distilled spirits and wine ("Data Analytics Services") is a relevant product market.

194.    Data Analytics Services are solutions offered to both suppliers and retailers that rely on data generated by retailers through their use of Online Alcohol Marketplaces. These data include transaction-level data such as purchasing volume, pricing, and order frequency, as well as application usage data such as searches, time spent per page, and user clicks. This data offers detailed information about retailers' purchasing patterns, including which products they searched for by name and which products they shopped for more generally.

195.    Retailer traffic on these marketplaces is driven by the value proposition of the marketplace as perceived by each retailer. More specifically, retailers use Online Alcohol Marketplaces like Provi because they offer a centralized way to browse, shop, and discover distilled spirits and wine products.

196.    Retailers that are free to decide when, where, and how they purchase distilled spirits and wine have been drawn to Provi because of its features and efficiencies.

197.    Using the data generated by retailer traffic, Data Analytics Services provide retailers with greater visibility into product availability and demand to enable retailers to make more informed purchasing decisions. One of the benefits of Data Analytics Services for retailers is that it exposes them to new products or brands that are trending or popular in their area. For example, a retailer viewing a whiskey product on the Provi marketplace will also see a list of "Other Best Sellers" in their geographic area on the same webpage. This feature offers retailers an easy way to learn about popular products without any additional work to the retailer. Through discovering new or trending brands in their area, retailers are able to better serve their customers and increase sales.

198.    An Online Alcohol Marketplace such as Provi, which is not owned by a distributor, offers richer benefits to retailers over what distributor marketplaces like Proof and eRNDC offer by virtue of Provi's cross-distributor data pool—which positions Provi as an especially effective competitor to Proof and eRNDC. Because Provi is open to all distributors, it collects a more comprehensive and robust dataset to understand retail purchasing patterns. This information gives Provi a more complete picture of retailer demand and enables it to convey information across all participating distributors' portfolios to retailers. In contrast, marketplaces like Proof and eRNDC deliberately share recommendations and insights that are limited to Southern and RNDC products, respectively.

199.    Data Analytics Services also provide valuable insight to suppliers for determining how to allocate their advertising spend. Companies like Provi aggregate retailer engagement data, such as searches run on the site, ads clicked on, and transaction data, to more closely track retailers'

engagement with advertising and whether that engagement resulted in a purchase of the advertised product. This feedback gives suppliers better data regarding their advertising ROI and ROAS on Online Alcohol Marketplaces like Provi, and enables them to optimize their advertising spend. Other feedback could be that advertisements for certain brands or product categories are unlikely to affect a supplier's sales, enabling the supplier to redirect that portion of its advertising spend to a better opportunity.

200.    To convey information about the efficacy of a supplier's advertising campaign or other insights such as the overall health of the wine or spirits industries, Provi provides data visualizations for its supplier customers. These visualizations are often in the form of dashboards that provide real-time metrics unique to the supplier's interests or needs. By offering Data Analytics Services, including tools like dashboards, Provi generates demand for advertising on its marketplace.

201.    Providers of Data Analytics Services can sell their underlying data or publications like reports that aggregate the data and provide an associated commentary to third parties, including suppliers and distributors. Provi is pursuing business opportunities with third-party data analysis firms to sell de-identified, aggregate-level data collected through the Provi Online Alcohol Marketplace. These nascent distribution channels will be a substantial line of business as the Data Analytics Services market matures.

202.    Defendants Southern and RNDC both recognize the value of the data that retailers generate on their Online Alcohol Marketplaces and are incentivized to eliminate competitors for retailer traffic and the data that they generate. With respect to retailers, the data tracking buying behavior is valuable because it provides insight into retailers' purchasing trends. With respect to

64

suppliers, the data generated on these marketplaces can give distributors leverage to win more brands, volume, and market share.

203.    The competitive landscape for Data Analytics Services includes Online Alcohol Marketplaces such as Provi, Proof, and eRNDC. Companies that do not operate Online Alcohol Marketplaces do not compete with offerings such as Provi, Proof, and eRNDC because they lack the traffic data that is a critical component of Data Analytics Services for distilled spirits and wine. Without this information, such companies are not able to provide the same robust and real-time insights into metrics such as trending products, advertising ROI, ROAS, and the health of the distilled spirits and wine markets.

204.    The relevant geographic market is each U.S. state and the District of Columbia. Data Analytics Services for both spirits and wine analyze local data to create meaningful output, such as product recommendations for retailers and advertising spend analyses for suppliers. A retailer located in Illinois, for example, is most interested in information relevant to the geographic market it serves rather than information about other states that does not bear on its market. Similarly, since advertising on Online Alcohol Marketplaces occurs at the local level, suppliers need information related to product sales within the geographies where they advertise.

205.    The scale of the marketplace is a significant barrier to entry in Data Analytics Services. Online Alcohol Marketplaces experience indirect network effects. Retailers value the marketplace more when there is increased participation from distributors (and other retailers). Suppliers value the marketplace more as retailer utilization increases, incentivizing suppliers to pressure their distributors to participate in the marketplace to increase their brands' sales. The data generated by retailers on Online Alcohol Marketplaces affect the quality of the Data Analytics Services that can be provided.

