**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| Tiz, Inc. d/b/a Provi, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No.  1:22-cv-1648 |
| | ) | |
| Southern Glazer's Wine and Spirits, LLC and | ) | Hon. Manish S. Shah |
| Republic National Distributing Company, LLC, | ) | |
| | ) | |
| Defendants. | ) | |

**DEFENDANTS' MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM
UNDER FEDERAL RULE OF CIVIL PROCEDURE 12(b)(6)**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................ ii

INTRODUCTION ............................................................................................................... 1

BACKGROUND ................................................................................................................. 4

LEGAL STANDARD ......................................................................................................... 5

ARGUMENT ...................................................................................................................... 5

I.      Provi Fails To Allege Antitrust Standing............................................................... 5

II.     Provi Fails To Allege A Plausible Monopolization Claim .................................... 9

     A.     Provi Fails to Allege that Defendants Have Monopoly Power in Any Market .... 10

     B.     Provi Fails to Allege that Defendants Engaged in any Exclusionary Conduct..... 14

III.    Provi Fails To Allege A Plausible Conspiracy .................................................... 17

     A.     Provi's Horizontal Conspiracy Allegations are Insufficient as a Matter of Law.. 17

     B.     Provi's Vertical Conspiracy Allegations Fail as a Matter of Law ........................ 21

     C.     Provi's Derivative State-Law Claim Likewise Fails as a Matter of Law ............ 22

IV.    Provi Fails To Allege Any Plausible Unlawful Tying Arrangement Against SGWS ...... 22

V.     Finally, Provi's Remaining State-Law Claims Fail ........................................... 25

CONCLUSION................................................................................................................... 25

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

**Cases**

*A-Abart Elec. Supply, Inc.*
  *v. Emerson Elec. Co.*,
  956 F.2d 1399 (7th Cir. 1992) ........................................................... 25

*Agnew v. NCAA*,
  683 F.3d 328 (7th Cir. 2012) ............................................................ 10

*Alarm Detection Sys., Inc.*
  *v. Village of Schaumburg*,
  930 F.3d 812 (7th Cir. 2019) ............................................................ 19

*American Acad. Suppliers, Inc.*
  *v. Beckley-Cardy, Inc.*,
  922 F.2d 1317 (7th Cir. 1991) ............................................................ 9

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009) ......................................................................... 5

*Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*,
  472 U.S. 585 (1985) ..................................................................... 3, 14

*Associated Gen. Contractors of Cal., Inc.*
  *v. California State Council of Carpenters*,
  459 U.S. 519 (1983) ...................................................................... 8, 9

*Atlantic Richfield Co. v. USA Petroleum Co.*,
  495 U.S. 328 (1990) ......................................................................... 5

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007) ................................................................. *passim*

*Brown Shoe Co. v. United States*,
  370 U.S. 294 (1962) ......................................................................... 6

*Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*,
  429 U.S. 477 (1977) ...................................................................... 6, 7

*Car Carriers, Inc. v. Ford Motor Co.*,
  745 F.2d 1101 (7th Cir. 1984) .......................................................... 6, 8

*Cargill, Inc. v. Monfort of Colo., Inc.*,
  479 U.S. 104 (1986) ...................................................................... 6, 9

*Chicago Studio Rental, Inc.*
  *v. Illinois Dep't of Com.*,
  940 F.3d 971 (7th Cir. 2019) ......................................................... 5, 17

*Collins v. Associated Pathologists, Ltd.*,
  844 F.2d 473 (7th Cir. 1988) ........................................................... 22

*Copperweld Corp. v. Independence Tube Corp.*,
  467 U.S. 752 (1984) ........................................................................ 17

*Eastern States Retail Lumber Dealers' Ass'n*
  *v. United States*,
  234 U.S. 600 (1914) ............................................................................ 20

*Eastman Kodak Co. v. Image Tech. Servs., Inc.*,
  504 U.S. 451 (1992) ...................................................................... 10, 23

*Fashion Originators' Guild of Am. v. FTC*,
  312 U.S. 457 (1941) ............................................................................ 20

*Force Partners, LLC*
  *v. KSA Lighting & Controls, Inc.*,
  2022 WL 580808 (N.D. Ill. Feb. 25, 2022) ...................................... 22

*Fortner Enters., Inc. v. U.S. Steel Corp.*,
  394 U.S. 495 (1969) ............................................................................ 23

*Four Corners Nephrology Assocs., P.C.*
  *v. Mercy Med. Ctr.*,
  582 F.3d 1216 (10th Cir. 2009) ........................................................... 8

*FTC v. Advocate Health Care Network*,
  841 F.3d 460 (7th Cir. 2016) ............................................................. 11

*Generac Corp. v. Caterpillar Inc.*,
  172 F.3d 971 (7th Cir. 1999) ............................................................. 24

*Genetic Sys. Corp. v. Abbott Lab'ys*,
  691 F.Supp. 407 (D.D.C. 1988) ........................................................ 21

*Geneva Pharms. Tech. Corp. v. Barr Lab'ys., Inc.*,
  386 F.3d 485 (2d Cir. 2004) .............................................................. 11

*Goldwasser v. Ameritech Corp.*,
  222 F.3d 390 (7th Cir. 2000) ......................................................... 2, 23

*Granholm v. Heald*,
  544 U.S. 460 (2005) ........................................................................... 13

*H.L. Hayden Co. of N.Y., Inc. v. Siemens Med. Sys., Inc.*,
  879 F.2d 1005 (2d Cir. 1989) ............................................................ 10

*Hartford Fire Ins. Co. v. California*,
  509 U.S. 764 (1993) ........................................................................... 20

*Hicks v. PGA Tour, Inc.*,
  897 F.3d 1109 (9th Cir. 2018) ........................................................... 12

*Hilton v. Apple Inc.*,
  2014 WL 10435005 (C.D. Cal. Apr. 18, 2014) ................................. 25

*Illinois ex rel. Burris*
  *v. Panhandle E. Pipe Line Co.*,
  935 F.2d 1469 (7th Cir. 1991) ........................................................... 10

*Illinois Tool Works Inc. v. Independent Ink, Inc.*,
   547 U.S. 28 (2006) .................................................................................. 23

*In re Humira (Adalimumab) Antitrust Litig.*,
   465 F.Supp.3d 811 (N.D. Ill. 2020) ....................................................... 5

*In re Musical Instruments & Equip. Antitrust Litig.*,
   798 F.3d 1186 (9th Cir. 2015) .............................................................. 19

*In re Text Messaging Antitrust Litig.*,
   782 F.3d 867 (7th Cir. 2015) ................................................................ 18

*Isaksen v. Vermont Castings, Inc.*,
   825 F.2d 1158 (7th Cir. 1987) .............................................................. 22

*Jack Walters & Sons Corp. v. Morton Bldg. Inc.*,
   737 F.2d 698 (7th Cir. 1984) ................................................................ 16

*Jamsports & Ent., LLC*
   *v. Paradama Prods., Inc.*,
   382 F.Supp.2d 1056 (N.D. Ill. 2005) .................................................... 25

*Kleen Prods. LLC v. Georgia-Pac. LLC*,
   910 F.3d 927 (7th Cir. 2018) ..................................................... 18, 19, 20

*Kleen Prods. LLC v. Int'l Paper*,
   276 F.Supp.3d 811 (N.D. Ill. 2017) ..................................................... 18

*LiveUniverse, Inc. v. MySpace, Inc.*,
   304 F.App'x 554 (9th Cir. 2008) .......................................................... 25

*M.A.P. Oil Co. v. Texaco, Inc.*,
   691 F.2d 1303 (9th Cir. 1982) .............................................................. 11

*Marion Diagnostic Ctr., LLC*
   *v. Becton Dickinson & Co.*,
   29 F.4th 337 (7th Cir. 2022) ............................................................ 5, 18

*MCI Commc'ns Corp. v. AT&T Co.*,
   708 F.2d 1081 (7th Cir. 1983) .............................................................. 10

*Mercatus Grp., LLC v. Lake Forest Hosp.*,
   641 F.3d 834 (7th Cir. 2011) ............................................................ 9, 10

*Midwest Gas Servs., Inc. v. Indiana Gas Co.*,
   317 F.3d 703 (7th Cir. 2003) ................................................................. 6

*Monsanto Co. v. Spray-Rite Serv. Corp.*,
   465 U.S. 752 (1984) .......................................................................... 17, 21

*Moore v. Boating Indus. Ass'ns*,
   819 F.2d 693 (7th Cir. 1987) ................................................................ 18

*Nat'l Funding, Inc.*
   *v. Com. Credit Counseling Servs., Inc.*,
   817 F.App'x 380 (9th Cir. 2020) .......................................................... 25

iv

*Novell, Inc. v. Microsoft Corp.*,
731 F.3d 1064 (10th Cir. 2013) ........................................................ 16

*Pacific Bell Tel. Co. v. Linkline Commc'ns, Inc.*,
555 U.S. 438 (2009) ........................................................................ 14

*PepsiCo, Inc. v. Coca-Cola Co.*,
114 F.Supp.2d 243 (S.D.N.Y. 2000) ................................................ 11

