**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| Tiz, Inc. d/b/a Provi, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Civil Action No. 1:22-cv-01648 |
| v. | ) | |
| | ) | Hon. Manish S. Shah |
| Southern Glazer's Wine and Spirits, LLC and | ) | |
| Republic National Distributing Company, LLC, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

**PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO**
**DEFENDANTS' MOTION TO DISMISS FOR FAILURE TO STATE A**
**CLAIM UNDER FEDERAL RULE OF CIVIL PROCEDURE 12(b)(6)**

**TABLE OF CONTENTS**

INTRODUCTION ........................................................................................................... 1

LEGAL STANDARD..................................................................................................... 3

ARGUMENT .................................................................................................................. 4

I.     PROVI HAS ANTITRUST STANDING.................................................................. 4

    A.     Provi Amply Alleges Antitrust Injury ........................................................ 4

    B.     Provi Is a Proper Plaintiff........................................................................... 9

II.    PROVI STATES CLAIMS FOR MONOPOLIZATION ........................................ 9

    A.     Provi Amply Alleges Monopoly Power in the Relevant Markets.................................. 10

        1.     Provi's alleged relevant markets are facially plausible ............................................. 10

        2.     Provi alleges direct evidence of monopoly power in each market ............................ 14

        3.     Provi alleges indirect evidence of monopoly power in each market......................... 14

    B.     Provi Amply Alleges that Defendants Engaged in Exclusionary Conduct.................... 17

III.   PROVI PLEADS PLAUSIBLE CONSPIRACY CLAIMS ................................................. 20

    A.     The Complaint Plausibly Alleges a Horizontal Boycott ................................................ 20

        1.     Provi sufficiently pleads parallel conduct ................................................................. 21

        2.     Provi pleads numerous "plus factors" ....................................................................... 22

    B.     The Complaint Adequately Alleges an Unlawful Vertical Restraint............................. 25

IV.   PROVI STATES A CLAIM FOR ILLEGAL TYING ........................................................ 27

V.    PROVI'S STATE-LAW CLAIMS ARE ADEQUATELY PLED ..................................... 29

    A.     Provi States a Claim under the Illinois Antitrust Act................................................... 29

    B.     Provi States Claims against Both Defendants for Tortious Interference ...................... 29

    C.     Provi States Claims under California's Unfair Competition Law................................. 30

CONCLUSION................................................................................................................ 30

**TABLE OF AUTHORITIES**

**Cases**

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009)..................................................................................................... 4

*Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*,
  472 U.S. 585 (1985)............................................................................. 14, 17, 18, 19

*Associated Gen. Contractors of Cal. v. Cal. State Council of Carpenters*,
  459 U.S. 519 (1983).................................................................................................... 9

*Bell Atl. Co. v. Twombly*,
  550 U.S. 544 (2007).................................................................................................... 4

*Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*,
  429 U.S. 477 (1977)................................................................................................ 4, 9

*Car Carriers, Inc. v. Ford Motor Co.*,
  745 F. 2d 1101 (7th Cir. 1984) ................................................................................. 9

*Cont'l Airlines, Inc. v. United Air Lines, Inc.*,
  120 F. Supp. 2d 556 (E.D. Va. 2000) ....................................................................... 5

*Covad Commc'ns Co. v. Bell Atl. Corp.*,
  398 F.3d 666 (D.C. Cir. 2005)................................................................................. 20

*Frame-Wilson v. Amazon.com, Inc.*,
  2022 WL 741878 (W.D. Wash. Mar. 11, 2022) ..................................................... 12

*FTC v. Staples, Inc.*,
  970 F. Supp. 1066 (D.D.C. 1997) ........................................................................... 12

*Hannah's Boutique, Inc. v. Surdej*,
  2013 WL 4553313 (N.D. Ill. Aug. 28, 2013) ......................................... 6, 8, 17, 19

*Hess v. Reg-Ellen Mach. Tool Corp.*,
  423 F.3d 653 (7th Cir. 2005) .................................................................................. 10

*In re Dairy Farmers of Am., Inc. Cheese Antitrust Litig.*,
  767 F. Supp. 2d 880 (N.D. Ill. 2011) ...................................................................... 10

*In re Loc. TV Advert. Antitrust Litig.*,
  2020 WL 6557665 (N.D. Ill. Nov. 6, 2020) ................................................ 10, 11, 13

*In re Plasma-Derivative Protein Therapies Antitrust Litig.*,
  764 F. Supp. 2d 991 (N.D. Ill. 2011) ...................................................................... 17

*In re Text Messaging Antitrust Litig.*,
  630 F.3d 622 (7th Cir. 2010) ............................................................................................ 21

*Jacobs v. City of Chicago*,
  215 F.3d 758 (7th Cir. 2000) ............................................................................................. 4

*Jamsports & Ent., LLC v. Paradama Prods. Inc.*,
  2003 WL 1873563 (N.D. Ill. Apr. 15, 2003) ..................................................................... 13

*Klein v. Facebook, Inc.*,
  2022 WL 141561 (N.D. Cal. Jan. 14, 2022) ....................................................................... 13

*L-3 Commc'ns Integrated Sys., L.P. v. Lockheed Martin Corp.*,
  2008 WL 4391020 (N.D. Tex. Sept. 29, 2008) .................................................................... 5

*McGarry & McGarry, LLC v. Bankr. Mgmt. Sols., Inc.*,
  937 F. 3d 1056 (7th Cir. 2019) ....................................................................................... 4, 9

*MCI Commc'ns Corp. v. AT&T Co.*,
  708 F.2d 1081 (7th Cir. 1983) .......................................................................................... 15

*McWane, Inc. v. FTC*,
  783 F.3d 814 (11th Cir. 2015) ........................................................................................... 5

*Midwest Gas Servs., Inc. v. Ind. Gas Co.*,
  317 F. 3d 703 (7th Cir. 2003) ............................................................................................ 9

*PepsiCo, Inc. v. Coca-Cola Co.*,
  114 F. Supp. 2d 243 (S.D.N.Y. 2000) ........................................................................... 11, 12

*Person v. Google, Inc.*,
  2007 WL 1831111 (N.D. Cal. June 25, 2007) .................................................................... 13

*Ploss v. Kraft Foods Grp., Inc.*,
  197 F. Supp. 3d 1037 (N.D. Ill. 2016) ......................................................................... 10, 14

*Pulse Network, LLC v. Visa, Inc.*,
  30 F.4th 480 (5th Cir. 2022) ............................................................................................. 8

*Serfecz v. Jewel Food Stores*,
  67 F. 3d 591 (7th Cir. 1995) ............................................................................................. 5

*Spectrum Sports, Inc. v. McQuillan*,
  506 U.S. 447 (1993) ....................................................................................................... 10

*Sw. Suburban Bd. of Realtors, Inc. v. Beverly Area Plan. Ass'n*,
  830 F.2d 1374 (7th Cir. 1987) ........................................................................................... 5

iii

*Swanson v. Citibank, N.A.*,
　614 F.3d 400 (7th Cir. 2010) ................................................................................................ 4

*Thompson's Gas & Elec. Serv., Inc. v. BP Am. Inc.*,
　691 F. Supp. 2d 860 (N.D. Ill. 2010) .................................................................................. 16

*Toys "R" Us, Inc. v. FTC*,
　221 F.3d 928 (7th Cir. 2000) ......................................................................................... 10, 21

United States v. Grinnell Corp.,
　384 U.S. 563 (1966) ............................................................................................................. 10

*Valley Liquors, Inc. v. Renfield Importers, Ltd.*,
　822 F.2d 656 (7th Cir. 1987) .............................................................................................. 15

*Viamedia, Inc. v. Comcast Corp.*,
　951 F.3d 429 (7th Cir. 2020) ..................................................................................... 4, 17, 20

*Yankees Ent. & Sports Network, LLC v. Cablevision Sys. Corp.*,
　224 F. Supp. 2d 657 (S.D.N.Y. 2002) .................................................................................. 5

*Zahn v. N. Am. Power & Gas, LLC*,
　815 F.3d 1082 (7th Cir. 2016) .............................................................................................. 3

**Treatises**

Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law: An Analysis of Antitrust Principles and
　Their Application* (5th ed. 2021) ........................................................................................ 17

iv

**INTRODUCTION**

In 2016, Plaintiff Provi brought much-needed innovation and new competition to the antiquated alcohol industry with its online marketplace for alcohol products. Provi offers a far more efficient, cost-effective, user-friendly, and robust means of ordering alcohol products over outmoded means of numerous phone calls, emails, text messages, faxes, and meetings with *each* of the multiple distributors an individual retailer depends on for its alcohol needs. With Provi, retailers—at no cost to them *or distributors*—can shop over 100,000 products across numerous distributors on a single marketplace at their convenience any hour of the day and submit a single, comprehensive order to multiple distributors with the ease of clicking a button online. Recognizing this extraordinary value, both retailers and distributors flocked to Provi to handle orders for alcohol products. Defendants SGWS and RNDC—which have long dominated the alcohol distribution industry—also recognized that value, reaping hundreds of millions of dollars in revenue *for years* from countless orders that *retailers chose to communicate* through Provi.

Then, within *just days of each* other in April 2019, SGWS and RNDC released their own online marketplaces—Proof and eRNDC, respectively—in competition with Provi. But contrary to the misleading narrative in their Motion, they did not stop accepting orders through Provi simply to rely on their own online marketplaces. Rather, they *continued* accepting orders that retailers chose to communicate through Provi *for two more years* after releasing Proof and eRNDC, leaving retailers free to choose among competing marketplaces. But Defendants eventually faced the reality that (i) retailers much prefer Provi over Proof and eRNDC—as Defendants concede in their Motion—and (ii) Provi's one-stop-shop marketplace drives unprecedented competition among distributors of alcohol products by enabling smaller distributors to do business with retailers in a way they could not before, thus threatening Defendants' longstanding distribution monopolies.

