**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| Tiz, Inc. d/b/a Provi, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No.  1:22-cv-1648 |
| | ) | |
| | ) | Hon. Manish S. Shah |
| Southern Glazer's Wine and Spirits, LLC and | ) | |
| Republic National Distributing Company, LLC, | ) | |
| | ) | |
| Defendants. | ) | |

**DEFENDANTS' REPLY IN SUPPORT OF
DEFENDANTS' MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM
UNDER FEDERAL RULE OF CIVIL PROCEDURE 12(b)(6)**

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................................................... ii

INTRODUCTION ............................................................................................................... 1

ARGUMENT ...................................................................................................................... 3

I.      Provi Fails To Allege Antitrust Standing................................................................ 3

II.     Provi Fails To Allege A Plausible Monopolization Claim ................................... 8

III.    Provi Fails To Allege A Plausible Conspiracy .................................................... 12

        A.      Provi's Horizontal Conspiracy Allegations are Insufficient as a Matter of Law.. 12

        B.      Provi's Vertical Conspiracy Allegations Fail as a Matter of Law ........................ 16

IV.     Provi Fails To Allege Any Plausible Unlawful Tying Arrangement Against SGWS ...... 18

V.      Finally, Provi's Remaining State-Law Claims Fail ............................................. 19

        A.      Provi's Illinois tort-law claims are based on conduct that is not unlawful........... 19

        B.      Provi's UCL claims fail because they are based on conduct that is not
                unlawful ................................................................................................... 20

CONCLUSION................................................................................................................... 20

CERTIFICATE OF SERVICE

## TABLE OF AUTHORITIES

**Cases**

**Page(s)**

*Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*,
472 U.S. 585 (1985).................................................................................................1, 11

*AT & T Mobility LLC v. AU Optronics Corp.*,
707 F.3d 1106 (9th Cir. 2013) .......................................................................................20

*Authenticom, Inc. v. CDK Glob., LLC*,
874 F.3d 1019 (7th Cir. 2017) .......................................................................................11

*Balaklaw v. Lovell*,
14 F.3d 793 (2d Cir. 1994)...........................................................................................2, 5

*Bell Atl. Corp. v. Twombly*,
550 U.S. 554 (2007).............................................................................4, 13, 15, 16, 17

*Brown Shoe Co., Inc. v. United States*,
370 U.S. 294 (1962).........................................................................................................3

*Carl Sandburg Vill. Condominium Ass'n No. 1 v. First Condominium Dev. Co.*,
758 F.2d 203 (7th Cir. 1985) .........................................................................................18

*Chicago Pro. Sports Ltd. P'ship v. NBA*,
961 F.2d 667 (7th Cir. 1992) ...........................................................................................3

*Chicago Studio Rental, Inc. v. Illinois Dep't of Com.*,
940 F.3d 971 (7th Cir. 2019) .......................................................................................3, 4

*Consol. Metal Prods., Inc. v. Am. Petroleum Inst.*,
846 F.2d 284 (5th Cir. 1988) .........................................................................................15

*In re Dairy Farmers of Am., Inc. Cheese Antitrust Litig.*,
2015 WL 3988488 (N.D. Ill. June 29, 2015)................................................................20

*Flip Side Prods., Inc. v. Jam Prods., Ltd.*,
843 F.2d 1024 (7th Cir. 1988) .......................................................................................11

*Fortner Enters., Inc. v. U.S. Steel Corp.*,
394 U.S. 495 (1969).......................................................................................................19

*Generac Corp. v. Caterpillar Inc.*,
172 F.3d 971 (7th Cir. 1999) ...........................................................................................5

*Glob. Material Techs., Inc. v. Dazheng Metal Fibre Co., Ltd.*,
2014 WL 1099039 (N.D. Ill. Mar. 20, 2014)...........................................................20

*Great Escape, Inc. v. Union City Body Co.*,
791 F.2d 532 (7th Cir. 1986) ...................................................................................6

*Hilton v. Apple Inc.*,
2014 WL 10435005 (C.D. Cal. Apr. 18, 2014) ........................................................20

*Indiana Grocery, Inc. v. Super Valu Stores, Inc.*,
864 F.2d 1409 (7th Cir. 1989) .................................................................................6

*Int'l Marketing, Ltd. v. Archer-Daniels-Midland Co.*,
192 F.3d 724 (7th Cir. 1999) ...................................................................................19

*Isaksen v. Vermont Castings, Inc.*,
825 F.2d 1158 (7th Cir. 1987) .................................................................................17

*Kleen Prods LLC v. Ga.-Pac.*,
910 F.3d 927 (7th Cir. 2018) ...................................................................................15

*Marion HealthCare, LLC v. S. Ill. Hosp. Servs.*,
2022 WL 2763502 (7th Cir. July 15, 2022)......................................................2, 9, 10

*Mercatus Grp., LLC v. Lake Forest Hosp.*,
641 F.3d 834 (7th Cir. 2011) ...................................................................................10

*MetroNet Servs. Corp. v. Qwest Corp.*,
383 F.3d 1124 (9th Cir. 2004) .................................................................................6

*Midwest Gas Servs., Inc. v. Indiana Gas Co.*,
317 F.3d 703 (7th Cir. 2003) ...................................................................................3

*Monsanto Co. v. Spray-Rite Serv. Corp.*,
465 U.S. 752 (1984)............................................................................................16, 17

*Novell, Inc. v. Microsoft Corp.*,
731 F.3d 1064 (10th Cir. 2013) ...............................................................................6

*Orchard Supply Hardware LLC v. Home Depot USA, Inc.*,
939 F. Supp. 2d 1002 (N.D. Cal. 2013) ...................................................................20

*Ploss v. Kraft Foods Grp., Inc.*,
197 F. Supp. 3d 1037 (N.D. Ill. 2016) .....................................................................9

*Reifert v. S. Cent. Wis. MLS Corp.*,
450 F.3d 312 (7th Cir. 2006) ...................................................................................18

iii

*Roland Mach. Co. v. Dresser Indus., Inc.*,
749 F.2d 380 (7th Cir. 1984) ................................................................................5

*Serfecz v. Jewel Food Stores*,
67 F.3d 591 (7th Cir. 1995) ............................................................................2, 3, 5

*Serv. By Air, Inc. v. Phoenix Cartage & Air Freight, LLC*,
78 F. Supp. 3d 852 (N.D. Ill. 2015) .......................................................................19

*Sw. Suburban Bd. of Realtors, Inc. v. Beverly Area Planning Ass'n*,
830 F.2d 1374 (7th Cir. 1987) (cited at Opp'n 5) .....................................................7

*Toys "R" Us, Inc. v. FTC*,
221 F.3d 928 (7th Cir. 2000) ................................................................................9

*United States v. Colgate & Co.*,
250 U.S. 300 (1919)......................................................................................16, 17

*Van Slyke v. Capital One Bank*,
2007 WL 3343943 (N.D. Cal. Nov. 7, 2007) ..........................................................20

*Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko, LLP*,
540 U.S. 398 (2004).......................................................................................1, 11

*Viamedia, Inc. v. Comcast Corp.*,
951 F.3d 429 (7th Cir. 2020) ........................................................................6, 11, 12

**Statutes**

California's Unfair Competition Law ........................................................................20

Illinois Antitrust Act ...........................................................................................20

Sherman Act..........................................................................................1, 10, 15, 20

iv

**INTRODUCTION**

This entire case turns on the answer to a straightforward question: do the antitrust laws require private parties to sell their exclusive products through third parties? The answer to that question is no, as the Supreme Court has consistently and resoundingly held.

