## IN THE UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF ILLINOIS

Tiz, Inc.,

        Plaintiff,

v.

Southern Glazer's Wine and Spirits, LLC et al,

        Defendants.

Case No. 22 CV 1648

Honorable Nancy L. Maldonado

## MEMORANDUM OPINION AND ORDER

Plaintiff Tiz, Inc. (d.b.a. "Provi") filed a ten-count complaint against Defendants Southern Glazer's Wine and Spirits, LLC ("Southern") and Republic National Distributing Company, LLC ("RNDC") (collectively, "Defendants") bringing claims under the Sherman Act, Illinois and California statutory law, and Illinois common law. (*See* Dkt. 1 ¶¶ 224–301.)[1] Specifically, Provi sues Defendants for horizontal and vertical conspiracy, in violation of § 1 of the Sherman Act, monopolization and, in the alternative, attempted monopolization, in violation of § 2 of the Sherman Act, violations of the Illinois Antitrust Act, unfair business practices under the California Unfair Competition Law, and intentional interference with a business expectancy under Illinois common law. (*Id.* ¶¶ 224–40, 251–301.) Provi also sues Southern alone for unlawful tying, in violation of § 1 of the Sherman Act. (*Id.* ¶¶ 241–50.) Defendants have filed a motion to dismiss Provi's Complaint. (Dkt. 24.) For the reasons stated in this Memorandum Opinion and Order, the Court denies Defendants' motion to dismiss in its entirety.

---

[1] Page numbers are taken from CM/ECF headers.

## Background

The Complaint alleges the following facts, which the Court accepts as true for the purpose of considering the instant motion to dismiss. *See Kubiak v. City of Chicago*, 810 F.3d 476, 480–81 (7th Cir. 2016). Provi is an online alcohol platform that operates as a "one-stop shop" for retailers to search for alcohol products across distributors and to communicate their orders to distributors for fulfillment. (Dkt. 1 ¶ 8.) In addition to providing an online marketplace for retailers, Provi sells Search and Display Advertising on its platform along with Data Analytics Services for wines and spirits. (*Id.*)

Defendants are both large wine and distilled spirits distributors in the United States. (*Id.* ¶¶ 29, 33.) Southern is the largest distributor of wine and distilled spirits in the United States and operates in 44 states and the District of Columbia. (*Id.* ¶ 28.) Southern has exclusive distribution rights to a number of "must-have" brands in several states. (*Id.* ¶ 29.) In April 2019, Southern launched Proof, which like Provi, is an Online Alcohol Marketplace that allows retailers to browse products that Southern distributes and to communicate orders for distribution. (*Id.* ¶¶ 31, 99.) Southern also sells Search and Display Advertising on Proof and Data Analytics Services. (*Id.*)

RNDC is the second largest distributor of wine and distilled spirits in the United States and operates in 37 states and the District of Columbia. (*Id.* ¶ 32.) RNDC also has exclusive distribution rights to a number of "must-have" brands in several states. (*Id.* ¶ 33.) RNDC launched its own proprietary Online Alcohol Marketplace, eRNDC, in April 2019 as well. (*Id.* ¶¶ 35, 99.) As is the case with Provi and Proof, eRNDC permits retailers to communicate their orders to RNDC, and provides Search and Display Advertising and Data Analytics Services. (*Id.*)

A brief discussion of the alcohol industry is required to contextualize Provi's claims.

2

## I.     The Alcohol Industry

The alcohol industry is subject to a long-standing regulatory framework that has uniquely shaped the industry. In 1933, Congress passed the Federal Alcohol Administration Act ("FAA Act"), 27 U.S.C. §§ 201–219a, which established the still-extant three-tier system for the manufacture, distribution, and sale of alcohol. (*Id.* ¶ 36.) With few exceptions, under this three-tier system, "only licensed suppliers may sell to distributors; only licensed distributors may sell to retailers; and only retailers may sell to consumers." (*Id.*)

Both the federal government and state governments regulate the distribution and sale of alcohol. (*Id.* ¶ 37.) The Alcohol and Tobacco Tax and Trade Bureau ("TTB") of the Department of the Treasury provides federal oversight of the alcohol industry. (*Id.*) Additionally, each state and the District of Columbia has a control board or commission to enforce alcohol licensing and sale regulations. (*Id.*) Alcohol suppliers and distributors must receive permits from both the TTB and state regulatory bodies. (*Id.* ¶ 38.)

Aside from the licensing requirements imposed by the federal government and the states, suppliers are also subject to franchise laws in a number of states that make it difficult for them to change or consolidate distributors. (*Id.* ¶¶ 58, 62.) Distribution agreements are ordinarily state-by-state, brand-by-brand, and exclusive, partially due to these franchise laws. (*Id.* ¶ 58.) These agreements typically last five years or more for wine and distilled spirits, but some last longer than ten years. (*Id.* ¶¶ 60, 67.)

In terms of product, there are three broad sectors of the alcohol beverage industry: distilled spirits, wine, and beer. (*Id.* ¶ 40.) Within both the distilled spirits and wine markets, certain distributors, like Southern and RNDC, have contracts with suppliers for the exclusive right to distribute particular alcohol brands that enjoy outsized popularity (so-called "must-have brands").

(*Id.* ¶¶ 56–57). These must-have brands enjoy tremendous sales volume and are "fixtures in bars throughout the country." (*Id.* at Chart 4; *id.* ¶ 45.) For example, Tito's was the top selling distilled spirit brand in 2020, and Southern has the exclusive right to distribute Tito's vodka in many states. (*Id.* at Chart 4; *id.* ¶ 56.) Similarly, Fireball was the fourth top selling distilled spirit brand in 2020, and RNDC has the exclusive right to distribute Fireball whiskey in some states. (*Id.* at Chart 4; *id.* ¶ 57.)

As a result of the alcohol industry's regulatory framework and alcohol distributors' ability to obtain the exclusive rights to distribute must-have brands, both the distilled spirits and wine distribution markets are highly concentrated. (*Id.* ¶¶ 48–49, 52.) In 2022, the U.S. Department of the Treasury, alongside the Department of Justice and the Federal Trade Commission, issued a report recognizing that one of the major trends in the alcohol industry has been consolidation. U.S. Dep't of the Treasury, *Competition in the Markets for Beer, Wine, and Spirits* 2 (Feb. 2022).[2]

The structure of the alcohol industry has historically required alcohol retailers to contact distributors individually to place orders for each location where they sell alcohol to consumers and to manage each of those orders until delivery. (*Id.* ¶ 74.) Certain alcohol retailers, so-called "National Accounts," that have numerous locations throughout the country "have centralized procurement processes and purchasing requirements that are more sophisticated than retailers with one or few locations." (*Id.* ¶ 75.) Large-scale distributors have an advantage with National Accounts as they are better equipped to meet these more involved requirements, and National Accounts seek business partners who can help them improve both administrative efficiencies (by

---

[2] "Judicial notice of historical documents, documents contained in the public record, and reports of administrative bodies is proper." *Hickman v. Wells Fargo Bank N.*A., 683 F. Supp. 2d 779, 784 (N.D. Ill. 2010) (quoting *Menominee Indian Tribe v. Thompson*, 161 F.3d 449, 456 (7th Cir.1998)). "'Courts routinely take judicial notice of the information on official government websites,' . . . because they are not subject to reasonable dispute." *Richburg v. Conagra Brands, Inc*., No. 22 CV 2420, 2023 WL 1818561, at *3 (N.D. Ill. Feb. 8, 2023) (taking judicial notice of FDA document).

providing services like online order management for storing invoices and order histories) and network efficiencies (for example, consolidating orders to avoid fees associated with placing small orders). (*Id.* ¶ 76.)

## II.    The Emergence of Provi

In 2016, Taylor Katzman founded Provi as a means of modernizing and facilitating how retailers and distributors interact. (*Id.* ¶¶ 8–10, 86–87.) Provi's platform allows retailers to browse across different distributors' products, compare pricing, communicate orders, and access a central repository of their order history, as opposed to reaching out to distributors on an individual basis. (*Id.* ¶¶ 8–10, 84, 86.) In addition, Provi developed a "proprietary algorithm that showcases a wide variety of products by suppliers and distributors by location and that complies with all applicable laws and rules." (*Id.* ¶ 93.) Since its inception, Provi has expanded into 35 states. (*Id.* ¶¶ 84, 87.) National Accounts, in particular, are an important portion of Provi's business, and partnerships with National Accounts have allowed Provi to scale up and compete effectively against other providers of Online Alcohol Marketplaces such as Proof and eRNDC. (*Id.* ¶ 84.)

Provi's ability to gather various distributor and retailers together on one platform has created additional opportunities for suppliers to advertise their alcohol products to retailers. (*Id.* ¶ 89.) Provi therefore competes with other providers of Online Alcohol Marketplaces for suppliers' advertising dollars. Retailer traffic and activity on Online Alcohol Marketplaces like Provi also generates valuable data that allows suppliers to learn more about retailers' habits and the efficacy of their advertising campaigns. (*Id.*)

Distributors can integrate with Provi. (*Id.* ¶¶ 95–96.) Distributor integration enables Provi to access a distributor's operational and inventory data in real time, and thus provides retailers with more detailed product pricing and availability. (*Id.* ¶ 96.) Additionally, integration allows retailers

to send their orders directly to distributors through Provi so that a distributor's sales representative can accept, reject, or edit orders without the need for manual reentry. (*Id.*) Distributors are, however, not required to integrate in order to receive and fulfill orders placed by retailers through Provi. (*Id.*) The top 14 distributors in the United States have integrated with Provi, but Southern and RNDC have not done so. (*Id.* ¶ 97.)

Although Defendants have not integrated with Provi and have, instead, developed their own e-commerce marketplaces, Defendants accepted numerous orders through Provi over the course of nearly five years. (*Id.* ¶¶ 11, 97.) Provi claims that before it ceased using Provi, "Southern generated approximately $145 million in retail sales through Provi and accepted some 87,000 orders." (*Id.* ¶ 121.) Additionally, "RNDC generated $45 million in retail sales through Provi and accepted more than 44,000 orders." (*Id.*)

Aside from Provi, there are a number of other independent providers of Online Alcohol Marketplaces. (*Id.* ¶ 98.) Some distributors, like RNDC and Southern, also have their own proprietary marketplaces. (*Id.*) While these other marketplaces have the same basic functionality as Provi, Proof, and eRNDC, Provi alleges that they remain fringe players because they "lack the broad range of products and geographic footprint that more developed marketplaces offer—and they lack the broad portfolio of 'must-have' brands under long-term, exclusive contracts that Defendants enjoy." (*Id.*)

### III. Provi's Allegations of Defendants' Unlawful Conduct

Provi alleges that beginning on or about May 2021, Defendants began to conspire to exclude Provi as a competing provider of Online Alcohol Marketplaces. (*Id.* ¶ 104.) Defendants have long maintained a close relationship, interacting through industry groups and events and forming a lobbying entity together, and executives of both companies have served on the Wine and

6

Spirits Wholesalers of America's board of directors. (*Id.* ¶ 102.) According to Provi, "it is common knowledge in the industry that senior executives at the two companies communicate with each other often" and "have been known at industry conferences to flash two upheld fingers to one another." (*Id.* ¶¶ 5, 102.)

Provi alleges that even before the events central to Provi's claim began in May 2021, Defendants were engaging in unfair business tactics. For example, Provi alleges that in 2018, RNDC and Southern set up meetings with Provi to gain competitive intelligence for launching their own Online Alcohol Marketplaces. (*Id.* ¶¶ 125–29.)

Provi further alleges that in 2020, RNDC began indicating its reluctance to working with Provi and discouraging retailers from placing orders through Provi, even though RNDC fulfilled orders via Provi from 2018 to 2020. On February 24, 2020, Alan Rosenberg, RNDC's General Counsel and Corporate Executive Vice President, sent Provi a cease-and-desist letter, accusing Provi of misrepresenting the existence of a partnership or relationship with RNDC to retailers and demanding that Provi cease making such representations. (*Id.* ¶ 132.) Provi denied these allegations in writing and informed RNDC that Provi's employees had been given instructions to make no such representations. (*Id.* ¶ 134.)

In May 2020, RNDC accused Provi of being owned by another alcohol distributor, Breakthru Beverage, even though Provi repeatedly reiterated that this was not the case. (*Id.* ¶ 138.) Retailers began calling Provi, informing Provi that "RNDC claimed it would no longer accept orders they chose to communicate through Provi because Breakthru Beverage owned Provi." (*Id.* ¶ 139.) Provi expended time and resources correcting this claim and asked RNDC to stop spreading this rumor. (*Id.* ¶ 142.)

In June 2020, RNDC "accused Provi of receiving RNDC pricing data from retailers and inputting the data on Provi." (*Id.* ¶ 140.) Provi explained that retailers post such pricing information on Provi, that RNDC had not previously restricted the disclosure of such information and that, in any case, Provi had removed all RNDC pricing information entered by retailers. (*Id.*) RNDC, however, told Provi that it would no longer accept any orders communicated through Provi, in part, due to the pricing information issue. (*Id.*) Moreover, RNDC programmed its computer system firewall to block communications from Provi and advised its employees not to respond to communications from Provi and not to accept orders placed through Provi. (*Id.* ¶ 141.) Yet, despite the firewall and RNDC's repeated insistence that it would no longer communicate with or accept orders placed through Provi, RNDC continued to receive and fill orders communicated through Provi. (*Id.*) Moreover, RNDC continued to periodically reach out to Provi for meetings, expressing interest in Provi's capabilities, even as late as July 29, 2021. (*Id.* ¶¶ 136–37, 144–45.)