206.     If powerful distributors like Defendants choose to boycott the marketplace and are large enough to withstand the resulting pressure from their suppliers and retailers, the quality of the Data Analytics Services declines. Because Southern and RNDC are the largest distributors in the United States and wield substantial market power in many markets across the country, Defendants are able to degrade the value of virtually any competitors' Data Analytics Services. Southern and RNDC thus cripple the competitive process, reduce consumer choice, and stifle innovation.

207.     Other barriers to entry in the Data Analytics Services market for distilled spirits and wine include capital requirements, technical expertise, and historical data. The investment needed to launch an Online Alcohol Marketplace is substantial. Southern has invested tens of millions of dollars to build and operate Proof. Provi has conducted several fundraising rounds, most recently closing a $75 million round in September 2021. Even with an investment in hand, the technical expertise needed to build out an Online Alcohol Marketplace is no easy feat.

208.     Moreover, new entrants will not have access to the historical data maintained by incumbents, which is an extremely valuable component of Data Analytics Services for both distilled spirits and wine. Historical data provides insights into changes in retailer behavior over time, which is necessary to provide industry insights, as well as to benchmark advertising performance for suppliers. And as explained above, the ability to develop scale is a prerequisite to meaningful competition in the Data Analytics Services market.

209.     Defendants Southern and RNDC have market power, and each of them has monopoly or market power, in each of the Data Analytics Services markets where they have a high share and/or the ability to control sales for must-have brands in the related spirits and wine distribution markets. As shown in Tables 3 and 4 above, Defendants had a share of 50% or more

in nearly two dozen of these markets as of 2019. Southern alone, as of 2019, had a share of 50% or more in 12 distilled spirits distribution markets (Arkansas, California, Florida, Hawaii, Indiana, Kentucky, Louisiana, Missouri, Nebraska, New Mexico, Nevada, and Washington), and seven wine distribution markets (Arkansas, Kansas, Kentucky, Louisiana, Missouri, Ohio and Washington). RNDC's share, as of 2019, exceeded 50% in two distilled spirits distribution markets (Oklahoma and South Dakota), and four wine distribution markets (District of Columbia, New Mexico, Oklahoma, and South Dakota).

210. Defendants' control of wine and spirits distribution allows them each to exercise market power in the Data Analytics Services market in essentially equal measure.

211. Taking Southern for example, retailers are forced to rely on Proof for online alcohol orders by virtue of Southern's refusal to allow retailers to use third-party Online Alcohol Marketplaces such as Provi, as discussed above. This means Southern possesses essentially the same substantial market power in the Data Analytics Services market as it does over alcohol distribution in those states where it controls distribution—which include Arkansas, Kentucky, and Washington among the many others listed above—because retailers that must come to Southern for distribution likewise must come to it for corresponding online alcohol orders. Those orders, as well as other retailer engagement with an Online Alcohol Marketplace (such as product searches) are what generate the highly valuable data that Southern seeks to collect by forcing retailers to Proof in lieu of Provi and other third-party Online Alcohol Marketplaces. With this information, Southern, in the Data Analytics Services market, can provide suppliers with information regarding the performance of their brands relative to others, similar to the type of feedback that Provi provides.

212. RNDC similarly exercises market or monopoly power in the Data Analytics Services market in those states, including Oklahoma and South Dakota, where it exercises power over markets for the distribution of distilled spirits and wine.

## HARM TO COMPETITION

213. Defendants' actions have inflicted, and are continuing to inflict, harms to competition in the relevant markets through their collective and individual anticompetitive and unlawful conduct by, *inter alia*:

    i.    Substantially foreclosing competition and raising costs to buyers in Online Alcohol Marketplaces, Advertising on Online Alcohol Marketplaces, and Data Analytics Services markets;

    ii.    Impeding innovation in the Online Alcohol Marketplaces and Data Analytics Services markets that would fuel competition, reduce costs, and drive efficiencies and other procompetitive benefits across the industry, including for consumers; and

    iii.    Denying or reducing customer choice in the Online Alcohol Marketplace, Advertising on Online Alcohol Marketplaces, and Data Analytics Services markets.

214. Defendants' actions have harmed competition in the Online Alcohol Marketplace market by restraining and substantially foreclosing competition, denying or reducing customer choice, increasing costs to retailers and ultimately consumers, and thwarting innovation. Defendants have substantially foreclosed Provi and other rivals in the Online Alcohol Marketplace market from competing for retailers' business, including entirely foreclosing Provi from orders for wine and spirits distributed by Defendants, which account for over half (or much more) of the available market in many relevant markets.

215.     Defendants have also foreclosed competition in the Data Analytics Services markets by eliminating rivals' ability to access the data produced by retailers who do business with Southern and RNDC. Defendants' conduct has weakened Data Analytics Services competitors as competitive alternatives by denying them scale and degrading the quality of their data, since they lack data related to orders that account for over half (or much more) of the available market in many relevant markets.

216.     Defendants also harm competition by limiting retailers' choice of which entities with which they want to share their data. By effectively requiring retailers to rely on Defendants' own Online Alcohol Marketplaces for online spirits and wine distribution, Defendants are forcing or coercing retailers to give data to Southern and RNDC that the retailers would rather give to Provi or other third parties.