*PepsiCo, Inc. v. Coca-Cola Co.*,
315 F.3d 101 (2d Cir. 2002) ............................................................ 11

*Person v. Google, Inc.*,
2007 WL 1831111 (N.D. Cal. June 25, 2007) .................................. 12

*Person v. Google, Inc.*,
346 F.App'x 230 (9th Cir. 2009) ...................................................... 12

*Port Dock & Stone Corp. v. Oldcastle Ne., Inc.*,
507 F.3d 117 (2d Cir. 2007) ............................................................ 15

*Pulse Network, LLC v. Visa, Inc.*,
30 F.4th 480 (5th Cir. 2022) ...................................................... 6, 7, 9

*Reapers Hockey Ass'n, Inc.*
*v. Amateur Hockey Ass'n Illinois, Inc.*,
412 F.Supp.3d 941 (N.D. Ill. 2019) ............................................ 14, 19

*Reifert v. S. Cent. Wisc. MLS Corp.*,
450 F.3d 312 (7th Cir. 2006) ............................................................ 24

*Reserve Supply Corp.*
*v. Owens-Corning Fiberglas Corp.*,
971 F.2d 37 (7th Cir. 1992) .............................................................. 19

*Schor v. Abbott Lab'ys*,
457 F.3d 608 (7th Cir. 2006) .............................................................. 2

*Shak v. JPMorgan Chase & Co.*,
156 F.Supp.3d 462 (S.D.N.Y. 2016) ................................................ 10

*Sharif Pharmacy, Inc. v. Prime Therapeutics, LLC*,
950 F.3d 911 (7th Cir. 2020) ...................................................... 10, 13

*Sheridan v. Marathon Petroleum Co. LLC*,
530 F.3d 590 (7th Cir. 2008) ...................................................... 10, 23

*Theater Enters., Inc.*
*v. Paramount Film Distrib. Corp.*,
346 U.S. 537 (1954) ........................................................................ 17

*United States Bd. of Oral Implantology*
*v. American Bd. of Dental Specialties*,
390 F.Supp.3d 892 (N.D. Ill. 2019) ................................................ 18

*United States v. Colgate & Co.*,
    250 U.S. 300 (1919) ............................................................................ 14

*United States v. E. I. du Pont de Nemours & Co.*,
    351 U.S. 377 (1956) ............................................................................ 13

*VBR Tours v. Nat'l R.R. Passenger Corp*,
    2015 WL 5693735 (N.D. Ill Sept. 28, 2015) ...................................... 22

*Verizon Commc'ns Inc.*
    *v. Law Offs. of Curtis V. Trinko, LLP*,
    540 U.S. 398 (2004) .......................................................... 2, 9, 14, 16

*Viamedia, Inc. v. Comcast Corp.*,
    951 F.3d 429 (7th Cir. 2020) .............................................................. 14

*Webb v. Frawley*,
    906 F.3d 569 (7th Cir. 2018) .............................................................. 25

**Statutes**

740 ILCS 10/11 .......................................................................................... 22

Ark. Code §3-4-605 ................................................................................... 17

Minn. Stat. §340A.307 .............................................................................. 17

## INTRODUCTION

In 2016, Plaintiff Tiz, Inc. ("Provi") launched "a new online marketplace for alcohol products" "where retailers can search for products across distributors, fill their shopping carts with products, and then click a button for Provi to communicate the order to all relevant parties for fulfillment." Compl. ¶¶1, 8. Provi aims to provide one-stop alcohol shopping for bars, restaurants, hotels and other retailers. The idea is simple, but Provi's plan is missing one critical element: Provi does not sell alcohol. Provi does not hold, and has not sought to hold, any inventory of alcohol. Nor can it. Since Prohibition ended, alcohol has been produced, distributed, and sold to consumers through a three-tier system, under which, with limited exceptions not relevant here, producers can only sell to distributors, distributors can only sell to retailers, and only retailers can sell to the public. But Provi is not a producer, distributor, or retailer; it is an online matchmaker for buyers and sellers of alcohol. *Id.* ¶26. Provi offers to put retailers that want to order certain brands of alcohol in touch with the distributors licensed to sell those products and then communicates the retailers' orders to the distributor(s) to be fulfilled. *Id.* ¶8.

So how does Provi make money? It claims it does so by "sell[ing]" ads on its platform and using the data it obtains from retailers' transactions with distributors to provide marketing insights to industry players. *Id.* ¶26. Because Provi does not sell its matchmaking services to retailers (or distributors, at least for now), Provi's business only works if major distributors agree to fulfill orders placed on its platform. Provi thus needs distributors—but distributors do not need Provi.

Still, Provi has been quite successful so far in securing a high transaction volume (and the traffic and data that come with it), with twelve of the fourteen largest alcohol distributors "sign[ing] agreements to integrate their inventory and fulfillment systems with Provi." *Id.* ¶95. The two that have not agreed to "integrate" with Provi—Southern Glazer's Wine and Spirits, LLC ("SGWS"), "the nation's largest distributor of wine and distilled spirits," *id.* ¶28, and Republic National Distributing Company, LLC ("RNDC"), "the second largest distributor," *id.* ¶32—are the two defendants in this case. Although SGWS and RNDC both accepted orders placed through Provi for a time (when neither defendant had an online ordering platform of its own), each ultimately

developed its own platform, and each announced in 2021 that it would no longer accept orders placed through Provi. *Id.* ¶¶11-12. Unable to have its way in the marketplace, Provi has now challenged defendants' decisions not to accept Provi orders under antitrust and various state laws.

Just restating what Provi complains about and seeks to accomplish in this litigation illustrates the basic problem with its claims. Provi's objection is that SGWS and RNDC chose to develop their own online ordering platforms and then declined to fill orders placed through Provi's. Its grievance, in other words, is that defendants have decided not to cooperate with it. But "[c]ooperation is a ***problem*** in antitrust, not one of its obligations." *Schor v. Abbott Lab'ys*, 457 F.3d 608, 610 (7th Cir. 2006). The antitrust laws "do[] not restrict the long recognized right of [a] trader … freely to exercise his own independent discretion as to parties with whom he will deal," except in narrow circumstances not present here. *Verizon Commc'ns Inc. v. Law Offs. of Curtis V. Trinko, LLP*, 540 U.S. 398, 408 (2004). Indeed, even monopolists are "entitled to compete"— and "[p]art of competing like everyone else is the ability to make decisions about with whom and on what terms one will deal." *Goldwasser v. Ameritech Corp.*, 222 F.3d 390, 397 (7th Cir. 2000).

Antitrust does not protect companies from competitors; it protects markets from conduct that undermines competition. And while Provi says that SGWS's and RNDC's decisions not to cooperate with it have led to "higher prices, lower output, reduced innovation, and decreased quality," Compl. ¶¶230, 239, 258, 270, 279, 283, 289, it alleges no facts to support its conclusory allegations. That makes sense, since the opposite is true. If Provi wins and secures a court-ordered marriage forcing SGWS and RNDC to fulfill orders placed through Provi, those metrics will all move in the wrong direction. If Provi has access to and control over data from defendants' online sales as well as the transactions of the other distributors, Provi will be able to charge more for data. And if more retailers order through Provi because SGWS- and RNDC-distributed products are available, Provi will be able to charge more for ads as a result of the increased traffic. If Provi wins, in other words, the prices in the markets it proposes—"Data Analytics Services for distilled wine and spirits" and "Advertising on Online Alcohol Marketplaces"—***will go up***, not down.

It should therefore come as no surprise that Provi's claims fail as a matter of law. As a threshold matter, Provi's alleged lost "volume and profits" stemming from its inability to force SGWS and RNDC to deal with it, *id.* ¶¶231, 240, 250, 261, 272, 280, 282, are the opposite of antitrust injury, and Provi's conclusory allegations of actual harm to competition only confirm that Provi is not a proper plaintiff to challenge the conduct about which it complains.

Things get no better for Provi from there. To support its claims that defendants have unlawfully monopolized the supposed markets for "Online Alcohol Marketplaces," "Advertising on Online Alcohol Marketplaces," and "Data Analytics Services for distilled wine and spirits," Provi alleges that, after fulfilling orders placed through Provi for a time, defendants now "refus[e] to deal with Provi." *Id.* ¶¶251-72. But not even monopolists—which SGWS and RNDC are not— are "under a duty to cooperate" with other businesses. *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585, 597 (1985). And while Provi tries to fit its claim into the narrow exception to that rule, it comes nowhere close to alleging facts plausibly establishing that defendants are forgoing short-term profits to harm competition; in fact, the Complaint is self-defeating, openly admitting that SGWS and RNDC are capturing the profits Provi might have otherwise enjoyed.