1

By the summer of 2021, Defendants realized Proof and eRNDC could not compete successfully with Provi, even after RNDC tried to steer retailers away from Provi through false statements about it. So Defendants agreed to *force* retailers to Proof and eRNDC. They agreed to forgo the substantial revenues they enjoyed for years on orders communicated through Provi and pursue the long-term benefits of eliminating competition from Provi and monopolizing the market for online alcohol marketplaces, among others. They did this by rejecting and blocking orders *retailers sought to communicate* to SGWS and RNDC through Provi. Both retailers and suppliers, including some of the world's largest companies, vocally objected to Defendants' boycott of Provi, complaining about the significant inferiority and inefficiency of Proof and eRNDC.

But Defendants have persisted, assured that retailers and suppliers will not leave them *because of the monopoly power they enjoy*, together and individually, in the distribution industry and beyond. Retailers have no choice but to buy from SGWS and RNDC because they have exclusive control throughout the country over the must-have products retailers need. And retailers no longer can choose Provi to order the products they must have from Defendants, cementing and extending Defendants' monopoly power in each of the relevant markets alleged in the Complaint. Defendants' conduct has caused tremendous harm to retailers, suppliers, other distributors, and ultimately consumers—and of course to Provi, the target of their boycott.

This is a classic antitrust case. Defendants pretend otherwise by disputing the facts in Provi's Complaint and offering misleading and inaccurate factual allegations that go beyond the Complaint. Perhaps the most egregious is Defendants' claim that they "have not tried to impose on retailers *any* sort of prohibition against using Provi." Mot. 8 (emphasis added). Not only does this contradict Provi's well-pleaded allegations, it's obviously incorrect. Compl. ¶¶ 114-16, 120, 146-47. A key reason for this lawsuit is the prohibition Defendants impose on *every* retailer against

2

using Provi to order Defendants' must-have and other alcohol products. They have even admitted they imposed this prohibition for the very purpose of steering retailers away from Provi—something they could not achieve through competition with Provi when retailers were free to choose which marketplace to use. Defendants try to obscure this failure by misleadingly alleging that that they "accepted orders placed through Provi for a time (*when neither defendant had an online ordering platform of its own*)." Mot. 1 (emphasis added). But again, they continued to accept orders that retailers placed through Provi *for years after launching Proof and eRNDC*—yet Provi's popularity continued to grow quickly, including among critical national retail chains (so-called National Accounts). So Defendants eventually agreed to eliminate competition from Provi for Proof and eRNDC, and they have succeeded. The harm to Provi and other market participants is exactly the type the antitrust laws were designed to prevent—and mandates relief.

To be clear, Provi is not asking Defendants to "use its platform" as they wrongly allege. Mot. 20-21. *Retailers* are the ones that "use its platform," to shop for and order the alcohol products they need. Provi seeks to stop Defendants from taking the affirmative step of eliminating competition by prohibiting retailers from doing that. There are no procompetitive justifications for this prohibition, nor could there be for their collusive boycott and SGWS's tying arrangement which are *per se* illegal. Forcing retailers to use Proof and eRNDC as an exercise of Defendants' conspiracy and monopoly power rather than competing against Provi for retailers' business is inherently anticompetitive and unlawful. The Court should deny Defendants' Motion.

## LEGAL STANDARD

On a Rule 12(b)(6) motion, courts must assume the complaint's factual allegations to be true and draw all reasonable inferences in the plaintiff's favor. *See*, *e.g.*, *Zahn v. N. Am. Power & Gas, LLC*, 815 F.3d 1082, 1087 (7th Cir. 2016) (internal citations omitted). A plaintiff need only allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Co. v. Twombly*,

3

550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). A "well-pleaded complaint may proceed [even] if it strikes a savvy judge that actual proof of those facts is improbable, and 'that a recovery is very remote and unlikely.'" *Twombly*, 550 U.S. at 556. The court may not consider allegations outside the complaint, including allegations proffered by defendants. *Jacobs v. City of Chi.*, 215 F.3d 758, 766 (7th Cir. 2000). Defendants here have run roughshod over this well-settled standard by disputing Provi's allegations and offering their own (inaccurate) narrative. Defendants' factual allegations and inferences (drawn in their own favor) are not allowed, nor can they be weighed against Provi's. *See Swanson v. Citibank, N.A.*, 614 F.3d 400, 404 (7th Cir. 2010).

## ARGUMENT

### I.     PROVI HAS ANTITRUST STANDING

Provi, as a competitor in the alleged relevant markets, presumptively has antitrust standing. *Viamedia, Inc. v. Comcast Corp.*, 951 F.3d 429, 482 (7th Cir. 2020) ("The general rule is that customers and competitors in the affected market have antitrust standing.") (collecting cases). Provi need only plead that it (1) was injured by the challenged anticompetitive conduct; and (2) is an efficient vindicator of the antitrust laws. *McGarry & McGarry, LLC v. Bankr. Mgmt. Sols., Inc.*, 937 F. 3d 1056, 1064-65 (7th Cir. 2019) (internal citations omitted). Provi pleads both.

#### A.     Provi Amply Alleges Antitrust Injury

Provi need only plead that the harm Defendants caused it is "of the type the antitrust laws were intended to prevent" and "flow[s] from that which makes [D]efendants' acts unlawful." *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977). Provi alleges that Defendants injured it by, *inter alia*, foreclosing it from certain relevant markets. Compl. ¶¶ 213-15. This is just the type of injury the antitrust laws were meant to prevent. *Serfecz v. Jewel Food*

4

*Stores*, 67 F. 3d 591, 597 (7th Cir. 1995) ("[W]hen a competitor is forced out of the market . . . compensat[ing] the injured [competitor] promotes the designated purpose of the antitrust law — the preservation of competition."); *see also Sw. Suburban Bd. of Realtors, Inc. v. Beverly Area Plan. Ass'n*, 830 F.2d 1374, 1382 (7th Cir. 1987) (finding antitrust injury where defendants' boycott drove plaintiff from market); *Cont'l Airlines, Inc. v. United Air Lines, Inc.*, 120 F. Supp. 2d 556, 569 (E.D. Va. 2000) (exclusion-driven lost profits are "classic antitrust injur[ies]"); *L-3 Commc'ns Integrated Sys., L.P. v. Lockheed Martin Corp.*, 2008 WL 4391020, at *3-5 (N.D. Tex. Sept. 29, 2008) (denying motion to dismiss regarding antitrust injury where, as here, plaintiff alleged it suffered lost profits and its damages "stem directly from the conduct it alleges violates the antitrust laws"); *Yankees Ent. & Sports Network, LLC v. Cablevision Sys. Corp.*, 224 F. Supp. 2d 657, 669-670 (S.D.N.Y. 2002) (exclusion of rival that reduces competition constitutes antitrust injury). Antitrust injury does not require that Defendants put Provi out of business. *See, e.g., McWane, Inc. v. FTC*, 783 F.3d 814, 838 (11th Cir. 2015) ("[Courts] have found monopolists liable for anticompetitive conduct where, as here, the targeted rival gained market share—but less than it likely would have absent the conduct.") (collecting cases).

Provi was growing by "leaps and bounds" until Defendants' anticompetitive conduct "caused key National Accounts and many other retailers to cease moving forward with planned rollouts" of Provi's products and services, directly hurting Provi's profits and greatly diminishing its scale as a competitor to Defendants. Compl. ¶¶ 10, 122, 222. National Accounts are the largest retailers, and their business is critical for online alcohol marketplace providers like Provi to achieve necessary scale to compete effectively long-term. *Id*. ¶ 84. Defendants' conduct also hurts Provi's advertising revenue, by stopping it from achieving necessary scale among retailers to maintain and attract critical order volume and advertising buyers. And suppliers have little or no reason to

5

advertise products on Provi that Defendants block retailers from ordering via Provi. *Id*. ¶¶ 122, 221, 233. Provi continues to suffer reduced order volume and lost profits, "degrading its products and impeding its growth" and "reduc[ing it] to a small-scale, fringe player in the relevant markets." *Id*. ¶¶ 122, 223, 215-16. Provi specifically alleges that many National Accounts and numerous others retailers would have continued using Provi if Defendants had not prohibited retailers from choosing to communicate their orders through Provi. *Id*. ¶¶ 85, 122, 152. Those allegations are supported by retailers themselves, who objected to Defendants' conduct. *Id*. ¶¶ 13-14, 116. Thus, Provi's injuries, including lost profits, flow directly from Defendants' exclusionary conduct.

Defendants resort to disputing and mischaracterizing the facts. They allege that "[t]he only real harm to Provi . . . arises from the fact that, by developing their own online ordering platforms (Proof and eRNDC), SGWS and RNDC now can compete with Provi and challenge its control over [the relevant markets]."[1] Mot. 7. But this imagined narrative finds no footing in the Complaint. *See Hannah's Boutique, Inc. v. Surdej,* 2013 WL 4553313, at *5 (N.D. Ill. Aug. 28, 2013) ("Defendants cannot defeat [plaintiff's] allegations by merely offering unsupported factual allegations of their own."). The Complaint paragraph Defendants cite states only that in May 2021, Defendants "began to coordinate and collude to stop Provi from gaining scale to compete effectively with their respective online marketplaces"—a well-recognized form of antitrust injury. Compl. ¶ 104; *see supra* 4-5. Defendants offer a competing (and inaccurate) narrative in an unavailing attempt to analogize this case to ones in which courts found that the alleged conduct was actually competition-*enhancing*. But this case is far removed from that paradigm.

Defendants' narrative is premised on a demonstrably inaccurate allegation: that they "accepted orders placed through Provi for a time (*when neither defendant had an online ordering*

---

[1] Defendants offer an incoherent story, alleging *both* that they "do not believe it is accurate to describe them as competitors to Provi," Mot. 6 n.1, *and* that they have "increased competition" with Provi, *id.* at 6-7.