Defendants have worked for decades to develop lawful distribution agreements with various wine and spirits manufacturers. Provi has no alcohol to sell or deliver. But it wants retailers to buy alcohol using its online ordering platform, because with traffic and transactions come valuable data and advertising revenue. So Provi asks this Court to force Defendants to fill (accept and deliver) orders for all of Defendants' distributed products placed by third-party retailers on Provi's platform. In other words, Provi wants to use the antitrust laws to compel other private parties to perform a service Provi itself cannot provide.[1] That is the opposite of what the antitrust laws are designed to accomplish. It should therefore come as no surprise that Provi's allegations are incurably deficient.

Although Provi colorfully describes the actions that precipitated this lawsuit, the only conduct it actually claims violates the antitrust laws is SGWS's and RNDC's decisions not to fill orders placed by retailers with Provi. That is not unlawful. "[T]he Sherman Act does not restrict the long recognized right of a trader or manufacturer engaged in an entirely private business, freely to exercise his own independent discretion as to parties with whom he will deal." *Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398, 408 (2004). Indeed, "even a firm with monopoly power has no general duty to engage … with a competitor," *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585, 600 (1985), and this case does not come close to fitting within the narrow *Aspen Skiing* exception to that bedrock principle.

That is far from the only problem with Provi's allegations. Provi's theory of antitrust injury is that Defendants' decisions not to fill orders placed through Provi's competing platform has "hurt[] Provi's profits" and undermined "Provi's ability to compete in the relevant markets."

---

[1] At this point, Provi's demand is that this Court force Defendants to do business with it. Will Provi next seek to have this Court force Defendants to *integrate* with it? Or to force large retailers or state-controlled liquor boards (which order alcohol in certain states) to do business with it on the same misguided theories?

Opp'n 5, 8. Those are not antitrust injuries. Antitrust injury is being "made worse off by higher prices or a reduction in output, the things that make monopolies objectionable." *Marion HealthCare, LLC v. S. Ill. Hosp. Servs.*, 2022 WL 2763502, at *2 (7th Cir. July 15, 2022). Provi does not allege any facts to show that any participant in any of the alleged product markets must now pay more or that output in those markets has reduced as a result of Defendants' conduct. Provi instead complains that Defendants' decisions to stop cooperating with it—*i.e.*, to start competing—have hurt ***Provi's*** output and ***Provi's*** profits. That is the opposite of antitrust injury. Antitrust law exists for "the preservation of competition," *Serfecz v. Jewel Food Stores*, 67 F.3d 591, 597 (7th Cir. 1995), and competition results in "winners and losers," *Balaklaw v. Lovell*, 14 F.3d 793, 801 (2d Cir. 1994). If the only way Provi can "compete" is through a court order forcing Defendants to cooperate, the problem is not with Defendants' conduct, but Provi's legal theory.

Provi's monopolization claims fail for a similar reason. Even putting aside that Provi's markets do not pass the facial plausibility test, Provi has not plausibly alleged that Defendants have monopoly power in those ill-defined markets or that Defendants have acted unlawfully. On market power, all Provi alleges is that Defendants have large shares of the markets for alcohol distribution in some states—but no cases hold that size in one unpled market somehow carries over and gives Defendants similarly large shares in other, allegedly tangential markets. In any event, all Defendants are actually alleged to have done for purposes of Provi's §2 claims is stop cooperating with Provi. That is competition, and competition cannot be unlawful.

Plaintiff's remaining claims are equally deficient. To try to prove a conspiracy, Provi relies on the alleged opportunity to collude and parallel conduct, neither of which plausibly states an unlawful conspiracy. And to try to prove an unlawful tie, Provi argues that SGWS is using its "distribution dominance" (Opp'n 16) to gain dominance in a market for a product ***that SGWS does not sell***. Even on the most charitable reading of the allegations, that is not an unlawful tie.

In sum, SGWS's and RNDC's decisions not to accept orders placed through Provi are entirely lawful; Provi's displeasure at the effectiveness of Defendants' competitive efforts is the opposite of antitrust injury; and Provi's conclusory allegations do not come close to establishing

2

plausible violations. Provi's Complaint fails to state a claim and should be dismissed.

## ARGUMENT

### I. Provi Fails To Allege Antitrust Standing.

Provi's claims rely on a basic misunderstanding of antitrust law. The threshold question for antitrust standing is not whether the plaintiff can show that the alleged conduct has "diminish[ed] its scale as a competitor" or "hurt[] [its] profits." Opp'n 5. "A private antitrust plaintiff … does not acquire [antitrust] standing merely by showing that he was injured by the defendant's conduct." *Serfecz*, 67 F.3d at 597. Rather, because "[i]t is competition, not competitors, which the [Sherman] Act protects," *Brown Shoe Co., Inc. v. United States*, 370 U.S. 294, 344 (1962), an antitrust plaintiff must "show that its loss comes from acts that reduce output or raise prices to consumers." *Chicago Pro. Sports Ltd. P'ship v. NBA*, 961 F.2d 667, 670 (7th Cir. 1992).

Defendants pointed all of this out in the MTD (at 5-6). Yet rather than engage with any of the on-point authority that defeats its claims, Provi relegates to a footnote every Seventh Circuit and Supreme Court decision Defendants cited on this basic point. *See* Opp'n 9 n.4. That is telling. So too is the disconnect between the injuries Provi alleges and what the law requires. To try to allege antitrust injury, Provi relies on allegations that Defendants' decisions to stop filling orders placed on Provi's platform have "imped[ed] its growth," caused it to suffer "lost profits," and prevented it "from gaining scale to compete effectively." Opp'n 6; *see also* Opp'n 5 ("Provi's profits" and "advertising revenue"); Opp'n 6 (Provi's "order volume"); Opp'n 8 ("Provi's ability to compete"). ***None of that is antitrust injury***. "While [Provi] may have lost profits as a result of [Defendants' alleged conduct], failure to realize expected profits due to competition is not an antitrust injury." *Midwest Gas Servs., Inc. v. Indiana Gas Co.*, 317 F.3d 703, 713 (7th Cir. 2003). And "decrease in [a plaintiff's] share of [a] market and inability to compete … are not proper antitrust injuries" either. *Chicago Studio Rental, Inc. v. Illinois Dep't of Com.*, 940 F.3d 971, 978 (7th Cir. 2019).