Starting in May 2021, Defendants began sending out "similar and near-simultaneous" communications to their own employees and to retailers not to accept orders placed through Provi. (*Id.* ¶ 105.) In July 2021, representatives from both Defendants attended the Wine & Spirits Wholesalers of America's NextGen Summit. (*Id.*) At the conference, Provi's Head of Strategic Partnerships, Andrew Levy, gave a presentation about Provi. (*Id.* ¶ 110). During the following Q&A session, RNDC's Alan Rosenberg made negative comments about Provi in front of Provi's current and potential business partners. (*Id.* ¶ 111.) Afterwards, Alan Rosenberg confronted Levy outside the presentation and "accused Provi of trying to scale its user base of retailers such that RNDC would have no choice but to work with Provi." (*Id.* ¶ 112.)

On or about July 7, 2021, Southern sent out a letter and left a voicemail to all its retailer customers, informing them that "[Southern] will no longer accept orders transmitted by third-party

e-commerce platforms or services, such as Provi, SevenFifty, or others." (*Id.* ¶ 114.) Southern further stated that all e-commerce orders would need to be made "entirely through Southern Glazer's employees and platforms." (*Id.*) Southern continued to disseminate this message to its customers in the weeks following. (*Id.* ¶ 115.)

On or about August 1, 2021, Southern affirmatively blocked Provi's domain in multiple states, automatically blocking orders that retailers communicated through Provi. (*Id.* ¶ 116.) Provi further alleges that Southern began telling its sales employees that accepting orders through a third-party platform like Provi is a violation of company policy and doing so could result in questioning and termination. (*Id.* ¶ 117.)

RNDC appeared to follow suit. (*Id.* ¶¶ 119–20.) On or around August 4, 2021, Ken Rosenberg, Senior Vice President for Wine and Supplier Business Development at RNDC, emailed an audio file of Southern's July 2021 voicemail announcement to another online marketplace. (*Id.* ¶ 119.) On or about August 20, 2021, a RNDC sales representative rejected an order communicated through Provi, stating, "'ERNDC' [sic] was RNDC's 'only permitted method of online orders' and '[o]rders placed via third-party applications or websites such as Provi will not be accepted, as they are a violation of company policy.'" (*Id.* ¶ 121.)

Retailers were apparently unhappy with Defendants' decision to stop accepting orders through Provi. (*Id.* ¶¶ 14, 106–107, 118.) In response to Southern's decision to block Provi's domain, one retailer asked Southern to "stop making our lives harder" and another expressed their preference for Provi. (*Id.* ¶¶ 14, 116.) Retailers also complained that Proof "seems to be 'down every week.'" (*Id.* ¶ 117.)

Nevertheless, as a result of the alleged boycott, over a dozen National Accounts either "stopped working with Provi on a nationwide basis or put their plans on hold" due to Provi's

inability to fulfill orders communicated to Defendants. (*Id.* ¶¶ 122, 148–51.) Supplier advertising growth on Provi also slowed significantly. (*Id.*) Provi has lost profits and volume because of Defendants' actions. (*Id.* ¶¶ 222–23.)

## IV.    Procedural History

Provi initiated this action by filing a complaint against Defendants on March 29, 2022. (*Id.*) In its Complaint, Provi alleges that Defendants' actions violate the Sherman Act, the Illinois Antitrust Act and the California Unfair Competition Law, and that Defendants have tortiously interfered with Provi's business expectancy. (*Id.* ¶¶ 224–301.)   Provi requests both statutory damages and an injunction enjoining Defendants from their unlawful conduct. (*Id.* ¶¶ 301(A)– (D).) Defendants filed the instant motion to dismiss Provi's Complaint in its entirety. (Dkt. 24.) The Court subsequently held oral arguments on Defendants' motion to dismiss, and afterwards, the parties filed supplemental briefing at the Court's request. (Dkts. 60, 61, 65.)

## Legal Standard

A motion to dismiss under Rule 12(b)(6) challenges the sufficiency of the complaint, not its merits.  Fed. R. Civ. P. 12(b)(6); *Gibson v. City of Chicago*, 910 F.2d 1510, 1520 (7th Cir. 1990). In considering a Rule 12(b)(6) motion, the Court accepts as true all well-pleaded facts in the plaintiff's complaint and draws all reasonable inferences from those facts in the plaintiff's favor. *Kubiak v. City of Chicago*, 810 F.3d 476, 480–81 (7th Cir. 2016).  To survive a Rule 12(b)(6) motion, the complaint must assert a facially plausible claim and provide fair notice to the defendant of the claim's basis.  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007); *Adams v. City of Indianapolis*, 742 F.3d 720, 728–29 (7th Cir. 2014).  A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw

the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678.

### Discussion

Provi brings the following claims against Defendants: (1) violation of § 1 of the Sherman Act for entering into a per se unlawful group boycott (or, horizontal conspiracy); (2) violation of § 1 of the Sherman Act for entering into vertical boycotts (or, vertical conspiracies) with their retailer customers; (3) violation of § 2 of the Sherman Act for monopolization (or in the alternative, attempted monopolization) of the relevant markets; (4) violation of the Illinois Antitrust Act for a per se unlawful group boycott; (5) violation of the California Unfair Competition Law for unfair business practices; and (6) tortious interference with Provi's business expectancy.[3] Additionally, Provi brings a tying claim against Southern alone under § 1 of the Sherman Act. For the purposes of its Sherman Act claims, Provi alleges that the following markets are relevant markets: (1) Online Alcohol Marketplaces; (2) Advertising on Online Alcohol Marketplaces; and (3) Data Analytics Services for distilled spirits and wine. (Dkt. 1 ¶¶ 162–204.) Provi further alleges that "[e]ach state in the United States is a relevant geographic market" for each of these proposed markets. (*Id.* ¶ 171; *see also id.* ¶¶ 187, 204.)

Before turning to the substance of Provi's claims—and given the length of this Memorandum Opinion—the Court will briefly preview its discussion of Provi's claims. Part I of the Opinion addresses Provi's Sherman Act claims. In Part I.A, the Court evaluates whether Provi adequately alleges that Online Alcohol Marketplaces, Advertising on Online Alcohol Marketplaces, and Data Analytics Services for Distilled Spirits and Wines constitute relevant

---

[3] Provi seeks treble damages, litigation costs, including attorneys' fees, and an injunctive order against Defendants under § 4 and § 16 of the Clayton Act. (Dkt. 1 ¶ 19.) Sections 4 and 16 of the Clayton Act enable a private plaintiff like Provi to seek treble damages and injunctive relief for antitrust violations. *See* 15 U.S.C. §§ 15, 26.

markets for the purposes of its Sherman Act claims. As discussed below, the Court finds that Provi has plausibly alleged the existence of these markets.

Parts I.B through Parts I.E deal with the substance of Provi's Sherman Act claims. In Part I.B, the Court concludes that Provi has plausibly stated monopolization claims against Defendants under § 2. Next, in Parts I.C and I.D, the Court holds that Provi has stated horizontal and vertical conspiracy claims under § 1 of the Sherman Act against Defendants. In Part I.E, the Court finds that Provi has stated a tying claim under § 1 of the Sherman Act against Southern. Part I.F ends the Court's discussion of Provi's Sherman Act claims by addressing Defendants' argument that Provi, as a threshold matter, lacks antitrust standing. The Court ultimately concludes, in light of the legal sufficiency of its Sherman Act claims, that Provi has adequately alleged antitrust standing.

Pivoting to Provi's state law claims, in Parts II and III, the Court finds that Provi has stated claims against Defendants under the Illinois Antitrust Act and the California Unfair Competition Law as Provi's state antitrust and unfair practice claims rise and fall with its Sherman Act claims. Finally, in Part IV, the Court concludes that Provi has stated a claim for tortious interference with a business expectancy. Accordingly, the Court denies Defendants' motion to dismiss in its entirety.

## I.    Sherman Act Claims

The Court begins with Provi's Sherman Act claims. As Defendants point out, a plaintiff must prove the existence of a relevant commercial market before a court can evaluate whether he or she has stated a claim under either § 1 or § 2 of the Sherman Act. (Dkt. 24 at 17) (citing *Agnew v. Nat'l Collegiate Athletic Ass'n*, 683 F.3d 328, 337 (7th Cir. 2012) ("It is the existence of a commercial market that implicates the Sherman Act in the first instance.")). The Court thus first evaluates whether the markets for Online Alcohol Marketplaces, Advertising on Online Alcohol

Marketplaces, and Data Analytics Services for Distilled Spirits and Wines are relevant markets under the Sherman Act.

## A. Relevant Markets

Provi alleges that "[e]ach state in the United States is a relevant geographic market" for its three proposed markets. (*Id.* ¶ 171; *see also id.* ¶¶ 187, 204.) "To establish a relevant market, an antitrust plaintiff must define both a product market and a geographic market." *Right Field Rooftops, LLC v. Chicago Baseball Holdings, LLC*, 87 F. Supp. 3d 874, 886 (N.D. Ill. 2015). The Court will therefore determine, in turn, whether Provi's definition of the product and geographic markets for each proposed market are plausible.

### i. Online Alcohol Marketplaces

#### 1. Product Market

Provi defines an Online Alcohol Marketplace as a "digital hub" for licensed retailers to browse and purchase wine and spirits. (Dkt. 1 ¶ 163.) Online Alcohol Marketplaces encompass only marketplaces that cater to "establishments licensed either to make, distribute, or sell alcohol products under the three-tier system," and therefore exclude direct-to-consumer online portals. (*Id.*) Online Alcohol Marketplaces offer: (1) 24/7 availability; (2) the capacity to browse, fulfill, and receive updates on orders through the same portal; and (3) order management tools. (*Id.* ¶ 172.) Additionally, distributors can integrate with Online Alcohol Marketplaces, creating an additional channel of information exchange and communication between the integrated distributor and retailers. (*Id.* ¶ 167.) Provi alleges that other competitors in this market include Proof, eRNDC, and "a fringe group of other smaller providers that lack market power" and that these entities "compete for retailers' traffic and the opportunity to communicate the retailers' orders to distributors . . . and corresponding data from retailers." (*Id.* ¶ 168.)

13

A product market is "determined by the reasonable interchangeability of use and the cross-elasticity of demand between the product itself and substitutes for it." *In re Dairy Farmers of Am., Inc. Cheese Antitrust Litig.*, 767 F. Supp. 2d 880, 901 (N.D. Ill. 2011). "In other words, the products in a market must have unique attributes that allow them to be substituted for one another but make them difficult to replace with substitute products from outside the market." *Id.* Courts in this circuit have repeatedly emphasized that "market definition is a deeply fact-intensive inquiry," which makes courts "hesitant to grant motions to dismiss for failure to plead a relevant product market." *Int'l Equip. Trading, Ltd. v. AB SCIEX LLC*, No. 13 C 1129, 2013 WL 4599903, at *3 (N.D. Ill. Aug. 29, 2013); *see also In re Dairy Farmers of Am., Inc. Cheese Antitrust Litig.*, 767 F. Supp. 2d at 901; *DSM Desotech Inc. v. 3D Sys. Corp.*, No. 08 CV 1531, 2009 WL 174989, at *8 (N.D. Ill. Jan. 26, 2009). As a result, courts will dismiss claims for failure to state a relevant market when the proposed market "clearly does not encompass all interchangeable substitute products" or when a plaintiff does not even "attempt a plausible explanation as to why a market should be limited in a particular way." *In re Dairy Farmers of Am., Inc. Cheese Antitrust Litig.*, 767 F.Supp.2d at 901.

Defendants argue that long-standing, alternate forms of ordering, such as ordering in-person, or via phone or email, are reasonable substitutes to Online Alcohol Marketplaces, and that Provi's proposed market definition fails to exclude these. (Dkt. 24 at 18.) Defendants further contend that Provi fails to address how retailer customers would react to a price increase in the proposed market, which is critical for delineating a market's outer bounds. (*Id.*) Lastly, Defendants argue that "the way a product is ordered does not constitute a distinct market." (*Id.*; Dkt. 32 at 16.)

The Court concludes that Provi has sufficiently alleged a product market. Provi extensively describes the market for Online Alcohol Marketplaces and alleges that Online Alcohol Marketplaces have unique attributes. (*See* Dkt. 1 ¶¶ 165–167, 172.) Provi explains that in-person,

phone, and email ordering are inadequate substitutes for Online Alcohol Marketplaces because these Marketplaces provide more than a means for placing orders. They enable retailers to organize, track, and aggregate information, thereby providing workstream advantages unavailable with manual ordering. (*Id.* ¶ 172.) Provi's description of the burdens imposed on retailers by the long-standing process of manually ordering with each individual distributor makes these distinctions even more compelling. (*Id.* ¶ 74) ("It can take an employee . . . as much as a full day or more, as often as each week, to navigate and complete these many tedious tasks when required to engage with each distributor on a distributor-by-distributor and brand-by-brand level. And then that employee, potentially among others, must devote additional time and resources to managing those distinct orders through the process until the products arrive at the retailer's location(s)."). Taking Provi's allegations to be true, the Court cannot say that Provi fails to "attempt a plausible explanation as to why a market should be limited in a particular way." *In re Dairy Farmers of Am., Inc. Cheese Antitrust Litig.*, 767 F.Supp.2d at 901; *see also Agnew*, 683 F.3d at 374 (granting motion to dismiss because plaintiffs' complaint omitted any discussion of the proposed market whatsoever). Moreover, courts have found similar allegations describing a product's special characteristics to be sufficient to survive a 12(b)(6) motion. *See In re Loc. TV Advert. Antitrust Litig.*, No. 18 C 6785, 2020 WL 6557665, at *12 (N.D. Ill. Nov. 6, 2020) (finding plaintiff plausibly alleged that television broadcasting advertisements were a relevant product market because they alleged "unique attributes" that made them difficult to replace with a substitute product).