217.     Defendants have increased costs to retailers by undermining the very efficiencies that Online Alcohol Marketplaces were designed to create. Absent Defendants' anticompetitive conduct, a retailer could review an aggregated order history that covered its entire wine and liquor portfolio, browse a single digital catalog spanning all available SKUs, and submit a single order through Provi that would be communicated to all relevant distributors. But as a direct result of Defendants' actions, retailers must duplicate their efforts in multiple Online Alcohol Marketplaces: retailers must analyze multiple order histories and summaries, compare products in several discrete catalogs with descriptive content of varying quality, and submit and track multiple orders with multiple distributors.

218.     By instituting a boycott of Provi and effectively requiring retailers to rely on Defendants' own Online Alcohol Marketplaces for online spirits and wine distribution, Southern

and RNDC have eliminated the efficiencies and value that Provi innovated, raising retailers' costs in terms of time, energy, attention, and more.

219.     Southern's and RNDC's actions also stifle innovation in the Online Alcohol Marketplace, Advertising in Online Alcohol Marketplaces, and Data Analytics Services markets. Robust competition between rival firms in the Online Alcohol Marketplaces market would ultimately produce more innovative product offerings, enhanced services, and new efficiencies in order to attract customers who would be able to choose the Online Alcohol Marketplace they prefer.

220.     Faced with competition from Provi, however, Southern and RNDC refused to innovate and instead effectively forced retailers to their inferior Online Alcohol Marketplaces. Indeed, they erected barriers to competition that thwart innovation, as Southern and RNDC no longer need to innovate in order to capture the relevant markets. Their unlawful boycott does this work for them—as does Southern's tie of Proof to its online spirits and wine distribution.

221.     Southern and RNDC have also harmed competition in the Advertising in Online Alcohol Marketplaces markets by reducing customer choice regarding where to advertise. Suppliers are the primary buyers of advertising on Online Alcohol Marketplaces. Had Defendants not imposed a boycott on Provi—and had Southern not tied Proof to its online spirits and wine distribution—a supplier with an exclusive arrangement with Southern would have the choice of reaching retail customers through multiple advertising sellers, including both Provi and Southern. The suppliers would be able to choose the advertising platform that best-suited its needs, either because the platform offered high value for the rates of conversion, had a large reach, or more effectively targeted particular submarkets or demographics. Whatever reason the supplier chose to advertise, the choice belonged to the supplier.

222.    Provi has also suffered injury as a direct result of Defendants' actions. Defendants' unlawful and anticompetitive boycott of orders communicated through Provi has caused key National Accounts and many other retailers to cease moving forward with planned rollouts. These National Accounts alone represent $1.5 billion Gross Merchandise Value ("GMV"). These delays have flowed through to Provi's bottom line, depriving it of profits it would have earned in competitive markets. As a result of Defendants' boycott, Provi's GMV for December of 2021, for example, had not only declined in absolute terms from where it stood in June 2021, before Defendants' unlawful conduct had fully taken effect, but was also only a fraction of what it was projected to be six months earlier.

223.    Defendants' conduct has also harmed Provi by degrading its products and impeding its growth so that it is reduced to a small-scale, fringe player in the relevant markets. Since Defendants have ceased accepting orders placed through Provi, the growth in revenue that Provi generates from advertising sales has declined. The decline of retailer traffic has also resulted in less robust retailer data, which has degraded Provi's services in the Data Analytics Services markets. These are just some of the ways Defendants' anticompetitive conduct has harmed Provi.

## COUNT I
### (Southern's and RNDC's Group Boycott Under § 1 of the Sherman Act, 15 U.S.C. § 1)

224.    Provi hereby restates and realleges the allegations set forth in paragraphs 1 through 223 above and incorporates them by reference.

225.    As alleged above, beginning at least as early as May 2021, and continuing thereafter, Southern and RNDC entered into and engaged in a conspiracy to block orders for their respective products that retailers communicated through Provi. Executives from Southern and RNDC have a history of interactions, including serving on the same trade association boards, attending the same industry events, and even forming a lobbying entity.

226. Both Southern and RNDC compete against Provi in the relevant markets for Online Alcohol Marketplaces, Advertising on Online Alcohol Marketplaces, and Data Analytics Services.

227. Motivated by a common interest in driving Provi from these markets, Southern and RNDC agreed that they would each stop accepting orders communicated through Provi, which they nearly-simultaneously effectuated by at or about the same times: (1) sending similar communications to retailers and their sales associates informing them that they could no longer communicate orders through Provi; (2) steering retailers away from Provi and toward their own Online Alcohol Marketplaces, Proof and eRNDC; and (3) blocking retailers' ability to communicate orders to Southern or RNDC through Provi. As a result of this conduct, Southern and RNDC sacrificed their short-term interests (i.e. millions of dollars' worth of orders, which Provi had been communicating to Southern and RNDC on a monthly basis prior to this conduct) in pursuit of the long-term benefit of foreclosing Provi from the Online Alcohol Marketplaces, Advertising on Online Alcohol Marketplaces, and Data Analytics Services markets.