Provi's conspiracy claims fare no better. While Provi litters its Complaint with references to the supposed closeness between defendants and harps on the fact that SGWS and RNDC each stopped fulfilling orders placed on Provi in the summer of 2021, neither the opportunity to collude nor parallel conduct plausibly states an unlawful conspiracy. A plaintiff must instead allege facts that tend to exclude the possibility of independent action and which, if believed, would support a finding of concerted action. Provi offers none. What is more, Provi does not allege that SGWS or RNDC has ever declined to buy or sell any good or service to Provi; all Provi claims is that SGWS and RNDC decided that online orders for the brands they distribute must be placed on their own respective platform. That is not unlawful. If it were, an intrepid tech firm could launch a new website, call it "The One-Stop Shop for Desirable Products" (or "Amazon"), list every product with a big consumer base for sale on its website, and force the manufacturers and distributors of

all those successful products to fulfill the orders—and then siphon for itself second-order profits through advertising and data analytics. Nothing in law or logic supports that result.

In sum, SGWS's and RNDC's decisions not to accept orders placed through Provi are not unlawful under any theory; Provi's displeasure at their alleged effect is the opposite of antitrust injury; and Provi's conclusory allegations do not come close to establishing plausible violations of the antitrust laws in any case. Provi's Complaint fails to state a claim and should be dismissed.

## BACKGROUND

Defendants are "the nation's [two] largest distributor[s] of wine and distilled spirits." Compl. ¶¶28, 32. Provi is not a distributor of wine or spirits; nor does it produce or sell alcohol at any level. Provi is a tech company that "offers an online alcohol marketplace" and makes money by "sell[ing]" advertising space on its platform and using the transaction data it obtains to sell marketing insights to other companies operating in the wine and spirits industry. *Id.* ¶26.

Defendants had no comparable online platforms when Provi launched in 2016, *see id.* ¶87, so both initially fulfilled orders placed through Provi, although neither "integrate[d] their systems with Provi," *id.* ¶97. Ultimately, though, each defendant created its own respective online marketplace (SGWS launched Proof; RNDC launched eRNDC) to sell the products each defendant distributes and to gather the information and revenue that comes with each transaction. *Id.* ¶¶11-12, 97. In 2021, both defendants announced that they would no longer fulfill orders placed through third-party platforms like Provi. *Id.* ¶¶114-120; *see also id.* ¶¶131, 137, 141, 143 (noting that RNDC began to disengage from Provi and stop fulfilling Provi orders "beginning in 2020").

Motivated by this competitive threat and spurned by defendants' decision not to respond to Provi's emails, Provi turned to litigation. Provi claims that defendants "boycotted" Provi, in violation of federal (Counts I and II) and Illinois (Count VI) antitrust law; monopolized the supposed "markets for Online Alcohol Marketplaces, Advertising on Online Alcohol Marketplaces, and Data Analytics Services" in more than a dozen states, in violation of §2 of the Sherman Act (Counts IV and V); and tortiously interfered with Provi's business relationships, in violation of Illinois common law (Counts IX and X). Provi also alleges that SGWS "tied" its

4

distribution services to Proof, in violation of §1 of the Sherman Act (Count III). Provi further claims that all of that violated California's unfair competition law (Counts VII and VIII). Provi seeks an injunction forcing defendants to cooperate with it and fulfill orders placed on its platform rather than compete with it, as well as treble damages, attorneys' fees, and various other relief.

## LEGAL STANDARD

A complaint must "state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 547 (2007). To clear that bar, plaintiffs "must provide more than labels and formulaic recitations of the elements of the cause of action." *In re Humira (Adalimumab) Antitrust Litig.*, 465 F.Supp.3d 811, 819 (N.D. Ill. 2020) (quoting *Twombly*, 550 U.S. at 555). And "[i]f a complaint pleads facts that are 'merely consistent with' liability, it 'stops short of the line between possibility and plausibility of entitlement to relief'" and fails to state a claim. *Id.* (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).

"In addition to satisfying" the elements of each claim alleged, antitrust plaintiffs "must show that they have suffered an antitrust injury and that they are the proper parties to bring suit." *Marion Diagnostic Ctr., LLC v. Becton Dickinson & Co.*, 29 F.4th 337, 347 (7th Cir. 2022). "To state an antitrust injury, a plaintiff must allege an anticompetitive injury that flows from defendant's actions and that the antitrust laws were intended to prevent," *i.e.*, "reduc[ing] output or rais[ing] prices to consumers." *Chicago Studio Rental, Inc. v. Illinois Dep't of Com.*, 940 F.3d 971, 978 (7th Cir. 2019). This ensures that plaintiffs cannot recover for lost profits or market share unless "the loss stems from a competition-***reducing*** aspect or effect of the defendant's behavior." *Atlantic Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 344 (1990).

## ARGUMENT

## I. Provi Fails To Allege Antitrust Standing.

Provi's claims fail at the threshold. A private plaintiff like Provi seeking damages and injunctive relief under Sections 4 and 16 of the Clayton Act, *see* Compl. ¶19, must establish antitrust injury—"injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful." *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429

U.S. 477, 489 (1977). Provi's claim is essentially that it would be able to charge higher prices and make more money if all distributors were forced to fulfill orders for their products placed on Provi's online marketplace. But that is less competition, not more, and contrary to the fundamental antitrust principle that the antitrust laws were designed to protect competition, not competitors. *See Brown Shoe Co. v. United States*, 370 U.S. 294, 344 (1962).

The clear impetus for this lawsuit is Provi's allegation that its "volume and profits" have been "reduced" as a result of each defendant's respective decision to stop fulfilling orders placed through Provi for products that distributor sells. Compl. ¶¶231, 240, 250, 261, 272, 280, 282. But "failure to realize expected profits due to competition is not an antitrust injury." *Midwest Gas Servs., Inc. v. Indiana Gas Co.*, 317 F.3d 703, 713 (7th Cir. 2003); *see Car Carriers, Inc. v. Ford Motor Co.*, 745 F.2d 1101, 1108 (7th Cir. 1984) ("The losers [in a market] must prove more than just their loss in order to secure relief under the antitrust laws." (alteration in original)). Indeed, "[l]oss from competition itself … does not constitute antitrust injury[] even if the defendant is violating antitrust laws." *Pulse Network, LLC v. Visa, Inc.*, 30 F.4th 480, 489 (5th Cir. 2022).

This well-settled principle that "antitrust law wasn't made to help a smaller firm expand where competition limits its ability to do so on its own," *id.* at 490, precludes Provi's claims. "The damages [Provi]" seeks "are designed to provide [it] with the profits [it] would have realized had" defendants continued to cooperate with Provi—*i.e.*, had defendants not allegedly "compet[ed]."[1] *Brunswick*, 429 U.S. at 488. But "it is in the interest of competition to permit [even] dominant firms" (which Provi claims both SGWS and RNDC are when it comes to alcohol distribution) "to engage in vigorous competition." *Cargill, Inc. v. Monfort of Colo., Inc.*, 479 U.S. 104, 116 (1986). Provi's "complain[t]," on the other hand, is "that [defendants'] mere presence in the [relevant] market[s]" it proposes "causes it injury." *Pulse*, 30 F.4th at 489. That is a complaint about

---

[1] Defendants do not believe it is accurate to describe them as competitors to Provi since neither defendant sells any aspect of its respective online ordering platforms independent of its alcohol distribution business. But because Provi has framed its complaint around the idea that defendants' respective platforms and actions have taken volume and profit away from Provi, defendants accept that characterization (as they must) solely for purposes of this Motion.

increased competition. Indeed, what Provi "seeks to gain" through this lawsuit is "not the opportunity to compete in the marketplace"; it can, and already does, do that in each of its proposed product markets, as evidenced by its agreements with twelve of the fourteen largest distributors. *Id.* Rather, Provi asks for "the benefits of increased concentration." *Id.* (quoting *Brunswick*, 429 U.S. at 488). Provi's Complaint boils down to saying that it would have made more money selling online advertising and data if defendants were forced to use Provi's online platform. In short, SGWS's and RNDC's respective decisions to stop fulfilling orders placed through Provi likely hurts Provi's bottom line, ***but that is not antitrust injury***, and it would be "inimical to the purposes of [antitrust] to award damages for th[at] type of injury." *Brunswick*, 429 U.S. at 488.

This holds true, moreover, even if the conduct described in the Complaint amounts to an antitrust violation. Even if the commonplace decision to control one's own means of distribution were somehow forbidden by the Sherman Act, ***that*** is not what harms Provi. The only real harm to Provi according to the Complaint arises from the fact that, by developing their own online ordering platforms (Proof and eRNDC), SGWS and RNDC now can compete with Provi and challenge its control over "Online Alcohol Marketplaces," "Advertising on Online Alcohol Marketplaces," and "Data Analytics Services for distilled wine and spirits." *See, e.g.*, Compl. ¶104 (complaining that defendants' decisions no longer to fulfill orders placed through Provi's platform will "stop Provi from gaining scale"). In other words, Provi gripes only about lost volume and profits "result[ing] from ***increased*** competition," not any increased price or decreased volume in the market generally. *Pulse*, 30 F.4th at 490-91. That is the opposite of antitrust injury.[2]

Hammering the point home, the remedy Provi seeks in this case is antithetical to antitrust. Provi's stated goal is to obtain a court order requiring defendants to cooperate with it. *See* Compl. at 87 (Request for Relief). That result is the opposite of what the antitrust laws are designed to

---

[2] What is more, the link between defendants' decisions not to fulfill orders placed through Provi's platform and Provi's alleged harm (lost volume and profit) is at best indirect. *See Associated Gen. Contractors of Cal., Inc. v. California State Council of Carpenters*, 459 U.S. 519, 540 (1983) (looking to "directness or indirectness of the asserted injury" in the antitrust injury inquiry). Defendants cannot force retailers to purchase the products they distribute. Similarly, advertisers decide how and where to place ads and whether or how to purchase "data analytics." They make the ultimate decisions, not defendants.

promote and a crystalline indication of the problems with Provi's theory. *See Associated Gen. Contractors*, 459 U.S. at 539 (dismissing boycott claim for lack of antitrust standing where it was "not clear whether [the plaintiff's] interests would be served or disserved by enhanced competition in the market"); *Four Corners Nephrology Assocs., P.C. v. Mercy Med. Ctr.*, 582 F.3d 1216, 1225-26 (10th Cir. 2009) (similar).