*platform of its own*)" and stopped after they developed Proof and eRNDC. Mot. 1 (emphasis added). But Defendants launched those platforms—virtually simultaneously—in April 2019, and they *continued for years* to accept orders placed through Provi *when each Defendant had an online ordering platform of its own*. Compl. ¶¶ 12, 101-23. Defendants' claim that "Provi's complaint . . . is that defendants' mere presence in the relevant markets it proposes causes it injury" contradicts Provi's allegations. Mot. 6 (quotation marks omitted). Provi competed against Proof and eRNDC for years and *thrived*, including landing numerous deals with sought-after National Accounts in 2021—*just before Defendants enacted their boycott*. Compl. ¶¶ 10, 84, 110, 148-52. Only after failing for years to beat Provi on the merits did Defendants prohibit retailers from using Provi, the biggest threat to Proof and eRNDC. *Id*. ¶¶ 256, 266. It is Defendants who object to Provi's mere presence in the relevant markets, and so they cut Provi out.[2] Provi welcomes the competition.

That Defendants continued to accept orders retailers placed through Provi *for years when each defendant had an online ordering platform of its own* belies their allegations that "[i]f Provi wins . . . the prices in the markets it proposes . . . **will go up**, not down," and that "Provi's claim is essentially that it would be able to charge higher prices and make more money if all distributors were forced to fulfill orders for their products placed on Provi's online marketplace." Mot. 2, 6 (emphasis in original). These allegations contradict the facts in Provi's Complaint and are nonsensical. There is no basis in the Complaint for this Court to find that Provi will "be able to charge higher prices," *id*. at 6, if retailers are *again* free to buy Defendants' products through Provi, especially given there are no allegations in the Complaint indicating Provi had that kind of pricing power when retailers enjoyed that *same* freedom for years before. In fact, the popular and growing

---

[2] Defendants' claim that "Provi asks for 'the benefits of increased concentration'" defies basic math. Mot. 7. Defendants' boycott of Provi has left retailers with *fewer* online alcohol marketplaces to choose from to obtain the products they must have from Defendants, thereby increasing market concentration. Compl. ¶ 214. For SGWS, retailers are left with *only one* online marketplace: Proof. *Id*. ¶ 114.

demand for Provi's products and services among retailers, suppliers, and distributors *in those years* is inconsistent with Defendants' fantastical allegations and renders implausible their speculation that Provi will charge supracompetitive prices if it prevails in returning to retailers the freedom they had before to choose their online marketplace providers. Compl. ¶¶ 10-11, 101. In any event, the Court cannot rely on Defendants' allegations. *Hannah's Boutique,* 2013 WL 4553313, at *5.

Importantly, though, Defendants' allegations ironically concede antitrust injury here. Their speculation that Provi would raise prices were customers *again* free to choose Provi's marketplace to order Defendants' products is explicitly premised on the condition that, in those circumstances, "*more* retailers order through Provi *because SGWS- and RNDC-distributed products are available*" **on Provi**. Mot. 2 (emphasis added). Defendants thus concede that (i) many retailers prefer Provi over Proof and eRNDC and, most importantly, (ii) there is a *direct cause and effect* between their prohibition on retailers from ordering through Provi and Provi's ability to compete in the markets—and the effect they concede is that *more* retailers would order through Provi *if SGWS- and RNDC-distributed products were available* **on Provi**. Taking action— collusively or unilaterally as a monopolist—to stifle competition from a better, more popular rival is unlawful *because it is anticompetitive*. When that anticompetitive conduct harms the rival, as it has here,[3] it constitutes precisely the kind of injury the antitrust laws were designed to remedy.

Finally, Defendants rely heavily on the Fifth Circuit's decision in *Pulse Network, LLC v. Visa, Inc*., 30 F.4th 480 (5th Cir. 2022), but that case directly refutes their arguments. For two of the three Visa policies challenged by Pulse, the Fifth Circuit ruled that Pulse suffered "textbook antitrust injury" as a rival that had "lost volume and market share," in part because Visa used its "market dominance to strong-arm merchants into avoiding [Pulse's product]," just as Defendants

---

[3] Defendants admit their "respective decisions to stop fulfilling orders placed through Provi *likely hurts Provi's bottom line*"—which is indeed antitrust injury on the facts here. Mot. 7 (emphasis added).

have done to Provi here. *Id*. at 491-95. The court found a lack of antitrust injury only for the third policy because Pulse's losses there resulted from merchants "choosing" Visa over Pulse. *Id*. at 489-91. But that underscores *Provi's injury*: unlike in *Pulse*, retailers (including many National Accounts), when given the choice, choose Provi over Proof and eRNDC, as Defendants concede. Compl. ¶ 12; Mot. 2. Again, Defendants attempt to obscure this fact, which the Court must accept as true, by misleadingly alleging that they "accepted orders placed through Provi for a time (when neither defendant had an online ordering platform of its own)."[4] Mot. 1. That is simply not correct.

### B.      Provi Is a Proper Plaintiff

Defendants' claim that Provi is not "the proper plaintiff[]" here is meritless. Mot. 9. Provi need only show that it can "efficiently vindicate the purposes of the antitrust laws." *McGarry*, 937 F.3d at 1065-66. Courts generally "presume that competitors and consumers in the relevant market are the only parties who . . . are in a position to efficiently vindicate the antitrust laws."[5] *Id.* at 1066 (citing *Associated Gen. Contractors of Cal. v. Carpenters*, 459 U.S. 519, 538 (1983)). Provi competes in all the relevant markets where it seeks relief. Compl. ¶¶ 101, 181, 185, 194-95.

## II.      PROVI STATES CLAIMS FOR MONOPOLIZATION

Provi alleges each element for its monopolization claims: (1) each Defendant's possession of "monopoly power in the relevant market;" and (2) "the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product,

---

[4] Defendants' other cases are inapposite because they involve losses stemming from more competition, not foreclosure of a competitor. *Brunswick Corp.*, 429 U.S. at 487-89 (no antitrust injury from competitive losses to defendant-acquired centers that otherwise would have gone bankrupt); *Midwest Gas Servs., Inc. v. Ind. Gas Co*., 317 F. 3d 703, 713 (7th Cir. 2003) (no antitrust injury from losses due to non-predatory price competition); *Car Carriers, Inc. v. Ford Motor Co*., 745 F. 2d 1101, 1110 (7th Cir. 1984) (same).
[5] Courts focus on: (1) "[t]he directness between the injury and the market restraint"; (2) "[t]he speculative nature of the damages"; and (3) "[t]he risk of duplicate recoveries or complex damages apportionment." *McGarry*, 937 F.3d at 1064-65. Provi satisfies all three factors. Its injuries flow directly from Defendants' conduct. *See supra* 4-6. No one is *more* directly harmed by Defendants' boycott of Provi, though retailers, suppliers, other distributors, and consumers *also* are harmed. And there is no risk of duplicative recoveries (Provi will recover only its own losses) and damages are routinely apportioned in cases like this.

business acumen, or historic accident." *Ploss v. Kraft Foods Grp., Inc.*, 197 F. Supp. 3d 1037, 1069 (N.D. Ill. 2016) (citing *United States v. Grinnell Corp.*, 384 U.S. 563, 570–71 (1966)).[6]

### A.     Provi Amply Alleges Monopoly Power in the Relevant Markets

Monopoly power is "the power to control prices or exclude competition." *Ploss*, 197 F. Supp. 3d at 1071 (citations omitted). It can be shown via "(1) 'direct evidence of anticompetitive effects'; or (2) indirect evidence of monopoly power with allegations of '[the] relevant product and geographic markets and by showing that the defendant's share exceeds whatever threshold is important for the practice in that case.'" *Id*. (quoting *Toys "R" Us, Inc. v. FTC*, 221 F.3d 928, 937 (7th Cir. 2000)). Provi offers both types of evidence with specific facts, satisfying its burden.

### 1.     Provi's alleged relevant markets are facially plausible

Defendants' claim that Provi does not identify an appropriate relevant market fails. Mot. 10. "Courts are generally hesitant to dismiss a Sherman Act claim for failure to allege a relevant product [market] '[b]ecause market definition is a deeply fact-intensive inquiry.'" *In re Loc. TV Advert. Antitrust Litig.*, 2020 WL 6557665, at *11 (N.D. Ill. Nov. 6, 2020) (internal citations omitted). "Courts should dismiss antitrust claims based on a market argument only when it is certain that 'the alleged relevant market clearly does not encompass all interchangeable substitute products.'" *Ploss*, 197 F. Supp. 3d at 1070-71 (citing *In re Dairy Farmers of Am., Inc. Cheese Antitrust Litig.*, 767 F. Supp. 2d 880, 901 (N.D. Ill. 2011)). No such deficiency exists here.

Provi alleges that each Defendant monopolizes three relevant product markets in states across the country: Online Alcohol Marketplaces, Advertising on Online Alcohol Marketplaces

---

[6] Provi alleges, alternatively, that each Defendant attempted to monopolize the relevant markets. Compl. ¶¶ 256, 266. Defendants do not address those claims and should not be allowed to do so on reply. *See Hess v. Reg-Ellen Mach. Tool Corp.,* 423 F.3d 653, 665 (7th Cir. 2005). In any event, Provi need only allege for those claims that (1) each Defendant engaged in anticompetitive conduct, with (2) a specific intent to monopolize and (3) a dangerous probability of success. *Spectrum Sports, Inc. v. McQuillan,* 506 U.S. 447, 456 (1993). Provi does so for each Defendant. *See*, *e.g*., Compl. ¶¶ 255-56 (SGWS); ¶¶ 265-66 (RNDC).