In arguing to the contrary, Provi (mis)characterizes a hodgepodge of decisions (Opp'n 4-

3

5) as holding that a competitor's lost profits and diminished market share are "well-recognized form[s] of antitrust injury." Opp'n 6. In reality, all those cases actually hold is that a competitor that suffered "lost profits" or "diminish[ed] … scale" (Opp'n 5), can bring antitrust claims when the conduct that led to its losses and stagnation ***reduced output or raised prices for consumers***. Because Provi does not even try to argue that Defendants' decisions to stop filling orders placed with Provi has led to reduced output or raised prices in the three markets on which it bases its claims (*see* Opp'n 4-9), Provi lacks antitrust injury, and its claims fail at the threshold.

To be sure, the Complaint incants that Defendants "have caused actual injury to competition in the form of higher prices, lower output, reduced innovation, and decreased quality in the [relevant] markets." Compl. ¶¶230, 239, 258, 270, 279, 283, 289; *see also id.* ¶¶213-21. But there is a reason Provi makes no mention of these allegations in its brief, outside of a single footnote: The Complaint does not come close to pleading facts sufficient to support the claim that Provi's "alleged injury" (lost profits and market share) stems from acts that "reduce output or raise prices to consumers." *Chicago Studio Rental*, 940 F.3d at 978. The most Provi says on this point is that Defendants' decisions to stop filling orders placed with Provi "increas[es] market concentration." Opp'n 7 n.2. But that assertion is self-evidently wrong. According to Provi, Proof and eRNDC are Provi's competitors in the (ill-defined) market for Online Alcohol Marketplaces. Forcing Defendants to cooperate with Provi rather than focus on developing their own platforms will increase Provi's share of that market. Indeed, that is Provi's entire (misguided) theory of antitrust injury—and that is the definition of "increasing market concentration." Opp'n 7 n.2. "In summary," to the extent Provi alleges cognizable antitrust injuries at all, it "merely states these assertions in a conclusory fashion and fails to allege factual allegations supporting the existence of an antitrust injury." *Chicago Studio Rental*, 940 F.3d at 979; *see Bell Atl. Corp. v. Twombly*, 550 U.S. 554, 564-70 (2007).

Provi's remaining arguments fare no better. Provi asserts that all of Defendants' cases "are inapposite because they involve losses stemming from more competition, not foreclosure of a competitor." Opp'n 9 n.4. This is both wrong and irrelevant. Conduct does not become unlawful

just because it results in a claimed injury to a firm that calls itself a "competitor." "Competitor" is not a magic word that anoints a plaintiff with antitrust standing. Neither is "foreclosure" or "exclusion." "The exclusion of one or even several competitors, for a short time or even a long time, is not *ipso facto* unreasonable." *Roland Mach. Co. v. Dresser Indus., Inc.*, 749 F.2d 380, 394 (7th Cir. 1984). In fact, "foreclosure of a competitor" (Opp'n 9 n.4), is often the ordinary consequence of competition—which is the whole point of antitrust. Antitrust law exists for "the preservation of competition," *Serfecz*, 67 F.3d at 597, and "[i]t is the nature of competition that at some point there are winners and losers, and the losers are excluded." *Balaklaw*, 14 F.3d at 801. In any event, the Complaint contains no allegations that Defendants have foreclosed Provi from any market. Just the opposite; the few well-pleaded allegations in the Complaint make clear that Provi has not been foreclosed and is not under threat of foreclosure. Provi alleges that twelve of the fourteen largest alcohol distributors "signed agreements to integrate their inventory and fulfillment systems with Provi." Compl. ¶95. Provi also alleges that retailers prefer its online-ordering experience. *Id.* ¶¶ 14, 118. All of this makes clear that a large share of customers will continue to use Provi. That is the opposite of foreclosure.

In arguing to the contrary, Provi gives away the game. Provi contends that SGWS "has foreclosed Provi *from the portion of each relevant market it controls*" by virtue of its exclusive distribution agreements with distillers and other producers (Opp'n 28-29, emphasis added), and it makes a similar argument about RNDC. Opp'n 4, 19. But Provi does not—and cannot—challenge the legality of either Defendant's "control[]" over the distribution of its exclusive products. Provi has no claim, for instance, for unlawful monopolization of the alleged markets for the specific products Defendants exclusively sell.[2]

This matters, because even if "hurting Provi's profits and greatly diminishing its scale" were cognizable antitrust injuries (Opp'n 5), Provi still cannot show that the conduct that drove

---

[2] Nor could it: "Not even the most zealous antitrust hawk has ever argued that Amoco gasoline, Mobil gasoline, and Shell gasoline are three separate product markets," and the same goes for Patron tequila and Jim Beam whiskey. *Generac Corp. v. Caterpillar Inc.*, 172 F.3d 971, 977 (7th Cir. 1999); *see* MTD 24.

those injuries is anticompetitive—and that is fatal to its claims. "[O]nly" conduct that "is anticompetitive" is "capable of inflicting antitrust injury." *Indiana Grocery, Inc. v. Super Valu Stores, Inc.*, 864 F.2d 1409, 1420 (7th Cir. 1989).

In its own words, Provi alleges: "[I]n April 2019, SGWS and RNDC released their own online marketplaces—Proof and eRNDC, respectively—in competition with Provi." Opp'n 1. Then, after "accepting orders that retailers chose to communicate through Provi for two more years," Defendants stopped filling "orders retailers sought to communicate to [them] through Provi." Opp'n 1-2. That is it. But entering into "competition with Provi" (Opp'n 1) by developing competing platforms is obviously not anticompetitive. Nor is accelerating competition by going from (1) filling orders wherever placed, to (2) only filling orders placed directly. Successful competition is not anticompetitive.

Nor does prior cooperation somehow make new competitive behavior anticompetitive. *See MetroNet Servs. Corp. v. Qwest Corp.*, 383 F.3d 1124, 1131-34 (9th Cir. 2004) (holding that it was not anticompetitive for a firm to "change [a] prior course of dealing after … realiz[ing] that [that course of dealing] was having a 'significantly negative' impact on its own profitability"). Provi goes to lengths to shore up its claim that SGWS and RNDC both filled Provi-placed orders for two years after initially launching their own respective platforms.[3] *See* Opp'n 6-9. But this history makes absolutely no difference. As the Seventh Circuit recently noted, a firm's decision "to withdraw from a prior course of dealing" (*e.g.*, filling orders placed with Provi) "to pursue an innovative replacement product" (*e.g.*, Proof and eRNDC, respectively) ***is not anticompetitive*** even if it hurts the prior cooperator or causes the firm to suffer "a short-term profit loss." *Viamedia, Inc. v. Comcast Corp.*, 951 F.3d 429, 457-58 (7th Cir. 2020) (quoting *Novell, Inc. v. Microsoft*

---

[3] Provi lambastes Defendants for a one-line parenthetical in the MTD that, according to Provi, wrongly suggests that "neither defendant had an online ordering platform of its own" at any point during the period in which they "accepted orders placed through Provi." Opp'n 6-7 (emphasis omitted) (quoting MTD 1; *see also* Opp'n 9. But Provi ignores that the MTD goes on to lay out the sequence of events exactly as Provi alleges it and describes it in its opposition brief: SGWS and RNDC each "developed their own competitive online ordering platforms in 2019," MTD 20 (citing Compl. ¶99), and "each announced in 2021 that it would no longer [fill] orders placed through Provi," MTD 1-2 (citing Compl. ¶¶11-12).