In addition, the Court declines to dismiss Provi's proposed market on the grounds that Provi fails to allege what substitutes retailers would turn to if the Online Alcohol Marketplaces market underwent a price increase. Courts in the Seventh Circuit do not consistently require plaintiffs to allege at the motion to dismiss stage what consumers would do in the event of a price increase in

the proposed product market. Rather, as stated above, courts in this Circuit have echoed the refrain that dismissal is appropriate only "where the plaintiff has not even attempted a plausible explanation of the proposed market, or it is apparent that the proposed market does not encompass all reasonable substitutable products." *See, e.g.*, *In re Dairy Farmers of Am., Inc. Cheese Antitrust Litig.*, 767 F.Supp.2d at 901; *Int'l Equip. Trading, Ltd.*, 2013 WL 4599903, *at* *3; *In re Loc. TV Advert. Antitrust Litig.*, 2020 WL 6557665, at *12; *Avnet, Inc.*, 2015 WL 5307515, at *4; *Ploss v. Kraft Foods Grp., Inc.*, 197 F. Supp. 3d 1037, 107–71 (N.D. Ill. 2016). Following discovery, the parties may offer expert evidence to determine the effect of a price increase on the proposed market, and this evidence may ultimately prove that the market definition is too broad or nebulous; market analysis is, however, extremely difficult on a 12(b)(6) motion. Accordingly, this Court will follow the suit of the courts cited above and not dismiss Provi's claim because it failed to allege what would happen in the event of a price increase.

Finally, the Court disagrees with Defendants that, as a matter of law, the way a product is ordered cannot constitute a separate market. Defendants rely only the summary judgment decision in *PepsiCo, Inc. v. Coca-Cola* for this assertion, but the *PepsiCo* court initially found that the plaintiff adequately pled that the "sales of fountain-dispensed soft drinks distributed through independent foodservice distributors throughout the United States" was a relevant market for its Sherman Act claims. *Pepsico, Inc. v. Coca-Cola Co.*, No. 98 CIV. 3282 (LAP), 1998 WL 547088, at *7 (S.D.N.Y. Aug. 27, 1998) ("[F]oodservice distributors satisfy all of their customers' supply needs at once, offering consolidated delivery and accounting systems, their customers buy supplies through them to the exclusion of all other methods of distribution. . . Thus, a manufacturer offering to sell its product through a foodservice distributor is offering something different from a manufacturer offering to sell the same product through other means of distribution.") (internal

citation omitted). While *PepsiCo* does not convince the Court of Defendants' argument, it does illustrate the meaningful difference between the governing legal standards at the motion to dismiss and summary judgment stages. *Id.* ("While not compelling on a motion to dismiss, Coca–Cola's arguments highlight the difficulties PepsiCo may encounter in proving the existence of the market it has alleged in the complaint."). Both parties should take heed of this distinction.

### 2. Geographic Market

Provi asserts that the geographic market for Online Alcohol Marketplaces should be state-by-state to account for each state's different regulatory framework as retailers in different states are exposed to different content on the Online Alcohol Marketplace and have different payment options. (Dkt. 1 ¶ 171.)

"Identifying a geographic market requires both, 'careful selection of the market area in which the seller operates, and to which the purchaser can practicably turn for supplies.'" *Republic Tobacco Co. v. N. Atl. Trading Co*., 381 F.3d 717, 738 (7th Cir. 2004) (citing *Tampa Elec. Co. v. Nashville Coal Co*., 365 U.S. 320, 327 (1961)). A geographic market must "correspond to the commercial realities of the industry," and courts determining a geographic market should employ a "pragmatic" and "factual" approach. *Sharif Pharmacy, Inc. v. Prime Therapeutics, LLC*, 950 F.3d 911, 917 (7th Cir. 2020).

Defendants generally contend that Provi's state-by-state geographic boundaries for the Online Alcohol Marketplaces market are implausible. They argue that Provi's justification for the proposed geographic market is merely an attempt to "bootstrap" Defendants' alleged control over the alcohol distribution market in some states. (Dkt. 24 at 19–20.) According to Defendants, Provi cannot rely on Defendants' market shares in the related markets of wine and spirit distribution because Provi is not a participant in those markets. (*Id.* at 20.)

The Court concludes that Provi's Complaint includes sufficient factual allegations in support of its proposed geographic market for Online Alcohol Marketplaces. Regulatory constraints make it plausible that a retailer would not turn to an Online Alcohol Marketplace across state-lines to browse for and order alcohol products as product availability may differ. (*See* Dkt. 1 ¶ 171) ("Online Alcohol Marketplaces must be tailored to satisfy the particular requirements of that state."). Provi explains that most states require distributors of wine or distilled spirits to have a state-specific permit and that retailers may only purchase distilled spirits or wine from authorized distributors within each state. (*Id.* ¶¶ 156, 159.) Online Alcohol Marketplaces, therefore, cater to retailers by offering products to browse and purchase that are only available in the retailer's location under governing alcohol regulations. (*Id.*) ("As a result, retailers using the same Online Alcohol Marketplace in different states can have different experiences, including different content displayed to them."). Indeed, Provi has developed a proprietary algorithm that "showcases a wide variety of products by suppliers and distributors *by location* and that complies with all applicable laws and rules." (*Id.* ¶ 93) (emphasis added). The impact of the distilled spirits and wine markets on the commercial reality of the Online Alcohol Marketplaces market therefore undermines Defendants' argument that Provi is merely "bootstrapping" Defendants' control of certain spirit and wine distribution markets. Provi is not asserting that Online Alcohol Marketplaces are directly subject to alcohol distribution regulations but rather, that these regulations bear on how Online Alcohol Marketplaces are structured. Finally, Provi's description of the platform suggests that it has been rolled out on a state-by-state basis, which further supports Provi's proposed geographic market. (*Id.* ¶ 87) ("[i]n early 2021, Provi was live in 11 states" and later "launched in 35 states").

One consideration, however, gives the Court pause: Provi's emphasis on its reliance on "National Accounts" or, large-scale retailers that operate across the country. Provi's relationship

with these "National Accounts" somewhat undercuts the plausibility of the state-by-state boundary of its proposed geographic market. Nevertheless, the Court finds, on balance, that the close connection between the distilled spirits and wine distribution markets and the Online Alcohol Marketplaces market makes Provi's proposed geographic market sufficiently plausible at the motion to dismiss stage. As the Court will continue to stress throughout this Memorandum Opinion, whether Provi can, in fact, prove its proposed market will be made clear after discovery.

### ii. Advertising on Online Alcohol Marketplaces

#### 1. Product Market

Provi proposes "Advertising on Online Alcohol Marketplaces" as a relevant product market and further divides it into two relevant submarkets: (1) "Search Advertising on Online Alcohol Marketplaces" and (2) "Display Advertising on Online Alcohol Marketplaces." (Dkt. 1 ¶ 174.) Search Advertising is based on "specific queries entered by retailers" that provide insight into retailers' "specific purchasing intent." (*Id.* ¶ 175.) Display Advertising is for suppliers who seek "to generally promote their brand in a geographic market, regardless of what retailers reveal about their preferences through searches or clicks" and is determined by a retailer's geographic location. (*Id.* ¶ 176.) Provi further explains that Search and Display Advertising are not interchangeable with each other because of the differences in their focus: display advertising focuses on a "broad set of retailers" while search advertising helps reveal the purchasing intent of specific retailers. (*Id.* ¶¶ 175, 180, 184, 186.)

Defendants assert that the Court should reject Provi's proposed market of Advertising on Online Alcohol Marketplaces because Provi neither sufficiently defines and delineates the market, nor plausibly explains why the proposed market definition should exclude other forms of

advertising (such as advertising on other websites). (Dkt. 24 at 18.) In other words, Defendants argue that the proposed market is both too broad and too narrow.

The Court finds that Provi has plausibly alleged that Advertising on Online Alcohol Marketplaces is a relevant product market. Provi provides adequate details for both Search Advertising and Display Advertising, and its argument that there are no reasonable substitutes for either form of advertising is plausible. (Dkt. 1 ¶¶ 174–77, 178–80, 184–85, 182, 186.) Provi asserts that both submarkets of the Advertising on Online Alcohol Marketplaces market exclude potential substitutes because these submarkets specifically target retail alcohol buyers. (Dkt. 31 at 17.) Provi alleges that advertising on sites that target consumers, rather than retailers, is not a reasonable substitute for Display Advertising on Online Alcohol Marketplaces "because of the differences in the audience and its attributes." (Dkt. 1 ¶ 186.) Provi further claims that advertising on other websites that are targeted towards retailers but do not allow retailers to purchase the advertised product is not a reasonable substitute for Search and Display Advertising on Online Alcohol Marketplaces. (*Id.* ¶¶ 182, 186). When retailers are not able to communicate orders in the same place that they see an advertisement, a supplier's Return on Ad Spend ("ROAS") data is poorer. (*Id.*) By advertising on Online Alcohol Marketplaces, suppliers can better assess the impact of their marketing investments because they can access both the advertising and purchasing data. (*Id.*) Similar principles apply when comparing Advertising on Online Alcohol Marketplaces and advertising via other media. It is plausible that a supplier who advertises over the radio might miss out on valuable advertising data—and spend additional resources on data aggregation and analysis—if retailers subsequently bought the advertised product elsewhere. At least one court in this district has found that allegations demonstrating the distinctness of a type of advertising, akin

to the ones described above, render a proposed product market plausible. *See In re Loc. TV Advert. Antitrust Litig.*, 2020 WL 6557665, at *11.

The Court is further persuaded by the court's opinion in *Klein v. Facebook*. 580 F. Supp. 3d 743 (N.D. Cal. 2022). In *Klein*, advertisers who bought advertising from Facebook sued Facebook under the Sherman Act and alleged that "social advertising" was a relevant product market. *Id.* at 782. Like the Defendants here, Facebook relied on the Ninth Circuit's decision in *Hicks v. PGA Tour, Inc.* to argue that advertising markets cannot be so narrowly subdivided such that certain types of advertising are distinct markets. *Id.* at 784 (citing 897 F.3d 1109 (9th Cir. 2018)). The Ninth Circuit in *Hicks* had rejected the plaintiffs' proposed product market of advertising to golf fans and the proposed submarket of "in-play" or "in-action" advertising during golf tournaments. 897 F.3d at 1121. The *Klein* court, however, held that "*Hicks* does not apply where a plaintiff has alleged that two types of advertising have fundamentally different purposes" and distinguished *Hicks* because the defendants in *Hicks* were "aiming to target professional golf fans" and thus had many options for advertising outside of "in-play" advertising that would fulfill the same fundamental objective of targeting golf fans. *Id.* In contrast, the advertisers in *Klein* alleged that social advertising was fundamentally distinguishable from other forms of online advertising because it enables "advertisers to reach specific purchasers with specific attributes," and it "appeals to different type of companies." *Id.* The court concluded that the relevant product market of social advertising was thus plausible because plaintiffs had established that it had both "a distinct 'use' and 'distinct customers.'" *Id.* Likewise, Provi has sufficiently explained how Advertising on Online Alcohol Marketplaces targets a distinct demographic and how Search Advertising and Display Advertising serve narrowly drawn functions. At bottom, the Court cannot definitively say that advertising via other means would constitute reasonable substitutes to

Advertising on Online Alcohol Marketplaces such that Provi's proposed product market, by excluding those other means, is implausible.

### 2. Geographic Market

As with the market for Online Alcohol Marketplaces, Provi asserts that the geographic market for Advertising on Online Alcohol Marketplaces is state-specific because suppliers decide where to direct their advertising spending based, in part, on retailers' locations. (Dkt. 1 ¶ 187.) Provi explains that because retailers can only see certain products in particular states, Online Alcohol Marketplace providers use state boundaries to determine where to direct advertisements. (*Id.*) Defendants respond that Provi's proposed geographic market for Advertising on Online Alcohol Marketplaces is "self-defeating" because Provi alleges that "[p]roviders of Online Alcohol Marketplaces compete for suppliers' advertising dollars on a nationwide basis." (Dkt. 24 at 20) (citing Dkt 1 ¶ 187). Defendants also point out that "must-have" alcohol brands are available in all markets nationwide. (*Id.*)

The Court finds that Provi's proposed geographic market for Advertising on Online Alcohol Marketplaces is plausible. Suppliers allegedly factor in retailers' locations when formulating their advertising campaigns because the alcohol distribution framework limits what alcohol products retailers have access to at the state level. Suppliers therefore coordinate their alcohol advertising campaigns on a state-by-state basis to not expend their advertising budget on products that retailers may not see. These allegations make it reasonable to infer that purchasers of Advertising on Online Alcohol Marketplaces will not turn across state lines for this type of advertising. Accordingly, the Court also rejects Defendants' argument that Provi's allegation that providers of Online Alcohol Marketplace compete for suppliers' advertising dollars nationwide renders Provi's proposed geographic market self-defeating. The Court understands Provi's

argument to be that even though their area of operation may be nationwide, suppliers interested in the relevant product—Advertising on Online Alcohol Marketplaces—do not look out of state for said product because of the regulatory constraints (and its effect on product availability) referenced above. Admittedly, the nationwide availability of must-have brands and the fact that Provi states that suppliers may run their advertising campaigns on Online Alcohol Marketplaces in a "combination of states" makes the plausibility of Provi's proposed geographic market a close call. But again, in the absence of any economic analysis or a fully developed factual record, the Court ultimately finds that Provi's proposed geographic market for Advertising on Online Alcohol Marketplaces is plausible.