228. Southern's and RNDC's agreement constitutes a *per se* unlawful group boycott. Alternatively, even if the agreement between Southern and RNDC is not a *per se* unlawful group boycott, their agreement constitutes an unlawful restraint under the rule of reason.

229. Southern's and RNDC's unlawful group boycott has no procompetitive benefits, and to the extent it did, they would be far outweighed by the substantial anticompetitive harms of that conduct. The reasons stated by Southern and RNDC for the conduct are illegitimate and pretextual, and are intended to mask their true anticompetitive motivations.

230. As a result of their unlawful group boycott, Southern and RNDC have caused actual injury to competition in the form of higher prices, lower output, reduced innovation, and decreased

quality in the Online Alcohol Marketplaces, Advertising on Online Alcohol Marketplaces, and Data Analytics Services markets.

231.    Provi has been, and will continue to be, directly and proximately injured by Southern's and RNDC's unlawful group boycott and the damage it has caused to free and fair competition in the Online Alcohol Marketplaces, Advertising on Online Alcohol Marketplaces, and Data Analytics Services markets. Provi has already seen volume and profits reduced as a result of this illegal conduct.

## COUNT II
### (Southern's Vertical Boycott and RNDC's Vertical Boycott in Violation of § 1 of the Sherman Act, 15 U.S.C. § 1)

232.    Provi hereby restates and realleges the allegations set forth in paragraphs 1 through 231 above and incorporates them by reference.

233.    There are relevant markets for: (1) Online Alcohol Marketplaces, (2) Advertising on Online Alcohol Marketplaces, and (3) Data Analytics Services in each state.

234.    Southern has monopoly power in the relevant markets for Online Alcohol Marketplaces, Advertising on Online Alcohol Marketplaces, and Data Analytics Services in at least Arkansas, California, Florida, Hawaii, Indiana, Kansas, Kentucky, Louisiana, Missouri, Nebraska, Nevada, New Mexico, Ohio, and Washington, by virtue of its distribution rights (typically exclusive to Southern pursuant to long-term contracts) to many of the most popular spirit and wine brands and its shares in excess of 50%. This monopoly power is protected by high barriers to competitive entry and expansion.

235.    RNDC has monopoly power in the relevant markets for Online Alcohol Marketplaces, Advertising on Online Alcohol Marketplaces, and Data Analytic Services in at least the District of Columbia, New Mexico, Oklahoma, and South Dakota by virtue of its distribution rights (typically exclusive to RNDC pursuant to long-term contracts to many of the most popular

spirit and wine brands and its shares in excess of 50%. This monopoly power is protected by high barriers to competitive entry and expansion.

236.    Beginning at least as early as August 2021, Southern and RNDC entered into continuing combinations or conspiracies with their retail customers to unreasonably restrain trade and commerce by refusing to accept orders communicated through Provi. Southern and RNDC devised this conspiracy with the purpose and intent of marginalizing and reducing the viability of Provi as a competitor in the relevant markets for Online Alcohol Marketplaces, Advertising on Online Alcohol Marketplaces, and Data Analytics Services, and to extend or maintain its own dominance in these markets.

237.    Southern and RNDC obtained their retail customers' agreement through coercion. Because Southern and RNDC maintain exclusive distribution agreements with many must-have brands, retailers must deal with Southern and RNDC in order to fulfill the alcohol orders essential to their business. By refusing to accept or acknowledge any orders that retail customers chose to communicate through Provi, Southern and RNDC effectively threatened to withhold—and in fact withheld—their respective distribution services from customers who chose to use Provi to submit orders to Southern and RNDC. Retailers' coerced compliance with this unlawful agreement is not fairly attributable to retailers' preferences.

238.    There is no legitimate procompetitive justification for the agreements between Southern and RNDC and their retail customers. The anticompetitive effects of the agreements outweigh any potential procompetitive effects they may have. Southern's and RNDC's stated reasons for the agreement are illegitimate and pretextual, intended to mask their true anticompetitive motivations.

239.     The result of Southern's and RNDC's conduct has been, and will continue to be, actual injury to competition in the form of higher prices, lower output, reduced innovation, and decreased quality in the relevant markets for Online Alcohol Marketplaces, Advertising on Online Alcohol Marketplaces, and Data Analytics Services.

240.     Provi has been, and will continue to be, directly and proximately injured by Southern's and RNDC's anticompetitive conduct and the damage it has caused to free and fair competition in the Online Alcohol Marketplaces, Advertising on Online Alcohol Marketplaces, and Data Analytics Services markets. Provi has already seen volume and profits reduced as a result of Southern's and RNDC's illegal conduct.

### COUNT III
### (Southern's Unlawful Tying Under § 1 of the Sherman Act, 15 U.S.C. § 1)

241.     Provi hereby restates and realleges the allegations set forth in paragraphs 1 through 240 above and incorporates them by reference.

242.     Southern's Distilled Spirits Distribution and Wine Distribution (each a tying product) is a separate and distinct product from Proof (the tied product), its Online Alcohol Marketplace product.