"Even if we look beyond this," moreover, the Complaint "does not in any way set forth facts to support the conclusion that [defendants' alleged conduct] had any anticompetitive effect" of the kind antitrust law is designed to remedy. *Car Carriers*, 745 F.2d at 1109-10. Despite spending nearly four pages on supposed "harms to competition in the relevant markets" from "Defendants' actions," Compl. ¶213, Provi alleges no facts showing that SGWS's and RNDC's decisions to stop fulfilling orders placed with Provi has reduced output or increased price in any way in any market. That is unsurprising. While Provi conclusorily alleges that defendants' actions have foreclosed it and others "from competing for retailers' business" (even though Provi does not sell alcohol to retailers) and has "effectively requir[ed] retailers to rely on" defendants' respective online platforms, *id.* ¶¶217-18, the few well-pleaded allegations in the Complaint resoundingly refute any such claim; as noted above, Provi claims that twelve of the nation's fourteen largest alcohol distributors "signed agreements to integrate their inventory and fulfillment systems with Provi." *Id.* ¶95. That is the opposite of foreclosure. Similarly, while Provi alleges that retailers "would rather give [their data] to Provi or other third parties [than to Defendants]," *id.* ¶216, Provi pleads no facts supporting that speculative assertion. Provi also ignores that defendants have not tried to impose on retailers any sort of prohibition against using Provi. All defendants are alleged to have done is stop relying on Provi to do something they prefer to do themselves. There is nothing unlawful, or injurious to competition, about that. Just as competition is not harmed when a manufacturer that used to work with an independent trucking firm decides to buy its own trucks and use only those trucks for deliveries, competition is not harmed when an alcohol distributor decides to build its own online ordering platform and use only that platform going forward.

If Provi wins this lawsuit and defendants are required to fulfill orders placed through Provi, Provi will control more data and generate more traffic, which means it will be able to charge more for data analytics and ads. This no doubt is part of Provi's plan. (It is thus unsurprising that after acquiring its major competitor SevenFifty earlier this year, Provi now does not consider itself to have any real competition, referring to all remaining online alcohol ordering platforms as "small fringe players." *Id.* ¶98.) Provi could even start charging distributors a fee for its matchmaking services. That is one of the many reasons why, even if Provi somehow has pleaded antitrust injury, its claims still fail because Provi is not a proper party. *See Associated Gen. Contractors*, 459 U.S. at 539. The "'proper plaintiff' … inquiry focuses on proximate causation," *Pulse*, 30 F.4th at 493, and "the existence of other parties that have been more directly harmed" by the alleged conduct defeats antitrust standing, *Cargill*, 479 U.S. at 111 n.6. The (speculative) "harms to competition" Provi posits—*i.e.*, those other than its own lost volume and profit—would fall most directly on actual market participants. If defendants' alleged conduct were truly as anticompetitive as Provi claims, we would expect other distributors, retailers, or advertisers to sue; and to the extent antitrust forbids anything defendants are alleged to have done, other distributors, retailers, or advertisers— not Provi—are the proper plaintiffs to vindicate the law. Provi is not a supplier, distributor, or retailer. Nor is it an ad buyer or a data consumer that could suffer from higher prices for ads or data analysis. Provi sells online ad space and data services, which means it would benefit from more concentration and higher prices, but suffer from competition. Provi lacks antitrust standing.

## II. Provi Fails To Allege A Plausible Monopolization Claim.

Section 2 of the Sherman Act does not outlaw the "mere possession of monopoly power, and the concomitant charging of monopoly prices." *Trinko*, 540 U.S. at 407. "The offense of monopolization is the acquisition of monopoly by improper methods or, more commonly[,] … the **abuse** of monopoly[.]" *Mercatus Grp., LLC v. Lake Forest Hosp.*, 641 F.3d 834, 854 (7th Cir. 2011) (quoting *American Acad. Suppliers, Inc. v. Beckley-Cardy, Inc.*, 922 F.2d 1317, 1320 (7th Cir. 1991)). So to state a monopolization claim, a plaintiff must show not only **(A)** that the defendants possess monopoly power—that is, the "ability to charge a price above the competitive

level … without losing so many sales to existing competitors or new entrants as to make the price increase unprofitable"—in relevant markets, *Sheridan v. Marathon Petroleum Co. LLC*, 530 F.3d 590, 594 (7th Cir. 2008), but also **(B)** that they "gain[ed] that power" by "unjustifiable means," *Mercatus*, 641 F.3d at 854 (quoting *Illinois ex rel. Burris v. Panhandle E. Pipe Line Co.*, 935 F.2d 1469, 1481 (7th Cir. 1991)). Provi fails to plausibly plead either element for either defendant.

### A.      Provi Fails to Allege that Defendants Have Monopoly Power in Any Market.

Because "the existence of a commercial market" is what "implicates the Sherman Act in the first instance," *Agnew v. NCAA*, 683 F.3d 328, 337 (7th Cir. 2012), plaintiffs must "identify a relevant product and geographic market," *Sharif Pharmacy, Inc. v. Prime Therapeutics, LLC*, 950 F.3d 911, 916 (7th Cir. 2020). Provi's §2 claims fail at this initial step, as Provi "cannot identify an appropriate … market where [defendants] had or threatened to have monopoly power." *Id.*

Provi emphasizes that defendants are big players in the markets for alcohol distribution in many states. But this is irrelevant, since Provi's §2 claim is ***not about those markets***. Provi alleges that defendants have unlawfully monopolized the allegedly related, ***but distinct***, markets "for: (1) Online Alcohol Marketplaces, (2) Advertising on Online Alcohol Marketplaces, and (3) Data Analytics Services in each state." Compl. ¶252. As a result, even if defendants really were monopolists in alcohol distribution markets—which they are plainly not[3]—Provi would still need to put forward "specific factual allegations[] that 'monopoly power in the [distribution] market[s] enables [defendants] to control prices" in these "different but … related market[s]." *Shak v. JPMorgan Chase & Co.*, 156 F.Supp.3d 462, 483 (S.D.N.Y. 2016) (citation omitted).

---

[3] "Monopoly power under §2 requires … something greater than market power under §1," *Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 481 (1992), and showing that a defendant has a market share above 50% is not enough. Rather, courts will not find monopoly power unless a defendant has "a market share of more than seventy to eighty percent." *MCI Commc'ns Corp. v. AT&T Co.*, 708 F.2d 1081, 1107 (7th Cir. 1983). Here, Provi alleges that SGWS's wine and spirits distribution market share exceeds 70% in just a handful of the 45 states it cites, and exceeds 80% in none; and the same is true for RNDC. *See* Compl. ¶¶160-61 & tbls. 3-4. Nor does it help Provi to "combine" SGWS's and RNDC's respective market shares. "[T]he market shares" of two competitors cannot "be aggregated to establish … monopoliz[ation]." *H.L. Hayden Co. of N.Y., Inc. v. Siemens Med. Sys., Inc.*, 879 F.2d 1005, 1018 (2d Cir. 1989).

That is a tall order—and Provi does not even try to achieve it. Defining a relevant market requires considering whether there are substitutes for a product. *FTC v. Advocate Health Care Network*, 841 F.3d 460, 467 (7th Cir. 2016); *see Geneva Pharms. Tech. Corp. v. Barr Lab'ys., Inc.*, 386 F.3d 485, 496 (2d Cir. 2004) (purpose of market definition is "to identify the market participants and competitive pressures that restrain an individual firm's ability to raise prices or restrict output"). The principal question in defining a product market is thus, what substitutes will consumers (here, retailers) turn to in response to a price increase? Merely posing that question highlights the basic problem with the proposed market for "Online Alcohol Marketplaces." Provi has not pleaded any facts that dispel the obvious reality that directly communicating orders by phone, email, etc.—the ways all orders were placed until a few years ago—are substitutes to which retailers will turn in response to a price increase in online ordering. All Provi provides are allegations about the benefits of online ordering. *See, e.g.*, Compl. ¶172. But such allegations say nothing about what would occur in response to a price increase. Provi's market definition also assumes that there is a separate market for ordering alcohol online as compared to ordering alcohol by phone, fax, text, or in person—but the way a product is ordered does not create a separate market. *PepsiCo, Inc. v. Coca-Cola Co.*, 114 F.Supp.2d 243, 250 (S.D.N.Y. 2000) ("[T]he mere preference for one form of delivery over another does not create separate markets for the same product delivered one way as opposed to another."), *aff'd*, 315 F.3d 101 (2d Cir. 2002); *cf. M.A.P. Oil Co. v. Texaco, Inc.*, 691 F.2d 1303, 1307 (9th Cir. 1982) (different methods of delivery for gasoline sold to service stations not different markets).