10

(consisting of submarkets for Display and Search Advertising), and Data Analytics Services. The Complaint includes specific facts regarding the scope of each product and geographic market, the features of the relevant products, the types of market participants, and the potential substitutability of alternatives. Compl. ¶¶ 162-72 (Online Alcohol Marketplaces); ¶¶ 173-92 (Advertising on Online Alcohol Marketplaces); ¶¶ 193-212 (Data Analytics Services). Defendants' ignore or outright dispute these factual allegations, which is improper under Rule 12.

Defendants first object to the Online Alcohol Marketplaces market as too narrow because it excludes phone, fax, text, email, and in-person meetings. Mot. 11. Defendants dispute the Complaint's factual allegations for why those alternatives are *not* reasonable substitutes for Online Alcohol Marketplaces, including one-stop-shopping, 24/7 availability, visibility of many more products, and unique order management and record-keeping tools—versus *numerous* individual emails, phone calls, faxes, texts, and meetings *consuming many hours of employee time during key business hours* for retailers every week with no central, web-accessible order repository. Compl. ¶ 172. Defendants bizarrely dismiss these unique attributes of online alcohol marketplaces as "the benefits of online ordering." Mot. 11. But the benefits of one product versus another are a key factor in assessing their substitutability. *In re Loc. TV Advert.*, 2020 WL 6557665, at *12 ("unique attributes" plausibly distinguished potentially substitutable products) (citation omitted). Provi specifically explains how the benefits—or unique attributes—of Online Alcohol Marketplaces render Defendants' alleged alternatives unreasonable substitutes. Compl. ¶¶ 172, 86-89, 96.

Defendants' reliance on the out-of-circuit *summary judgment* decision in *PepsiCo, Inc. v. Coca-Cola Co.*, 114 F. Supp. 2d 243 (S.D.N.Y. 2000), is misplaced. The district court found that "market realities, evidenced by the voluminous submissions on the instant motion, demonstrate a far broader relevant market than that identified in the Amended Complaint." *Id.* at 248. Thus,

11

PepsiCo failed to *prove* its market definition allegations in its complaint, *which the court had found sufficient to defeat dismissal. Id.* at 248, 245. And Defendants' sweeping claim that, as a matter of law, "the way a product is ordered does not create a separate market" (Mot. 11) is unsupported and wrong. *See, e.g., Frame-Wilson v. Amazon.com, Inc.*, 2022 WL 741878, at *10 (W.D. Wash. Mar. 11, 2022) (sustaining relevant market for retail ecommerce excluding goods sold in physical stores); *FTC v. Staples, Inc.*, 970 F. Supp. 1066, 1074-75 (D.D.C. 1997) (sustaining relevant market for office supplies from office supply superstores excluding other retail outlets).[7]

Defendants next argue that Provi fails to "reasonably delineate" the Advertising on Online Alcohol Marketplaces and Data Analytics Services market boundaries. Mot. 11. Not so. Provi alleges that the general search and display advertising options Defendants cite, such as radio (*id.* at 12), are not reasonably interchangeable with Search and Display Advertising on Online Alcohol Marketplaces because, among other things, the latter are *specifically targeted to retail alcohol buyers* and thus provide suppliers *much higher returns* on their ad spends—which means suppliers very likely would not turn to other forms of advertising or data analytics even in the face of a small but significant non-transitory increase in price. Compl. ¶¶ 181-82, 186.[8] That Defendants do not understand this may help explain why so many ad buyers prefer Provi over Proof and eRNDC. Regardless, Defendants are wrong that the relevant advertising markets here include other media

---

[7] That Defendants do not understand that buyer demand for the unique attributes of online marketplaces can be so great as to render them distinct relevant markets (or submarkets) perhaps provides some insight into why Proof and eRNDC could not meet that particular demand in competition with Provi. Defendants' allegation that "the ways all orders were placed until a few years ago" were "by phone, email, etc." rather than online alcohol marketplaces (Mot. 11) contradicts the Complaint (¶¶ 8, 11), is factually wrong, and suggests why they were so late to release Proof and eRNDC, years after Provi and others launched.

[8] The same holds for the Data Analytics Services market which Defendants mention only in passing. Mot. 11. It involves rich, valuable data *specifically regarding retail alcohol buyers*, from what they purchase to what they search for and consider on an online alcohol marketplace and more. Compl. ¶¶ 194, 197, 199-200. Defendants themselves emphasize the unique commercial value of this data (*id.* ¶ 114) and proffer no reasonable substitutes in their Motion (Mot. 11-12).

as a matter of law.[9] Defendants implicitly concede this in speculating that Provi will "charge more for data" and "for ads" if it wins this case. Mot. 2. That assumes Provi would face no substitutes to which ad buyers could turn to defeat such a price increase, which posits a much narrower market than Defendants allege. It also refutes Defendants' claim that Provi's "allegations say nothing about what would occur in response to a price increase." *Id*. at 11.

Defendants next dispute the geographic bounds of Provi's relevant markets, arguing that Provi "provides no basis to plausibly infer that the markets for online advertising and data insights break down at state lines." Mot. 12-13. But Provi alleges that the availability of spirit and wine products *vary by state*, as do the distributors that offer each product and the regulations governing alcohol distribution, which necessarily affect where suppliers choose to advertise because target "[r]etailers in any given state or states will only be interested in products where they operate." Compl. ¶ 187. Defendants nonsensically insist that wine and spirits ads for products available in, say, California must be included in the same relevant market as (i) ads for products *unavailable* in California, as well as (ii) ads directed at, say, retailers in Oklahoma that retailers in California do not even see. Defendants emphasize that "[p]roviders of Online Alcohol Marketplaces compete for suppliers' advertising dollars on a nationwide basis." Mot. 13 (quoting Compl. ¶ 187). But that does not bear on whether the advertising products sold for one state reasonably substitute for those sold for another state—*they do not*. Compl. ¶ 187. The same holds for the Data Analytics Services markets, because those buyers require insights about their jurisdiction's unique regulatory

---

[9] Defendants' reliance on the 2007 out-of-circuit decision in *Person v. Google, Inc.*, 2007 WL 1831111 (N.D. Cal. June 25, 2007), is misplaced. Much more recent cases from that and other district courts recognize distinct relevant markets limited to one form of advertising. *See*, *e.g.*, *Klein v. Facebook, Inc.*, 2022 WL 141561, at *21 (N.D. Cal. Jan. 14, 2022) (finding that search advertising constituted a separate market from social media advertising); *In re Loc. TV Advert.*, 2020 WL 6557665, at *12 (broadcast television advertising market distinct from digital media advertising). And Provi need not "anticipate and refute in its complaint all possible market substitutes." *Jamsports & Ent., LLC v. Paradama Prods. Inc.*, 2003 WL 1873563, at *6 (N.D. Ill. Apr. 15, 2003).

and operating circumstances and the different supplier-distributor relationships that exist in that state. Compl. ¶ 204. Defendants may disagree, but Provi's specific factual allegations must be accepted as true at this stage—and they amply support the alleged relevant markets.[10]

### 2. Provi alleges direct evidence of monopoly power in each market

It is difficult to imagine more direct evidence of monopoly power than a firm's ability to eliminate competition from a firm and force customers to use its own product when they vocally do not want to—which is exactly what Provi alleges here for each Defendant. Compl. ¶¶ 220, 13-14, 85, 116-17, 148-52. Provi also alleges specific anticompetitive effects from Defendants' exclusionary conduct, including "degrading its products and impeding its growth so that it is reduced to a small-scale, fringe player in the relevant markets" and effectively cannot compete at all for retailers buying Defendants' alcohol products. *Id*. ¶¶ 223, 215-16. This is a direct output restriction in the relevant markets flowing from Defendants' foreclosure of a key rival. *Id.* ¶¶ 258, 270; *see supra* 7 n.2. Provi also alleges "actual injury to competition in the form of higher prices, . . . reduced innovation, and decreased quality in the relevant markets." *Id.* ¶¶ 230, 239, 258, 270, 279, 283, 289. Given this showing, Provi need not allege circumstantial evidence of Defendants' monopoly power. *Ploss*, 197 F. Supp. 3d at 1071 (allegations of direct evidence of anticompetitive effects are "enough to allege monopoly power in the relevant market"). But Provi does anyway.

### 3. Provi alleges indirect evidence of monopoly power in each market

The Complaint alleges facts from which this Court can plausibly infer Defendants' monopoly power in each of the relevant markets. Provi alleges that SGWS controls over 70% of

---

[10] *Aspen Skiing* further refutes Defendants' arguments that the relevant markets are overly narrow. That case involved a relevant market, or submarket, of "[d]ownhill skiing at destination ski resorts" in the "Aspen area," with the defendant controlling three of the four mountains in that narrow market—despite many other ski resorts that skiers could turn to around the country including in the vicinity of the four mountains at issue in that case. *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585, 596 (1985).

14

distilled spirits distribution in five states, and over 50% in seven others. Compl. 17 tbl. 1. SGWS similarly controls over 70% share in wine distribution in two states and 50% share in five others. *Id*. at 18 tbl. 2. Likewise, RNDC controls over 70% of wine distribution and over 50% of spirits distribution in two states and over 60% for wine distribution in four states.[11] *Id*. at 17 tbl. 1, 18 tbl. 2. And SGWS and RNDC each have exclusive rights to distribute "must-have" alcohol products under long-term contracts in many states, giving them each "tremendous market power over local, regional, and national distribution" and "mak[ing] it virtually impossible for retailers to avoid purchasing from Southern and RNDC." Compl. ¶¶ 50, 56-57.