*Corp.*, 731 F.3d 1064, 1075 (10th Cir. 2013)); *cf. Great Escape, Inc. v. Union City Body Co.*, 791 F.2d 532, 539 (7th Cir. 1986) ("There is no anticompetitive effect when a buyer simply terminates an at-will contract with one supplier and enters into a similar contract with another supplier."). And this case is even easier. Provi's allegations confirm that Defendants will not suffer any short-term profit loss by ceasing to accept orders through Provi. Provi repeatedly alleges that Defendants sell "must-have" alcohol products. Compl. ¶¶ 4, 50, 52, 160. That means customers will continue to buy Defendants' products. And if customers buy directly from Defendants rather than through Provi, Defendants will earn profits on two dimensions rather than just one: They will make money on the sales themselves; and they will make money through the second-order advertising- and data-based profits that the sales generate. Defendants' conduct is thus ***competitive*** by definition.

That is likely why Provi strives so mightily to describe SGWS's and RNDC's conduct as "prohibit[ing] retailers from" using Provi altogether. *E.g.*, Opp'n 2, 3, 6, 7, 8. Punishing third parties for dealing with a competitor can be anticompetitive—but Provi does not claim that is what is going on here, and the conduct it calls a "prohibition" is nothing of the sort. Provi does not (and cannot) claim that SGWS or RNDC have raised their prices for retailers that use Provi to order other firms' alcohol, or that they have taken any other sort of retaliatory measure against them. Provi likewise does not (and cannot) deny that retailers remain free to order as much of anyone else's alcohol as they want from the multiple distributors that fill orders placed on Provi. Advertisers can continue to place ads with Provi; retailers can continue to order dozens of products through Provi; and valuable transaction data will still be generated by Provi. Provi has zero allegations to the contrary. This is not a case where defendants tried to induce third parties "not to do business with [the plaintiff]." *Sw. Suburban Bd. of Realtors, Inc. v. Beverly Area Planning Ass'n*, 830 F.2d 1374, 1382 (7th Cir. 1987) (cited at Opp'n 5). All Provi alleges is that Defendants will no longer fill orders ***for Defendants' products*** placed through Provi, which (as Defendants pointed out in the MTD) does not have Defendants' products to sell. That is not a "prohibition"; it is certainly not anticompetitive, let alone unlawful. If it were, then Apple would be required to fill orders for iPhones placed on random websites, even if the proprietors of those websites had no

iPhones to sell, and would face treble damages if it declined.  That is obviously not the law.

There's more.  Provi says nothing about the fact that the remedy it seeks is a court order requiring Defendants to do business with it.  *See* MTD 8-9; Compl. at 87.  Nor does Provi contest that if it wins this lawsuit and secures an order compelling Defendants to fill orders placed through its platform, it will control more data and generate more traffic to its platform.  Provi, in other words, wants this Court to anoint it the Amazon of alcohol.  And although Provi knocks Defendants' argument that ruling for Provi (and thus mandating that its share of data and traffic to increase) will enable Provi to charge more for data analytics and ads (Opp'n 7), it does not explain how this inference is inaccurate—because it cannot.  That is (just one of the many reasons) why, even if Provi somehow has pleaded antitrust injury, its claims still fail, because Provi is not a proper party.  *See* MTD 9 (citing cases).  Indeed, Provi cannot help but concede the point.  Provi asserts that no "retailers" and no "consumers" are "***more*** directly harmed" than Provi by Defendants' decision not to fill Provi orders.  Opp'n 9 n.5.  The only way that can be true, though, is if Defendants' decision not to fill Provi orders ***does not cause anyone to pay higher prices or face reduced output***.  Provi lacks antitrust standing.

## II.     Provi Fails To Allege A Plausible Monopolization Claim.

Provi's efforts to defend its §2 claims end up proving Defendants' point.  In Provi's telling, the fact that it "effectively cannot compete at all for retailers buying Defendants' alcohol products" unless Defendants fill orders for ***their*** products that retailers place with Provi is "direct evidence of [Defendants'] monopoly power" in the proposed markets for Online Alcohol Marketplaces, Advertising on Online Alcohol Marketplaces, and Data Analytics Services.  Opp'n 14.  In reality, the only thing that Provi's inability to compete ***in the sale of*** "***Defendants' alcohol products***" shows is that Defendants control the markets ***for*** "***Defendants' alcohol products***," which is neither surprising nor unlawful—and, more to the point, not something Provi challenges in this lawsuit.

Nor can Provi repackage Defendants' unchallenged exclusive rights to sell certain brands in certain states as "indirect evidence of monopoly power" in any market other than the markets for Defendants' exclusive products (*contra* Opp'n 14-17)—which, again, are not the markets at

issue in this case. The way to show monopoly power via actual "indirect evidence" is to show that "the defendant's share" of the "relevant product and geographic markets … exceeds whatever threshold is important for the practice in that case." *Ploss v. Kraft Foods Grp., Inc.*, 197 F. Supp. 3d 1037, 1071 (N.D. Ill. 2016) (quoting *Toys "R" Us, Inc. v. FTC*, 221 F.3d 928, 937 (7th Cir. 2000)). Here, though, Provi has not alleged sufficient facts from which this Court could even infer Defendants' respective shares of the three relevant markets, let alone that Defendants' respective shares of those markets cross that threshold. Indeed, Provi has not alleged facts to allow an inference of what that threshold even is for its markets. That is fatal to Provi's §2 claims.