### iii. Data Analytics Services

#### 1. Product Market

Finally, Provi proposes "Data Analytics Services for distilled spirits and wines" as a relevant market. (Dkt. 1 ¶ 193.) Provi defines "Data Analytics Services" as "solutions offered to both suppliers and retailers that rely on data generated by retailers through their use of Online Alcohol Marketplaces." (*Id.* ¶ 194.) Retailers generate both "transaction-level data," which tracks, for example, what retailers are buying and how much, and "application usage data," which tracks retailers' interactions with the Online Alcohol Marketplace, such as their searches and time spent per page. (*Id.*) This data is valuable because it provides insights into retailers' purchasing patterns. (*Id.* ¶ 198.)

Provi alleges that Data Analytics Services provide a number of benefits. First, Data Analytics Services help suppliers decide how to allocate their advertising budget, and they generate data visualizations that help convey important information (such as the efficacy of a supplier's advertising campaign or the overall health of the wine or spirits industries). (*Id.* ¶¶ 199–

200.) Data Analytics Services also give retailers more information on alternate products on the market, which enables them to make more informed purchasing decisions. (*Id.* ¶ 197.) Lastly, providers of Data Analytic Services are also able to sell the underlying data to publications that aggregate or extrapolate from the underlying data, which acts as another source of revenue from Data Analytic Services. (*Id.* at ¶ 201.) Provi clarifies that the Data Analytics Services market does not encompass data services provided by non-operators of Online Alcohol Marketplaces, as the retailer traffic and engagement data on Online Alcohol Marketplaces are critical to this specific type of Data Analytics Services. *(Id.* ¶ 203.)

Defendants raise the same objections to the proposed Data Analytics Services market as they did to Provi's proposed Advertising on Online Alcohol Marketplace market: the market is insufficiently delineated, and Provi fails to explain how this market excludes reasonable substitutes.

The Court concludes that Provi has adequately alleged that the Data Analytics Services Market is a relevant product market. Provi provides a detailed explanation of the market and argues that the specificity of the proposed market (*i.e.*, data analytics services specifically involving alcohol retailers' data on Online Alcohol Marketplaces) makes this proposed market properly delineated. (Dkt. 1 ¶¶ 198–201); (Dkt. 31 at 17.) The Court's reasoning *supra* Part I.A.ii.1 applies to the Data Analytics Services market as well: Provi has described the product's unique attributes and its distinct subset of customers. The Court thus cannot say that Provi has failed to attempt to justify the product market, or that Provi's proposed market definition clearly fails to exclude reasonable substitutes. *See In re Dairy Farmers of Am., Inc. Cheese Antitrust Litig*., 767 F. Supp. 2d at 901.

### 2. Geographic Market

Provi alleges that the relevant geographic market for Data Analytic Services on Online Alcohol Marketplaces is each state in the United States and the District of Columbia. (Dkt. 1 ¶ 204.) Provi asserts that the proposed geographic market is justified because retailers will be most interested in information relevant to the state that they serve, and suppliers require information related to product sales in the states where they advertise. (*Id.*) Defendants object to Provi's proposed geographic market for the same reasons stated above, *supra* Part I.A.ii.2, and add that Provi has not explained why the Data Analytic Services market "is an entire state as opposed to a smaller area…or even a demographically similar place outside the state." (Dkt. 24 at 20.)

The Court concludes that the state-by-state geographic market for Data Analytic Services is plausible for the same reason that it found the proposed geographic markets for the other two relevant markets to be plausible: the interrelatedness between the distilled spirits and wine distribution markets and the Data Analytic Services market. As was the case with the other two proposed markets, the value of Data Analytic Services provided by Online Alcohol Marketplaces lies in the state-specific insights they can provide both suppliers and retailers. (Dkt. 1 ¶ 204.)

Accordingly, the Court concludes that Provi has adequately pled the existence of the Online Alcohol Marketplaces, Online Advertising on Online Alcohol Marketplaces, and Data Analytic Services on Online Alcohol Marketplaces markets.

### B. Sherman Act § 2 Claims

Having determined that Provi has adequately pled the existence of relevant markets, the Court now turns to Provi's monopolization claims under § 2 of the Sherman Act. Section 2 requires that a plaintiff demonstrate that the defendant "(1) possesses 'monopoly power in the relevant market' and (2) engages in 'the willful acquisition or maintenance of that power as distinguished

from growth or development as a consequence of a superior product, business acumen, or historic accident.'" *Viamedia, Inc. v. Comcast Corp.*, 951 F.3d 429, 451 (7th Cir. 2020) (quoting *Verizon Communications, Inc. v. Law Offices of Curtis v. Trinko, LLP*, 540 U.S. 398, 407 (2004)) (citations omitted). The Court will address each of these elements separately.

### i.  Monopoly Power in the Relevant Markets

The Court first evaluates whether Provi has demonstrated that Defendants have monopoly power in the relevant markets. *See In re Dairy Farmers of Am., Inc. Cheese Antitrust Litig.*, 767 F. Supp. 2d at 902. "Monopoly power is the power to control prices or exclude competition." *Id.* (quoting *United States v. E.I. du Pont de Nemours & Co.*, 351 U.S. 377, 391 (1956)). A plaintiff can establish that a defendant has monopoly power in the relevant market, by either providing "direct evidence of anticompetitive effects" or "by proving relevant product and geographic markets and by showing that the defendant's share exceeds whatever threshold is important for the practice in that case." *Toys "R" Us, Inc. v. FTC*, 221 F.3d 928, 937 (7th Cir. 2000). Ultimately, "[q]uestions of whether the defendant possessed the requisite market power to establish a monopoly are addressed in a motion for summary judgment or trial" except when a plaintiff has failed to provide any factual allegations that would enable a court to infer that the defendant has monopoly power. *Endsley v. City of Chicago*, 230 F.3d 276, 283 (7th Cir. 2000).

### 1.  Direct Evidence of Monopoly Power

The Court finds that Provi has alleged direct evidence of Defendants' monopoly power in the relevant markets. Provi contends that Defendants have eliminated competition in each of the relevant markets (Online Alcohol Marketplaces, Advertising on Online Alcohol Marketplaces, and Data Analytic Services) and forced retailers to use Defendants' platforms. (Dkt. 31 at 19.) Provi further alleges that Defendants' conduct has resulted in "higher prices . . . reduced innovation, and

decreased quality in the relevant markets." (*Id.*) (citing Dkt. 1 ¶¶ 230, 239, 258, 270, 279, 283, 289.) By pushing Provi out of the relevant markets, Defendants have allegedly increased retailers' costs because retailers must duplicate the process of comparing products, placing orders, and tracking transactions across multiple Online Alcohol Marketplaces, and those increased costs are passed down to consumers through higher prices. (*Id.* ¶¶ 214, 217.) Taking these allegations to be true, the Court finds that Provi has demonstrated that Defendants "ha[ve] sufficient market power to produce anticompetitive effects in the relevant market." *See Hannah's Boutique, Inc. v. Surdej*, No. 13 C 2564, 2013 WL 4553313 (*Hannah's Boutique I*), at *4 (N.D. Ill. Aug. 28, 2013) (finding direct evidence of anticompetitive effects partially based on plaintiff's allegation that the defendant had ordered other third parties to cease doing business with them).

The Court recognizes that although Provi alleges that prices were increased due to Defendants' conduct, Provi appears to be referring to the transaction costs of Online Alcohol Marketplaces under a theory that these costs are passed onto consumers. Provi contends that using Provi saves retailers money by reducing inefficiencies, and implicitly asserts that these savings would, in turn, be passed onto consumers. (Dkt. 1 ¶ 214) ("Defendants' actions have harmed competition in the Online Alcohol Marketplaces by…increasing costs to retailers and ultimately consumers"). Provi's theory for how Defendants have raised prices in the three relevant markets thus deviates from other cases where the plaintiff provided direct evidence of the defendant's monopoly power by alleging that the defendant could or did in fact directly raise the price of its products. *See, e.g.*, *Hannah's Boutique I*, 2013 WL 4553313, at *4–5 (plaintiff alleged that defendant "has been able to greatly inflate dress prices to consumers by as much as 200–250%"); *Ploss v. Kraft Foods Grp., Inc.,* 197 F. Supp. 3d 1037, 1072–73 (N.D. Ill. 2016) (plaintiff alleged that Kraft had "great influence or control over the prices" and used its power "to force up

December 2011 wheat prices").The Court leaves open the question of whether such an attenuated theory adequately alleges monopoly power because, in any case, the Court finds that Provi has adequately alleged circumstantial evidence of monopoly power.

## 2. Circumstantial Evidence of Monopoly Power

Provi posits the following theory of Defendants' monopoly power in the relevant markets: Defendants' substantial market power in the distilled spirits and wine markets gives them commensurate market power in the relevant markets. (Dkt. 31 at 20.) Provi alleges that Southern "controls over 70% of the distilled spirits distribution in five states, and over 50% in seven others," (Dkt. 31 at 20) (citing Dkt. 1 at Table 1), and "over 70% share in wine distribution in two states and 50% share in five others." (*Id.*) (citing Dkt. 1 at Table 2). Provi further alleges that "RNDC controls over 70% of wine distribution and over 50% of spirits distribution in two states and over 60% for wine distribution in four states." (*Id.*) (Dkt. 1 at Table 1, Table 2). Provi asserts that Defendants' exclusive rights to distribute must-have distilled spirits and wine brands also contribute to their comparable market shares in the three relevant markets. (*Id.*) (citing Dkt. 1 ¶¶ 50, 56–57.) Finally, Provi alleges high barriers of entry "including high capital expenditures, technical expertise, economies of scale, and historical data." (*Id.* at 21) (citing Dkt. 1 ¶¶ 98, 188–192, 205–12, 253, 264). In response, Defendants contend that Provi's theory is unavailing as Provi is not present in the distilled spirits and wine markets, Provi has failed to allege the market share of any participant in the relevant markets, and not all of Defendants' sales are made via online ordering. (Dkt. 24 at 19.)

Evidence of monopoly power in the relevant market "ordinarily may be inferred from the predominant share of the market." *Amerigas Propane, L.P. v. BP Am., Inc.*, 691 F. Supp. 2d 844, 850 (N.D. Ill. 2010). Courts, however, have also recognized that "in markets with low barriers to

entry, a large market share does not necessarily translate into power over the prices in a market" and have thus required plaintiffs to also allege high barriers to entry. *See e.g.*, *In re Dairy Farmers of Am., Inc. Cheese Antitrust Litig.,* 767 F. Supp. 2d at 902.

The Court concludes that Provi has provided adequate circumstantial evidence for the Court to reasonably infer that Defendants have monopoly power in the relevant markets. As stated in Part I.A, Provi has adequately alleged the existence of the three relevant markets. Provi has further alleged that Defendants have substantial market share of certain states' distilled spirits and wine distribution markets. Finally, Provi has alleged that Defendants have exclusive distribution rights to must-have brands and that retailers are "significantly less likely to split their basket of orders once they are already shopping directly with [Defendants] . . ." (Dkt. 1 ¶ 6.) Based on these allegations, Provi has provided a plausible theory for why Defendants' market shares in the distilled spirits and wine distribution markets would translate into the three relevant markets, given the interrelatedness among all of these markets.

Moreover, this interrelatedness means the fact that Provi is not present in the distilled spirits and wine distribution markets is not dispositive. Provi might be unable to state with certainty that Defendants have market shares in the relevant markets equal to their market shares in the distilled spirits and wine markets in certain states, but Provi does not need to state a specific market share percentage at the pleading stage. *Hannah's Boutique I*, 2013 WL 4553313, at *3 (rejecting argument that plaintiff must "allege a specific market size or percentage market share"); *Avnet, Inc. v. Motio, Inc.*, No. 12 C 2100, 2015 WL 5307515, at *4 (N.D. Ill. Sept. 9, 2015) (same).

Lastly, Provi has also alleged high barriers to entry for these three relevant markets such as "capital requirements, technical expertise, and historical data." (*See, e.g.*, Dkt. 1 ¶¶ 93, 98, 207–208.) Provi alleges that while there are other small fringe players in the Online Alcohol

Marketplace industry, they "lack the broad range of products and geographic footprint that more developed marketplaces offer—and they lack the broad portfolio of 'must-have' brands under long-term exclusive contracts that Defendants enjoy." *(Id.* ¶ 98.) Provi's allegations demonstrate that it is difficult for new firms to enter the three relevant markets, notably, in large part because distributors, like Defendants, have exclusive contracts to distribute "must-have" brands. The Court thus finds that Provi has provided sufficient circumstantial evidence for the Court to infer that Defendants have monopoly power in the three relevant markets.

### ii. Exclusionary Conduct

The Court next determines whether Provi has adequately pled the second element of a § 2 monopolization claim: the "willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident." *Viamedia*, 951 F.3d at 451 (quoting *Trinko*, 540 U.S. at 407). Plaintiffs can meet this second prong by pleading predatory or exclusionary conduct, which is defined as conduct that "impair[s] rivals' opportunity to compete in a way that is inconsistent with 'competition on the merits.'" *Id.*; *In re Dairy Farmers of Am., Inc. Cheese Antitrust Litig.*, 767 F. Supp. 2d at 905. Defendants contend that Provi's allegations describe a "refusal-to-deal" situation, but that its allegations insufficiently demonstrate that Defendants' conduct constituted anticompetitive behavior. (Dkt. 24 at 21.)

Caselaw on monopolization claims under § 2 draws an uneasy distinction between the long-established principle that "even monopolists 'are free to choose the parties with whom they deal, as well as the prices, terms, and conditions of that dealing'" and courts' recognition that there are limited circumstances when refusing to deal with a competitor may constitute anticompetitive behavior. *Viamedia,* 951 F. 3d at 454. The Supreme Court's opinion in *Aspen Skiing Company v.*

*Aspen Highlands Skiing Corporation* is the leading case on when monopolists may be held liable under § 2 for refusing to deal with a competitor. *Id.* at 453 (citing 472 U.S. 585). The Supreme Court, however, has also noted that *Aspen Skiing* is "at or near the outer boundary of § 2 liability." *Trinko*, 540 U.S. at 409.