243.     Southern is coercing its Distilled Spirits Distribution and Wine Distribution customers into adopting Proof for online orders, to the exclusion of other products in the Online Alcohol Marketplace market, by refusing to fill orders communicated through Provi's platform or any other product in the Online Alcohol Marketplace market.

244.     As set forth above, Southern has sufficient market power in the relevant markets for the Distribution of Distilled Spirits and the Distribution of Wine in at least Arkansas, California, Florida, Hawaii, Indiana, Kansas, Kentucky, Louisiana, Missouri, Nebraska, Nevada, New Mexico, Ohio, and Washington to force or coerce its customers into adopting Proof for online

orders to the exclusion of competing products in the relevant market for Online Alcohol Marketplaces, including Provi.

245.    The amount of commerce in the relevant market for Online Alcohol Marketplaces is at least $1 billion annually and not insubstantial.

246.    Southern's tying is *per se* unlawful given the substantial market power it has in the relevant markets for the Distribution of Distilled Spirits and the Distribution of Wine in at least Arkansas, California, Florida, Hawaii, Indiana, Kansas, Kentucky, Louisiana, Missouri, Nebraska, Nevada, New Mexico, Ohio, and Washington, as evidenced by its market shares in excess of 50% and distribution rights (typically exclusive to Southern pursuant to long-term contracts) to many of the most popular spirit and wine brands.

247.    Competition in the relevant market for Online Alcohol Marketplaces has been, and continues to be, appreciably restrained as a consequence of Southern's conduct.

248.    Alternatively, even if Southern's tying is not a *per se* violation, Southern's tying unreasonably restrains competition in the tied market for Online Alcohol Marketplaces and constitutes an unlawful restraint under the rule of reason.

249.    Southern's tying conduct has no procompetitive benefits, and to the extent it did, they would be far outweighed by the substantial anticompetitive harms of that conduct. Southern's stated reasons for the tie are illegitimate and pretextual, intended to mask its true anticompetitive motivations.

250.    Provi has been, and will continue to be, directly and proximately injured by Southern's anticompetitive conduct and the damage it has caused to free and fair competition in the Online Alcohol Marketplaces market. Provi has already seen volume and profits reduced as a result of Southern's illegal conduct.

## COUNT IV
### (Southern's Monopolization in Violation of § 2 of the Sherman Act, 15 U.S.C. § 2)

251.     Provi hereby restates and realleges the allegations set forth in paragraphs 1 through 250 above and incorporates them by reference.

252.     There are relevant markets for: (1) Online Alcohol Marketplaces, (2) Advertising on Online Alcohol Marketplaces, and (3) Data Analytics Services in each state.

253.     Southern has monopoly power in the relevant markets for Online Alcohol Marketplaces, Advertising on Online Alcohol Marketplaces, and Data Analytics Services in at least Arkansas, California, Florida, Hawaii, Indiana, Kansas, Kentucky, Louisiana, Missouri, Nebraska, Nevada, New Mexico, Ohio, and Washington, by virtue of its distribution rights (typically exclusive to Southern pursuant to long-term contracts) to many of the most popular spirit and wine brands and its shares in excess of 50%. This monopoly power is protected by high barriers to competitive entry and expansion.

254.     Before it suddenly changed course in mid-2021, Southern had consistently and voluntarily accepted orders communicated through Provi since it launched in July 2016. These long-term prior dealings between Southern and Provi were mutually beneficial, with Provi recording approximately $145 million worth of revenue for Southern between July 2016 and September 2021.

255.     Southern has engaged in anticompetitive conduct for the purpose of maintaining and enhancing its monopoly power in the relevant markets for Online Alcohol Marketplaces, Advertising on Online Alcohol Marketplaces, and Data Analytics Services in these states. Such anticompetitive conduct includes: (1) forcing retailers onto its own Online Alcohol Marketplace (Proof) despite their independent decision and desire to use those from third parties, including

77

Provi; (2) Southern's efforts to affirmatively block Provi's email domain; and (3) threatening its own sales associates with termination or discipline if they failed to comply.

256.    In the alternative, Southern has a dangerous probability of acquiring a monopoly in the relevant markets for Online Alcohol Marketplaces, Advertising on Online Alcohol Marketplaces, and Data Analytics Services in these states through anticompetitive conduct. Such anticompetitive conduct includes: (1) Southern forcing retailers onto its own Online Alcohol Marketplace (Proof) despite their independent decision and desire to use those from third parties, including Provi; (2) Southern's efforts to affirmatively block Provi's email domain; and (3) threatening its own sales associates with termination or discipline if they failed to comply. Southern has undertaken this conduct with the specific intent of obtaining monopoly power not by competing on the merits, but rather through conduct designed to exclude rivals and protect its business from competition so as to maintain higher prices and profits from selling alcohol, advertisements, and data analytic services than it otherwise could.

257.    Southern's refusal to deal with Provi can only be explained as an attempt to harm its competitors and help it maintain, in the long run, its monopoly in the relevant markets for the Distribution of Distilled Spirits, the Distribution of Wine, Online Alcohol Marketplaces, Advertising on Online Alcohol Marketplaces, and Data Analytics Services. By forsaking (1) profits it could have realized through these potential sales communicated through Provi, and (2) substantial goodwill with numerous customers, including important National Accounts, Southern's conduct was economically irrational in the short run.