Provi's allegations for its two other proposed markets ("Advertising on Online Alcohol Marketplaces" and "Data Analytics Services") fare no better. At the outset, Provi does not even attempt to reasonably delineate the bounds of these free-wheeling "markets." Indeed, if taken at face value, Provi's description of these "markets" would seem to incorporate all manner of commercial conduct. That is two problems in one. Plaintiffs must plausibly define the markets they propose, and also must define a market by reference to excluding potential substitutes. Provi does neither. To take just one example, it is not plausible that the market for advertising to alcohol

purchasers in State *X* is limited only to "online alcohol marketplaces" available in that state. Why? Because purchasers long have been, and still can be (and often are), reached through advertising through trade journals, television, radio, and even other websites. That explains why courts have rejected artificially drawn market definitions just like Provi's. *See, e.g.*, *Hicks v. PGA Tour, Inc.*, 897 F.3d 1109, 1122 (9th Cir. 2018) (rejecting proposed market defined as "advertising during the live-action of golf tournaments" because that definition "rests on the implausible assumption that a distinct group of golf fans watches tournament broadcasts but either consumes no other forms of golf media or is uninfluenced by advertisements in all other forms of golf media"); *Person v. Google, Inc.*, 2007 WL 1831111, at *3 (N.D. Cal. June 25, 2007) (dismissing antitrust claims because there is "no basis for distinguishing the alleged 'search advertising market' from the larger market for Internet advertising … search-based advertising is reasonably interchangeable with other forms of Internet advertising"), *aff'd*, 346 F.App'x 230 (9th Cir. 2009).

Even putting all of these pleading deficiencies aside, Provi's allegations that defendants have market power in any of the alleged markets still fail. All Provi alleges is that defendants' supposed "power in wine and spirits distribution" somehow "allows [them] to exercise comparable power in the Search Advertising and Display Advertising on Online Alcohol Marketplaces markets" and the "Data Analytics Services markets." Compl. ¶¶190, 209. But conclusions about power in ***online advertising*** or ***data*** markets cannot possibly—let alone plausibly—be drawn from allegations of power in alcohol ***distribution*** markets, if for no reason other than Provi is present in the former "markets" ***but not in the latter***. What is more, Provi acknowledges that not all of defendants' sales are made through online platforms, *see, e.g.*, *id.* ¶¶255, 265 (referencing defendants' respective "sales associates"), which means some of their sales have no impact on Provi's share of online advertising or data markets at all. In short, Provi has alleged three markets in which it claims that SGWS, RNDC, and others compete, *see id.* ¶98, but omits basic facts about ***those*** markets, such as the market share of any participant in those markets—not even its own.

Provi's proposed markets fail for another reason too: The geographic bounds it proposes make no sense. Provi posits state-by-state markets, *id.* ¶252 ("in each state"), but provides no basis

12

to plausibly infer that the markets for online advertising and data insights break down at state lines. First, on the data side, a given retailer looking for data insights may be "most interested in information relevant to the geographic market it serves," *id.* ¶204, but nothing in the Complaint explains why that "market" is an entire state as opposed to a smaller area like a city or region or a larger area like the "Northeast" or even a demographically similar place outside the state. Provi simply ignores this reality. Second, on the advertising side, the Complaint is self-defeating. Provi admits that "[p]roviders of Online Alcohol Marketplaces compete for suppliers' advertising dollars on a nationwide basis." *Id.* ¶187. And while retailer location may well affect suppliers' choice of where "to direct their advertisements," "must-have" "spirits and wine" "brands" are "available" in all markets nationwide, *id.* ¶¶187-88, and this Court is not required to credit conclusory allegations of harm to alleged state "markets" the boundaries of which make no sense.

Provi tries to save its markets by pointing out that each state has a "unique" "regulatory framework" for alcohol sales. *Id.* ¶171; *see Granholm v. Heald*, 544 U.S. 460, 466-67 (2005). But Provi is not a participant in those regulated markets. And, again, despite spilling considerable ink on "Alcohol Distribution Markets," Compl. at 46; *see id.* ¶¶153-61 & tbls. 3-4, Provi does not claim, not even conclusorily, that defendants harmed competition in those markets. Provi instead attempts to bootstrap defendants' alleged shares of the markets for alcohol distribution in some states, *see id.* ¶¶160-61 & tbls. 3-4, into a claim that defendants have unlawfully monopolized allegedly related, but distinct, markets in the same states for online marketplaces, online ad space, and online data (which Provi does not define with any specificity). That is not how the law works. "A 'relevant market' under the Sherman Act is comprised of the 'commodities reasonably interchangeable by consumers for the same purposes.'" *Sharif Pharmacy*, 950 F.3d at 916 (quoting *United States v. E. I. du Pont de Nemours & Co.*, 351 U.S. 377, 395 (1956)). The "commodities" here are not wine or spirits; they are online marketplaces, ad buys, and data analytics services.

And the Complaint contains no facts to support a plausible inference that those markets break down at the state line, let alone that defendants have monopoly power in any of them.[4]

### B.  Provi Fails to Allege that Defendants Engaged in any Exclusionary Conduct.

Even if Provi has somehow plausibly pleaded monopoly power in any cognizable market, its §2 claims fail nonetheless, because they are premised on conduct that the Supreme Court and Seventh Circuit have long recognized is perfectly lawful.  "[A]s a general matter, the Sherman Act 'does not restrict the long recognized right of [a] trader … freely to exercise his own independent discretion as to parties with whom he will deal.'"  *Trinko*, 540 U.S. at 408 (alteration in original) (quoting *United States v. Colgate & Co.*, 250 U.S. 300, 307 (1919)).  While there are "certain circumstances" in which "a refusal to cooperate" can "violate §2," such circumstances are few and far between, "because of the uncertain virtue of forced sharing and the difficulty of identifying and remedying anticompetitive conduct by a single firm."  *Id.*; *see Pacific Bell Tel. Co. v. Linkline Commc'ns, Inc.*, 555 U.S. 438, 450 (2009); *Reapers Hockey*, 412 F.Supp.3d at 956.

This case is not one of those circumstances.  Refusal-to-deal claims require, at a minimum, "alleg[ing] plausibly that the refusal to deal has some of the key anticompetitive characteristics identified in *Aspen Skiing*."  *Viamedia, Inc. v. Comcast Corp.*, 951 F.3d 429, 462 (7th Cir. 2020); *see Trinko*, 540 U.S. at 409 ("*Aspen Skiing* is at or near the outer boundary of §2 liability.").  Those "key anticompetitive characteristics" are "a prior course of voluntary conduct, sacrifice of short-term profits, and refusal to sell to rivals on the same terms as other potential buyers."  *Viamedia*, 951 F.3d at 463.  Although Provi has tried to allege that defendants would forgo short-term profits by refusing to deal with it, *see, e.g.*, Compl. ¶¶15, 257, 259, 268, 270, those conclusory allegations are contradicted by other allegations.  Perhaps most notable, the Complaint recognizes the procompetitive benefits of a vertically integrated online distribution platform.  *See, e.g., id.* ¶¶96,

---

[4] Provi's failure to plausibly plead relevant markets dooms its boycott/conspiracy claims under §1 as well. *See Reapers Hockey Ass'n, Inc. v. Amateur Hockey Ass'n Illinois, Inc.*, 412 F.Supp.3d 941, 952 (N.D. Ill. 2019) ("The failure to allege the existence of a relevant commercial market is fatal to both [§1 and §2] claims, regardless of whether per se, quick-look, or rule-of-reason analysis is applied.").  The arguments relating to market definition above apply in full to Counts I, II, III, and VI, as well as Counts IV and V.

167. That is unsurprising. *See Port Dock & Stone Corp. v. Oldcastle Ne., Inc.*, 507 F.3d 117, 124 (2d Cir. 2007) (affirming dismissal for failure to state a claim where plaintiff alleged manufacturer had monopolized distribution market and refused to deal with former distributor because monopolist's "vertical expansion into another level of the same product market will ordinarily be for the purpose of increasing its efficiency, which is a prototypical valid business purpose"). Far from establishing that defendants were forgoing short-term profits by refusing to deal with Provi, these allegations show that defendants were vertically integrating to capture Provi's profits for themselves, and at the same time to make online ordering more efficient for their customers. None of that is unlawful.