Provi specifically explains how Defendants have abused their well-established dominance in these distribution markets to obtain *commensurate monopoly power* in the related relevant markets. For Online Alcohol Marketplaces, Provi alleges that retailers "(i) must buy certain brands from [Defendants]; and (ii) are significantly less likely to split their basket of orders once they are already shopping directly with [SGWS] or RNDC to buy lesser-known products from other distributors, even if those distributors offer better prices or service." Compl. ¶ 6; *see also id*. ¶ 237 ("retailers must deal with [SGWS] and RNDC in order to fulfill the alcohol orders essential to their business"). Provi similarly alleges that "Defendants' power in wine and spirits distribution allows them to exercise comparable power in the Search Advertising and Display Advertising on Online Alcohol Marketplaces markets" because Defendants are able to force retailers to use Proof and eRNDC for online alcohol orders, which "subject retailers to" the online advertising *Defendants*

---

[11] Defendants remarkably claim that "courts will not find monopoly power unless a defendant has 'a market share of more than seventy to eighty percent.'" Mot. 10 n.3. (citing *MCI Commc'ns Corp. v. AT&T Co.*, 708 F.2d 1081, 1107 (7th Cir. 1983)). Countless cases belie this claim, and the Seventh Circuit has accepted market shares of approximately 50% as sufficient in § 2 cases. *Valley Liquors, Inc. v. Renfield Importers, Ltd.*, 822 F.2d 656, 666-67 (7th Cir. 1987) (collecting cases). Defendants find no support in the *MCI* case they cite, which merely observed that where the "data reveals a market share of more than seventy to eighty percent, the courts have inferred the existence of monopoly power." 708 F.2d at 1107. *MCI* in no way specifies "seventy to eighty percent" as the *floor* for monopoly power as Defendants wrongly claim.

15

*sell* on Proof and eRNDC. *Id*. ¶¶ 190-92. Finally, Provi alleges that "Defendants' control of wine and spirits distribution allows them each to exercise market power in the Data Analytics Services market in essentially equal measure" because retailers must come to Proof and eRNDC for their online alcohol orders, which in turn, "generate[s] the highly valuable data" marketed to suppliers and retailers in this market—especially given the volume of online retailer data Defendants can capture and control due to their distribution dominance. *Id*. ¶¶ 209-12. That Provi is not a distributor in the alcohol distribution markets Defendants have long dominated does not negate the facts showing Defendants' abuse of that dominance to also monopolize the relevant markets where Provi competes, as Defendants wrongly claim.[12] Mot. 12.

Provi also specifically alleges high barriers to entry in the relevant markets, including high capital expenditures, technical expertise, economies of scale, and historical data. Compl. ¶¶ 98, 188-92, 205-12, 253, 264. Defendants entirely ignore these allegations and what they show about the magnitude and durability of Defendants' monopoly power in the relevant markets (Mot. 10-14). *See Thompson's Gas & Elec. Serv., Inc. v. BP Am. Inc.*, 691 F. Supp. 2d 860, 865 (N.D. Ill. 2010) ("[T]he existence of significant barriers to entry [is] another factor considered by courts to indicate to what extent Defendants were able to exclude competition.").

Defendants claim that Provi does not specify "the market share of any participant" in the proposed markets (Mot. 12). This misstates Provi's allegations and the law. First, Provi specifically alleges how Defendants' market shares in the distribution markets reflect their

---

[12] Provi need not allege competitive harm in the distribution markets Defendants control, but it nonetheless has, contrary to Defendants' claim (Mot. 13). *See*, *e.g.*, Compl. ¶¶ 6 (Defendants foreclose competition from smaller distributors "even if those distributors offer better prices or service"), 9 (Defendants' boycott of Provi reduces retailers' "visibility to the hundreds of small distributors across the country that only carry lesser-known or up-and-coming commodity or craft beverages"), 12 ("Provi's growing popularity [is] a threat to [Defendants'] market power and their plans to keep retailers away from other distributors"), 16 ("Defendants' conduct has unlawfully restrained competition among alcohol distributors . . .").

16

commensurate shares for the related Online Alcohol Marketplaces because of their ability to force the same retailers buying their alcohol products to use Proof and eRNDC for online orders. Compl. ¶¶ 190-92. Second, there is no requirement for a plaintiff to allege specific market shares at the pleading stage. *See Hannah's Boutique,* 2013 WL 4553313, at *3 (noting defendants failed to "cite any case requiring a plaintiff to allege a specific market size or percentage market share" and denying motion to dismiss). Further, the data needed to *more precisely* estimate Defendants' market shares for every relevant market is not publicly available; thus, it is not required at the pleading stage and instead is a subject for discovery and expert analyses. *See, e.g., In re Plasma-Derivative Protein Therapies Antitrust Litig.,* 764 F. Supp. 2d 991, 1003 n.10 (N.D. Ill. 2011) ("private plaintiffs [] do not have access to inside information" and "the pleading standard must take into account that a complaint will ordinarily be limited to . . . publicly available data").

**B.      Provi Amply Alleges that Defendants Engaged in Exclusionary Conduct**

A monopolist's conduct violates § 2 if it "(1) tends to impair the opportunities of rivals, [and] also (2) either does not further competition on the merits or does so in an unnecessarily restrictive way." *Aspen Skiing*, 472 U.S. at 605, 605 n.32 ("If a firm has been 'attempting to exclude rivals on some basis other than efficiency,' it is fair to characterize its behavior as predatory."). The Court must assess "whether, viewing the monopolist's conduct as a whole, it has unreasonably maintained or enhanced its monopoly position," rather than viewing each act or omission in isolation. *Viamedia*, 951 F.3d at 469 (citing Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law: An Analysis of Antitrust Principles and Their Application* ¶ 777 (4th ed. 2015)).

Provi alleges a pattern of exclusionary conduct by each Defendant that includes: (1) conspiring with each other to boycott Provi (Compl. ¶¶ 101-123); (2) forcing retailers onto their own inferior online alcohol marketplaces despite retailers' strong desire to use others (*id.* ¶ 14, 150-51, 211-12, 255-56, 265-66); and (3) blocking Provi's email domain to prevent *retailers* from

17

sending orders to their respective sales representatives (*id*. ¶¶ 12, 15, 108, 116, 141, 147, 225, 227, 255-56, 265-66). SGWS threatened its own sales representatives with termination or discipline if they failed to comply with the Provi boycott (*id*. ¶¶ 117, 255-56). RNDC also (1) harassed Provi's customer service representatives (*id*. ¶ 146); (2) sent baseless cease-and-desist letters intended to intimidate Provi (*id*. ¶¶ 132-34, 146); (3) spread false claims about Provi intended to steer market participants away from it (*id.* ¶¶ 138-39); and (4) publicly attacked Provi at a trade association meeting with numerous other distributors in an apparent effort to orchestrate a broader boycott of Provi in the industry (*id.* ¶¶ 210-11). And Provi alleges that Defendants openly acknowledge the exclusionary success of their conduct, with their respective executives flashing two fingers at each other to signify that they are the only two meaningful firms in the industry, a position which they seek to maintain and extend. *Id.* ¶ 5. Defendants ignore these many specific factual allegations of *affirmative* anticompetitive conduct and effects in wrongly claiming that Provi's case merely seeks cooperation from Defendants. Mot. 2, 7, 15. Far from it.

Nevertheless, Provi adequately pleads an unlawful refusal-to-deal claim as *part* of its case. The Supreme Court's holding in *Aspen Skiing* that a monopolist violated § 2 by refusing to deal with a competitor fully supports Provi's claims:

- Much like the parties here mutually served retailers for years, including as competitors after Proof and eRNDC launched (Compl. ¶¶ 11-12, 120, 130), the parties in *Aspen Skiing* mutually served customers for years with a joint lift ticket for their respective ski resorts until the defendant suddenly killed the program, 472 U.S. at 585.

- Each Defendant decided to forgo substantial revenues from orders through Provi and destroy good will with retailers by rejecting those orders for the purpose of eliminating competition from Provi (Compl. ¶¶ 15, 227); likewise, the defendant in *Aspen Skiing* was willing to forgo significant revenues "because it was more interested in reducing competition . . . over the long run by harming its smaller competitor," 472 U.S. at 601.

- Provi tried various measures to meet the demand of retailers to communicate their orders to Defendants *at no cost to Defendants*, but they affirmatively blocked those efforts (Compl. ¶¶ 101-123); likewise, the plaintiff in *Aspen Skiing* offered to buy the defendant's lift tickets at retail price and provided vouchers to skiers to pay for the

18

defendant's tickets, but the defendant refused both options, 472 U.S. at 593-94.[13]

- Just as Defendants' conduct foreclosed Provi from the relevant markets and hurt its growth and profits (Compl. ¶¶ 121-22, 152, 223), the defendant gobbled up the plaintiff's market share in *Aspen Skiing* through its conduct, 472 U.S. at 594-95.

- Much like the defendant's conduct in *Aspen Skiing* evinced "a decision by a monopolist to make an important change in the character of the market," 472 U.S. at 604-05, each Defendant here decided to fundamentally change the character of the Online Alcohol Marketplaces and other relevant markets by suddenly blocking retailers from using Provi for Defendants' must-have alcohol products (Compl. ¶¶ 105, 108, 114-20).

- Consumers in *Aspen Skiing* were "adversely affected" by the elimination of the joint ticket because they "demonstrably preferred four mountains to three," 472 U.S. at 606; similarly, retailers strongly objected to Defendants excluding Provi from the relevant markets and forcing them to use Proof and eRNDC instead (Compl. ¶¶ 13-14, 116).[14]

Defendants' response is, again, to simply dispute Provi's allegations. For example, Defendants allege they did not suffer "meaningful short-term harm." Mot. 15. But the Court cannot credit this self-serving allegation at this stage, which contradicts Provi's factual allegations (Compl. ¶¶ 12, 15, 152, 227, 276).[15] *See Hannah's Boutique,* 2013 WL 4553313, at *5.