Provi says it does not need to plead any of this because it alleges (summarily) that Defendants' "dominance in [certain states' alcohol] distribution markets" enables Defendants "to obtain commensurate monopoly power in the related relevant markets." Opp'n 15 (emphasis omitted). But no principle of law supports the claim that having large shares of distribution markets in some states gives a firm "commensurate" shares in other, allegedly tangential markets. If there were such a principle, Provi would presumably cite at least one case to support it— especially since Defendants made this argument in the MTD (at 10-11). But Provi cites none, because none exists. A defendant's share of other markets is at best "a poor proxy for power to affect price" in the relevant market. *Marion HealthCare*, 2022 WL 2763502, at *3.[4]

In all events, even if Provi's meager allegations establish monopoly power in the markets it proposes, its §2 claims still fail, because Provi has not plausibly alleged anticompetitive conduct in those markets. Provi uses intemperate language to refer to the actions that led to this suit, but it cannot escape the fact that "prevent[ing] retailers from sending orders" for Defendants' products through Provi (which does not have any of Defendants' products) and instead "forcing retailers" to buy Defendants' products directly from Defendants, or not at all, is not "anticompetitive conduct." *Contra* Opp'n 17-18. Consider this. If you want to buy a new Birkin bag, you have to

---

[4] For example, just because Tesla has a large share of its own brand of cars, or even of the entire electric vehicle market in general, does not mean that it also has a high share of the market for selling cars in dealerships—and that is true even if there are "high barriers to entry." *Contra* Opp'n 16.

buy it from Hermès. You cannot buy one from Amazon, or Walmart, or Nordstrom, or any other outlet; Hermès will not allow it. Yet the mere fact that Hermès "force[s] customers to use its own [platforms]" if they want to buy its products (Opp'n 14), does not somehow give Hermès "monopoly power" in any market *other than the market for its products* (which is not a cognizable market for antitrust purposes, for the same reasons Defendants explained in the MTD (at 24) that markets for "Jim Beam" or SGWS's "must-have" brands are not). By the same token, even though the decision not to permit third-party sellers to sell new Birkin bags might "degrad[e]" those sellers' businesses or "imped[e] [their] growth" (Opp'n 14), that is not a §2 violation, because nothing in the Sherman Act gives anyone but Hermès the right to sell new Hermès bags.

So too here. Only Defendants can sell certain in-demand alcohol products to retailers in certain states. Opp'n 15. That exclusivity—which Provi does not (and cannot) challenge—does not transform Defendants into monopolists in the purported ancillary "market" for the platforms on which retailers buy alcohol, let alone in the even-more-derivative "markets" for advertising on those platforms and analyzing data from them. Likewise, that Defendants' decisions not to let Provi sell *Defendants' products* may impede Provi's growth (Opp'n 14), does not render unlawful Defendants' decisions to control the means of purchasing *Defendants' products*. Defendants may have (lawful) power over the distribution of *Defendants' products*, just like Hermès may have power over the sale of its products. But that is not "direct evidence of monopoly power," *id.*, in any market *other than* the (non-cognizable) markets for the products in question.

Nor are Defendants' decisions to control the point of sale for Defendants' products otherwise "unjustifiable." *See Mercatus Grp., LLC v. Lake Forest Hosp.*, 641 F.3d 834, 854 (7th Cir. 2011) (§2 claim requires "unjustifiable means"). Outside the narrow "essential-facilities" context, *see Marion HealthCare*, 2022 WL 2763502, at *4; MTD 16-17—which Provi wisely does not claim applies here—antitrust law does not preclude a firm with lawfully obtained exclusive rights to sell certain products from "forc[ing]" customers to buy from them or not at all. *Contra* Opp'n 15. The commonplace decision to control the point of sale for a firm's exclusive wares does not become problematic just because customers are "less likely … to buy lesser-known

10

products" sold by third parties once they have purchased the "must-haves." *Contra id.*[5]

Even putting all of that aside, moreover, Provi has not pleaded enough to establish that its proposed markets are facially plausible. Provi ignores that its allegations of the benefits of online-platform ordering vis-à-vis ordering by phone or email say nothing about what would occur in response to a price increase in the "market" for Online Alcohol Marketplaces—the critical question in delineating the bounds of the market. *See Flip Side Prods., Inc. v. Jam Prods., Ltd.*, 843 F.2d 1024, 1032 (7th Cir. 1988). Provi likewise has no response to the fact that retailers consume ads in multiple fora and platforms, which means Provi's artificially drawn advertising/data market definitions fail on their faces. Defendants pointed all of this out in the MTD (at 10-12); Provi offers no response, other than to say (Opp'n 11) that Defendants' cases were resolved at summary judgment. That other plaintiffs' market allegations were less obviously deficient does not mean that Provi gets a reprieve—or an opportunity to impose unnecessary costs on the parties and the Court—through summary judgment.

Finally, even assuming *arguendo **both*** that the proposed markets pass the facial plausibility test ***and*** that Provi has pleaded enough to establish a plausible inference of monopoly power in those markets, Provi's monopolization claims still fail. As noted at the outset, what Provi wants to accomplish in this litigation is to secure a court order compelling Defendants to cooperate with it. *See* Compl. at 87. But "an order to continue to do business with a firm is proper only if the case fits 'within the limited exception recognized in *Aspen Skiing*." *Authenticom, Inc. v. CDK Glob., LLC*, 874 F.3d 1019, 1026 (7th Cir. 2017) (quoting *Trinko*, 540 U.S. at 409). And Provi comes nowhere close to fitting its allegations into the narrow *Aspen Skiing* doctrine. *Aspen Skiing* claims require "a prior course of voluntary conduct, sacrifice of short-term profits, and refusal to sell to rivals on the same terms as other potential buyers." *Viamedia, Inc. v. Comcast Corp.*, 951 F.3d 429, 463 (7th Cir. 2020). Whatever the precise contours of Defendants' dealings with Provi

---

[5] That also dooms Provi's supposedly "alternative[]" claims "that each Defendant ***attempted to*** monopolize the relevant markets." Opp'n 10 n.6 (emphasis added). As Provi notes, "those claims" require plausible allegations, *inter alia*, that "each Defendant engaged in anticompetitive conduct." *Id.* Provi has none.

11

until mid-2021, Provi has alleged no facts from which this Court could infer that Defendants have suffered or will suffer "short-term profit[]" losses, *id.*, as a result of their decisions to stop filling orders for their products placed with Provi. Provi's short-term-suffering claim is premised entirely on the allegation that Defendants "decided to forgo substantial revenues from orders through Provi." Opp'n 18 (citing Compl. ¶¶15, 227). But declining to fill orders placed through Provi does not mean the orders were "forego[ne]." While Provi now says in response that its "allegations are based on knowledge of unfilled orders" (Opp'n 19 n.15), it offers no indication of the magnitude of those "unfilled orders" or any other details whatsoever about them. What it does provide is reason to doubt this unpled and illogical say-so. If Defendants' products are "must-haves," as Provi continually asserts, the natural inference is that retailers shifted from ordering through Provi to ordering directly from Defendants. And even if some retailers declined (or were for some reason unable) to order from Defendants, Provi's allegations—and its entire business model—make clear that Defendants will make *more* money (via ad sales and data analytics) selling through Proof and eRNDC rather than through Provi. Defendants pointed this out in the MTD (at 15); Provi offers no response other than to point out that Defendants filled Provi orders for two years after launching their platforms. Opp'n 15-16. But, again, the obvious inference from the pleaded sequence of events is that Defendants can make more money controlling the point of sale for their exclusive products rather than allowing Provi to siphon off second-order profits from sales of their exclusive products. In short, Provi's own allegations defeat its §2 claims.