*Aspen Skiing* refusal to deal claims have been distilled to three factors: "a prior course of voluntary conduct, sacrifice of short-term profits, and refusal to sell to rivals on the same terms as other potential buyers." *Viamedia*, 951 F.3d at 463. "No factor is always decisive by itself," and "it is enough to allege plausibly that the refusal to deal has some of the key anticompetitive characteristics identified in *Aspen Skiing*." *Id.* at 457, 462. Defendants mainly assert that Provi has failed to adequately allege that Defendants forwent short-term profits. (Dkt. 24 at 21–23.) Additionally, Defendants claim that their exclusive rights to distribute must-have products in certain states should not subject them to a "special required-to-deal rule." (*Id.*)

The Court concludes that Provi has adequately alleged that Defendants sacrificed short-term profits by blocking all orders placed through Provi and refusing to fulfill orders placed on Provi. (Dkt. 1 ¶¶ 15, 121.) Provi alleges that before the purported boycott, "Southern generated approximately $145 million in retail sales through Provi and accepted some 87,000 orders, and RNDC generated $45 million in retail sales through Provi and accepted more than 44,000 orders. After initiating the boycott, these combined sales numbers dropped precipitously." (*Id.* ¶ 121.) Defendants, however, argue that Provi's claim suffers from a logical fallacy: the fact that Defendants blocked orders through Provi does not mean that those orders went unfulfilled. (Dkt. 24 at 22.) Although the Court agrees that Defendants' refusal to fulfill orders through Provi does not necessarily mean that they did not fulfill those orders at all, it does not require a "speculative leap" to presume that Defendants lost at least some revenue or sales by automatically blocking

orders. *See Alarm Detection Sys., Inc. v. Village of Schaumburg*, 930 F.3d 812, 828 (7th Cir. 2019). Whatever the actual amount of revenue or profit lost, the Court finds that it is plausible to infer that Defendants, for at least a short period of time, lost business, and likely profits, by automatically blocking orders that came through Provi. It may be that retailers chose to re-fulfill their orders with Defendants directly, resulting in marginal losses of short-term profits, but that is not the legal standard applied to 12(b)(6) motions. *Swanson v. Citibank, N.A.*, 614 F.3d 400, 404 (7th Cir. 2010) ("'Plausibility' in [the legal pleading] context does not imply that the district court should decide . . . which version is more likely than not…").

Defendants further rely on *Novell, Inc. v. Microsoft Corporation* to assert that even if they did sacrifice short-term profits, they did so to pursue "an innovative replacement product of its own," which is procompetitive and legal conduct. (Dkt. 24 at 23) (citing 731 F.3d 1064, 1075 (10th Cir. 2013)). *Viamedia*, however, forecloses Defendants' argument. While such justifications are important at summary judgment, a court is not required to credit them at the motion to dismiss stage so long as the plaintiff has plausibly pled the *Aspen Skiing* factors. *Viamedia*, 951 F.3d at 460–62 ("[B]alancing anticompetitive effects against hypothesized justifications depends on evidence and is not amenable to resolution on the pleadings, at least where the plaintiff has alleged conduct similar to that in *Aspen Skiing*.") (citations omitted). Moreover, the Seventh Circuit explicitly distinguished *Novell* because "*Novell* was a decision based on an eight-week trial." *Id.* at 460. For similar reasons, the Court rejects Defendants' argument that Provi's own allegations demonstrate "the procompetitive benefits of a vertically integrated online distribution platform" and that Defendants' choice to push retailers to use Proof and eRNDC suggests that Defendants independently decided to invest in vertical integration. (Dkt. 24 at 21–23.) Again, Defendants may ultimately prove that their conduct merely amounted to vertical integration, but at the motion to

dismiss stage, the Court finds that Provi has sufficiently alleged that Defendants sacrificed short-term profits.

The Court additionally finds, upon its own review of Provi's Complaint, that Provi has adequately demonstrated a second *Aspen Skiing* factor: Defendants' conduct constituted a departure from a voluntary and established business practice. Provi alleges that each Defendant had a relationship with Provi for several years, and continually fulfilled orders placed through Provi, even after the launch of their own proprietary platforms. (Dkt. 1 ¶¶ 11, 141.)  The fact that Defendants continued to use Provi even following the rollout of Proof and e-RNDC strengthens the inference that Defendants continued this relationship willingly and found it to be favorable. Defendants then publicly announced that they would stop using Provi and proceeded to block orders placed through Provi. (*Id.* ¶¶ 114–16, 119–120.) These allegations make it reasonable to infer that Defendants had previously, voluntarily engaged in a commercially beneficial business relationship, which Defendants suddenly terminated.

Aside from meeting two out of three of the *Aspen Skiing* factors, Provi's Complaint contains other allegations considered significant in both *Aspen Skiing* and *Viamedia*. In *Viamedia*, the Seventh Circuit used a table to compare the plaintiffs' allegations there to the jury's findings in *Aspen Skiing*. 951 F.3d at 459.  A similar analysis here, as shown in the chart below, shows that in addition to  its allegations that Defendants sacrificed short-term profits and voluntarily departed from a long-term business relationship, Provi's allegations are similar to several of the jury's findings in *Aspen Skiing*:

| Factors Considered in *Aspen Skiing* | Provi's Allegations |
|---|---|
| (1) "Long-term business relationship that created joint offering"; | Same. |
| (2) The relationship existed absent any statutory duties (and the jury was thus able to presume the relationship had been mutually advantageous); | Same. |

| | |
|---|---|
| (3) "Sudden course reversal"; | Same. |
| (4) "[A]t a monetary loss for defendant"; | Same. |
| (5) "Refusal to sell service/product at retail price; | Not applicable |
| (6) "Sold product at retail price to others in the relevant market; | Not applicable |
| (7) "Unhappy customers"; | Same |
| (8) "discouraged customers from doing business with its smaller rival"; | Same |
| (9) "Defendant continued to deal with competitors in other competitive markets"; | Not applicable |
| (10) "Procompetitive justifications are a question for the factfinder"; | Same |
| (11) "Exclusionary conduct aimed at the only other competitor in the market"; | Not applicable |
| (12) Product or service at issue. | Online Alcohol Marketplaces, Advertising on Online Alcohol Marketplaces, and Data Analytics Services |

In summary, Provi's relationship with Defendants was entered into voluntarily and not pursuant to a statutory duty. Provi also alleges that retailers have expressed dissatisfaction with Defendants' conduct. (Dkt. 1 ¶¶ 14, 116.) Finally, Provi alleges that an executive of RNDC "asserted baselessly that Provi harms retailers" in front of Provi's current and potential business partners, (*id.* ¶ 111), and that Southern repeatedly reminded its retail customers of the alleged boycott. (*Id.* ¶ 115.) These allegations—and their similarity to the allegations in *Viamedia* and the jury findings in *Aspen Skiing*—strengthen the plausibility of Provi's refusal to deal claim.

For the reasons stated above, the Court concludes that Provi has stated a claim for monopolization under § 2 of the Sherman Act. Defendants' motion to dismiss Provi's monopolization claim is therefore denied.[4]

---

[4] Because Defendants did not raise any arguments specific to Provi's attempted monopolization claim in its motion to dismiss, and then only mentioned attempted monopolization in a footnote in their reply brief, the Court need not ascertain whether Provi has stated a claim or not for attempted monopolization under § 2 of the Sherman Act. *See G & S Holdings LLC v. Cont'l Cas. Co.*, 697 F.3d 534, 538 (7th Cir. 2012); *United States v. Hassebrock*, 663 F.3d 906, 914 (7th Cir. 2011) (finding underdeveloped argument was waived).

### C. Sherman Act § 1 Claims – Horizontal Conspiracy

Provi also brings horizontal and vertical conspiracy claims under § 1 of the Sherman Act against Defendants. The Court will consider Provi's § 1 claims in turn, beginning with Provi's horizontal conspiracy claim. Provi alleges that Defendants entered into an illegal agreement to boycott Provi, which is a per se violation of § 1 of the Sherman Act. (Dkt. 1 ¶ 228.) Defendants argue, in support of dismissal, that Provi has not adequately demonstrated that Defendants had an agreement to engage in the allegedly anticompetitive conduct. (Dkt. 24 at 24.)

Section 1 of the Sherman Act states, "Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal." 15 U.S.C. § 1. A plaintiff bringing a § 1 claim "must allege that the defendant '(1) entered into an agreement that (2) unreasonably restrains trade in the relevant market and (3) caused the plaintiff an antitrust injury.'" *Marion Diagnostic Ctr., LLC v. Becton Dickinson & Co*., 29 F.4th 337, 349 (7th Cir. 2022). "Group boycotts are *per se* illegal if they involve 'joint efforts by a firm or firms to disadvantage competitors by either directly denying or persuading or coercing suppliers or customers to deny relationships the competitors need in the competitive struggle.'" *Hannah's Boutique, Inc. v. Surdej* (*Hannah's Boutique II*)*,* 112 F. Supp. 3d 758 (N.D. Ill. 2015) (quoting *Toys "R" Us, Inc.*, 221 F.3d at 936); *In re Dealer Mgmt. Sys. Antitrust Litig.*, 313 F. Supp. 3d 931, 951–52 (N.D. Ill. 2018).

For a § 1 claim, the plaintiff must provide "enough factual matter (taken as true) to suggest that an agreement was made." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007). "Plaintiff can satisfy this burden by pleading either direct or circumstantial evidence." *Tichy v. Hyatt Hotels Corp.*, 376 F. Supp. 3d 821, 834 (N.D. Ill. 2019). "Direct evidence is 'explicit and requires no inferences to establish the proposition or conclusion being asserted.'" *Id.* In other words, direct

evidence is "the smoking gun." *In re Text Messaging Antitrust Litig.*, 630 F.3d 622, 629 (7th Cir. 2010). If a plaintiff does not have direct evidence, the plaintiff can satisfy the pleading burden for circumstantial evidence by alleging "(1) parallel conduct and (2) additional factual circumstances, or "plus factors," indicating an agreement." *Tichy*, 376 F. Supp. 3d at 834. Provi does not claim that it has direct evidence of an agreement. The Court therefore focuses solely on whether Provi has provided sufficient circumstantial evidence—parallel conduct and plus factors—to reasonably infer Defendants had an agreement to boycott Provi.

### i. Parallel Conduct

Parallel conduct comprises behavior that "would probably not result from chance, coincidence, independent responses to common stimuli, or mere interdependence unaided by an advance understanding among the parties." *In re Text Messaging Antitrust Litig.*, 630 F.3d at 629 (citing *Twombly*, 550 U.S. at 557 n.4).

Provi alleges that Defendants' following behavior constitutes parallel conduct: (1) that Defendants launched their online platforms within days of each other; (2) that Defendants sent "similar and near-simultaneous" communications to their customers and employees, announcing that Defendants would cease accepting retailers' orders through Provi; (3) that Defendants "affirmatively blocked Provi's email domain so retailers' orders 'literally would not reach [Defendants'] respective sale representatives and, therefore, would go unfulfilled.'" (Dkt. 1 ¶¶ 12, 99, 105–116, 141, 227.) Defendants respond that the actions cited by Provi are merely indicative of independent or "follow the leader" conduct that does not stem from coordination or agreement. (Dkt. 24 at 24–25.)

The Court finds that Provi's allegations of parallel conduct are sufficient for a horizontal conspiracy claim. Provi alleges that Defendants repeatedly took similar steps within the same

36

narrow timeframe, making it plausible that their actions were not attributable to mere chance or coincidence. *See In re Plasma-Derivative Protein Therapies Antitrust Litig.,* 764 F. Supp. 2d 991, 1000 (N.D. Ill. 2011) ("*Twombly* does not require that a complaint include allegations of such an unnatural coincidence in the management of competitors' businesses."). As Defendants point out, however, their behavior could be equally consistent with innocent conduct, which is why the Supreme Court held in *Twombly* that a plaintiff must assert "plus factors" beyond allegations of parallel conduct to demonstrate that an agreement is plausible for the purposes of a § 1 claim. 550 U.S. at 557 n.4. Provi has asserted several plus factors, which the Court will address below.

### ii. Plus Factors

Relevant plus factors to bolster circumstantial evidence of an agreement include whether the parallel acts were against the economic self-interest of the parties, the market structure of the relevant markets, and whether there were opportunities to collude. *See In re Loc. TV Advert. Antitrust Litig.,* 2020 WL 6557665, at *9; *Tichy,* 376 F. Supp. 3d at 835–42. When deciding whether an agreement is reasonably inferable, the Court considers plus factors—alongside allegations of parallel conduct—as a whole. *See In re Loc. TV Advert. Antitrust Litig.*, 2020 WL 6557665, at *9. Provi alleges that Defendants acted against their own economic self-interest, they operate in a concentrated market, and they had opportunities to collude as plus factors. (*See* Dkt. 1 ¶¶ 15, 98, 102, 109–12, 188–92, 205–12, 253, 265.) The Court agrees, and additionally finds that Defendants' change in conduct constitutes another plus factor.