258.    Southern's conduct has marginalized and reduced the viability of Provi and other rivals in the relevant markets for Online Alcohol Marketplaces, Advertising on Online Alcohol Marketplaces, and Data Analytics Services. The result of Southern's conduct has been, and will

continue to be, actual injury to competition in the form of higher prices, lower output, reduced innovation, and decreased quality in the relevant markets for Online Alcohol Marketplaces, Advertising on Online Alcohol Marketplaces, and Data Analytics Services.

259.    Southern has no credible business rationale for refusing to deal with Provi. When Southern announced it would stop accepting orders from Provi in mid-2021, the economic relationship between Provi and Southern had never been stronger, with Provi communicating a record $9.9 million worth of revenue to Southern in July 2021.

260.    Southern's conduct has yielded no procompetitive benefits. Any possibility that any procompetitive effects would result from Southern's conduct is nonexistent or remote, and any such effects would be far outweighed by the anticompetitive harms. Southern's stated reasons for its conduct are illegitimate and pretextual, intended to mask its true anticompetitive motivations.

261.    Provi has been, and will continue to be, directly and proximately injured by Southern's anticompetitive conduct and the damage it has caused to free and fair competition in the Online Alcohol Marketplaces, Advertising on Online Alcohol Marketplaces, and Data Analytics Services markets. Provi has already seen volume and profits reduced as a result of Southern's illegal conduct.

## COUNT V
### (RNDC's Monopolization in Violation of § 2 of the Sherman Act, 15 U.S.C. § 2)

262.    Provi hereby restates and realleges the allegations set forth in paragraphs 1 through 261 above and incorporates them by reference.

263.    There are relevant markets for: (1) Online Alcohol Marketplaces, (2) Advertising on Online Alcohol Marketplaces, and (3) Data Analytics Services in each state.

264.    RNDC has monopoly power in the relevant markets for Online Alcohol Marketplaces, Advertising on Online Alcohol Marketplaces, and Data Analytics Services in at

least the District of Columbia, New Mexico, Oklahoma, and South Dakota by virtue of its distribution rights (typically exclusive to RNDC pursuant to long-term contracts) to many of the most popular spirit and wine brands, and its shares in excess of 50%. This monopoly power is protected by high barriers to competitive entry and expansion.

265. RNDC has engaged in anticompetitive conduct for the purpose of maintaining and enhancing its monopoly power in the relevant markets for Online Alcohol Marketplaces, Advertising on Online Alcohol Marketplaces, and Data Analytics Services in these states. Such anticompetitive conduct includes: (1) RNDC forcing retailers onto its own Online Alcohol Marketplace (eRNDC) despite their independent decision and desire to use those from third parties, including Provi; (2) RNDC's efforts to affirmatively block Provi's email domain; and (3) threatening its own sales associates if they failed to comply.

266. In the alternative, RNDC has a dangerous probability of acquiring a monopoly in the relevant markets for Online Alcohol Marketplaces, Advertising on Online Alcohol Marketplaces, and Data Analytics Services in these states through anticompetitive conduct. Such anticompetitive conduct includes: (1) RNDC forcing retailers onto its own Online Alcohol Marketplace (eRNDC) despite their independent decision and desire to use those from third parties, including Provi; (2) RNDC's efforts to affirmatively block Provi's email domain; and (3) threatening its own sales associates with termination or discipline if they failed to comply. RNDC has undertaken this conduct with the specific intent of obtaining monopoly power not by competing on the merits, but rather through conduct designed to exclude rivals and protect its business from competition so as to maintain higher prices and profits from selling alcohol, advertisements, and data analytic services than it otherwise could.

267.     Before it suddenly changed course in mid-2021, RNDC had consistently and voluntarily accepted orders communicated through Provi since at least 2018. These long-term, prior dealings between RNDC and Provi were mutually beneficial, with Provi recording approximately $45 million worth of revenue for RNDC between 2018 and mid-2021.

268.     RNDC's refusal to deal with Provi can only be explained as an attempt to harm its competitors and help it maintain, in the long run, its monopoly in the relevant markets for the Distribution of Distilled Spirits, the Distribution of Wine, Online Alcohol Marketplaces, Advertising on Online Alcohol Marketplaces, and Data Analytics Services. By forsaking (1) profits it could have realized through these potential sales communicated through Provi, and (2) substantial goodwill with numerous customers, including important National Accounts, RNDC's conduct was economically irrational in the short run.

269.     RNDC has no credible business rationale for refusing to deal with Provi. Claims that Provi provides retailers with inaccurate pricing are false, as Provi's platform does not publish RNDC pricing information. RNDC's General Counsel admitted that RNDC's refusal to deal with Provi is motivated by a desire to "steer our customers towards [eRNDC, and] away from Provi." RNDC's assertion that valid business justifications motivate its conduct is not rooted in fact and is a mere pretext for its refusal to deal with Provi.