Provi also offers no factual basis to support its charge that SGWS and RNDC suffered meaningful short-term harm from their independent decisions not to deal with Provi. For instance, Provi seems to assume that, because defendants failed to respond to Provi's emails, they did not fill any of the orders Provi "communicat[ed]" to them. *Id.* ¶¶227, 257, 268. That is not a reasonable inference, and certainly not one this Court is required to credit based on Provi's conclusory allegations. The Complaint is premised on the idea that defendants distribute "must-have" brands, *id.* ¶¶4, 29, 33, and Provi admits that there are lots of "other methods of communicating retail alcohol orders" besides through Provi, *id.* ¶172; *see also, e.g., id.* ¶¶77-80 (discussing defendants' "special teams to service National Accounts"). It is not plausible that retailers looking to buy the myriad "'must-have' brands" that defendants distribute would not figure out a way to get the alcohol they wanted. After all, retailers ordered and received alcohol from defendants before there were online platforms like Provi's or Proof and eRNDC. The "millions of dollars' worth of orders" that Provi conclusorily alleges defendants supposedly let die on the vine rather than cooperate with Provi, *id.* ¶¶227, 276, are simply illusory.

Provi's allegations boil down to pleading that defendants have cut out the middleman by vertically integrating their online ordering systems with their established distribution system. (After all, Provi admits that all it does is display the products distributors offer and the prices at which they offer them, communicate orders for those products, and then make money not from the

sale of beer, wine, or spirits, but through selling advertising and data from its users. *Id.* ¶¶26, 96.) That is not only a common type of vertical integration, it is also "usually … procompetitive." *Jack Walters & Sons Corp. v. Morton Bldg. Inc.*, 737 F.2d 698, 710 (7th Cir. 1984).

In any event, even if Provi could show that defendants' migration away from Provi caused them to suffer temporary financial or reputational hits, that still would not be enough. The decision to walk away from a prior course of dealing is not inherently suspect. On the contrary, to "withdraw from a prior course of dealing and suffer a short-term profit loss … to pursue an innovative replacement product of its own"—*i.e.*, to do exactly what Provi claims defendants did here with Proof/eRNDC—is "perfectly procompetitive" and legal. *Novell, Inc. v. Microsoft Corp.*, 731 F.3d 1064, 1075 (10th Cir. 2013). If businesses had to maintain suboptimal business arrangements (like filling orders placed through Provi *ad infinitum*) even when "they no longer make economic sense" lest they face antitrust liability, then no firm would ever agree to a "trial run" with a potential vendor. *Id.* That is not the law—and especially not in this context, where defendants are alleged to have stopped dealing with Provi after developing their own platforms.

Finally, the fact that defendants have exclusive rights to distribute some "must-have" products in some states does not change the analysis. Provi insinuates that defendants' exclusive distribution agreements render their commercial decisions subject to more scrutiny, but the courts have expressly rejected the idea that even monopolists are subject to a special required-to-deal rule. The only exception is the "essential facilities" doctrine under which firms with exclusive access to certain "essential facilities" (like electric power, water, or other utilities) may have a duty to deal under narrow circumstances. But even putting aside that alcohol is not an essential facility, the Supreme Court has made crystal clear that "essential facility claims" not only face a high bar generally, but should "be denied where a state or federal agency has effective power to compel sharing and to regulate its scope and terms." *Trinko*, 540 U.S. at 411. That dooms Provi's §2 claims, as state or federal agencies could negate (or require) defendants' exclusive licenses. *See,*

16

*e.g.*, Minn. Stat. §340A.307 (prohibiting exclusive distribution agreements); Ark. Code §3-4-605(i) (requiring exclusive statewide distribution).  Counts III and IV fail as a matter of law.[5]

### III.    Provi Fails To Allege A Plausible Conspiracy.

Unable to state a §2 claim, Provi tries to shoehorn its allegations into the §1 framework. These efforts fare no better.  Provi's allegations of a conspiracy between SGWS and RNDC to "boycott" Provi (Count I) and of separate, "vertical" conspiracies between each defendant and its respective retail customers to do the same (Counts II and III), do not plausibly allege a boycott. Provi's conspiracy claims—including its state-law claim (Count VI)—thus fail as a matter of law.

### A.    Provi's Horizontal Conspiracy Allegations are Insufficient as a Matter of Law.

Section 1 of the Sherman Act prohibits "only restraints effected by a contract, combination, or conspiracy."  *Twombly*, 550 U.S. at 553 (quoting *Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752, 775 (1984)).  "'[T]he crucial question'" for a §1 claim "is whether the challenged anticompetitive conduct 'stem[s] from independent decision or from an agreement." *Id.* (alterations in original) (quoting *Theater Enters., Inc. v. Paramount Film Distrib. Corp.*, 346 U.S. 537, 540 (1954)).  Allegations that competitors ultimately came to the same conclusion on a particular issue or behaved in the same way do not alone suggest a conspiracy.  *Id.*  And group boycott claims like Provi's require a ***concerted*** refusal, because private parties in this country "generally ha[ve] a right to deal, or refuse to deal, with whomever [they] likes, as long as [they] do[] so independently."  *Monsanto Co. v. Spray-Rite Serv. Corp.*, 465 U.S. 752, 761 (1984).  In short, there can be no violation of §1 absent an actual agreement, so plaintiffs must allege facts plausibly "tending to exclude the possibility of independent action."  *Twombly*, 550 U.S. at 554.

Provi's allegations for Count I fall well short of that bar.  Provi's horizontal conspiracy theory is based on the following observations:  SGWS and RNDC executives often attend the same conferences and sit on the same trade association boards; the two firms sometimes join forces to lobby for mutually beneficial regulatory outcomes; and some of SGWS's and RNDC's actions—

---

[5] Provi's monopolization claims fail for the additional reason that Provi fails to plausibly plead cognizable anticompetitive effects.  *See Chicago Studio Rental*, 940 F.3d at 979; Part I (Antitrust Standing), *supra*.

most notably, the firms' respective decisions to develop their own online ordering platforms and then stop using Provi—were temporally proximate.  Compl. ¶225; *see also id.* ¶¶12, 102, 105, 109. In Provi's telling, the fact that SGWS and RNDC, despite being fierce competitors, "know each other well … and enjoy many opportunities to collude" must mean that each company's decision to stop using Provi's platform after having developed online platforms of their own, *see id.* ¶¶105, 108, is proof of a conspiracy against Provi, *id.* ¶102.  ***Literally dozens of cases reject that theory*** and hold that such opportunity-based allegations do not establish a plausible violation.  *See Kleen Prods. LLC v. Int'l Paper*, 276 F.Supp.3d 811, 833-36 (N.D. Ill. 2017) (citing many cases), *aff'd sub nom. Kleen Prods. LLC v. Georgia-Pac. LLC*, 910 F.3d 927 (7th Cir. 2018); *see also, e.g.*, *Moore v. Boating Indus. Ass'ns*, 819 F.2d 693, 712 (7th Cir. 1987) (trade association membership or attendance at trade association meetings and activities not enough); *United States Bd. of Oral Implantology v. American Bd. of Dental Specialties*, 390 F.Supp.3d 892, 902-03 (N.D. Ill. 2019).

As these cases make clear, parallel conduct is often "just as much in line with a wide swath of rational and competitive business strategy unilaterally prompted by common perceptions of the market" as it is "with conspiracy."  *Twombly*, 550 U.S. at 554.  That is why "more than temporal proximity is required to infer conspiracy," *Kleen*, 276 F.Supp.3d at 834, and why courts "should dismiss … for failure to state a claim" "conspiracy complaints" like Provi's that do no more than allege "parallel conduct" that could just as well be independent action.  *Marion Diagnostic Ctr.*, 29 F.4th at 351.  Indeed, allegations of parallel conduct are not enough even when a defendant is alleged to have acted ***knowing*** that a competitor already did the same.  "[C]onscious parallelism[] does not violate §1[.]"  *In re Text Messaging Antitrust Litig.*, 782 F.3d 867, 879 (7th Cir. 2015).

That is particularly true when the relevant markets are highly concentrated, which Provi alleges is the case here, *e.g.*, Compl. ¶¶98, 168.  As the Seventh Circuit recently explained, even seemingly suspicious conduct, like a firm's decision to raise prices after a competitor has raised its own prices rather than lower them (as Economics 101 would seem to say is the rational response), "can be consistent with rational self-interest in oligopolies."  *Kleen*, 910 F.3d at 935-36.  Given its allegations that the proposed markets here have few participants, Provi needs well-

pleaded facts plausibly showing actual "coordination or agreement." *Id.* at 936. Yet all it offers is "a conclusory allegation of agreement at some unidentified point." *Twombly*, 550 U.S. at 557. Indeed, Provi's "on information and belief" allegations of conspiracy are the very definition of conclusory, *see, e.g.*, Compl. ¶104 (alleging "on information and belief" that SGWS and RNDC "began to coordinate and collude to stop Provi from gaining scale to compete effectively with their respective online marketplaces"), and nowhere near sufficient to state a plausible claim under §1. *See Alarm Detection Sys., Inc. v. Village of Schaumburg*, 930 F.3d 812, 827 (7th Cir. 2019) (affirming dismissal of a §1 claim for failure to plead sufficient circumstantial allegations of agreement). Nor does Provi's allegation that defendants shared a common motive, Compl. ¶276, get Provi over the line. "[M]otivation to enter a conspiracy is never enough to establish a traditional conspiracy." *Reapers Hockey*, 412 F.Supp.3d at 955 (quoting *Reserve Supply Corp. v. Owens-Corning Fiberglas Corp.*, 971 F.2d 37, 51 (7th Cir. 1992)); *see, e.g.*, *In re Musical Instruments & Equip. Antitrust Litig.*, 798 F.3d 1186, 1195 (9th Cir. 2015). And neither is an alleged desire to usurp another firm's market position. Yet that, at most, is all Provi has alleged.