Defendants devote much of their argument to alleging a procompetitive justification for their conduct: that they merely "were vertically integrating to capture Provi's profits for themselves, and at the same time to make online ordering more efficient for their customers," while ending *allegedly* "suboptimal business arrangements" with Provi. Mot. 14-16. But this fails for multiple reasons. First, again, the Court cannot rely on Defendants' factual allegations to dismiss Provi's claims. *Hannah's Boutique,* 2013 WL 4553313, at *5. Second, the Complaint does *not*

---

[13] The Supreme Court found that the defendant was "motivated entirely by a decision to avoid providing any benefit to Highlands even though accepting the coupons would have entailed no cost to Ski Co. itself, would have provided it with immediate benefits, and would have satisfied its potential customers." 472 U.S. at 610. Provi alleges very similar facts here. Compl. ¶¶ 15, 106-07, 116-17, 257-60, 267-71.

[14] Compl. ¶ 14 ("a marketplace like Provi is my preferred solution . . . ***Forcing me to use*** . . . ***single source ordering solutions like Proof sucks***"), 116 ("***stop making our lives harder***") (emphases added).

[15] Provi's Complaint does not, as Defendants allege, simply "assume that, because defendants failed to respond to Provi's emails, they did not fill any of the orders" retailers submitted through Provi. Mot. 15. Rather, Provi's allegations are based on knowledge of unfilled orders, and Provi bears no duty to identify specific retailers in its Complaint (who may face retaliation from Defendants).

19

support these allegations.[16]   Third, Defendants continued to accept orders retailers submitted through Provi *for years* after the alleged "vertical integration" of their distribution services with Proof and eRNDC in April 2019; what changed in the summer of 2021 is that they took the affirmative step of suddenly rejecting orders through Provi.  *See supra* 1.  This was no "vertical integration" of years-old Proof or eRNDC; rather, it involved blocking Provi's email domain with Defendants' firewalls, making false statements about Provi, harassing Provi's sales associates, and forcing retailers to use Proof and eRNDC over their objections.[17]   *Id.*   The Court must reject Defendants' attempt to "shoehorn" Provi's allegations into the category of "cases involving vertically integrated defendants with facts that, in crucial ways, do not map onto this case." *Viamedia*, 951 F.3d at 464.  Further, "balancing anticompetitive effects against hypothesized justifications depends on evidence and is not amenable to resolution on the pleadings."  *Id*. at 460; *see also Covad Commc'ns Co. v. Bell Atl. Corp.,* 398 F.3d 666, 676 (D.C. Cir. 2005) (similar).

## III.   PROVI PLEADS PLAUSIBLE CONSPIRACY CLAIMS

### A.   The Complaint Plausibly Alleges a Horizontal Boycott

Horizontal agreements to boycott a competitor are *per se* illegal under § 1 of the Sherman

---

[16] Defendants cite Complaint ¶¶ 96 and 167.  Mot. 14-15.  But those explain the benefits of *third-party distributors* integrating with Online Alcohol Marketplaces such as Provi, which are generally *open to all distributors*.  The Complaint distinguishes this from *limiting* Online Alcohol Marketplaces to *only one or two distributors*—especially to the distributors that *own those marketplaces*—which is what Defendants mean by "vertical integration" of Proof and eRNDC with their *own* distribution businesses.  Compl. ¶ 167 ("Proof and eRNDC . . . are integrated with *the* distributor *by design*" ***versus*** "Provi encourages *distributors* to integrate") (emphasis added).  And Defendants omit that Provi emphasizes that integration is *not* needed "for retailers to obtain the benefit of using the Provi platform."  *Id.*

[17] Defendants cite *Novell, Inc. v. Microsoft Corp.*, 731 F.3d 1064 (10th Cir. 2013), but to no avail.  Mot. 16.  "*Novell* was a decision based on an eight-week trial," not a motion to dismiss.  *Viamedia,* 951 F.3d at 460.  And the facts in *Novell* are the *opposite* of those here in key ways.  Microsoft stopped sharing its APIs with Novell and others *upon the anticipated release* of a new version of Windows (*not years later*) and ***did not block customers*** from using Novell's software with Windows (*as Defendants did with Provi*); and Novell ultimately was able to quickly devise an integration on its own without Microsoft's help, enabling it to continue to compete with Microsoft.  *Novell*, 731 F.3d at 1068-69.  In other words, Microsoft did not boycott or otherwise foreclose Novell from the relevant market; nor did it collude with the second biggest provider in the industry to do so, as Defendants did to Provi here.  *See supra* 17-19 and *infra* § III.A.

Act. *Toys "R" Us, Inc.*, 221 F.3d at 936. Such conspiracies can be proven by direct or circumstantial evidence. *In re Text Messaging Antitrust Litig.*, 630 F.3d 622, 629 (7th Cir. 2010) (collecting cases). To state a § 1 claim, a complaint must allege only "enough factual matter (taken as true) to suggest that an agreement was made." *Twombly*, 550 U.S. at 556; *see also In re Dealer Mgmt. Sys. Antitrust Litig.*, 2018 WL 6629250, at *11 (N.D. Ill. Oct. 22, 2018) ("specific allegations" of the "who, what, where, and when" not required). Courts recognize that plaintiffs are rarely able to put forth "the smoking gun" prior to discovery. *Text Messaging*, 630 F.3d at 629. Provi may satisfy its nominal pleading burden with allegations of Defendants' parallel market conduct plus "additional factual circumstances, or 'plus factors,' indicating an agreement." *Tichy v. Hyatt Hotels Corp.*, 376 F. Supp. 3d 821, 834 (N.D. Ill. 2019).[18]

### 1.     Provi sufficiently pleads parallel conduct

Provi alleges that Defendants engaged in parallel conduct since at least April 2019, when they launched Proof and eRNDC *within days of each other*.[19]   Compl. ¶¶ 12, 99.   After unsuccessfully competing with Provi over the next two years, Defendants (1) sent "similar and near-simultaneous" communications to retailers and employees announcing that they would stop accepting retailers' orders through Provi's marketplace in August 2021 (*id*. ¶¶ 12, 105-115, 227); (2) affirmatively blocked Provi's email domain so retailers' orders "literally would not reach [Defendants'] respective sales representatives and, therefore, would go unfulfilled" (*id*. ¶¶ 12, 116,

---

[18] Defendants argue that "Provi's failure to plausibly plead relevant markets dooms its boycott/conspiracy claims under § 1," citing *Reapers Hockey Ass'n, Inc. v. Amateur Hockey Ass'n Ill., Inc.*, 412 F. Supp. 3d 941, 952 (N.D. Ill. 2019) (Shah, J.). Mot. 14 n.4. But Provi plausibly alleges three relevant markets. *See supra* § II.A.1. And *Reapers* is inapposite. The plaintiff alleged that the relevant market was "competitive amateur youth hockey at the Tier I level," but Tier 1 merely referred to players' skill level, not a commercial product. *Id*. at 952. This court held that label was "akin to a trademark or brand that cannot define a market for antitrust scrutiny." *Id*. at 953. Provi alleges no market based on "a trademark or brand"; the relevant markets here are based on recognized commercial products and services, *as Defendants admit*. Mot. 13 (conceding that "online marketplaces, ad buys, and data analytics services" are recognized "commodities").
[19] That Defendants *just coincidentally* completed their *years-long, multimillion-dollar* efforts to develop and launch Proof and eRNDC as competing online marketplaces *within the same week* is not credible.

141, 227);[20] and (3) specifically steered retailers away from Provi (*id*. ¶¶ 13, 114, 120, 227).

Defendants curiously argue that "Provi pleads itself out of court" because the Complaint alleges that "RNDC began taking steps to discourage retailers from using Provi" "***beginning in 2020***." Mot. 19 (citing Compl. ¶ 131). Defendants miss the point: *RNDC did not stop filling orders through Provi in 2020*. Compl. ¶ 120 (RNDC accepted 25,000 orders from retailers June 2020 to August 2021). RNDC stopped *only when **both** Defendants* implemented their boycott of Provi in August 2021. *Id*. And RNDC confirmed Defendants' coordination: on or around August 4, 2021, *RNDC's Senior Vice President* for Wine and Supplier Business Development emailed a third-party online marketplace provider *SGWS's* voicemail announcement that it was rejecting retailers' orders through Provi. *Id*. ¶ 119. Further, at a July 2021 industry conference that senior leads of *both* Defendants attended (organized by an association *Defendants' executives control*), RNDC's Corporate Executive Vice President made public remarks in a room full of distributors "designed to encourage a boycott of Provi by both retailers and distributors"—which Defendants themselves enacted shortly thereafter.[21] *Id*. ¶¶ 109-113. Provi's specific factual allegations support a reasonable inference that Defendants did not act unilaterally but rather agreed to boycott Provi after they failed to compete with Provi successfully for years. *Id.* ¶ 113.

### 2. Provi pleads numerous "plus factors"

Provi also alleges specific "plus factors" that further evidence Defendants' conspiracy:

Actions against Individual Self-Interest. Defendants' actions against their own economic

---

[20] Defendants' argument that Provi "claims only that defendants have chosen not to use its platform" improperly disputes Provi's allegations and is wrong. Mot. 20-21. *Defendants themselves* need not "use [Provi's] platform"; they need only fill the orders retailers submit using Provi as with any other orders. But Defendants have *blocked retailers* from using Provi to buy must-have and many other needed products where Defendants control the lion's share of the distribution markets. That is a quintessential boycott.