## III.      Provi Fails To Allege A Plausible Conspiracy.

### A.       Provi's Horizontal Conspiracy Allegations are Insufficient as a Matter of Law.

Provi acknowledges that it has not alleged an express agreement among Defendants, and instead argues that it has alleged "circumstantial" evidence plausibly showing such an agreement. Opp'n 21. At most, however, Provi's allegations show that Defendants had common reactions to common stimuli, and the "plus factors" Provi cites only reinforce that Defendants' conduct is just as consistent with independent action as with conspiracy. That is not enough.

Allegations of "parallel conduct, even conduct consciously undertaken, needs some setting

12

suggesting the agreement necessary to make out a §1 claim." *Twombly*, 550 U.S. at 557. Parallel behavior that results from "chance, coincidence, independent responses to common stimuli, or mere interdependence unaided by advanced understanding" does not state a claim under §1. *Id.* at 556 n.4. Whether that suggested setting is enough depends on how that conduct is "viewed in light of common economic experience." *Id.* at 565. Here, that context shows that Defendants' alleged conduct (telling their customers that they would only fill orders placed with them, not through a third party) does not suggest a conspiracy. The mere fact that each Defendant would want its customers to use its own system to order its own products is not a plausible allegation of conspiracy. It is good business—and competitive.

In trying to salvage its claims, Provi points to its allegation that "within days of each other" in 2019, both Defendants "launched" their own online ordering platforms. Opp'n 21. But the timing of Defendants' announcements about launching their own platforms has nothing to do with an alleged boycott of Provi that Defendants purportedly instituted nearly ***two years later***, something Provi concedes in the Complaint given it does not even claim that Defendants "began to coordinate or collude" until *May 2021*. Compl. ¶¶104-08; 227. And even putting that aside, the simple fact that each Defendant launched its own platform is not surprising, given Provi's allegation that Defendants "recognize[d] retailers' demand for e-commerce solutions" (Compl. ¶99); indeed, Provi spends much of the Complaint extolling the virtues of online ordering. That Defendants would offer a service their customers want is hardly suggestive of a boycott. Moreover, none of Provi's other allegations suggests that the respective decisions of two fierce competitors to offer their own platforms were based on an "advanced understanding" with each other. Provi does not allege, *e.g.*, that Defendants discussed launching platforms (which in Provi's telling would compete with each other) before they did, much less that they ***agreed*** to do so.

Next, Provi argues that Defendants both announced that they would not accept orders placed through Provi in August 2021 and soon after each "blocked" orders placed through Provi by refusing orders sent from Provi's email domain. Opp'n 21. Provi's mischaracterization of this as parallel conduct glosses over its admissions that RNDC repeatedly told Provi and RNDC

employees—beginning *more than a year* earlier—that RNDC would no longer fill orders placed through Provi. *See* Compl. ¶¶131 (RNDC told retailers not to use Provi beginning in 2020), 137 (May 2020), 140 (June 2020). Provi also ignores its admission that RNDC "blocked" emails from Provi and told employees not to accept Provi orders *not* in August 2021, when SGWS "blocked" orders from Provi, but more *than a year earlier*, in June 2020. *See id.* ¶141.

Provi tries to bolster its boycott claim by citing various "plus" factors, but those factors only reinforce that its allegations are just as consistent with competition as with conspiracy.

Provi claims that Defendants' decisions not to accept orders placed through Provi were "against" Defendants' self-interest because their refusal supposedly caused Defendants to lose those orders. That makes no sense. As Provi has alleged, "*retailers must deal with* [*SGWS*] *and RNDC in order to fulfill the alcohol orders essential to their businesses*." Compl. ¶237 (emphasis added). Put differently, Defendants' decisions to not accept orders through Provi does not mean Defendants did not receive those orders; it simply means that Defendants received the orders directly from their customers rather than through Provi. *Id.* ¶7. And elsewhere still, Provi recognizes the benefits of vertically integrating distribution systems (*id.* ¶¶96-97), as Defendants have done here, which likewise confirms that Defendants' insistence that customers order directly from them rather than Provi, is not against their economic self-interest, it is *in it*.

Provi's other "plus" factors likewise do not suggest that Defendants' decisions to deal with their customers directly resulted from a boycott. First, that an RNDC employee knew SGWS had taken similar actions (Opp'n 22), because it received (then forwarded) a voicemail left with a SGWS customer where SGWS announced that action, is no surprise—and does not support an inference of conspiracy. Second, the mere fact that Defendants participate in a "concentrated market," *id.* at 23, is not enough. For one thing, that the *distribution* market is concentrated says nothing about the concentration or competitiveness of the three markets on which Provi bases its claims. In any event, although courts have noted that collusion is easier in concentrated markets, concentrated markets also allow participants to simply *follow* their rivals' actions—and as *Twombly* makes clear, conscious parallelism does not violate the Sherman Act. That is why courts,

14

including the Seventh Circuit, have recognized that market concentration just as often reflects lawful conscious parallelism as it does unlawful collusion. *See Kleen Prods LLC v. Ga.-Pac.*, 910 F.3d 927, 935 (7th Cir. 2018) (noting that concentration, vertical integration, inelastic demand, standardized products, and high barriers to entry all "make it easier for companies *either* to form a cartel *or* to follow the leader independently" (emphases added)).

Finally, Provi argues that membership in trade associations and *opportunities* for inter-firm communications make its conspiracy claim plausible. Opp'n 24. Trade associations are not "by [their] nature … walking conspira[cies]," *Consol. Metal Prods., Inc. v. Am. Petroleum Inst.*, 846 F.2d 284, 293-94 (5th Cir. 1988), and simply alleging the opportunity to collude is not enough. MTD 18 (citing cases). Indeed, Provi's own cases highlight the gulf between Provi's allegations and allegations that courts have found sufficient. In *Text Messaging*, for instance, the plaintiffs alleged that cellular providers agreed to fix text messaging rates, that they "exchanged price information directly at [trade] association meetings," and that they belonged to "an elite leadership council" with the "stated mission . . . to urge its members to substitute 'co-opetition for competition." 630 F.3d 622, 628 (7th Cir. 2010). That is nothing like Provi's allegations.

Likewise, in *Broiler Chicken*, the court emphasized that the "context within which [trade association] meetings take place is key to determining the significance of… those meetings to the plausibility of a conspiracy claim." 290 F. Supp. 3d 772, 799-800 (N.D. Ill. 2017). The alleged context in that case was nothing like what Provi alleges here. The *Broiler Chicken* defendants all allegedly announced production cuts right on the heels of a trade association meeting; one defendant's CEO allegedly admitted that he knew "some companies have cut back and have not announced." *Id.* at 782. The alleged production cuts there all followed years of increased production. *Id.* The defendants there all allegedly exchanged data about planned production through a third party, which met with the defendants at trade association meeting. *Id.* at 781. And, finally, the defendants allegedly *again* all announced, after yet *another* trade association meeting, that they would be cutting production *again*, with one CEO allegedly proclaiming that he was

15

"comfortable" that production in "the industry is going to remain constrained." *Id.* at 783.