### 1. Actions against Individual Self-Interest

First, Provi alleges that Defendants "acted against their economic self-interest when they refused to accept orders that retailers chose to communicate through Provi, forgoing substantial revenue and sacrificing important customer good will." (Dkt. 31 at 28) (citing Dkt. 1 ¶ 15). Provi

further explains that "[c]ollusion enabled [Defendants] to eliminate the risk that either would lose customers to the other by *acting alone* in rejecting orders placed through Provi . . ." (Dkt. 31 at 28) (emphasis in original). In other words, Provi alleges that RNDC did not follow through on its 2020 threats to boycott Provi because it feared losing customers to another party that chose to continue placing orders through Provi. (*Id.*)

Defendants respond that Provi's argument suffers from a logical fallacy, echoing their argument *supra* Part I.B.ii. According to Defendants, there is no reason to believe that Defendants sacrificed orders when they blocked orders that retailers placed through Provi. Rather, Defendants suggest that they could have still received orders through other means and therefore Defendants were not necessarily acting against their own self-interest by refusing to accept orders through Provi. (Dkt. 32 at 19.)

As stated above, the Court finds that it is reasonable to infer that Defendants acted against their self-interest by blocking orders that came through Provi. The Court has already found, *supra* Part I.B.ii, that it is reasonable to infer that automatically blocking orders resulted in the loss of some revenue or orders for Defendants. The Court also finds that the fact that RNDC threatened Provi a year before the alleged boycott occurred makes it more, not less, reasonable to infer that there was an agreement between Defendants to block orders. Provi alleges that RNDC told Provi that it would no longer accept orders placed through Provi, but that RNDC continued to fill orders its threat notwithstanding. If RNDC had been unhappy with Provi's service or had wanted its customers to pivot towards using eRNDC, it could have acted on its threats and blocked orders placed through Provi far in advance of August 2021; fear of being at a competitive disadvantage is a plausible and compelling justification for why it chose not to do so. According to the Complaint, retailers enjoyed using Provi, and the popularity of Provi could have increased the risk

that retailers would favor the distributor who continued to place orders through Provi, causing the other to suffer. Provi's explanation for why an agreement was necessary for Defendants to avoid being at a competitive disadvantage thus plausibly clarifies Defendants' behavior. *See Plasma–Derivative,* 764 F. Supp. 2d at 1002 ("The risk involved in leading a supply reduction suggests that purely interdependent supply decisions are unlikely."); *In re Musical Instruments & Equip. Antitrust Litig.*, 798 F.3d 1186, 1195 (9th Cir. 2015) ("More extreme action against self-interest, however, may suggest prior agreement—for example, where individual action would be so perilous in the absence of advance agreement that no reasonable firm would make the challenged move without such an agreement.").

Finally, as mentioned above, Provi alleges that its platform was popular and that retailers found the transition from Provi to Defendants' own platforms to be a difficult one. (Dkt. 1 ¶¶ 106, 116, 117.) Provi alleges that one retailer, in response to the alleged boycott, asked Defendants to stop "making our lives harder." (*Id.* ¶ 116.) These allegations further support Provi's argument that Defendants sacrificed goodwill with retailers by refusing to fulfill orders placed through Provi. For the reasons stated above, the Court finds that it is plausible that Defendants' decision to automatically block orders placed through Provi was against Defendants' self-interest, making it a compelling plus factor.

## 2. Concentrated Market

Provi alleges that the relevant markets are highly concentrated and have high barriers to entry. (Dkt. 31 at 28–29). To reiterate, Provi alleges that Defendants have concentrated market power in the wine and distilled spirits distribution market, which gives them commensurate market power in the three relevant markets—Online Alcohol Marketplaces, Advertising on Online Alcohol Marketplaces, and Data Analytic Services—in which Provi participates. (Dkt. 1 ¶¶ 191–

92, 211–12.) Provi further contends that there are high barriers of entry to the three relevant markets as product range, geographic footprint, and desirable portfolio are difficult to obtain. (*Id.* ¶ 98.)

Defendants dispute whether the proposed markets are concentrated, making similar arguments to the ones they made in response to Provi's allegations of monopoly power. (Dkt. 32 at 19.) Specifically, Defendants argue that the fact that the alcohol distribution market is concentrated is irrelevant to the concentration of the relevant markets. (*Id.*) Defendants further argue that courts have noted that a concentrated market is often just as indicative of non-collusive, "follow the leader" behavior. (*Id.* at 19–20) (citing *Kleen Prods LLC v. Ga.-Pac.*, 910 F.3d 927, 935 (7th Cir. 2018)).

The Court finds that the market concentration in the relevant markets is another plus factor. The Court has already concluded, *supra* Part I.B.i.2, that Provi has provided sufficient circumstantial evidence of Defendants' monopoly power in the three relevant markets by comparing Defendants' market power in the wine and spirits distribution market to the other relevant markets. Defendants are correct that the market concentration factor can cut both ways: while market concentration can facilitate collusion, it can also make the impulse to "follow the leader" more urgent. *See In re Text Messaging Antitrust Litig.*, 782 F.3d 867, 871 (7th Cir. 2015). The Court, however, is required to make inferences in favor of the plaintiff on 12(b)(6) motions.

### 3. Inter-Firm Communications and Opportunities to Collude

Provi argues that Defendants had opportunities to collude due to their mutual membership in trade associations, their close relationship, and their frequent communications. (Dkt. 31 at 29) (citing Dkt. 1 ¶ 102). Provi alleges that representatives of both Defendants attended a July 2021 conference where a senior executive at RNDC made purportedly disparaging comments about

Provi during the Q&A session of a presentation by Provi. (Dkt. 1 ¶¶ 110–11.) Following the July 2021 industry conference, Southern began to inform retailer customers that it would no longer be accepting orders through Provi. (*Id.* ¶¶ 114–15.) Subsequently, both Defendants stopped accepting orders through Provi in August 2021, just weeks after the July 2021 industry conference. (*Id.* ¶¶ 116, 120.)

While participation in a trade association and public announcements likely do not constitute sufficient evidence of a conspiracy on their own, these allegations can help "fill-out the picture" of the conspiracy. *In re Broiler Chicken Antitrust Litigation*, 290 F. Supp. 3d 772, 800 (N.D. Ill. 2017). For example, in *In re Broiler Chicken Antitrust Litigation*, the plaintiffs claimed that the defendants, industrial broiler chicken producers, conspired to reduce production and increase prices. *Id.* at 783. The plaintiffs alleged that the defendants' "'opportunities' to collude at industry trade association meetings" and "public statements by defendants' executives" were plus factors, suggestive of conspiracy. *Id.* at 797. The court agreed, reasoning that these meetings and statements took place immediately before the defendants changed a well-established course of conduct and engaged in apparently irrational economic behavior for the industry. *Id.* at 798. The court focused on the fact that the defendants had made public statements in support of industry-wide production cuts, which were notable as they "involve[d] more than a mere announcement of [each individual] [d]efendant's own planned course of conduct." *Id.*

The Court finds that Provi adequately alleges that Defendants had opportunities to collude and channels for communication though the Court will not attribute much weight to this plus factor. Provi alleges that Defendants are both part of the same trade and lobbying organizations, that their executives enjoy a close relationship, and that they have been known to raise two fingers to one another as a symbol of their joint command of the industry. (Dkt. 1 ¶¶ 5, 102, 109, 112.)

Presumably, Provi is alleging that Defendants' executives flash each other the "peace" sign, which could be an innocent greeting. That said, when there is a legitimate business justification for these communications, some courts have required further allegations so that the Court is not merely speculating about the contents of those meetings. *See Kleen Prod. LLC*, 910 F.3d at 938; *Washington Cnty Health Care Auth., Inc. v. Baxter Int'l Inc.*, 328 F. Supp. 3d 824, 843 (N.D. Ill. 2018) ("Absent additional facts addressing the content of defendants' discussions at or the (nefarious) subjects of trade organization meetings, allegations that defendants were members of the same trade organizations are unspectacular and fail to move the needle.") The fact that Defendants are part of the same trade associations or have attended the same industry conference, "is true in virtually every industry." *Washington Cnty. Health Care Auth., Inc.*, 328 F. Supp. 3d at 843. Provi does allege that Alan Rosenberg made disparaging comments about Provi, including that Provi harms retailers, during a Q&A session about Provi at an industry conference. (Dkt. 1 ¶¶ 110–11.) While it is perhaps not a huge leap to infer that executives from the two Defendants continued their critique of Provi in private, this is where reasonable inference bleeds into speculation and the Court will not go so far. Although the Court finds that Provi has sufficiently alleged that Defendants had opportunities to collude, those allegations are flimsy, and the Court thus attributes little weight to this plus factor.

### 4. Departure from Established Practice

Finally, the Court independently finds that Provi's allegation that Defendants departed from their practice of ordering through Provi constitutes another plus factor. The court in *Tichy* recognized that a departure from an established practice may suggest collusion. 376 F. Supp. 3d at 842. In *Tichy*, the plaintiff alleged that the change in the defendant hotel companies' established practice of bidding on branded keywords, which was signaled by a concomitant change in Internet

search results, was indicative of collusion. *Id*. at 841. Addressing the defendants' argument that the plaintiff's allegations undercut whether the change was "abrupt," the *Tichy* court found that "even assuming the shift [in search results] occurred over a year or more, Plaintiff's First Amended Complaint can reasonably be read to allege that there was a stable pattern of advertising in the market for online hotel rooms followed by a noticeable and lasting change." *Id*. The *Tichy* court concluded that this "visible change in search results" supported an inference that the defendants had agreed to prevent branded keyword advertising. *Id*.

Likewise, this Court finds that Provi has provided factual allegations demonstrating that Defendants simultaneously changed their sustained business practice of fulfilling orders through Provi. Provi alleges that "from as early as 2016 until the latter half of 2021," Defendants fulfilled orders through Provi. (Dkt. 1 ¶ 11.) Defendants continued accepting orders through Provi even though they launched their own online platforms in 2019. (*Id.* ¶ 12.) Defendants eventually, at different times, started to express their intentions to stop partnering with Provi. (*Id.* ¶¶ 105, 141.) Defendants, however, did not affirmatively begin blocking orders fulfilled through Provi until August of 2021, and they did so within weeks of each other. (*Id.* ¶¶ 114, 120.) Each step, taken in isolation, does not necessarily indicate collusion, but the fact that Defendants changed a relatively stable pattern of behavior within the same small timeframe does plausibly suggest coordination.

In summary, Provi's allegations, particularly those that suggest Defendants took actions against their own self-interest and departed from a persistent practice, constitute sufficient plus factors for the Court to infer that Defendants entered into an agreement to boycott Provi. Defendants relied heavily on the Supreme Court's decision in *Twombly*, but *Twombly* stands for the proposition that "an allegation of parallel conduct and a bare assertion of conspiracy will not suffice." 550 U.S. at 556. Provi has alleged considerably more than parallel conduct and has,

43

therefore, adequately alleged an agreement in violation of § 1 of the Sherman Act. Accordingly, the Court concludes that Provi has stated a per se horizontal conspiracy claim and denies Defendants' motion to dismiss Provi's horizontal conspiracy claim.

### D. Sherman Act § 1 Claims – Vertical Conspiracy

The Court will now address Provi's vertical conspiracy claim. Provi alleges that Defendants coerced retailers into boycotting Provi, in violation of § 1 of the Sherman Act. "Vertical restraints are analyzed under the fact-specific rule of reason." *Marion Diagnostic Ctr., LLC v. Becton Dickinson & Co.*, 29 F.4th 337, 348 (7th Cir. 2022). A plaintiff alleging a vertical conspiracy must provide "direct or circumstantial evidence that reasonably tends to prove that the manufacturer and others had a conscious commitment to a common scheme designed to achieve an unlawful objective." *Marion Diagnostic Ctr., LLC*, 29 F.4th at 348 (quoting *Monsanto Co. v. Spray-Rite Service Corp.*, 465 U.S. 752, 768 (1984)).

Provi's vertical boycott theory posits that Defendants coerced retailers to agree to boycott Provi by weaponizing the exclusive distribution agreements that give Defendants access to must-have brands. (Dkt. 1 ¶ 237.) Because these must-have brands are essential to retailers' business, Defendants' alleged boycott of Provi effectively forced retailers to forgo Provi, contrary to these retailers' preference. (*Id.* ¶ 238.) Defendants seek dismissal of Provi's vertical conspiracy claims on the grounds that Provi does not identify any of the retailers involved in this vertical boycott or the contents of these alleged agreements. (Dkt. 24 at 28.) Defendants further contend that a plaintiff cannot state a vertical conspiracy claim by merely asserting that a defendant has announced a course of behavior that a customer must follow to continue accessing the defendant's products. (*Id.* at 28–29) (citing *Monsanto*, 465 U.S. 752). In other words, Defendants assert that Provi has

not established that there was a meeting of the minds between Defendants and the retailers. (Dkt. 32 at 22.)[5]

The Court concludes that Provi has adequately pled a vertical conspiracy between Defendants and their retailer customers. First, at the motion to dismiss stage, a plaintiff need not allege the who, what, where, and when of an agreement to plead a § 1 claim. *In re Delta Dental Antitrust Litig*., 484 F. Supp. 3d 627, 638 n.3 (N.D. Ill. 2020) (rejecting defendants' argument that plaintiffs were required to demonstrate the "who, what, when, where, and how" of the alleged antitrust violation as "the Seventh Circuit has made clear that Rule 8, not Rule 9(b), governs antitrust claims"). The fact that Provi has not pled the specific retailers involved in the conspiracy therefore does not mean that its vertical conspiracy claims should be dismissed.