270.     RNDC's conduct has marginalized and reduced the viability of Provi and other rivals in the relevant markets for Online Alcohol Marketplaces, Advertising on Online Alcohol Marketplaces, and Data Analytics Services. The result of RNDC's conduct has been, and will continue to be, actual injury to competition in the form of higher prices, lower output, reduced innovation, and decreased quality in the relevant markets for Online Alcohol Marketplaces, Advertising on Online Alcohol Marketplaces, and Data Analytics Services.

271.     RNDC's conduct has yielded no procompetitive benefits. Any possibility that any procompetitive effects would result from RNDC's conduct is nonexistent or remote, and any such effects would be far outweighed by the anticompetitive harms. RNDC's stated reasons for its conduct are illegitimate and pretextual, intended to mask its true anticompetitive motivations.

272.     Provi has been, and will continue to be, directly and proximately injured by RNDC's anticompetitive conduct and the damage it has caused to free and fair competition in the Online Alcohol Marketplaces, Advertising on Online Alcohol Marketplaces, and Data Analytics Services markets. Provi has already seen volume and profits reduced as a result of RNDC's illegal conduct.

## COUNT VI
## (Southern's and RNDC's Group Boycott Under the Illinois Antitrust Act, 740 ILCS 10/3)

273.     Provi hereby restates and realleges the allegations set forth in paragraphs 1 through 272 above and incorporates them by reference.

274.     As alleged above, beginning at least as early as May 2021, and continuing thereafter, Southern and RNDC entered into and engaged in a conspiracy to block orders for their respective products that retailers communicated through Provi. Executives from Southern and RNDC have a history of interactions, including serving on the same trade association boards, attending the same industry events, and even forming a lobbying entity.

275.     Both Southern and RNDC compete against Provi in the relevant markets for Online Alcohol Marketplaces, Advertising on Online Alcohol Marketplaces, and Data Analytics Services.

276.     Motivated by a common interest in driving Provi from these markets, Southern and RNDC agreed that they would each stop accepting orders communicated through Provi, which they nearly-simultaneously effectuated by at or about the same times: (1) sending similar communications to retailers and their sales associates informing them that they could no longer

communicate orders through Provi; (2) steering retailers away from Provi and toward their own Online Alcohol Marketplaces, Proof and eRNDC; and (3) blocking retailers' ability to communicate orders to Southern or RNDC through Provi. As a result of this conduct, Southern and RNDC sacrificed their short-term interests (*i.e.* millions of dollars' worth of orders, which Provi had been communicating to Southern and RNDC on a monthly basis prior to this conduct) in pursuit of the long-term benefit of foreclosing Provi from the Online Alcohol Marketplaces, Advertising on Online Alcohol Marketplaces, and Data Analytics Services markets.

277.    Southern's and RNDC's agreement constitutes a *per se* unlawful group boycott. Alternatively, even if the agreement between Southern and RNDC is not a *per se* unlawful group boycott, their agreement constitutes an unlawful restraint under the rule of reason.

278.    Southern's and RNDC's unlawful group boycott has no procompetitive benefits, and to the extent it did, they would be far outweighed by the substantial anticompetitive harms of that conduct. The reasons stated by Southern and RNDC for the conduct are illegitimate and pretextual, and are intended to mask their true anticompetitive motivations.

279.    As a result of their unlawful group boycott, Southern and RNDC have caused actual injury to competition in Illinois in the form of higher prices, lower output, reduced innovation, and decreased quality in the Online Alcohol Marketplaces, Advertising on Online Alcohol Marketplaces, and Data Analytics Services markets.

280.    Provi has been, and will continue to be, directly and proximately injured in Illinois by Southern's and RNDC's unlawful group boycott and the damage it has caused to free and fair competition in the Online Alcohol Marketplaces, Advertising on Online Alcohol Marketplaces, and Data Analytics Services markets. Provi has already seen volume and profits reduced as a result of this illegal conduct.

## COUNT VII
### (Southern's Unfair Business Practices Under the California Unfair Competition Law, Cal. Bus. & Prof. Code §§ 17200 to 17210)

281. Provi hereby restates and realleges the allegations set forth in paragraphs 1 through 280 above and incorporates them by reference.

282. Southern committed business acts or practices as alleged above that violated section 17200 and in so doing directly and proximately caused Provi to suffer injury and loss of money or property. Southern's boycott has injured Provi by blocking all orders by California-based retailers who would otherwise choose to communicate their order through Provi. Absent injunctive relief, Provi will suffer loss of money or property and an economic injury in fact, specifically reduced order volume and profits, and substantial and unnecessary litigation expenses, and thus has standing to seek relief under Section 17200.

283. Southern's conduct violates the policy and spirit of the nation's antitrust laws by significantly harming competition in the relevant markets for Online Alcohol Marketplaces, Advertising on Online Alcohol Marketplaces, and Data Analytics Services. Southern's conduct has marginalized and reduced the viability of Provi and other rivals in these relevant markets, resulting in actual injury to competition in the form of higher prices, lower output, reduced innovation, and decreased quality. Southern's conduct is thus "unfair" within the meaning of Section 17200.

284. Southern's conduct violates the Sherman Act, the Illinois Antitrust Act, and the common law of intentional interference with business relationships, and thus constitutes unlawful conduct under Section 17200.