Perhaps recognizing the implausibility of its allegations of collusion, Provi tries to narrow the focus to a few weeks in 2021 when SGWS and RNDC announced that they would each stop using third-party online ordering platforms. *See* Compl. ¶¶109-19. But Provi pleads itself out of court, as it claims "RNDC began taking steps to discourage retailers from using Provi" "***beginning in 2020***." *Id.* ¶131. Provi alleges that after RNDC had raised many concerns with Provi about its business, including its concern that Provi was misrepresenting that it had a partnership with RNDC, *id.* ¶132, RNDC communicated its intention to "not … accept[] orders from Provi ***as early as May 2020***, *id.* ¶¶138, 142-43, and began "blocking communications from Provi," "program[ing] its computer system firewall to block emails from Provi," and "advis[ing] its employees not to respond to communications from Provi and not to accept orders that retailers chose to communicate through Provi" ***in June 2020***, *id.* ¶141.[6] That is over a ***year earlier*** than

_____

[6] While Provi suggests that it addressed RNDC's concerns (regarding, *e.g.*, Provi's misrepresentations to customers about a "relationship" with RNDC, harassment of RNDC's sales and customer service personnel,

SGWS allegedly announced its decision to stop accepting orders placed through Provi. *See Kleen*, 910 F.3d at 936 ("follow[ing] suit over a ***month*** later" not "suspicio[u]s"). And once SGWS announced its decision to stop using third-party platforms, RNDC simply made public its position, communicated to Provi more than a year earlier, that it would not fill orders placed with Provi. *See* Compl. ¶141 (alleging that RNDC held this position as early as May 2020). And, recall, SGWS and RNDC are both alleged to have developed their own competitive online ordering platforms in 2019. *Id.* ¶99. That hardly suggests collusion. In any event, even if Provi's allegations are viewed through the most favorable lens imaginable, they are still no more than "factually neutral" rather than "factually suggestive" of conspiracy—and that is not enough. *Twombly*, 550 U.S. at 557 n.5.

Provi's boycott claims fail for another reason: The conduct Provi alleges simply does not amount to an unlawful boycott. A group boycott is a "concerted … refus[al] to engage in" Transaction *A* or *B* done to coerce a party to change its behavior with respect to "unrelated" Transactions *C* or *D*. *Hartford Fire Ins. Co. v. California*, 509 U.S. 764, 802-03 (1993). But Provi does not allege that defendants have ever refused to fulfill an order placed by retailers on their platforms simply because those retailers place other, unrelated orders on Provi. Nor does Provi allege that they have declined to buy or sell any good or service to Provi or attempted to coerce Provi to change its conduct at all. *Cf., e.g.*, *Fashion Originators' Guild of Am. v. FTC*, 312 U.S. 457 (1941) (unlawful boycott found where defendant refused to sell to retailers who bought from other clothing makers); *Eastern States Retail Lumber Dealers' Ass'n v. United States*, 234 U.S. 600 (1914) (unlawful boycott found where defendant refused to buy lumber from wholesalers who also sold directly to consumers). All Provi alleges is that SGWS and RNDC decided that online orders for the products they distribute must be placed through their own respective platforms rather than through Provi. Provi, in other words, claims only that defendants have chosen not to use its

---

and efforts to drive a wedge between RNDC and its customers), none of these issues, which RNDC disputes, needs to be resolved by the Court at the pleading stage, given that Provi's claims fail as a matter of law.

platform. That is not a boycott, and the law does not prevent firms from controlling the means of distributing their products or force unwilling companies to go into business together.

### B. Provi's Vertical Conspiracy Allegations Fail as a Matter of Law.

Provi claims in Counts II and III that SGWS and RNDC, respectively, have conspired with retailer customers to boycott Provi. But Provi alleges no facts *at all* to substantiate these claims. The Complaint does not identify SGWS's or RNDC'S customers in any of the states alleged to have been affected by these conspiracies; does not say which, if any, of their respective customers agreed not to deal with Provi; and does not allege whether any such agreement was ever discussed or requested. These pleading failures are fatal. They are also ultimately beside the point, because Counts II and III suffer from two legal defects that could not be cured with better pleading.

First, agreements between either SGWS or RNDC "and the purchasers of [their respective] product[s]" would not amount to an unlawful boycott even if they were adequately pleaded. *Genetic Sys. Corp. v. Abbott Lab'ys*, 691 F.Supp. 407, 416-17 (D.D.C. 1988). A vertical boycott "is really" just a horizontal boycott in which "some vertically related entity" (like customers) "is also involved in the alleged [conduct]." *Id.* "A mere exclusionary agreement between businesses at different levels of competition" is thus not a boycott, and plaintiffs alleging vertical boycotts "must still show that '*multiple* manufacturers or *multiple* distributors' were involved in the alleged conspiracy." *Id.* Because Provi's horizontal conspiracy claim fails, Counts II and III fail as well.

Second, even if, as Provi alleges, SGWS and RNDC told their customers that they would not accept orders submitted through Provi and customers complied with that condition, that would not amount to an agreement that could support a claim under the Sherman Act. To make out a vertical boycott claim, an antitrust plaintiff must do more than show that a firm announced conditions of doing business with it and told its customers that it will "refuse to deal with those who fail to comply"; rather, a plaintiff must establish that the firm and its customers "had a conscious commitment to a common scheme designed to achieve an unlawful objective." *Monsanto*, 465 U.S. at 764. Showing that a customer conformed to the upstream firm's conditions is not enough to establish an agreement. *Id.* at 764 n.9; *see also* Areeda & Hovenkamp, *Antitrust*

*Law* ¶1446e (2d ed. 1999) ("*Monsanto* expressly declares that no agreement arises when a supplier announces the course of behavior that customers must follow in order to receive future supplies; nor does agreement occur upon … compliance[,] even if coerced by the fear of termination."); *Isaksen v. Vermont Castings, Inc.*, 825 F.2d 1158, 1164 (7th Cir. 1987).

Provi's claims run headlong into this long-settled law. Provi alleges defendants announced conditions of service—"refusing to accept or acknowledge any orders that retail customers chose to communicate through Provi" and "threaten[ing] to withhold … distribution"—and that their respective retailer customers acquiesced. *E.g.*, Compl. ¶237. Under *Monsanto*, that is not an agreement that can support a claim under the Sherman Act. Counts II and III fail twice over.[7]

### C. Provi's Derivative State-Law Claim Likewise Fails as a Matter of Law.

Provi's Illinois boycott claim (Count VI) fails for the same reasons as do its Sherman Act claims. "The Illinois Antitrust Act expressly requires harmonization with the federal laws." *Force Partners, LLC v. KSA Lighting & Controls, Inc.*, 2022 WL 580808, at *18 (N.D. Ill. Feb. 25, 2022) (citing 740 ILCS 10/11). Because Provi's "federal claims are" legally deficient and should be "dismissed, the equivalent state claims should be dismissed" as well. *Id.*; *accord, e.g.*, *VBR Tours v. Nat'l R.R. Passenger Corp*, 2015 WL 5693735, at *16 (N.D. Ill Sept. 28, 2015).

### IV. Provi Fails To Allege Any Plausible Unlawful Tying Arrangement Against SGWS.

Unable to make out a plausible monopolization claim, Provi alleges in Count III that SGWS "is coercing its Distilled Spirits Distribution and Wine Distribution customers into adopting Proof for online orders," causing "damage … to free and fair competition in the Online Alcohol

---

[7] Provi's boycott claims fail for another reason, too: Unless an alleged boycott is used to enforce an underlying agreement that is itself unlawful, it is subject not to per se condemnation, but to the rule of reason, which requires that plaintiffs allege both market power and anticompetitive effects. *See Collins v. Associated Pathologists, Ltd.*, 844 F.2d 473, 479 (7th Cir. 1988) ("[B]oycotts are illegal per se only if used to enforce agreements that are themselves illegal per se—for example price fixing agreements." (citation omitted)). Provi does not claim SGWS or RNDC entered into an underlying agreement that is itself unlawful, so the rule of reason applies to Provi's boycott claims. And, as explained at length above, Provi does not come anywhere near plausibly alleging market power or anticompetitive effects.

Marketplaces market."[8]  Compl. ¶¶243, 250.  But this effort fares no better.  Just as Provi alleges no unlawful refusal to deal, Provi's allegations do not describe an unlawful tying arrangement.