[21] Apparently this case is not Defendants' only boycott of a rival. In *Hendershot v. S. Glazers Wine & Spirits of Okla., LLP*, 2021 WL 3501523, at *1 (N.D. Okla. Aug. 9, 2021), the court recently denied a motion to dismiss a group boycott claim asserted against SGWS, RNDC, and another defendant.

self-interest are a plus factor in § 1 cases. *See, e.g., Tichy*, 376 F. Supp. 3d at 838 (motion to dismiss denied in part where complaint "plausibly alleged that curtailing an existing, effective form of competition would, absent the conspiracy, damage Defendants' economic interests."); *In re Loc. TV Advert.*, 2020 WL 6557665, at *9 ("[C]onduct that would be against . . . [defendants'] unilateral self-interest in the absence of an anticompetitive agreement" supported inference of collusion). Provi alleges Defendants acted against their economic self-interest when they refused to accept orders that retailers chose to communicate through Provi, forgoing substantial revenue and sacrificing important customer good will. Compl. ¶ 15. Collusion enabled SGWS and RNDC to eliminate the risk that either would lose dissatisfied customers to the other by *acting alone* in rejecting orders placed through Provi—which, again, explains why RNDC did not follow through on its threats to boycott Provi in 2020 and instead ***waited until SGWS agreed to do it too in 2021***.[22] *See Int'l Constr. Prods. LLC v. Caterpillar Inc.*, 2016 WL 4445232, at *2-3 (D. Del. Aug. 22, 2016) (suppliers' threats to block a dealer were contrary to self-interest and plausibly evidenced agreement because they would have driven dealers to rival suppliers absent collusion).

Concentrated Market. Provi alleges highly-concentrated relevant markets with significant barriers to entry, another § 1 plus factor (Compl. ¶¶ 98, 188-92, 205-12, 253, 264). *Text Messaging,* 630 F.3d at 627-28 ("[A]n industry structure that facilitates collusion constitutes supporting evidence of collusion."); *Plasma Derivative*, 764 F. Supp. 2d at 1002 (allegations that "[t]he industry was highly consolidated, with only a handful of firms, making coordination easier" showed it "was ripe for collusion"); *Standard Iron Works v. ArcelorMittal*, 639 F. Supp. 2d 877, 883 (N.D. Ill. 2009) ("[S]ignificant barriers to entry" are key market factors "that courts, antitrust experts, and economists agree make an industry conducive to collusion.").

---

[22] Compl. ¶¶ 105 (emphasizing RNDC "in reality had not effectuated" boycott of Provi in 2020), 141 ("RNDC continued to receive and fill those orders" from Provi in 2020, *until August 2021*).

Inter-Firm Communications and Opportunities to Collude: Inter-firm communications, including mutual membership in trade associations, are also a § 1 plus factor. *See Text Messaging,* 630 F.3d at 628; *SD3, LLC v. Black & Decker (U.S.) Inc.*, 801 F.3d 412, 432 (4th Cir. 2015), *as amended on reh'g in part* (Oct. 29, 2015) ("Allegations of communications and meetings among conspirators can support an inference of agreement because they provide the means and opportunity to conspire."). "As the Seventh Circuit has held," industry meetings can "'facilitate price fixing.'" *In re Broiler Chicken Antitrust Litig.*, 290 F. Supp. 3d 772, 799 (N.D. Ill. 2017) (quoting *Text Messaging*, 630 F.3d at 628). The *Broiler Chicken* court held that allegations of important industry conferences with "suspicious timing" followed by alleged anticompetitive conduct and market movements supported the plaintiffs' conspiracy claim because they "plausibly help to fill-out the picture of Defendants' alleged conspiratorial agreement." 290 F. Supp. 3d at 799-800. That's what Provi alleges here: "senior executives at the two companies communicate with each other often," "developed cozy relationships," and meet frequently through the trade association and lobbying organization they control (Compl. ¶ 102); and Defendants met at a July 2021 conference where an RNDC senior executive publicly attacked Provi and encouraged a group boycott in a room full of distributors *just weeks before* Defendants simultaneously stopped accepting orders that retailers choose to submit through Provi (Compl. ¶¶ 109-12). As in *Broiler Chicken*, the "suspicious timing of [this] important industry conference[] . . . plausibly help[s] to fill-out the picture of Defendants' alleged conspiratorial agreement." 290 F. Supp. 3d at 800.

Defendants curiously rely on *Hartford Fire Insurance Co. v. California*, 509 U.S. 764 (1993), to challenge the boycott Provi alleges. Mot. 20. But Defendants apply the *wrong legal standard*. *Hartford* involved a boycott under the McCarran-Ferguson Act, an insurance law that does not apply here. "[T]he term 'boycott' as applied in Sherman Act cases generally has a broader

24

meaning than it has in the much more specific McCarran-Ferguson legislation . . . ." Areeda, *supra*, ¶ 2201b. "More important, a concerted refusal to deal can be a naked restraint whether or not it is a boycott meeting *Hartford's* relatively narrow definition." *Id*.

Defendants further betray the impropriety of their arguments on a motion to dismiss by relying heavily on summary judgment and similar decisions in contesting Provi's conspiracy allegations. Mot. 18 (citing *Kleen Prods. LLC v. Int'l Paper*, 276 F. Supp. 3d 811 (N.D. Ill. 2017), *aff'd sub nom. Kleen Prods. LLC v. Georgia-Pac. LLC*, 910 F.3d 927 (7th Cir. 2018) (affirming summary judgment); *Moore v. Boating Indus. Ass'ns*, 819 F.2d 693 (7th Cir. 1987) (affirming in part and denying in part judgment after a jury trial). The few motion to dismiss cases they cite are inapposite. For example, in *U.S. Board of Oral Implantology v. American Board of Dental Specialties*, the court dismissed the plaintiffs' § 1 claim because "[e]ven if the complaint had sufficiently alleged a conspiracy, it does not allege a cognizable restraint on trade," as *none of the alleged anticompetitive action prevented the plaintiffs from offering their rival services*—which of course is not the case with Provi here.[23] 390 F. Supp. 3d 892, 905 (N.D. Ill. 2019).[24] Provi alleges much more than conscious parallelism, including specific facts and accepted plus factors.

**B.      The Complaint Adequately Alleges an Unlawful Vertical Restraint**

Defendants' argument that "Provi's vertical conspiracy allegations fail" misstates the law. Mot. 21. First, "specific allegations" of the "who, what, where, and when" are not required

---

[23] In *Alarm Detection Systems, Inc. v. Village of Schaumburg*, 930 F.3d 812 (7th Cir. 2019), the defendants did not compete in the same market, and the alleged communications among them reflected normal business operations. *Id*. at 828. Besides a potential motive to profit (which the court rejected), no other plus factors were alleged. *Id*. In *Reapers*, unlike here, the plaintiff alleged *no* communications among defendants, and this Court found that the defendants lacked the power to perform the allegedly unlawful acts in any event. 412 F. Supp. 3d at 955-56. *In re Musical Instruments & Equipment Antitrust Litigation*, 798 F.3d 1186 (9th Cir. 2015), was a price-fixing class-action involving a competitive market, not the highly concentrated market here that provides many opportunities and motives for collusion and foreclosure of a key rival.

[24] Defendants do not address Provi's allegation that even if Defendants' agreement "is not a *per se* unlawful group boycott, their agreement constitutes an unlawful restraint under the rule of reason." Compl. ¶¶ 228, 277. They should not be permitted to do so on reply. *See Hess*, 423 F.3d at 665.

to plead a § 1 claim. *In re Dealer Mgmt. Sys. Antitrust Litig.*, 2018 WL 6629250, at \*11. Second, Provi alleges (Compl. ¶¶ 237-38) that Defendants coerced numerous retailers (which it need not name at this stage) in the relevant markets to acquiesce to "a conscious commitment to a common scheme designed to achieve an unlawful objective"—which violates § 1 as Defendants concede. Mot. 21 (quoting *Monsanto Co. v. Spray-Rite Serv. Corp.*, 465 U.S. 752, 764 (1984)). As the Supreme Court explained in *Monsanto*, Provi need only allege that the retailers "communicated [their] acquiescence" to that commitment "and that this was sought by" each Defendant.[25] *Id.* at 764 n.9. Retailers confirmed their "acquiescence" to Defendants' demands when, *inter alia*, they stopped working with Provi *at Defendants' insistence*, which Defendants sought for "an unlawful objective."[26] Compl. ¶¶ 122, 152, 222, 232-40, 273-80. Third, Defendants rely on an out-of-circuit case to argue that a "mere exclusionary agreement between businesses at different levels of competition" is lawful. Mot. 21 (quoting *Genetic Sys. Corp. v. Abbott Lab'ys*, 691 F. Supp. 407, 416-17 (D.D.C. 1988)). But the Seventh Circuit disagrees. *Prods. Liab. Ins. Agency, Inc. v. Crum & Forster Ins. Cos.*, 682 F.2d 660, 663 (7th Cir. 1982) (finding *vertical* agreement not to deal with competitor can be unlawful under § 1). The Seventh Circuit ruled that "[t]o prevail in such a case the plaintiff must show that the refusal to deal is likely to reduce competition," as Provi alleges. *Id.* (citing *Oreck Corp. v. Whirlpool Corp.*, 579 F.2d 126, 133-34 (2d Cir. 1978) (en banc)).[27]

---

[25] The Seventh Circuit has rejected Defendants' argument that coerced acquiescence "is not an agreement that can support a claim under the Sherman Act" (Mot. 22). *Isaksen v. Vt. Castings, Inc.*, 825 F.2d 1158, 1163 (7th Cir. 1987) ("an agreement procured by threats is still an agreement for purposes of section 1").

[26] Whether Count II challenges a "boycott" or "vertical restraint" is semantics and does not affect its viability. *House of Brides, Inc. v. Alfred Angelo, Inc.*, 2014 WL 6845862, at \*5 (N.D. Ill. Dec. 4, 2014) (analyzing "boycott" claim "as claim against a vertical restraint"). Also, Defendants erroneously refer to Count III as a "boycott claim" (Mot. 21), but it is a tying claim.

[27] Defendants curiously cite *Isaksen* without explanation. Mot. 22. But there, the Seventh Circuit explicitly found that "vertical" agreements "between firms at different levels" can violate § 1. 825 F.2d at 1162-63 (finding that vertical "agreement to harass would be actionable" as would vertical "informal agreement" for downstream dealer "to raise his prices").