Nothing of the sort is alleged here. Here, the only allegation that Provi was even discussed at a trade association meeting is that, in Provi's telling, during a Q&A session with a Provi representative, Provi claims an RNDC executive said he believed "Provi harms retailers." Compl. ¶111. Provi says these remarks were made "***just weeks before*** Defendants simultaneously stopped accepting orders retailers cho[]se to submit through Provi," Opp'n 24 (emphasis in original), and "seemed designed to encourage a boycott" of Provi, Compl. ¶111. But, again, Provi admits that in June 2020—***one year before this trade association meeting***—RNDC had blocked communications from Provi, programmed its computer system firewall to block emails from Provi, and directed its employees not to respond to communications from Provi and not to fill orders that retailers communicated through Provi. Compl. ¶141. As Provi asserts, despite taking all this action to try to prevent Provi from placing orders with RNDC, Provi continued to circumvent RNDC firewalls and clear and explicit employee instructions. *Id.* It is hardly surprising, therefore, that RNDC expressed its frustration with Provi during Provi's presentation at the trade association meeting. Provi's suggestion that RNDC's public statement serves as evidence of a conspiracy is at best sheer speculation, which this Court need not accept. *See, e.g.*, *Twombly*, 550 U.S. at 555.

## B. Provi's Vertical Conspiracy Allegations Fail as a Matter of Law.

Provi's response ignores not only the Supreme Court's longstanding recognition that firms may announce the conditions on which they will deal with customers and refuse to deal with those that will not comply with them, *Monsanto Co. v. Spray-Rite Serv. Corp.*, 465 U.S. 752, 761 (1984) (citing *United States v. Colgate & Co.*, 250 U.S. 300, 307 (1919)), but also its equally clear holding that when a customer complies with the dealer's conditions to "avoid termination," ***that is not an agreement under §1***. *See id.* at 764 n.9 (§1 requires "more than [that a customer] conformed"). Provi's response confirms its allegations are barred. Provi alleges that Defendants and their customers supposedly "agreed" not to deal with Provi based solely on Defendants' respective decisions to "refus[e] to accept or acknowledge any orders that retail customers chose to communicate through Provi" and to "with[hold] … distribution services from customers who

16

chose to use Provi." Compl. ¶237. Straightforward application of precedent shows that is insufficient.

Provi argues that its claims are different because Defendants "coerced" their customers' agreement, and a coerced agreement, so Provi says, is an agreement all the same. Opp'n 26. What Provi means by coercion, however, is only that Defendants' customers did not place orders with Defendants through Provi after Defendants said they would not fill such orders. That is not an agreement and, in fact, the Seventh Circuit explicitly rejected Provi's suggested definition, since it would forbid what *Monsanto* and *Colgate* plainly permit. *See, e.g.*, *Isaksen v. Vermont Castings, Inc.*, 825 F.2d 1158, 1164 (7th Cir. 1987); *see also* Areeda & Hovenkamp, *Antitrust Law* ¶1446e ("*Monsanto* expressly declares that no agreement arises when a supplier announces the course of behavior that customers must follow in order to receive future supplies; nor does agreement occur upon … compliance ***even if coerced*** by the fear of termination." (emphasis added)). Alleging that Defendants' customers followed the conditions Defendants set for dealing with them does not allege a vertical agreement under §1.

That is not the only problem with Provi's vertical conspiracy claim. Provi admits that it has not identified the retailers with whom Defendants allegedly conspired, claiming instead that it does not need to "name [them] at this stage." Opp'n 26. Provi thus asks this Court to take the notice out of notice pleading—an approach the Supreme Court rightly rejected in *Twombly*. *See Twombly*, 550 U.S. at 565 n.10. What is more, where the alleged agreement is between firms at different levels of distribution—as Provi acknowledges is the case here—the "meeting of the minds" needed for a §1 claim requires "***both*** that the [retailer] communicated its acquiescence or agreement, ***and*** this was sought by the [distributor]." *Monsanto*, 465 U.S. at 764 n.9 (emphasis added). Here, though, the Complaint contains no allegations about ***which retailers*** Defendants supposedly communicated with to seek such an agreement, much less that any retailers communicated their agreement to Defendants.

In sum, Defendants' announcements that they would not accept orders through Provi and their customers' responses to that condition to continue to do business with Defendants does not

17

show an agreement under §1, and these claims must be dismissed.

## IV.     Provi Fails To Allege Any Plausible Unlawful Tying Arrangement Against SGWS.

Provi's opposition confirms the mismatch between its tying allegations against SGWS and the basic problem that unlawful-tying law seeks to solve. An unlawful tie happens when customers are **forced to purchase**—*i.e.*, to pay for—a good or service they do not want in order to be able to purchase a good or service they do want. A critical element of an unlawful-tying claim is thus that "the tying seller has some economic interest in the **sales** of the tied product." *Reifert v. S. Cent. Wis. MLS Corp.*, 450 F.3d 312, 317 (7th Cir. 2006) (emphasis added). That is not what is going on here; Provi does not allege SGWS sells the "tied" product—SGWS's platform, Proof—or even charges anyone to use it. (SGWS does not.) Nor does Provi allege that SGWS charges more for its brands on Proof than it did through Provi. (Ditto.) That is fatal to Provi's unlawful-tying claim.

To be sure, Provi alleges SGWS makes more money through ads selling SGWS's products directly than it did through Provi. But that is not an unlawful tie. "[T]he economic interest requirement" of an unlawful-tying claim "is not met where a plaintiff merely alleges that the tying seller is receiving substantial revenue as a result of his sale of two products as a package," and a "plaintiff does not establish the requisite economic interest in the tied product market merely by alleging that the tying seller is receiving a profit from the transaction as a whole." *Carl Sandburg Vill. Condominium Ass'n No. 1 v. First Condominium Dev. Co.*, 758 F.2d 203, 208-09 (7th Cir. 1985). In any event, SGWS does not force anyone to purchase through Proof. While Provi thinks online ordering is best, it cannot deny that customers are free to order SGWS products through SGWS's various "ordering products and services" **other than Proof**. Opp'n 28. There is no tying.

Provi's confused monopoly power arguments fare no better. As explained above, Provi fails to demonstrate that SGWS has "sufficient market power to restrain free competition in the tied product market" (here, the "market" for Online Alcohol Marketplaces). *Reifert*, 450 F.3d at 317 (sufficient market power existed when "it [wa]s impossible to perform the tasks of a real estate agent or appraiser in the relevant geographic market without using" the tied product). Provi's own allegations effectively admit as much. Provi asserts that "[i]t is critical that [SGWS] continue to

18

invest in the [eCommerce] channel." Opp'n 27. But actual monopolists capable of tying do not need to continue to invest in the tied product, precisely because they can force consumers to pay for it regardless—that is the whole point of illegal tying schemes. Provi's own description of SGWS's conduct demonstrates that SGWS is competing on the merits.[6]

This claim fails for another reason: Provi has not plausibly alleged that a not-insubstantial volume of commerce is affected by the supposed tie. To be sure, Provi asserts "the tied markets are estimated at $1 billion annually." Opp'n 29 (citing Compl. ¶¶245, 254). But the size of the supposedly tied markets is not the figure that matters; what matters is how much of that market is allegedly affected **by the tie**. *See Fortner Enters., Inc. v. U.S. Steel Corp.*, 394 U.S. 495, 501-02 (1969). Since Provi has not alleged that SGWS charges for Proof, or that fewer sales have occurred following the alleged tying arrangement, the presumptive dollar volume affected by the tie is zero.