Second, for a plaintiff to prove that there was a "meeting of the minds" for the purposes of a vertical conspiracy, the plaintiff must demonstrate that "the distributor communicated its acquiescence or agreement, and that this was sought by the manufacturer." *Monsanto*, 465 U.S. at 765 n.9. More specifically, a plaintiff may allege that a conspiracy was created through coercion, so long as the coerced party acted in response to the coercion or threat. *See Hytera Commc'ns Corp. Ltd. v. Motorola Sols., Inc.*, 623 F. Supp. 3d 857, 881 (N.D. Ill. 2022) (citing *MCM Partners, Inc. v. Andrews-Bartlett & Assocs., Inc*., 62 F.3d 967, 974 (7th Cir. 1995)) ("Later courts have applied this principle in a variety of settings, concluding that the 'combination or conspiracy' element of a section 1 violation is not negated by the fact that one or more of the co-conspirators acted unwillingly, reluctantly, or only in response to coercion."). The Supreme Court in *Monsanto*

---

[5] Defendants also argue that a vertical boycott claim is, in reality, merely a horizontal boycott in which "'some vertically related entity' (like customers) 'is also involved in the alleged [conduct]'" and, therefore, that Provi's vertical conspiracy claims rise and fall with its horizontal claims. (Dkt. 24 at 28) (citing *Genetic Sys. Corp. v. Abbott* Lab'ys, 691 F. Supp. 407, 416–17 (D.D.C. 1988). Provi, unsurprisingly, disputes this statement of the law. (Dkt. 31 at 31–32.) Resolution of this issue is, however, unnecessary as the Court already found *supra* Part I.C that Provi has stated a claim for horizontal conspiracy.

confirmed, however, that a plaintiff bringing a vertical conspiracy claim must still eventually provide sufficient "evidence that tends to exclude the possibility that [the conspirators] were acting independently." 465 U.S. at 764.

The Court concludes that Provi has adequately alleged that Defendants sought the retailers' agreement to their demands that the retailers stop using Provi and that the retailers communicated their acquiescence to Defendants through their subsequent conduct. Provi alleges that Defendants told retailers individually and then repeatedly reminded them afterwards that Defendants would no longer accept orders placed through a third-party e-commerce platform and named Provi as an example. (Dkt. 1 ¶¶ 115, 120.) It further alleges that it lost volume due to the vertical conspiracy between Defendants and their respective retailer customers as a number of National Accounts stopped working with Provi because of their inability to place orders with Defendants. (*Id*. ¶¶ 122, 240.) Finally, Provi alleges that retailers expressed their reluctance and even unwillingness to place orders through Proof and e-RNDC. (*Id.* ¶¶ 116, 237.) These allegations make it plausible that Defendants sought retailers' acquiescence to their demands to stop using Provi and that these retailers responded to the implicit threat contained therein *i.e.*, that continued use of Provi would result in lack of access to the must-have brands distributed by Defendant. The fact that there was not an explicit agreement between Defendants and the retailers does not necessarily mean that Provi's vertical conspiracy claims should fail as a matter of law; so long as there is an actual agreement, acceptance of the agreement can be signaled implicitly or via conduct. *See Isaksen v. Vermont Castings, Inc*., 825 F.2d 1158, 1164 (7th Cir. 1987) ("If (but only if) he *agrees* to adhere (having been asked to), there is an agreement, no matter how unwilling he is; but it does not follow that his agreement to adhere can never be implicit, or signified by conduct in lieu of promissory language.") (emphasis in the original).

The Court acknowledges that Provi's allegations walk a fine line. In *Isaksen*, the Seventh Circuit stated, "[A]n agreement procured by threats is still an agreement for purposes of section 1," but explained that a distributor's adherence to a supplier's announced, suggested retail prices out of fear of termination does not, by itself, establish an agreement to fix prices. *Id.* (discussing *Monsanto*, 465 U.S. at 764, n.9). The Court reads *Isaksen* as emphasizing, more generally, that the Court's role when evaluating a vertical conspiracy claim is to determine whether there was an actual agreement or not. Provi's allegations come very close to looking like mere adherence to a unilateral policy, but ultimately, the Court finds that this question requires further factual development—especially given that Defendants, when arguing that Provi's vertical conspiracy claims should fail as a matter of law, did not cite to any cases decided at the motion to dismiss stage. The Court finds that Provi has provided sufficient allegations that there was an implicit agreement between Defendants and retailers, which retailers acted pursuant to by eventually forgoing Provi; these allegations suggest more than mere adherence to an announced suggestion or exercise of independent business judgment. As the court recognized in *Hytera*, the evidence may later establish that the opposite is true, but a plaintiff is not required to exclude these possibilities at the motion to dismiss stage. *See* 623 F. Supp. at 881 ("It's true that the evidence might later show that the dealers' decisions to work with Motorola were the result of their independent business judgment, and not the result of any threats. But the Court will cross that bridge when it comes to it, down the road."). The Court thus denies Defendants' motion to dismiss Provi's vertical conspiracy claims.[6]

---

[6] Because the parties predominantly focused on whether Provi had adequately alleged an agreement between Defendants and retailers, the parties did not fully address whether Provi's vertical conspiracy claims otherwise satisfy a rule of reason analysis. Rather, they only applied the rule of reason analysis to Provi's vertical conspiracy claims in competing footnotes. (*See* Dkt. 24 at 29, n. 7; Dkt. 31 at 32 n.28.) "Under a [r]ule of [r]eason analysis, the plaintiff carries the burden of showing that an agreement or contract has an anticompetitive effect on a given market within a given geographic area. As a threshold matter, a plaintiff must show that the defendant has market power—that is, the ability to raise prices significantly without going out of business—without which the defendant could not cause

### E.  Sherman Act § 1 Claim – Tying Claim against Southern

The Court now addresses Provi's tying claim under § 1 of the Sherman Act against Southern. Provi claims that Southern has instituted a per se illegal tying arrangement by using its market power in the distilled spirits and wine markets (Provi alleges each is a tying market) to coerce its retailer customers to use Southern's e-platform, Proof (the tied product), to the exclusion of other Online Alcohol Marketplaces. (Dkt. 1 ¶¶ 242–44.) Provi further argues that Southern has substantial market power and the alleged arrangement's impact is "at least $1 billion annually and not insubstantial." (*Id.* ¶¶ 245–46.)

A tying agreement is "an agreement by one party to sell a product (the tying product) to another on the condition that the buyer also purchase a different product (the tied product). *Carl Sandburg Village Condominium Ass'n No. 1, et al., v. First Condominium Development Co., et al., 758* F.2d 203, 207 (1985). A plaintiff must establish three elements for a per se illegal tying agreement: "(1) the tying arrangement is between two distinct products or services, (2) the defendant has sufficient economic power in the tying market to appreciably restrain free competition in the market for the tied product, and (3) a not insubstantial amount of interstate commerce is affected." *Id.* The Seventh Circuit also requires that the tying seller has some economic interest in the sales of the tied product. *Reifert v. S. Cent. Wisconsin MLS Corp.*, 450 F.3d 312, 317 (7th Cir. 2006).

---

anticompetitive effects on market pricing." *Agnew*, 683 F.3d at 335. Provi alleges that Defendants' vertical conspiracies injured competition by raising prices, lowering output, reducing innovation, and decreasing quality in the Online Alcohol Marketplaces, Advertising on Online Alcohol Marketplaces, and Data Analytics Services markets. (Dkt. 1 ¶ 239.) Given the parties' abbreviated briefing on the issue and the Court's findings *supra* Part I.B.i that Provi has adequately alleged monopoly power and anticompetitive effects, the Court summarily finds that Provi's vertical conspiracy claims satisfy the rule of reason analysis.

### i. Tying Arrangement Between Two Distinct Products or Services

At the outset, the Court concludes that Provi has adequately alleged that the tying arrangement is between two distinct products or services. As discussed *supra* Part I.A.i.1, Online Alcohol Marketplaces provide additional e-commerce services beyond the fulfillment of alcohol orders, and they have unique attributes that render them distinguishable from other forms of manual ordering. Online Alcohol Marketplaces are thus sufficiently distinct from the distribution of distilled spirits and wine for the purposes of a tying arrangement.

### ii. Economic Interest

Southern contends that Provi has failed to allege that Southern has an economic interest in the sale of the tied product, Proof, because Provi does not allege that Southern charges retailers to use Proof (or that it charges retailers to use Proof, independent from any charges imposed for its wine and spirits distribution services). (Dkt. 24 at 30) (citing *Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 461 (1992); *Sheridan v. Marathon Petroleum Co. LLC*, 530 F.3d 590, 592 (7th Cir. 2008)). Rather, Southern argues that Provi essentially alleges that Southern makes a greater overall profit from the transaction, which is insufficient for establishing economic interest. (Dkt. 32 at 23) (citing *Carl Sandburg*, 758 F.2d at 208–09). In response, Provi clarifies that it is alleging that Southern conditions retailers' access to its distribution services on retailers only using Proof and not any other Online Alcohol Marketplace to purchase alcohol products. (Dkt. 31 at 33.) Provi further argues that, in any case, the data that retailers provide to Southern when they use Proof is their consideration for using the e-platform; in other words, retailers are paying Southern to use Proof with their data. (Dkt. 31 at 33.)

Before discussing whether Provi has met the economic interest requirement, the Court attempts to clarify the alleged tying arrangement. Provi relies on the Supreme Court's decision in

*Eastman Kodak Company v. Image Technical Services, Inc.* to describe Southern's tying arrangement: "A tying arrangement is 'an arrangement by a party to sell one product but only on the condition that the buyer also purchase a different (tied) product, *or at least agrees that he will not purchase that product from any other supplier.*'" (Dkt. 31 at 32–33) (citing 504 U.S. 451, 461 (1992)) (emphasis added). Other courts have treated this line from the *Eastman Kodak* opinion as the Supreme Court's recognition of a "negative tie." *See, e.g.*, *In re Dealer Mgmt. Sys. Antitrust Litig.*, 313 F. Supp. 3d at 959–60. A "negative tie occurs when the customer promises not to take the tied product from the defendant's competitor," and although negative tie claims are untraditional, they are nevertheless still prohibited under § 1 of the Sherman Act. *Id.* Provi, without using the label of "negative tie," appears to describe such an arrangement: Southern "conditions sales of its alcohol products (the tying product) on retailers *not* using an Online Alcohol Marketplace (the tied product) offered by 'any other supplier' to purchase those products." (Dkt. 31 at 33) (citation omitted). The Court thus understands Provi to be alleging that retailers are not forced to use Proof (as opposed to other forms of alcohol product ordering through Southern) but that they are forced to use Proof to the exclusion of other Online Alcohol Marketplaces.

Having established that Provi appears to be describing a "negative tie," the Court finds that Provi adequately alleges that Southern has an economic interest in retailers using Proof to the exclusion of other Online Alcohol Marketplaces. In other parts of its Complaint, Provi alleges that retailers' data on Online Alcohol Marketplaces is itself valuable and that providers of Online Alcohol Marketplaces "are incentivized to eliminate competitors for retailer traffic and the data that they generate." (Dkt. 1 ¶ 202.) Southern has an economic interest in this negative tie presumably because it is able to obtain retailers' data that would otherwise go to other Online Alcohol Marketplace providers. The Court finds this theory plausible.

Additionally, the Court cannot hold, as matter of law, that consideration for the sale of a tied product must be a monetary charge. The Court recognizes that this situation is unusual because Proof is a nominally free service, and Southern's cited authorities refer to "the sales of the tied product." *See Eastman Kodak Co*., 504 U.S. at 461; *Sheridan*, 530 F.3d at 592 (tying is when "a seller conditions the sale of a product or service on the buyer's buying another product or service"). These cases, however, do not explicitly limit the sale to a monetary charge, and Defendants do not explain why that should be the case. Indeed, "courts have imposed this economic interest requirement because when the seller of the tying goods has no interest in the sale of the tied product, [it] is not using his power in the tying product market to invade a second market." *Carl Sandburg,* 758 F.2d at 208. As stated above, Provi alleges that providers of Online Alcohol Marketplaces "are incentivized to eliminate competitors for retailer traffic and the data that they generate." (Dkt. 1 ¶ 202.) Provi's allegations suggest that Southern has an independent economic interest in leveraging its market power in the wine and distilled spirits distribution markets to push retailers to use Proof so that it can obtain their data, which is in itself valuable.

Southern further argues that Provi only alleges increased profits from packaging Proof and Southern's distribution services together, which would not sustain a tying claim. The Court disagrees upon consideration of the Seventh Circuit's decision in *Carl Sandburg*. 758 F.3d at 208. There, the Seventh Circuit held that "the economic interest requirement is not met where a plaintiff merely alleges that the tying seller is receiving substantial revenue as a result of his sale of two products as a package." 758 F.3d at 208. In other words, the plaintiff cannot meet the economic interest requirement "by alleging that the tying seller is receiving a profit from the transactions as a whole." *Id.* This requirement is another means of testing that the seller of the tying product has a separate economic interest in the sale of the tied product. *See id.* at 209 ("a tying seller's increased

sales and efficiency as a result of selling two products as a package do not show the tying seller's economic interest in the tied product market"). Applying these principles, the Seventh Circuit held that there was no tying arrangement between condominium management services (the tied product) and condominium units (the tying product) because the plaintiffs had merely alleged that "the tied seller's ability to conceal defects in the condominium units resulted in increased sales and economic benefit to the tying sellers." *Id.* at 209. As the plaintiffs failed to establish that the tying sellers participated for profits in the market for management services, the Seventh Circuit concluded that the plaintiffs had not demonstrated that the tying sellers had an economic interest in the tied product market. Here, in contrast, Provi alleges that Southern has a separate economic interest in retailers using Proof so that it can obtain retailers' data, which allegedly carries its own independent, economic value. Additionally, Provi alleges that Southern competes for retailer data in the Online Alcohol Marketplaces market. (Dkt. 1 ¶ 168) ("[a]ll of these Online Alcohol Marketplaces compete for the same business and corresponding data from retailers"). The Court thus finds that Provi is not merely alleging that Southern receives increased revenue from the tying product—Southern's distribution services—by forcing retailers to use Proof; Provi is, instead, alleging that Southern derives distinct economic value from Proof via retailer data. The Court might have concluded otherwise if Provi, for example, had alleged that Southern was interested in forcing retailers to use Proof to increase its distribution sales. In that case, it would be reasonable to infer that Southern was solely concerned with retailers using Proof because it improved Southern's sale of its distribution services and thereby increased Southern's profits overall. Accordingly, the Court concludes that Provi has plausibly demonstrated that Southern has an economic interest in retailers using Proof.