285. Provi seeks injunctive relief under Section 17200. Unless Southern is restrained by a preliminary and permanent injunction, Provi will suffer severe, irreparable harm.

**COUNT VIII**
**(RNDC's Unfair Business Practices Under the California Unfair Competition Law, Cal.**
**Bus. & Prof. Code §§ 17200 to 17210)**

286.     Provi hereby restates and realleges the allegations set forth in paragraphs 1 through 285 above and incorporates them by reference.

287.     RNDC committed business acts or practices as alleged above that violated Section 17200 and in so doing directly and proximately caused Provi to suffer injury and loss of money or property. RNDC's boycott has injured Provi by blocking all orders by California-based retailers who would otherwise choose to communicate their order through Provi.

288.     Absent injunctive relief, Provi will suffer loss of money or property and an economic injury in fact, specifically reduced order volume and profits, and substantial and unnecessary litigation expenses, and thus has standing to seek relief under Section 17200.

289.     RNDC's conduct violates the policy and spirit of the nation's antitrust laws by significantly harming competition in the relevant markets for Online Alcohol Marketplaces, Advertising on Online Alcohol Marketplaces, and Data Analytics Services. RNDC's conduct has marginalized and reduced the viability of Provi and other rivals in these relevant markets, resulting in actual injury to competition in the form of higher prices, lower output, reduced innovation, and decreased quality. RNDC's conduct is thus "unfair" within the meaning of Section 17200.

290.     RNDC's conduct violates the Sherman Act, the Illinois Antitrust Act, and the common law of intentional interference with business relationships, and thus constitutes unlawful conduct under Section 17200.

291.     Provi seeks injunctive relief under Section 17200. Unless RNDC is restrained by a preliminary and permanent injunction, Provi will suffer severe, irreparable harm.

## COUNT IX
## (Southern's Tortious Interference with Provi's Business Relationships in Violation of Illinois Common Law)

292.    Provi hereby restates and realleges the allegations set forth in paragraphs 1 through 291 above and incorporates them by reference.

293.    Provi as a business has a reasonable expectation of entering into valid business relationships including being able to freely enter into business contracts.

294.    Southern was aware that Provi was entering business relations with various retailers, and particularly with National Accounts. Southern was also aware that many of its retailer customers used Provi to communicate their wholesale orders.

295.    Southern has purposefully interfered with Provi's expectation of being able to enter into, or continue, these business relationships. Southern intentionally and without justification induced retailers to breach their agreements with Provi.

296.    Provi has suffered damages as a direct result of Southern's tortious conduct.

## COUNT X
## (RNDC's Tortious Interference with Provi's Business Relationships in Violation of Illinois Common Law)

297.    Provi hereby restates and realleges the allegations set forth in paragraphs 1 through 296 above and incorporates them by reference.

298.    Provi as a business has a reasonable expectation of entering into valid business relationships including being able to freely enter into business contracts.

299.    RNDC was aware that Provi was entering business relations with various retailers, and particularly with National Accounts. RNDC was also aware that many of its retailer customers used Provi to communicate their wholesale orders.

300.    RNDC has purposefully interfered with Provi's expectation of being able to enter into, or continue, these business relationships. RNDC intentionally and without justification induced retailers to breach their agreement with Provi.

301.    Provi has suffered damages as a direct result of RNDC's tortious conduct.

## REQUEST FOR RELIEF

WHEREFORE, Provi respectfully requests the following relief:

A.    Entry of judgment that the unlawful actions alleged here be adjudged by the Court to be:

   a.  Violations of the Sherman Antitrust Act, 15 U.S.C. §§ 1 and 2; and

   b.  Violations of the Illinois Antitrust Act, 740 ILCS 10/3; and

   c.  Violations of California's Unfair Competition Law, Cal. Bus. & Prof. Code §§ 17200 to 17210; and

   d.  Violations of common law torts.

B.    An order awarding treble damages, along with attorneys' fees and costs, plus pre-judgment and post-judgment interest, for Defendants' violation of the antitrust laws.

C.    An order enjoining Defendants from continuing their unlawful conduct.

D.    Any and all other legal and equitable relief as may be available under law and which the Court may deem proper.

Dated: March 29, 2022  Respectfully submitted,

/s/ *Andrea C. Halverson (as local counsel)*

David D. Cross (*pro hac vice* application pending)
Alexander Okuliar (*pro hac vice* application pending)
Mary G. Kaiser (*pro hac vice* application pending)
MORRISON & FOERSTER LLP
2100 L Street, NW
Suite 900
Washington, DC 20006
Telephone: (202) 887-1500
DCross@mofo.com
AOkuliar@mofo.com
MKaiser@mofo.com

Andrea C. Halverson (Local Counsel)
Jeffrey M. Hansen (Local Counsel)
ACTUATE LAW, LLC
641 W. Lake Street, 5th Floor
Chicago, Illinois 60661
Telephone: (312) 579-3108
Fax: (312) 579-3131
andrea.halverson@actuatelaw.com
jeff.hansen@actuatelaw.com

*Counsel for Plaintiff Tiz, Inc.*