First of all, Provi *does not allege that SGWS charges retailers to use Proof* (the allegedly tied product), let alone that SGWS imposes a Proof-only charge that is separate from what it charges retailers to sell wine and spirits to them (the alleged tying services).  That is fatal, since "[a] tying arrangement is 'an agreement by a party to *sell* one product but only on the condition that the buyer *also purchases* a different (or tied) product.'"  *Eastman Kodak*, 504 U.S. at 461 (emphases added); *accord Sheridan*, 530 F.3d at 592 (tying is when "a seller conditions the sale of a product or service on the buyer's buying another product or service").

Provi's claim fails for the further reason that Provi has not plausibly pleaded market power.  *See Eastman Kodak*, 504 U.S. at 461-62 (a tying arrangement only "violates §1" and is unlawful "if the seller has 'appreciable economic power' in the tying product market" (quoting *Fortner Enters., Inc. v. U.S. Steel Corp.*, 394 U.S. 495, 503 (1969))); *Sheridan*, 530 F.3d at 593-94.  Provi alleges that, by dint of its over-50% market share in the markets for wine and distilled spirits distribution in some states (the supposedly tying product/service markets), *see* Compl. ¶¶160-61 & tbls. 3-4, SGWS has enough "market power" to permit it "to force or coerce its customers into adopting Proof for online orders to the exclusion of competing products in the relevant market for Online Alcohol Marketplaces" (the supposedly tied product).  *Id.* ¶244.  But "market shares in excess of 50%" in a fraction of states, *see id.* ¶246, do not equate to market power.  "[I]t is exceedingly difficult to prove market power" under the Sherman Act.  *Goldwasser*, 222 F.3d at 397.  Courts cannot "presum[e]" "market power" even when "a tying product is patented" (and the seller has a product monopoly).  *Illinois Tool Works Inc. v. Independent Ink, Inc.*, 547 U.S. 28, 31 (2006).  Provi's allegations do not establish market power sufficient to support a tying claim, especially since retailers have many other means of obtaining SGWS-sold alcohol besides the (freely provided) Proof, *see, e.g.*, Compl. ¶255 (referencing SGWS's "sales associates").

---

[8] Provi does not allege any tying with respect to its two other proposed markets.

Provi attempts to salvage its market-power allegations by pointing to SGWS's exclusive distribution agreements with various producers of highly desirable alcohol products like "Jim Beam, Tanqueray, Smirnoff, and Patron," as well as "Franzia, Robert Mondavi, and Yellowtail" wine. *Id.* ¶56. But Provi's fixation on SGWS's exclusive distribution arrangements (and the business they generate for SGWS) is a red herring. To make out an unlawful tying claim, Provi must show that SGWS has power in the market for the "tying" product, *i.e.*, alcohol distribution. That market is not the market for distribution of "***Franzia***" or "***Jim Beam***," which are products sold in that market. So while SGWS may maintain exclusive distribution rights for ***some*** alcohol brands in ***some*** states, Provi does not (and cannot) allege that SGWS has a monopoly on the market for alcohol distribution. That is fatal to Provi's claim, unless the Court is prepared to scope the relevant market for "distribution services" so narrowly (to the brand-specific level) that all exclusive distribution agreements will become suspect. *Cf. Generac Corp. v. Caterpillar Inc.*, 172 F.3d 971, 977 (7th Cir. 1999) ("Not even the most zealous antitrust hawk has ever argued that Amoco gasoline, Mobil gasoline, and Shell gasoline are three separate product markets….").

Third and finally, Provi has not plausibly alleged "'a substantial volume of commerce is foreclosed' because of the [supposed] tie." *Reifert v. S. Cent. Wisc. MLS Corp.*, 450 F.3d 312, 317 (7th Cir. 2006). Just the opposite; one of the few well-pleaded allegations in the Complaint is that twelve of the fourteen largest distributors have "signed agreements to integrate their inventory and fulfillment systems with Provi." Compl. ¶95. The two that have not are the defendants in this case. If this is substantial foreclosure, this third factor is entirely toothless. That is not the law.

In sum, Provi fails to plausibly plead any of the elements of a tying claim. That is unsurprising, since the conduct it tries to paint as tying—a distributor exercising control over the means through which it will accept orders—is commonplace, accepted, and lawful. No one thinks Starbucks has to make its coffees available for delivery on DoorDash. This case is no different. And Provi's suggestion that there is something improper about SGWS's exclusive distribution agreements is even less persuasive; such agreements are ubiquitous and wholly lawful.

**V.      Finally, Provi's Remaining State-Law Claims Fail.**

1.      Provi's tortious interference allegations (Counts IX and X) are deficient across the board.  Provi claims it signed partnership agreements with several retailers, *id.* ¶148, but fails to plead that defendants knew about any specific agreement.  Provi claims that some retailers have stopped using its platform, *id.* ¶150, but it pleads no facts showing that that conduct breached any agreement between Provi and any retailer.  And even assuming a breach, Provi does not plead that defendants "intended to cause the [alleged] breach." *Webb v. Frawley*, 906 F.3d 569, 579 (7th Cir. 2018).  That is three strikes against Provi's claims.  *See id.* (Illinois-law tortious interference claim requires proof that defendant knew of agreements, induced breaches of them, and actually intended to do so).  Provi's accusations simply describe legitimate, competitive market behavior—and competition is not a tort.[9]

2.      Finally, Provi's California UCL claims (Counts VII and VIII) are derivative of its other claims.  *See* Compl. ¶¶282-84, 287-89.  Because those claims fail, its UCL claims fail too. *See LiveUniverse, Inc. v. MySpace, Inc.*, 304 F.App'x 554, 557 (9th Cir. 2008) (antitrust); *Nat'l Funding, Inc. v. Com. Credit Counseling Servs., Inc.*, 817 F.App'x 380, 384 (9th Cir. 2020) (intentional interference).  In addition, UCL claims cannot be based on violations of law other than federal or California law; so even if Provi's Illinois law claims survive, they cannot be the basis for its UCL claims.  *Hilton v. Apple Inc.*, 2014 WL 10435005, at *3 (C.D. Cal. Apr. 18, 2014).

**CONCLUSION**

The Court should grant defendants' motion and dismiss the Complaint in its entirety with prejudice.

---

[9] To the extent Provi means to plead a claim for intentional interference with prospective economic advantage, *see* Compl. ¶293, that claim fails *a fortiori* because a party's interest in a potential future business arrangement "receives less protection than its enforceable contract rights."  *A-Abart Elec. Supply, Inc. v. Emerson Elec. Co.*, 956 F.2d 1399, 1404 (7th Cir. 1992).  (It also fails for the same reasons that Provi's federal antitrust claims fail, discussed at length above.  *See, e.g.*, *Jamsports & Ent., LLC v. Paradama Prods., Inc.*, 382 F.Supp.2d 1056, 1062 (N.D. Ill. 2005).)

Dated:  June 1, 2022

Respectfully submitted,

/s/ *James H. Mutchnik*

CRAIG S. PRIMIS**
MATTHEW D. ROWEN**
KIRKLAND & ELLIS LLP
1301 Pennsylvania Avenue, NW
Washington, DC 20004
(202) 389-5000
craig.primis@kirkland.com
matthew.rowen@kirkland.com

JAMES H. MUTCHNIK        (ARDC #6201681)
KIRKLAND & ELLIS LLP
300 N. LaSalle Drive
Chicago, IL 60654
(312) 862-2000
jmutchnik@kirkland.com

** pro hac vice forthcoming

*Attorneys for Defendant Southern Glazer's Wine and Spirits, LLC*

Richard S. Krumholz*
Preston Glasscock*
NORTON ROSE FULBRIGHT US LLP
2200 Ross Avenue, Suite 3600
Dallas, Texas 75201-2784
Telephone: (214) 855-8000
Facsimile: (214) 855-8200
richard.krumholz@nortonrosefulbright.com
preston.glasscock@nortonrosefulbright.com

Robin D. Adelstein*
NORTON ROSE FULBRIGHT US LLP
1301 Avenue of the Americas
New York, New York 10019
Telephone: 212-318-3108
Facsimile: 212-408-5100
robin.adelstein@nortonrosefulbright.com

Eliot F. Turner*
Abraham Chang*
NORTON ROSE FULBRIGHT US LLP
1301 McKinney, Suite 5100
Houston, Texas 77010
Telephone: 713-651-5151
Facsimile: 713-651-5246
eliot.turner@nortonrosefulbright.com
abraham.chang@nortonrosefulbright.com

/s/ *Jeffery Moore Cross*
Jeffery Moore Cross        (ARDC #0547980)
Dylan Smith                    (ARDC #6298703)
Lillian Grappe Lamphere  (ARDC #6340044)
FREEBORN & PETERS LLP
311 South Wacker Drive, Suite 3000
Chicago, IL 60606
Tel.: (312) 360-6000
jcross@freeborn.com
llamphere@freeborn.com
dsmith@freeborn.com

*admitted pro hac vice

*Attorneys for Defendant Republic National Distributing Company*

**CERTIFICATE OF SERVICE**

I certify that on June 1, 2022, I caused a copy of the foregoing document to be served by the ECF System for the U.S. District Court for the Northern District of Illinois.

/s/ *James H. Mutchnik*
James H. Mutchnik