26

Thus, Count II does not depend on a horizontal conspiracy between Defendants as they wrongly argue.[28]  But even if it did, Provi adequately alleges such a conspiracy here.  *See supra* § III.A.

## IV.    PROVI STATES A CLAIM FOR ILLEGAL TYING

For its § 1 *per se* tying claim, Provi must allege: (1) a tie between separate products; (2) sufficient economic power in the tying market for SGWS to restrain competition in the tied market; (3) an effect on a not-insubstantial amount of interstate commerce; and (4) "some economic interest [by SGWS] in the sales of the tied product."  *Reifert v. S. Cent. Wis. MLS Corp.,* 450 F.3d 312, 317 (7th Cir. 2006).  Provi amply alleges each element.

First, Provi explains how the tying product (spirits and wine distribution) is separate from the tied product (Proof).  Compl. ¶¶ 243, 153-72.  Second, Provi alleges that SGWS has substantial market power in the tying markets for distilled spirits and wine distribution in numerous states given its market shares of about 50% to 80% or more and given its typically-exclusive rights to distribute must-have spirits and wine products.  *Id*. ¶ 246.  Third, the amount of commerce at stake is not insubstantial—the tied markets are valued at $1 billion annually.  *Id*. ¶¶ 245, 254.  Fourth, SGWS has a critical economic interest in sales of the tied product (Proof).  Provi specifically alleges, among other things, that SGWS's Vice President of eCommerce "recently acknowledged that '[i]t is critical that [SGWS] continue to invest in the [eCommerce] channel,' and stated that [SGWS's] 'goal is to achieve a *higher share online vs offline*.'"  *Id*. ¶ 114 (emphasis added).  These factual allegations readily meet Provi's nominal pleading burden.

SGWS's arguments fail.  First, its argument that a tying claim requires the defendant to charge buyers for the tied product misstates the law.  Mot. 23.  SGWS's only cited authority, *Eastman Kodak Co. v. Image Technical Services, Inc*., refutes its argument, holding that a "tying

---

[28] Should the rule of reason apply to Count II as Defendants argue (Mot. 22 n.7), their arguments about market power and anticompetitive effects would still fail.  *See supra* § II.

arrangement" requires "that the buyer also purchases a different (or tied) product, or at least agrees that he will not purchase that product from any other supplier.'" 504 U.S. 451, 461 (1992). *Kodak* does *not* require that the consideration exchanged for the tied product must be a monetary "charge" paid by the buyer as SGWS contends. The data alone that retailers provide SGWS when they use Proof is consideration for that service, as SGWS emphasizes. Compl. ¶¶ 100, 191. And again, SGWS conditions sales of its alcohol products (the tying product) on retailers *not* using any Online Alcohol Marketplace (the tied product) offered by "any other supplier" to purchase those products.

Second, SGWS's argument regarding its market power fails for the reasons stated above. *See supra* § II.A.[29] But the challenge is even weaker here because for the tying claim SGWS need *not* have monopoly power (although it does, *id.*), as SGWS wrongly argues (Mot. 24). It need have only enough market power in the tying product to force or coerce customers to use the tied product (Proof). *Reifert,* 450 F.3d at 317. Provi alleges exactly that. Compl. ¶ 191. And SGWS admits this, conceding fewer retailers order through Provi when SGWS products are unavailable through Provi. Mot. 2. SGWS also claims "retailers have many other means of obtaining SGWS-sold alcohol besides the (freely provided) Proof" but notes that the Complaint identifies only SGWS's own sales associates'" (Mot. 23), *not* products or services offered by *another supplier*. So when retailers buy their must-have wine and spirits that SGWS controls, they must use *only SGWS's* ordering products and services, which includes only Proof for online marketplace orders.

Finally, SGWS wrongly claims that Provi fails to allege that "'a substantial volume of commerce is foreclosed'" by the tie. Mot. 24. SGWS's reliance on Provi's integration with 12 of the 14 largest distributors is misleading. *Id*. (citing Compl. ¶ 95). SGWS ignores that, as the largest spirits and wine distributor, it alone controls nearly as much or a whole lot more than *the*

---

[29] SGWS's claim that Provi defines distribution markets at the *brand* level and estimates SGWS's market power only at that level obviously misstates the Complaint (Mot. 24). Compl. ¶¶ 160-61.

*other 12 distributors combined* in the tied markets—and it has foreclosed Provi from the portion of each relevant market it controls. Compl. ¶¶ 28-29, 114, 149-50. And the affected commerce need only be "substantial enough in terms of dollar-volume so as not to be merely de minimis." *Fortner Enters. v. U.S. Steel Corp.*, 394 U.S. 495, 501 (1969); *Datagate, Inc. v. Hewlett-Packard Co.*, 60 F.3d 1421, 1425 (9th Cir. 1995) (foreclosure of single purchaser sufficient where sales are "not insubstantial"). The tied markets are estimated at $1 billion annually. Compl. ¶¶ 245, 254.[30]

## V.     PROVI'S STATE-LAW CLAIMS ARE ADEQUATELY PLED

### A.     Provi States a Claim under the Illinois Antitrust Act

Defendants admit Provi's Illinois Antitrust Act claim cannot be dismissed if Provi states a claim under the Sherman Act (Mot. 22), which it has done. *See supra* § III.A.

### B.     Provi States Claims against Both Defendants for Tortious Interference

For its intentional interference with a business expectancy claim, Provi need only allege: (1) a reasonable expectancy of entering into a valid business relationship; (2) Defendants' knowledge of the expectancy; (3) their intentional and unjustified interference that prevents the realization of the business expectancy; and (4) damages resulting from the interference. *Mannion v. Stallings & Co.*, 561 N.E.2d 1134, 1139 (Ill. App. Ct. 1990). Provi alleges each element: (1) it had a reasonable expectation of entering into or continuing business relationships with numerous retailers, including critical National Accounts (Compl. ¶¶ 94, 143, 150, 293, 298); Defendants knew this (*id.* ¶¶ 109-10, 145, 294, 299); they intentionally disrupted these relationships by blocking retailers from using Provi for the many "must-have" products, making misstatements about Provi, and urging others not to work with Provi (*id.* ¶¶ 85, 109-13, 122, 149-51); and Provi

---

[30] SGWS does not address Provi's allegation, in the alternative that, SGWS's tying arrangement unreasonably restrains competition in the tied market under the rule of reason (Compl. ¶ 248), and it should not be permitted to do so for the first time on reply. *See Hess,* 423 F.3d at 665.

suffered damages as a result, including lost profits (*id.* ¶¶ 152, 296, 301). Defendants' only response is to cite the elements for a *different* tort—tortious interference with contractual relations. Mot. 25. For tortious interference *with a business expectancy*—the claim Provi asserts—no contract is needed. *Lusher v. Becker Brothers, Inc.,* 509 N.E.2d 444, 446 (Ill. App. Ct. 1987).[31]

### C.      Provi States Claims under California's Unfair Competition Law

Defendants' only response to Provi's UCL claims is that they "are derivative of its other claims." Mot. at 25. Not so. Even absent a violation of the Sherman Act, Defendants' conduct still would violate the California UCL, which encompasses "unfair" conduct that does not require an antitrust violation. *See Epic Games, Inc. v. Apple Inc.*, 559 F. Supp. 3d 898, 1055 (N.D. Cal. 2021) (finding Apple's anti-steering provisions violated California UCL's "unfair" prong even though Plaintiff did not prove "present antitrust violation").

### CONCLUSION

This is a straightforward antitrust case. It is the story of two massive companies (SGWS and RNDC) that have long dominated an antiquated industry and that decided to foreclose an innovative upstart (Provi) from the relevant markets after unsuccessfully competing against that rival company for years. They were able to do so by colluding and by exploiting their respective monopoly power, despite the strenuous objections of retailers, suppliers, and others. Faced with their own unlawful conduct, Defendants misstate the law, improperly dispute Provi's allegations, and offer their own inaccurate narrative.[32] But Provi's allegations are more than sufficient to meet its pleading burden.[33] The Court should deny this Motion and move forward expeditiously.

---

[31] Defendants' argument that "a claim for intentional interference with prospective economic advantage" is barred (Mot. 25 n.9) applies only where "defendant's actions are not … anti-competitive." *E-One, Inc. v. Oshkosh Truck Corp.*, 2006 WL 3320441, at *3 (N.D. Ill. 2006). Provi alleges anticompetitive acts here.
[32]  Provi asked Defendants to rectify specific factual misstatements in their Motion. They declined.
[33]  Should the Court nonetheless grant this Motion, Provi seeks leave to file an amended complaint.

Dated: July 18, 2022       Respectfully submitted,

/s/ *David D. Cross*

David D. Cross (admitted *pro hac vice*)
Alexander Okuliar (admitted *pro hac vice*)
Mary G. Kaiser (admitted *pro hac vice*)
MORRISON & FOERSTER LLP
2100 L Street, NW
Suite 900
Washington, DC 20006
Telephone: (202) 887-1500
DCross@mofo.com
AOkuliar@mofo.com
MKaiser@mofo.com

Andrea C. Halverson (Local Counsel)
ACTUATE LAW, LLC
641 W. Lake Street, 5th Floor
Chicago, Illinois 60661
Ph: (312) 579-3108
Fx: (312) 579-3131
andrea.halverson@actuatelaw.com

*Counsel for Plaintiff Tiz, Inc. d/b/a Provi*

31

**CERTIFICATE OF SERVICE**

I hereby certify that on this 18th day of July, 2022, a true and correct copy of the foregoing

**PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM UNDER FEDERAL RULE OF CIVIL PROCEDURE 12(b)(6)** was electronically filed with the Clerk of the Court using the

Court's ECF system and thereby served on all counsel of record.

/s/ *David D. Cross*
David D. Cross

32