## V.     Finally, Provi's Remaining State-Law Claims Fail.

### A.     Provi's Illinois tort-law claims are based on conduct that is not unlawful.

Although Provi claims it has sufficiently alleged the elements of tortious interference, its Illinois common-law claims must be dismissed because Provi has also alleged that SGWS and RNDC are its competitors—and under Illinois law, competitors are allowed to "interfere" with one other's business expectancies, and thus cannot be liable for **tortious** interference.

"Under Illinois law, commercial competitors are privileged to interfere with each other's business expectancy." *Serv. By Air, Inc. v. Phoenix Cartage & Air Freight, LLC*, 78 F. Supp. 3d 852, 868 (N.D. Ill. 2015). The "competitor's privilege" serves as a complete defense to an intentional interference claim. *Int'l Marketing, Ltd. v. Archer-Daniels-Midland Co.*, 192 F.3d 724, 732 (7th Cir. 1999). Throughout its complaint, Provi repeatedly describes SGWS and RNDC as its competitors. *See, e.g.*, Compl. ¶169 ("Defendants recognize that their Online Alcohol Marketplaces compete with Provi"); ¶198 ("Provi as an especially effective competitor to Proof and eRNDC"); ¶226 ("[SGWS] and RNDC compete against Provi"). When, as here, a plaintiff

---

[6] Provi also never explains how it can be that SGWS **alone** has market power sufficient for an unlawful tying claim, when the entire Complaint is about the supposed combined duopoly of SGWS and RNDC.

19

pleads facts showing that the privilege applies, a complaint may be dismissed. *Glob. Material Techs., Inc. v. Dazheng Metal Fibre Co., Ltd.*, 2014 WL 1099039, at *6 (N.D. Ill. Mar. 20, 2014).

Because Provi's allegations establish that SGWS's and RNDC's respective conduct is protected by the competitor's privilege, Provi's tortious interference claims must be dismissed.

**B.       Provi's UCL claims fail because they are based on conduct that is not unlawful.**

California's Unfair Competition Law allows claims challenging "unlawful" or "unfair" business practices. But a practice is "unlawful" under the UCL only if it violates another California or federal law. *AT & T Mobility LLC v. AU Optronics Corp.*, 707 F.3d 1106, 1107 n.1 (9th Cir. 2013). "[N]o courts have 'allow[ed] a plaintiff to import either statutes or precedent from another state as an unlawful business practice.'" *Hilton v. Apple Inc.*, 2014 WL 10435005, at *3 (C.D. Cal. Apr. 18, 2014) (quoting *Van Slyke v. Capital One Bank*, 2007 WL 3343943, at *14 (N.D. Cal. Nov. 7, 2007)). Thus, even if Provi's claims under the Illinois Antitrust Act or Illinois common law were sufficiently pleaded, Provi cannot base its UCL claims on violation of Illinois law, as it has tried to do. *See* Compl. ¶290.

Because Provi's Sherman Act and Illinois-tortious-inference claims also fail, it cannot base its UCL claims on those claims either, even by contending that they are "unfair." "[A]cts permissible under antitrust laws ***cannot be deemed unfair*** under the unfair competition law, at least not where a plaintiff alleges that the acts are unfair for the same reason it argues that they violate antitrust law." *Orchard Supply Hardware LLC v. Home Depot USA, Inc.*, 939 F. Supp. 2d 1002, 1011 (N.D. Cal. 2013) (emphasis added); *see also In re Dairy Farmers of Am., Inc. Cheese Antitrust Litig.*, 2015 WL 3988488, at *18 (N.D. Ill. June 29, 2015) (same). Yet that is all that Provi has done. *See* Opp'n 30. Provi has failed to state claims under federal antitrust or California law, and so its derivative UCL claims must also be dismissed.

**CONCLUSION**

The Court should grant Defendants' MTD and dismiss Provi's Complaint with prejudice.

20

Dated: August 1, 2022

Respectfully submitted,

/s/ *James H. Mutchnik*

CRAIG S. PRIMIS\*
KIRKLAND & ELLIS LLP
1301 Pennsylvania Avenue, NW
Washington, DC 20004
(202) 389-5000
craig.primis@kirkland.com

JAMES H. MUTCHNIK   (ARDC #6201681)
KIRKLAND & ELLIS LLP
300 N. LaSalle Drive
Chicago, IL 60654
(312) 862-2000
jmutchnik@kirkland.com

\* admitted pro hac vice

*Attorneys for Defendant Southern Glazer's Wine and Spirits, LLC*


Richard S. Krumholz\*
Preston Glasscock\*
NORTON ROSE FULBRIGHT US LLP
2200 Ross Avenue, Suite 3600
Dallas, Texas 75201-2784
Telephone: (214) 855-8000
Facsimile: (214) 855-8200
richard.krumholz@nortonrosefulbright.com
preston.glasscock@nortonrosefulbright.com

Robin D. Adelstein\*
NORTON ROSE FULBRIGHT US LLP
1301 Avenue of the Americas
New York, New York 10019
Telephone: 212-318-3108
Facsimile: 212-408-5100
robin.adelstein@nortonrosefulbright.com

Eliot F. Turner\*
Abraham Chang\*
NORTON ROSE FULBRIGHT US LLP
1301 McKinney, Suite 5100
Houston, Texas 77010
Telephone: 713-651-5151
Facsimile: 713-651-5246
eliot.turner@nortonrosefulbright.com
abraham.chang@nortonrosefulbright.com

\*admitted pro hac vice

/s/ *Jeffery Moore Cross*

Jeffery Moore Cross   (ARDC #0547980)
Dylan Smith   (ARDC #6298703)
Lillian Grappe Lamphere  (ARDC #6340044)
FREEBORN & PETERS LLP
311 South Wacker Drive, Suite 3000
Chicago, IL 60606
Tel.: (312) 360-6000
jcross@freeborn.com
llamphere@freeborn.com
dsmith@freeborn.com

*Attorneys for Defendant Republic National Distributing Company*

21

## CERTIFICATE OF SERVICE

I certify that on August 1, 2022, I caused a copy of the foregoing document to be served by the ECF System for the U.S. District Court for the Northern District of Illinois.

/s/ *James H. Mutchnik*
James H. Mutchnik

22