### iii. Sufficient Market Power in the Tying Market

Next, Southern contends that Provi has not demonstrated sufficient market power in the tying market. (Dkt. 24 at 30–31.) According to Southern, Provi's allegation that Southern has an over-50% market share in the wine and distilled spirits distribution markets in certain states is insufficient for establishing market power required for a tying arrangement, particularly as retailers have other means of obtaining alcohol distributed by Southern. (*Id*.) Southern, in particular, challenges the relevance of its exclusive distribution agreements with must-have brands, arguing that they do not demonstrate that Southern has market power in the overall markets for wine and distilled spirit distribution. (*Id*. at 31.)

The Court finds that Provi has adequately demonstrated that Southern has sufficient market power in the tying market to force retailers "to appreciably restrain free competition in the market for the tied product." *Carl Sandburg*, 758 F.2d at 207. The Court has already found that Provi has adequately alleged that both Defendants have monopoly power in the three relevant markets based on Defendants' substantial market shares in the wine and distilled spirits distribution market in certain states. *Supra* Part I.B.i.2. As the Court so concluded with respect to Provi's monopolization claim, Provi plausibly alleges that Southern leverages its substantial market shares and its exclusive rights to distribute must-have brands to force retailers to use Proof if retailers want to order products online.

Southern's cabined view of the influence that its exclusive rights with these must-have brands provide Southern is unavailing. At bottom, "the essential characteristic of an invalid tying arrangement lies in the seller's exploitation of its control over the tying product to force the buyer into the purchase of a tied product that the buyer either did not want at all, or might have preferred to purchase elsewhere on different terms." *Rocha v. FedEx Corp*., 15 F. Supp. 3d 796, 810 (N.D.

Ill. 2014) (quoting *Jefferson Parish Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2, 12 (1984) *abrogated on other grounds by Ill. Tool Works*, 547 U.S. 28 (2006)). Provi's allegations conform to this description.

### iv. Foreclosure of a Substantial Volume of Commerce

Finally, Southern argues that Provi has not alleged that a "substantial volume of commerce is foreclosed" due to Southern's alleged tying arrangement. (Dkt. 24 at 31.) Southern points to Provi's allegation that twelve of the fourteen largest wine and spirits distributors have integrated with Provi in support of this argument. (*Id*.) (citing Dkt. 1 ¶ 95).

The Court disagrees and finds that Provi has sufficiently alleged that a "substantial volume of commerce is foreclosed" by the tie. "This element can be broken into two sub-questions: (1) Is there at least one competitor in the tied product market other than the favored seller; and (2) Is the quantity of interstate commerce affected not-insubstantial?" *Reifert*, 450 F.3d at 318. Provi alleges that other competitors in the Online Alcohol Marketplaces include Defendants, other distributors with their own proprietary marketplaces, and other independent marketplaces. (Dkt. 1 ¶¶ 98, 168.) Provi further alleges that the quantity of commerce in the Online Alcohol Marketplaces is at least $1 billion annually. (*Id.* ¶ 245.) Taking Provi's allegations as true, the affected commerce is clearly not insubstantial. Provi has therefore stated a claim for a per se tying arrangement under § 1.

### F. Antitrust Injury and Standing

Having discussed the substance of Provi's various Sherman Act claims, the Court will now address Defendants' argument that Provi has failed to allege antitrust injury and standing.

### i. Antitrust Injury

Private plaintiffs seeking monetary and injunctive relief under the Clayton Act for antitrust violations must plead an antitrust injury, or an "injury of the type the antitrust laws were intended

to prevent and that flows from that which makes defendants' acts unlawful." *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977).

Defendants argue that Provi has failed to allege an antitrust injury because Provi ultimately seeks to "expand where competition limits its ability to do so on its own," contrary to the objectives of antitrust law. (Dkt. 24 at 13) (citing *Pulse Network, LLC v. Visa, Inc.* 30 F.4th 480, 489 (5th Cir. 2022)). In support of its argument, Defendants point to one of the remedies that Provi seeks: a court order requiring Defendants to cooperate with Provi. (*Id.* at 14.) Additionally, according to Defendants, Provi has failed to allege sufficient facts demonstrating anticompetitive effects, such as reduced output or increased price, as required for establishing antitrust injury. (*Id.* at 15). Finally, Defendants argue (in a footnote) that Provi has not adequately alleged the causal connection required to state an antitrust injury. (*Id.* at 14 n.2.) They argue that Provi's alleged harm (lost volume and profit) does not directly flow from Defendants' decision to block Provi's orders as retailers and suppliers are free to choose where they purchase their alcohol products and place their ads. (*Id.*)

The Court disagrees and finds that Provi has adequately alleged antitrust injury. The Seventh Circuit has held that a competitor's exclusion from the market constitutes an antitrust injury. *Viamedia*, 951 F. 3d at 482 (collecting cases); *Tri-Gen Inc. v. Int'l Union of Operating Engineers, Loc. 150, AFL-CIO*, 433 F.3d 1024, 1032 (7th Cir. 2006) ("[T]his Court has recognized that competitors can bring an antitrust claim when they are excluded from the market and injured by defendants' actions."); *see also Alarm Detection Sys., Inc. v. Orland Fire Prot. Dist.*, 129 F. Supp. 3d 614, 635–36 (N.D. Ill. 2015) ("When an antitrust violator seeks to exclude a competitor from the market by anticompetitive means, 'the harm suffered by a consumer forced to pay inflated prices, and the harm inflicted on an excluded competitor . . . both result from the anticompetitive

effect of the [violator's actions, and] they are both antitrust injuries.'") (quoting *Blackburn v. Sweeney,* 53 F.3d 825, 830 (7th Cir.1995)). In *Viamedia*, the Seventh Circuit found that a plaintiff who alleges harms resulting from plausible claims of exclusionary conduct and tying arrangements adequately demonstrates antitrust injury. 951 F.3d at 481. As stated in Parts I.B.ii and I.E, Provi has adequately alleged that Defendants engaged in exclusionary conduct and that Southern instituted an unlawful tying arrangement. The Seventh Circuit's response to the partial dissent in *Viamedia* applies here as well: "To the extent that the partial dissent suggests that the tying conduct at issue is not illegal or exclusionary, that goes to the merits, not to antitrust injury." 951 F.2d at 483.

Defendants' concern with Provi's requested injunctive relief is well-taken, but Provi seeks this relief as a result of allegedly anticompetitive behavior on the part of Defendants. While Provi may eventually have to provide ample evidence to justify the grant of such drastic relief, the requested relief itself, viewed in a vacuum, does not automatically mean that Provi is "seeking relief based on a theory that competition should have been *reduced.*" *Viamedia*, 951 F.3d at 482 (emphasis in original). As was the case in *Viamedia*, the Court, based on a review of the pleadings and making all inferences in favor of Provi, finds that Provi is properly seeking an opportunity to compete on the merits.

The Court further finds that Provi has also sufficiently alleged a causal connection between its harms, lost profits and lost volume, and Defendants' allegedly anticompetitive conduct. (*See* Dkt. 1 ¶¶ 213–14.) While retailers are free to choose where to place their orders, Provi alleges that retailers are effectively coerced into forgoing other Online Alcohol Marketplaces because retailers must buy must-have brands, distributed exclusively by Defendants, and they are "significantly less likely to split their basket of orders once they are already shopping directly with" Defendants,

despite the availability of better prices or services. (*Id.* ¶ 6.) Provi has thus plausibly threaded the needle.

Finally, Defendants' allegedly anticompetitive conduct affects both competitors and customers in the relevant markets, making it even more reasonable to infer that Defendants' allegedly anticompetitive conduct harms competition in the relevant markets, as opposed to Provi individually. Provi alleges that Defendants sought to prevent retailers from using other competitors in the three relevant markets. (*See, e.g.*, *id.* ¶ 114) ("Southern simultaneously communicated the same message via phone, leaving voicemails, stating '[Southern] will no longer accept orders transmitted by third-party e-commerce platforms or services, such as Provi, SevenFifty, or others.'") (emphasis in original); (*id.* ¶ 120.) ("[A] RNDC sales representative, in rejecting an order communicated through Provi, stated that 'ERNDC' [sic] was RNDC's 'only permitted method of online ordering' and '[o]rders placed *via third-party applications or websites such as Provi* will not be accepted, as they are a violation of company policy.") (emphasis added). Moreover, Provi alleges that Defendants' actions have constrained retail customers from exercising their individual choices. (*See, e.g.*, *id.* ¶¶ 14, 116.) These allegations suggest that any harm stemming from Defendants' behavior was not limited to Provi alone.

### ii. Antitrust Standing

Aside from requiring the plaintiff to demonstrate antitrust injury, the Supreme Court has also held that private plaintiffs must plead antitrust standing and establish that they are the "proper plaintiff." *Associated Gen. Contractors of Cal., Inc. v. California State Council of Carpenters*, 459 U.S. 519, 539 (1983). This inquiry centers on proximate causation and asks about "the existence of other parties that have been more directly harmed" by the alleged anticompetitive conduct. *Id.*

Defendants argue that Provi is the incorrect plaintiff for this suit and that retailers, distributors, or advertisers would be better plaintiffs instead. (Dkt. 24 at 16.)

The Court disagrees. "The general rule is that customers and competitors in the affected market have antitrust standing." *Viamedia*, 951 F.3d at 482. As discussed at length, Provi has plausibly alleged that the relevant markets are Online Alcohol Marketplaces, Advertising on Online Alcohol Marketplaces, and Data Analytic Services and that it competes in all three of these markets. Provi has also adequately alleged an antitrust injury directly stemming from Defendants' actions. The Court concludes that these allegations are sufficient to establish antitrust standing. Accordingly, the Court denies Defendants' motion to dismiss Provi's Sherman Act claims.

## II. Illinois Antitrust Act Claim

Both parties agree that Provi's Illinois Antitrust Act claims rise and fall with Provi's Sherman Act claims. (Dkt. 24 at 29); (Dkt. 31 at 34.); *see also Force Partners, LLC v. KSA Lighting & Controls, Inc.*, 2022 WL 580808, at *18 (N.D. Ill. Feb. 25, 2022) (citing 740 ILCS 10/11) ("The Illinois Antitrust Act expressly requires harmonization with the federal laws."). As the Court has concluded that Provi has stated claims under § 1 and § 2 of the Sherman Act, Provi has also stated a claim under the Illinois Antitrust Act as well.

## III. California Unfair Competition Law

Likewise, both parties appear to agree, at minimum, that a violation of federal antitrust law constitutes a violation of California's Unfair Competition Law—although they dispute whether California's Unfair Competition Law covers conduct courts have found to be legal under federal antitrust laws. (Dkt. 24 at 29); (Dkt. 31 at 35). As the Court has determined that Provi has stated claims under §1 and 2 of the Sherman Act, Provi has also stated a claim under the California Unfair Competition Law. Consequently, there is no need at this juncture to resolve the parties' dispute

over the correct interpretation of "unfair business practices" under California's Unfair Competition Law when a plaintiff has failed to state a Sherman Act claim.

### IV. Tortious Interference with a Business Expectancy

Finally, Defendants argue that Provi has failed to state a claim under Illinois common law for tortious interference with a business expectancy. (Dkt. 24 at 32.) The elements of an intentional interference with a business expectancy claim are: "(1) the existence of a valid business expectancy by plaintiff, (2) the defendant's knowledge of the expectancy, (3) the defendant's intentional and unjustified interference which prevents the realization of the business expectancy, and (4) damages." *Mannion v. Stallings & Co*., 561 N.E.2d 1134, 1139 (Ill. App. Ct. 1990). Illinois courts recognize a "competition privilege" to the assertion of tortious interference with a prospective business relationship. *Jamsports & Ent., LLC v. Paradama Prods., Inc*., 382 F. Supp. 2d 1056, 1060–61 (N.D. Ill. 2005). In brief, under the competition privilege, "[a]n entity that is competing for prospective business, and is doing so lawfully, cannot be held liable for tortious interference with prospective advantage." *Id.*

The Court finds that Provi's allegations satisfy the elements of tortious interference with a business expectancy. First, Provi alleges that it was in the process of negotiating partnerships and had signed partnership agreements with several National Accounts. (Dkt. 1 ¶ 148.) Second, Provi alleges that Southern knew of these business expectancies, as signaled by the fact that Southern mentioned Provi by name in its announcements to its customers that Southern would no longer be accepting orders fulfilled through third-party applications or websites. (*Id.* ¶¶ 120, 149.) Provi similarly alleges that a RNDC sales representative brought up Provi's name when informing a customer that RNDC would no longer be accepting orders fulfilled through third-party applications or websites. (*Id.* 1 ¶¶ 120.) Additionally, Provi alleges that Alan Rosenberg told Provi that "RNDC

59

will continue to promote and steer our customers towards using our own e-commerce platform and away from Provi . . ." (*Id.* ¶ 143.) These allegations suggest that Defendants knew of Provi's business expectancies with its retailer customers and intentionally interfered with—and thus prevented the realization of—said expectancies. Finally, Provi alleges damages, (*id.* ¶¶ 296, 301), and, as stated above, Provi has pled anticompetitive conduct. Provi has thus stated a claim against both Defendants for intentional interference with a business expectancy.

### Conclusion

For the foregoing reasons, Defendants' motion to dismiss is denied.

Dated: 5/30/24

_____
Honorable Nancy L. Maldonado
U.S. District Judge